Rob Bonta
Attorney General of California
Neli Palma
Senior Assistant Attorney General
Kathleen Boergers
Supervising Deputy Attorney General
William Bellamy
Maria F. Buxton
Katherine Milton
Kevin G. Reyes
Stephanie T. Yu
Anna Rich (State Bar No. 230195)
Deputy Attorneys General
  1515 Clay Street Suite 2000, P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-0296
  E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **State of California; State of Arizona; State of Colorado; State of Connecticut; State of Delaware; State of Hawaii; State of Illinois; State of Maine; State of Maryland; Commonwealth of Massachusetts; State of Michigan; State of Minnesota; State of Nevada; State of New Jersey; State of New Mexico; State of New York; State of Oregon; State of Rhode Island; State of Vermont; State of Washington,** | 3:25-cv-05536-VC<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION, WITH MEMORANDUM OF POINTS AND AUTHORITIES** |
| Plaintiffs, | Date:        August 28, 2025<br>Time:        10:00 a.m.<br>Courtroom:   Courtroom 4<br>Judge:       Hon. Vince Chhabria<br>Trial Date:  Not set<br>Action Filed: July 1, 2025 |
| **v.** | |
| **U.S. Department of Health and Human Services; Robert F. Kennedy, Jr.,** in his official capacity as Secretary of the U.S. Department of Health and Human Services; **U.S. Department of Homeland Security; Kristi Noem,** in her official capacity as Secretary of Homeland Security**,** | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ......................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    I.      Legal and Factual Background............................................................... 2

    II.     Defendants' Disclosure of Medicaid Data Breaks Confidentiality........................ 7

LEGAL STANDARD ................................................................................................... 10

ARGUMENT ............................................................................................................... 11

    I.      The States Have Standing ................................................................... 11

    II.     Defendants are Likely Violating the Spending Clause ......................................... 13

    III.    The States are Likely to Succeed on the Merits of their APA Procedural Claim and "Arbitrary and Capricious" Claim ......................................................... 16

        A.     Defendants' Acts are Subject to Review.................................................. 16

        B.     Plaintiffs Are Likely to Succeed on the Complaint's Third Cause of Action that Defendants Violated the APA's Procedural Requirements.................................................................................... 17

        C.     Plaintiffs Are Likely to Succeed on the Complaint's First Cause of Action that the Challenged Actions Are Arbitrary and Capricious .......... 19

    IV.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction............................. 20

        A.     Defendants' Actions Will Chill Enrollment in and Access to Healthcare ................................................................................... 21

        B.     Loss of Federal Medicaid Funding from Chilling Effect......................... 23

        C.     Harms to Public Health and Safety from Chilling Effect ........................ 23

    V.     The Balance of Hardships and the Public Interest Supports a Preliminary Injunction ...................................................................................... 24

CONCLUSION ............................................................................................................ 25

i

**TABLE OF AUTHORITIES**

**Page**

CASES

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
    901 F.3d 1166 (9th Cir. 2018)................................................................. 11

*Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*
    836 F.3d 963 (8th Cir. 2016)................................................................... 17

*Am. Fed. of State, County, and Municipal Employees, AFL-CIO v. Social Security Administration*
    No. 25-0596, 2025 WL 1206246 (D. Md. Apr. 17, 2025)...................... 10

*Ariz. Dream Act Coal. v. Brewer*
    757 F.3d 1053 (9th Cir. 2014)................................................................. 25

*Arizona v. Yellen*
    34 F.4th 841 (9th Cir. 2022).................................................................... 12

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
    548 U.S. 291 (2006)................................................................................ 14

*Bennett v. Spear*
    520 U.S. 154 (1997)........................................................................... 16, 17

*California ex. rel. Beccera v. Azar*
    501 F. Supp. 3d 830 (N.D. Cal. 2020) .................................................... 2

*California v. U.S. Bureau of Land Mgmt.*
    277 F. Supp. 3d. 1106 (N.D. Cal. 2017) ............................................... 20

*California v. U.S. Dep't of Transp.*
    No. 25-CV-208, 2025 WL 1711531 (D.R.I. June 19, 2025).................. 15

*Chamber of Com. v. Reich*
    74 F.3d 1322 (D.C. Cir. 1996) ............................................................... 16

*City & Cnty. of San Francisco v. Trump*
    No. 25-CV-01350, 2025 WL 1282637 (N.D. Cal. May 3, 2025) .......... 15

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) ................................................ 21

*City and Cnty. of San Francisco v. U.S. Citizenship & Immig. Servs.*
    981 F.3d 742 (9th Cir. 2020)............................................................. 13, 25

## TABLE OF AUTHORITIES
### (continued)

Page

*City of Los Angeles v. Barr*
   929 F.3d 1163 (9th Cir. 2019) ........................................................................... 12, 13

*Cnty. of Santa Clara v. Trump*
   250 F. Supp. 3d 497 (N.D. Cal. 2017) ................................................................. 23

*Cresote Council v. Johnson*
   555 F. Supp. 2d 36 (D.D.C. 2008) ...................................................................... 25

*Dep't of Com. v. New York*
   588 U.S. 752 (2019) ............................................................................................ 11, 13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*
   591 U.S. 1 (2020) ................................................................................................ 16, 19

*Diamond Alt. Energy, LLC v. Env't Prot. Agency*
   145 S. Ct. 2121 (2025) ........................................................................................ 11, 13

*E. Bay Sanctuary Covenant v. Biden*
   993 F.3d 640 (9th Cir. 2021) ............................................................................... 11

*Encino Motorcars, LLC v. Navarro*
   579 U.S. 211 (2016) ............................................................................................ 19

*Food & Drug Admin. v. All. for Hippocratic Med.*
   602 U.S. 367 (2024) ............................................................................................ 11

*Hawaii v. Trump*
   859 F.3d 741 (9th Cir. 2017) ............................................................................... 12

*Hemp Indus. Ass'n v. Drug Enf't Admin.*
   333 F.3d 1082 (9th Cir. 2003) ............................................................................. 17

*Her Majesty the Queen in Right of Ontario v. E.P.A.*
   912 F.2d 1525 (D.C. Cir. 1990) .......................................................................... 16

*Ipsen Biopharmaceuticals, Inc. v. Azar*
   943 F.3d 953 (D.C. Cir. 2019) ............................................................................ 16

*League of Women Voters of United States v. Harrington*
   560 F. Supp. 3d 177 (D.D.C. 2021) .................................................................... 20

*Lovo v. Miller*
   107 F.4th 199 (4th Cir. 2024) .............................................................................. 16

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Lujan v. Def. of Wildlife*
    504 U.S. 555 (1992) ............................................................................................. 11

*M.R. v. Dreyfus*
    697 F. 3d 706 (9th Cir. 2012) ............................................................................. 21

*Michigan v. U.S. Army Corps of Eng'rs*
    667 F. 3d 765 (7th Cir. 2011) ............................................................................. 21

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983) .............................................................................................. 19

*N. Mariana Islands v. United States*
    686 F. Supp. 2d 7 (D.D.C 2009) ........................................................................ 25

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*
    417 F.3d 1272 (D.C. Cir. 2005) .......................................................................... 16

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
    567 U.S. 519 (2012) ................................................................................ 13, 14, 15

*New York v. U.S. Dep't of Health & Hum. Servs.*
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................................................. 14

*New York v. United States*
    505 U.S. 144 (1992) ............................................................................................ 15

*Open Communities All. v. Carson*
    286 F. Supp. 3d 148 (D.D.C. 2017) .................................................................... 25

*Pennhurst State Sch. & Hosp. v. Halderman*
    451 U.S. 1 (1981) ................................................................................................ 13

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Security.*
    908 F.3d 476 (9th Cir. 2018) ............................................................................... 20

*South Dakota v. Dole*
    483 U.S. 203 (1987) ................................................................................ 13, 14, 15

*State v. Bureau of Land Mgmt.*
    286 F.Supp.3d 1054 (N.D. Cal. 2018) ................................................................ 23

*Valle del Sol Inc. v. Whiting*
    732 F.3d 1006 (9th Cir. 2013) ............................................................................. 24

# TABLE OF AUTHORITIES
(continued)

Page

*Venetian Casino Resort, LLC v. EEOC*
    530 F.3d 925 (D.C. Cir. 2008) ................................................................. 17

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) .................................................................. 10, 21, 22, 24. 25

### STATUTES

5 U.S.C. § 553(b) ................................................................................ 17

5. U.S.C. § 553(c) ................................................................................ 17

5 U.S.C. § 706(2)(1) ............................................................................ 20

5 U.S.C. § 706(2)(A) ........................................................................... 19

8 U.S.C. § 1611(b)(1)(A) ...................................................................... 3

8 U.S.C. § 1621(d) ............................................................................... 9

42 U.S.C. § 1306 (a)(1) ....................................................................... 18

42 U.S.C. §§ 1395dd(a), (b)(1), (c)(1) ................................................... 3

42 U.S.C. § 1396a *et seq.* .................................................................... 2

42 U.S.C. § 1396b(v)(3) .................................................................... 3, 9

42 U.S.C. § 1396b(d)(1) ....................................................................... 5

42 U.S.C. § 1396b(r)(1)(F) ................................................................... 4

Administrative Procedure Act .......................................................... *passim*

Cal. Welf. & Inst. Code § 10850 .......................................................... 11

Colo. Rev. Stat. § 25.5-1-116 .............................................................. 11

Emergency Medical Treatment and Labor Act ........................................ 3

Haw. Rev. Stat. § 346-10 .................................................................... 11

Medicaid Act ............................................................................ 1, 5, 17

Minn. Stat. Ann. § 13.46 subd. 2(a)(6) ................................................. 11

N.Y. Soc. Serv. Law §§ 367-b(4) ......................................................... 11

**TABLE OF AUTHORITIES**
(continued)

**Page**

Or. Rev. Stat. 413.175 ........................................................................................... 11

R.I. Gen. Laws § 40-6-12 ...................................................................................... 11

Social Security Act ............................................................................................ 11, 18

Vt. Stat. Ann. Title 33, § 1902a ............................................................................ 11

Wash. Rev. Code Chapter 70.02 ........................................................................... 11

REGULATIONS

42 C.F.R. § 401.101(a)(1) ...................................................................................... 18

42 C.F.R. § 401.126(c) ............................................................................................. 5

42 C.F.R. § 401.134(a) ......................................................................................... 5, 19

42 C.F.R. § 401.134(c) ............................................................................................ 19

42 C.F.R. §§ 431.300-307 ........................................................................................ 5

42 C.F.R. §§ 433.116, 438.818 ................................................................................ 4

42 C.F.R. § 435.907(b) ............................................................................................. 6

42 C.F.R. § 435.907(e)(1) ......................................................................................... 5

42 C.F.R.§ 440.255(b)(2) .......................................................................................... 3

Haw. Admin. R. Chapter 17-1702 .......................................................................... 11

CONSTITUTIONAL PROVISIONS

U.S. Const., Article I, § 8, cl. 1, The Spending Clause ......................................... *passim*

OTHER AUTHORITIES

Claudia Boyd-Barrett, *California Immigrants Weigh Health Coverage Against Deportation Risk*, KFF (July 1, 2025),
    https://kffhealthnews.org/news/article/california-immigrants-medi-cal-medicaid-health-insurance-raids-fears/view/republish/ .... ...................................................... 22

Ctrs. for Medicare & Medicaid Servs., *CMS Privacy Home Page*,
    https://www.cms.gov/about-cms/information-systems/privacy (last updated Sept. 10, 2024) (emphasis added) ............................................................ 2

### TABLE OF AUTHORITIES
#### (continued)

**Page**

Health Ins. Marketplace, Dep't of Health & Hum. Servs.
OMB No. 0938-1191, Application for Health Coverage & Help Paying Costs,
*available at* https://www.medicaid.gov/state-resource-center/mac-learning-collaboratives/downloads/single-streamlined-application.pdf (last visited Jun. 21, 2025) ................................................................................................................. 6

Kristen Hwang, *Gov. Newsom Lambasts Trump for Giving Immigrants' Health Data to Deportation Officials*, CalMatters (June 13, 2025),
https://calmatters.org/health/2025/06/newsom-trump-immigrant-data-deportation-medicaid/ ................................................................................................... 22

U.S. Citizenship and Immigration Services (USCIS), About SAVE (last updated May 22, 2025), https://www.uscis.gov/save/about-save/about-save. ..................................... 9

USCIS, *Register an Agency for SAVE* (last updated June 25, 2025),
https://www.uscis.gov/save/prospective-user-agencies/register-an-agency-for-save.......................................................................................................................... 9

U.S. Dep't of Homeland Sec., U.S. Immigr. & Customs Enf't, Clarification of Existing Practices Related to Certain Health Care Information (Oct. 25, 2013),
*available at* https://www.ice.gov/doclib/ero-outreach/pdf/ice-aca-memo.pdf. ... .................... 6

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

**PLEASE TAKE NOTICE** that on August 28, 2025, at 10:00 a.m.,[1] Plaintiffs the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and the Commonwealth of Massachusetts (collectively, Plaintiffs or the States) will and hereby do move this Court pursuant to Federal Rule of Civil Procedure 65 and Local Rule 7-2 for a preliminary injunction against Defendants U.S. Department of Health and Human Services (HHS); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; U.S. Department of Homeland Security (DHS); and Kristi Noem, in her official capacity as Secretary of DHS; and their officers, agents, servants, employees, and any other persons who are in active concert or participation with them.

Plaintiffs respectfully move the Court to enter a preliminary injunction: (1) prohibiting Defendants from transferring the States' Medicaid data files containing personally identifiable, protected health information to DHS, the Department of Government Efficiency (DOGE), or any other federal agency; (2) prohibiting Defendants from using such data for purposes of immigration enforcement, population surveillance, or other similar purposes; and (3) any additional preliminary relief that the Court deems proper and the interests of justice may require.

This motion is based on this notice, the Complaint for Declaratory and Injunctive Relief (ECF No. 1); the accompanying Memorandum of Points and Authorities; the supporting declarations; this Court's file; and any matters properly before the Court.

---

[1] Plaintiff States' have concurrently filed a Motion to Shorten Time.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiff States challenge Defendants the U.S. Department of Health and Human Services (HHS) and Secretary Robert F. Kennedy, Jr.'s unprecedented decision in June 2025 to transfer State Medicaid data files containing millions of individuals' highly sensitive personal health information, without any public notice and over the objections of career civil servants at the Centers for Medicare & Medicaid Services (CMS), to Defendant Department of Homeland Security (DHS). The States now move for an order temporarily enjoining future similar Medicaid data transfers, and prohibiting use of that data for immigration enforcement, or other similar purposes, pending final judicial review of Defendants' actions.

In the seven decades since Congress enacted the Medicaid Act, CMS has never before engaged in this kind of wholesale transfer of sensitive Medicaid beneficiary data outside of HHS. This is for good reason: only HHS is responsible for the administration of the Medicaid program. If Medicaid applicants and beneficiaries fear that seeking healthcare could put them in the crosshairs of DHS and its immigration enforcement agency Immigration and Customs Enforcement (ICE), they will think twice about using necessary services which they are eligible for under federal and state law.

Defendants' actions are not only unsound, they are illegal. They upend the deal Congress has struck with States in violation of the U.S. Constitution's Spending Clause. Plaintiffs have provided confidential Medicaid data to the federal government based on a mutual understanding that this data would be securely maintained and only used for the administration of Medicaid benefits and healthcare programs. The federal government may not violate that agreement by using States' data illegally and contrary to States' wishes; the Spending Clause does not permit surprise conditions to be attached to federal funding, nor would it permit Defendants to coerce the States into agreeing to this unlawful use of their data. These actions also fly in the face of preexisting CMS regulations and policies, in violation of the Administrative Procedure Act (APA)'s rules for how federal agencies should behave, starting with the requirements that

(i) agencies must give the public notice and an opportunity to comment before changing their rules and (ii) may not engage in arbitrary and capricious decision-making by abruptly reversing long-standing policies relied upon by the public without reasoned consideration.

Defendants broke their own well-established rules despite the likelihood of predictable, substantial harms to the States. The States cannot operate their Medicaid programs according to the assurances required by state and federal law when the federal government violates its own rules regarding data use and lacks respect for patient privacy and confidentiality. Undermining those assurances will lead to loss of federal Medicaid dollars as eligible state residents avoid using federally reimbursable Medicaid services, not to mention harm to the public health and to the lives and well-being of State residents in need of healthcare.

Temporary, qualified limits on HHS's ability to transfer data, and DHS's ability to use data already obtained, are needed to protect States, and the public, from further consequences of Defendants' actions while discovery proceeds and the underlying legal questions are adjudicated.

## STATEMENT OF FACTS

### I.    LEGAL AND FACTUAL BACKGROUND

This case concerns data collected by the States from patients, healthcare providers, and health plans for the purpose of administration of their individual Medicaid programs. As this Court has noted, Medicaid is an "incredibly complicated" program with details that vary depending on the particular State Medicaid plan and the particular services at issue, in which "the federal government and the states work together to ensure that health care providers receive payment for services offered to low-income and disabled patients who qualify for Medicaid assistance." *California ex. rel. Beccera v. Azar*, 501 F. Supp. 3d 830, 833 (N.D. Cal. 2020). That federal-state partnership is by design. Congress has authorized HHS to establish nationwide eligibility standards, benefit levels, and administrative rules, and to oversee the States' administration of their Medicaid programs, while leaving States responsible for day-to-day administration, including determining eligibility, issuing benefits, and ensuring program integrity. 42 U.S.C. § 1396a *et seq*. The costs of Medicaid services are shared between the

federal government and the States, with the federal government generally paying at least 50 percent, and sometimes more. States can also choose to use state funds to establish their own versions of Medicaid that cover a broader range of services or serve a broader range of individuals including, in some jurisdictions, noncitizens who do not qualify for comprehensive (also known as "full-scope") federally funded Medicaid. *See, e.g.*, Declaration of Emma Sandoe (Sandoe Decl.) ¶ 7; Declaration of Charissa Fotinos (Fotinos Decl.) ¶ 13; Declaration of Michelle Probert (Probert Decl.) ¶ 8; Declaration of Peter Hadler (Hadler Decl.) ¶ 15; Declaration of Laura Phelan (Phelan Decl.) ¶¶ 9-10; Declaration of John Connolly (Connolly Decl.) ¶ 9; Declaration of Amir Bassiri (Bassiri Decl.) ¶¶ 4-8; *see also* Declaration of Judith Cash (Cash Decl.) ¶ 10.

Notwithstanding state-by-state variations, federal law makes *all* low-income individuals in the United States, regardless of citizenship or immigration status, eligible for federally funded Medicaid in an emergency, including childbirth. The federal Emergency Medical Treatment and Labor Act requires all hospitals with emergency roomsparticipating in the federal Medicare and Medicaid programs, including those owned and operated by the States and their political subdivisions, to screen patients to determine "whether or not an emergency medical condition . . . exists" and, if so, to stabilize the patient or transfer her to another facility. 42 U.S.C. §§ 1395dd(a), (b)(1), (c)(1). To ameliorate the financial impact of this obligation, Congress authorizes federal Medicaid dollars to be used in treatment of those emergency medical conditions. 42 U.S.C. § 1396b(v)(3); 8 U.S.C. § 1611(b)(1)(A); *see also* 42 C.F.R. § 440.255(b)(2) (coverage for prenatal care, labor and delivery, and postpartum care).

Because the States certify eligibility for and pay for Medicaid services, they necessarily collect and maintain a great deal of sensitive personal information about Medicaid applicants and beneficiaries. In order to determine eligibility for Medicaid (both full-scope and emergency), the States, and other entities authorized by the States to help in eligibility determinations, collect and house sensitive, personally identifiable information (PII), including personal health information (PHI), from millions of individuals and their families who apply for or receive Medicaid.

3

Information relating to eligibility may include Social Security numbers, birth dates, addresses, financial data, household membership, and codes indicating an individual's eligibility category. As part of paying for Medicaid healthcare services, the States, as well as entities like health plans authorized to enroll Medicaid beneficiaries, collect and house claims data arising from patient medical records. These data include names and addresses of healthcare providers, prescription drug records, records of reproductive healthcare, mental health treatments, testing results for sensitive health conditions like HIV, and more.

States, in turn, report a large quantity of information they collect to administer Medicaid benefits to HHS. CMS's largest collection of PHI is the Transformed Medicaid Statistical Information System (T-MSIS). All the States must report monthly to T-MSIS in order to obtain an enhanced federal reimbursement. *See* 42 U.S.C. § 1396b(r)(1)(F); 42 C.F.R. §§ 433.116, 438.818. State-reported data held by CMS in T-MSIS includes Medicaid beneficiary eligibility and demographic information, including unique identifiers (addresses, sex, race and ethnicity, etc.); records of health claims and encounters, including beneficiaries' diagnosis and treatment information; and Medicaid provider enrollment data, including identifiers and addresses.[2] Declaration of Tyler Sadwith (Sadwith Decl.) ¶ 12; Declaration of Judy Mohr Peterson (Peterson Decl.) ¶ 10. T-MSIS collects enrollee data for all federally authorized health plans, regardless of whether those enrollees receive federally funded or state-only services. The purpose of T-MSIS is to provide "improved program monitoring and oversight, technical assistance with states, policy implementation, and data-driven and high-quality Medicaid and CHIP programs that ensure better care, access to coverage, and improved health." *See* CMS, Notice of a Modified System of Records, 84 Fed. Reg. 2,230-02 (Feb. 6, 2019).

CMS also routinely collects data from the States as part of its Medicaid oversight activities. These include a quarterly accounting statement of the State Medicaid program's actual recorded expenditures and use of federal funds; and States's enrollment activity for all

---

[2] *See* T-MSIS Data Guide (Ver. 3.38.0), Ctrs. for Medicare & Medicaid Servs., https://www.medicaid.gov/tmsis/dataguide/v3/ (last visited July 10, 2025).

populations receiving comprehensive Medicaid and CHIP benefits, as well as state program performance data. *See, e.g.*, Declaration of Marshall Wilmot (Wilmot Decl.) ¶¶ 9-12; Declaration of Adela Flores-Brennan (Brennan Decl.) ¶¶ 8-10; Declaration of Andrew Wilson (Wilson Decl.) ¶¶ 8-11; Declaration of Ryan Moran (Moran Decl.) ¶¶ 9-11; Declaration of Meghan Groen (Groen Decl.) ¶¶ 9-12; Declaration of Kari Armijo (Armijo Decl.) ¶¶ 9-11; Declaration of Sarah Adelman (Adelman Decl.) ¶¶ 12-15; Declaration of Kristin Pono Sousa (Pono Sousa Decl.) ¶¶ 8-11; Declaration of Ashley Berliner (Berliner Decl.) ¶¶ 8-10. Federal law further requires the States to respond to "such other investigation as the [HHS] Secretary may find necessary" to calculate proper payments to States. 42 U.S.C. § 1396b(d)(1).

Historically, HHS (and its predecessors) has complied with its obligation to protect PHI collected from Medicaid applicants and beneficiaries via the States. Cash Decl. ¶¶ 15-29. As CMS's privacy policy states, the agency is "committed to keeping [enrollees'] personal information safe with the highest level of privacy protections possible . . .only sharing information with people who need to know" and that CMS will "tell [enrollees] before [CMS] collect[s] any personal information [CMS] need[s] to run [CMS's] health programs, and *only use it for that purpose*."[3] CMS's own regulations for the release of Medicare and Medicaid information to the general public and to state and federal agencies make clear that Medicaid Act data is only to be disclosed "for the purposes of administration" of the Medicaid Act. 42 C.F.R. § 401.134(a); *see also, e.g.*, 42 C.F.R. § 401.126(c) (Medicaid data can only be made available "when this can be done consistently with obligations of confidentiality and administrative necessity"); 42 C.F.R. §§ 431.300-307, *id.* at §§ 435.907(e)(1) (limiting state agency collection of information to only what is necessary to make eligibility determinations or administer State Medicaid plan), (e)(3) (limits on state collection of Social Security Numbers (SSNs), including that non-applicant SSNs be voluntary and "used only to determine an applicant's or beneficiary's eligibility for Medicaid or other insurance affordability program or for a purpose directly

---

[3] Ctrs. for Medicare & Medicaid Servs., *CMS Privacy Home Page*, https://www.cms.gov/about-cms/information-systems/privacy (last updated Sept. 10, 2024) (emphasis added).

connected to the administration of the State plan"); Sadwith Decl. ¶ 14. CMS strictly enforces

background checks, training requirements, and agreements outlining sanctions for misuse of

data, and limits employees' access to sensitive data to only what they need in order to perform

their assigned job responsibilities. *See* Cash Decl. ¶¶ 16-17. Established federal privacy and

confidentiality policies include an explicit prohibition on use of Medicaid data files for

immigration enforcement. On Healthcare.gov, where individuals can apply for various health

benefit programs, HHS states: "We won't use any immigration status you share with us for

immigration enforcement purposes." *Id*. at ¶ 36. In accordance with these limits, DHS policy

historically has not allowed use of Medicaid personal information for immigration enforcement

purposes. An October 25, 2013, ICE policy memorandum explains:

> ICE does not use information about such individuals or members of their household that
> is obtained for purposes of determining eligibility for [Medicaid and other federally
> funded healthcare] coverage as the basis for pursing a civil immigration enforcement
> action against such individuals or members of their household, whether that information
> is provided by a federal agency to the Department of Homeland Security for purposes of
> verifying immigration status information or whether the information is provided to ICE
> by another source.[4]

This ICE policy has been publicly available on DHS's website for years.

States, Medicaid providers, and applicants and beneficiaries have shared data with the

federal government in reliance on these longstanding regulations and policies. Indeed, CMS's

template Medicaid application expressly states to prospective applicants, "We'll keep all the

information you provide private and secure as required by law. We'll use personal information

only to check if you're eligible for health coverage."[5] States must use this, or similar language,

in their state-specific application materials, which CMS approves. 42 C.F.R. § 435.907(b).

Relying on all these assurances, States in turn have assured the public of the confidentiality

of their Medicaid data. Wilmot Decl. ¶¶ 13-14; Flores-Brennan Decl. ¶¶ 11-12; Hadler Decl. ¶¶

---

[4] U.S. Dep't of Homeland Sec., U.S. Immigr. & Customs Enf't, Clarification of Existing
Practices Related to Certain Health Care Information (Oct. 25, 2013), *available at*
https://www.ice.gov/doclib/ero-outreach/pdf/ice-aca-memo.pdf.
[5] Health Ins. Marketplace, Dep't of Health & Hum. Servs., OMB No. 0938-1191, Application for
Health Coverage & Help Paying Costs at 1, *available at* https://www.medicaid.gov/state-
resource-center/mac-learning-collaboratives/downloads/single-streamlined-application.pdf (last
visited Jun. 21, 2025).

25-27; Wilson Decl. ¶¶ 12-13; Phelan Delcl., ¶¶ 19-22; Moran Decl. ¶ 12; Probert Decl. ¶¶ 12, 14; Groen Decl. ¶¶ 14-15; Connolly Decl. ¶¶ 15-17; Armijo Decl. ¶ 12-13; Adelman Decl. ¶ 16; Bassiri Decl. ¶¶ 13-18; Sandoe Decl. ¶¶ 11-12; Pono Sousa Decl. ¶¶ 12-13; Berliner Decl. ¶¶ 11-12; Fotinos Decl. ¶¶ 15-16; Peterson Decl. ¶ 13; Declaration of Michael Levine (Levine Decl.) ¶¶ 9-11. Assuming that CMS would follow its own privacy protections, States represented to their residents that their Medicaid data would only be used for limited and appropriate purposes, such as paying for healthcare and administering State Medicaid programs. Sadwith Decl. ¶ 15; Peterson Decl. ¶ 13; Levine Decl. ¶ 11. Residents who enrolled in State Medicaid programs have relied on the assurances that it was safe to use legally available healthcare benefits, and that doing so would not open them to immigration enforcement or government surveillance. *See* Declaration of Mitesh Popat (Popat Decl.) ¶ 13; Declaration of Adriana Mendoza (Mendoza Decl.) ¶¶ 8,11; Declaration of Lee Che P. Leong (Leong Decl.) ¶¶ 8-9.

## II.    DEFENDANTS' DISCLOSURE OF MEDICAID DATA BREAKS CONFIDENTIALITY

On June 13, 2025, the States received news of Defendants' dramatic departure from established practices for handling Medicaid data. According to an article published by the Associated Press (AP), senior HHS political appointees directed that millions of individuals' Medicaid data be shared with DHS, over the objections of career staff who warned that such a data transfer would violate the law. Declaration of Kathleen Boergers (Boergers Decl.), Ex. A. CMS officials had only 54 minutes to comply with the directive. *Id*. The data transferred was personally identifiable (i.e., not anonymized, hashed, or otherwise protected) and it included Medicaid beneficiaries' addresses and health claims data, among other details. *Id*. When an AP reporter contacted California's Department of Health Care Services (DHCS) just prior to publication, she informed DHCS that the data had been shared for "potential immigration enforcement purposes." Sadwith Decl. ¶ 19.

Plaintiffs California, Washington, and Illinois are three of the states whose residents' PHI was reportedly included in the transfer to DHS. The timing of the transfer strongly suggests that California's Medicaid data included information provided to CMS in response to a March 2025

7

information request by California for the federal Medicaid funding contribution for "individuals without satisfactory immigration status." *Id*. at ¶ 16, 18. CMS requested data that included individual enrollees' Medicaid IDs, immigration statuses, and the periods they were eligible for emergency Medicaid, along with narrative explanations of how DHCS operates Medi-Cal (California's Medicaid program), how emergency Medi-Cal services are paid for, how DHCS verifies immigration status, and how DHCS defines "emergency condition." *Id*. at ¶ 17. Nothing in the request suggested that CMS planned to share the data provided outside of HHS. *Id*. at ¶ 16. DHCS responded on April 30 and provided a substantial amount of information, assuming that CMS would use the data for routine auditing consistent with its statutory authority to administer the Medicaid program. *Id*. at ¶ 18. After the AP reporter contact, DHCS emailed CMS to determine if the reporting about the transfer of Medicaid data to DHS was correct, and to request further explanation; to date, CMS has not responded. *Id*. at ¶ 19.

Other Plaintiff States are now facing similar data demands centered around the data of noncitizen Medicaid recipients.[6] On June 6, 2025, CMS requested a significant amount of PII and information from the Oregon Health Authority (OHA) that, combined with T-MSIS data, would yield PII and more information about individuals' immigration status. Sandoe Decl. ¶ 13. On June 26, 2025, OHA staff met with CMS staff to discuss the information request. *Id*. at ¶ 15. During the meeting, CMS staff confirmed to Oregon that they intend to combine data provided by OHA with data CMS had already received through T-MSIS, making it easier for the federal government to obtain PII and to determine the identity and immigration status of Oregon Health Plan members. *Id*. When OHA staff asked whether CMS would transfer the data to DHS, CMS staff indicated that they would confer with their leadership and provide a follow-up answer; to date, CMS has not responded to Oregon. *Id*.

---

[6] Some Plaintiffs have not received this kind of targeted audit request, but worry that their T-MSIS data, or future audit data, will be transferred without their knowledge or consent. Connolly Decl. ¶ 20; *see also* Sandoe Decl. ¶ 15 (discussing concern that combination of audit data with T-MSIS data would yield PII).

HHS and DHS have, however, confirmed the AP's reporting to the press. HHS claimed that "HHS acted entirely within its legal authority—and in full compliance with applicable laws" (although it did not identify any particular authority). Boergers Decl. Ex. A. The agency further stated that the purpose of the data transfer was "to ensure that Medicaid benefits are reserved for individuals who are lawfully entitled to receive them," *id.*, even though federal law provides emergency Medicaid benefits regardless of immigration status, and permits states to use their own dollars to provide additional Medicaid benefits. *See* 42 U.S.C. § 1396b(v)(3); 8 U.S.C. § 1621(d). Follow up statements to National Public Radio similarly claim that the federal government's purposes are to prevent fraud by either individuals or States that "may be misusing federal Medicaid funds to subsidize care for illegal immigrants." Boergers Decl. Ex. B.

These program integrity justifications are not credible reasons to suddenly transfer large amounts of personally identifiable Medicaid data to DHS.[7] Federal and state agencies already submit queries to DHS's Systematic Alien Verification for Entitlements (SAVE) database to confirm immigration status for benefit eligibility determinations and reviews.[8] *See* Cash Decl. ¶¶ 47, 50. There is no reason why DHS would need personally identifiable, un-anonymized or hashed data from CMS—lacking any of the protections or compliance measures built into SAVE—to ensure that ineligible people are not receiving benefits when these narrower and legally compliant data sharing systems already exist. *See id.* at ¶ 50 (describing role of DHS and SAVE). Significantly, HHS has never before needed to share broad, unfettered data access with DHS—or any other federal agency—to investigate fraud, waste, and abuse. *Id.* at ¶¶ 44-45, 50.

---

[7] The lack of credibility begins with DHS's justification to the press that the number of persons residing in the United States unlawfully increased by "tens of millions" during the Biden administration. Boergers Decl. Ex. A. No credible evidence supports this statement.
[8] USCIS's website includes details on this online system and describes its access and use. *See* U.S. Citizenship and Immigration Services (USCIS), *About SAVE* (last updated May 22, 2025), https://www.uscis.gov/save/about-save/about-save. Use of the SAVE database is governed by user agreements which ensure that government agencies can perform necessary immigration status checks in a manner that complies with laws that protect data privacy and security. USCIS has posted sample agreements on its website, and these documents include numerous required terms to ensure that government agencies use SAVE for approved purposes and in accordance with federal law. *See* USCIS, *Register an Agency for SAVE* (last updated June 25, 2025), https://www.uscis.gov/save/prospective-user-agencies/register-an-agency-for-save.

Furthermore, program integrity purposes cannot justify the depth and breadth of data transferred. *See generally id*. at ¶¶ 37-42 (discussing CMS's robust program integrity efforts). A former Acting Chief of Staff at the Social Security Administration explained that audits or similar investigations typically "start with access to high-level, anonymized data based on the least amount of data the analyst or auditor would need to know." *Am. Fed. of State, County, and Municipal Employees, AFL-CIO v. Social Security Administration*, No. 25-0596, 2025 WL 1206246, at *13 (D. Md. Apr. 17, 2025), *stayed pending appeal*, 145 S. Ct. 1626 (2025) (mem.). Only if suspicious entries appear would the reviewer then gain "'access [to] more granular, nonanonymized data [limited] to just that subset of files.'" *Id*.

Important details about what data has been transferred, and for what purposes, remain unknown to the States, although Presidential executive actions and news reports provide ample basis for the inference that it will be used for immigration enforcement and population surveillance, which is well beyond the scope of the Medicaid program. *See, e.g*., Complaint ¶¶ 201-205, 207, 217-220. Meanwhile, reasonable and well-founded fears that Medicaid data are or will be used for immigration enforcement are spreading among communities in Plaintiff States. *See, e.g.*, Mendoza Decl. ¶¶ 12-16; Leong Decl. ¶ 10. Patients are failing to show up for medical appointments in record numbers. Popat Decl. ¶¶ 9, 11, 12, 13; Declaration of James Mangia (Mangia Decl.) ¶¶ 21, 24. Safety net healthcare providers are facing financial instability as a result. Popat Decl. ¶ 18; Mangia Decl. ¶ 30; Declaration of Francisco Silva (Silva Decl.) ¶ 16.

## LEGAL STANDARD

To obtain a preliminary injunction, the plaintiff must demonstrate that (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "'serious questions go[ing] to the merits of its claims" and showing that the "balance of hardships . . .tips 'sharply'" in plaintiff's favor. *A Woman's Friend Pregnancy Res. Clinic v.*

*Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018); *see also E. Bay Sanctuary Covenant v. Biden*, 993

F.3d 640, 668 (9th Cir. 2021).

## ARGUMENT

### I.    THE STATES HAVE STANDING

As a preliminary matter, the States have standing to assert their claims. Defendants' acts

threaten the States' sovereign, proprietary, and quasi-sovereign interests. "To have standing, a

plaintiff must 'present an injury that is concrete, particularized, and actual or imminent; fairly

traceable to the defendant's challenged behavior; and likely to be redressed by a favorable

ruling.'" *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (quoting *Davis v. Fed. Election

Comm'n*, 554 U.S. 724, 733 (2008)); *see also Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61

(1992). "[P]laintiffs must show that they possess 'a "personal stake" in the dispute' and are not

mere bystanders." *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2133

(2025) (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024)).

The States have a deep stake in this case. First, Defendants' actions will interfere with the

States' administration of their Medicaid programs. *See* Wilmot Decl. ¶¶ 16, 21; Flores-Brennan

Decl. ¶¶ 19-25; Hadler Decl. ¶¶ 40-41; Wilson Decl. ¶¶ 22-23; Phelan Decl. ¶ 27, 29-30, 34;

Moran Decl. ¶¶ 21-22; Probert Decl. ¶¶21-22; Groen Decl. ¶¶ 21, 28-29; Connolly Decl. ¶¶ 30,

32; Arijo Decl. ¶¶ 25-26; Adelman Decl. ¶ 26; Bassiri Decl. ¶¶ 29, 34-35; Sandoe Decl. ¶¶ 17,

22-25; Pono Sandoe Decl. ¶ 17; Fotinos Decl. ¶ 27, 32-33; Peterson Decl. ¶¶ 17-25; Levine Decl.

¶¶ 11-13. Moreover, the States have enacted their own laws, consistent with the Social Security

Act and other federal laws, that protect the privacy of Medicaid applicants and recipients and

limit the sharing of data except for purposes of administration of the program. *See, e.g.*, Cal.

Welf. & Inst. Code § 10850; Colo. Rev. Stat. § 25.5-1-116; Haw. Rev. Stat. § 346-10, Haw.

Admin. R. ch. 17-1702; 22 Minn. Stat. Ann. § 13.46 subdiv. 2(a)(6); Or. Rev. Stat. 413.175; R.I.

Gen. Laws § 40-6-12; N.Y. Soc. Serv. Law §§ 367-b(4); 369(4); Wash. Rev. Code ch. 70.02; Vt.

Stat. Ann. tit. 33, § 1902a. The States' ability to implement these laws is frustrated by

Defendants' sharing of Medicaid data for purposes of immigration enforcement, population

surveillance, or any purpose not directly connected with administration of the Medicaid program. The States therefore have standing to challenge these irreparable injuries. *Cf. Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017) (holding that state had sovereign interest in its ability to carry out its own refugee policies), *vacated on other grounds* 138 S. Ct. 377 (2017) (mem.).

Alternatively, the States face an unconstitutionally coercive choice: they can ignore Defendants' unlawful misuse of their data (and the ensuing higher state healthcare costs and increased risks to public health), or they can refuse to be complicit in this illegal conduct by withholding their data from CMS (putting themselves at risk of potential disallowance of Medicaid funding). This Spending Clause violation raises "sufficiently concrete and particularized harms to [Plaintiffs'] ability to exercise [their] sovereign prerogatives" to confer standing. *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022). Furthermore, "States have standing when an allegedly unconstitutional funding offer is made to them, and they do not need to first violate a condition of an allegedly unconstitutional contract to have standing to challenge it." *Id.* It is sufficient for standing purposes that Plaintiffs do not want their confidential Medicaid data to be unlawfully used for immigration enforcement, but reasonably believe that Defendants will threaten their states' Medicaid funding if they withhold that data. *See id.* at 849-51; *see also City of Los Angeles v. Barr*, 929 F.3d 1163, 1173-74 (9th Cir. 2019) (potential loss of funding due to city's refusal to participate in federal immigration enforcement activities is sufficient to confer standing).

Although the harm to the States' sovereign interests is more than sufficient to establish standing, the Defendants' actions also harm the States' proprietary interests. As a result of the threats of immigration enforcement raised by Defendants' unexplained, unjustified transfer of Medicaid data from HHS to DHS, the States also face loss of federal funds to support their Medicaid programs. If individuals in need of emergency healthcare refuse to apply, or disenroll, from federally funded emergency Medicaid, the States (and political subdivisions) that run safety net hospitals will incur new unfunded healthcare costs, and/or increased demand for state-only sources of healthcare. *See, e.g.*, Flores-Brennan Decl. ¶ 23; Hadler Decl. ¶ 38; Moran Decl. ¶¶

18, 20; Probert Decl. ¶ 19-20; Groen Decl. ¶ 23, 27; Connolly Decl. ¶ 28; Arijo Decl. ¶ 24; Adelman Decl. ¶ 24; Bassiri Decl. ¶¶ 28-30; Sandoe Decl. ¶ 20; Fotinos Decl. ¶ 29; Peterson Decl. ¶ 21. There is "no question that an increased demand for aid supplied by the state and local entities" would be an injury sufficient for Article III purposes. *City and Cnty. of San Francisco v. U.S. Citizenship & Immig. Servs.*, 981 F.3d 742, 754 (9th Cir. 2020). And the Supreme Court has held that injuries to States caused by "the predictable effect of Government action on the decisions of third parties," specifically including harms caused by noncitizens' fears of federal immigration enforcement, are a sufficient basis for standing. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Relatedly, the Supreme Court recently reaffirmed that "[e]ven 'one dollar' of additional revenue . . . would satisfy the redressability component of Article III standing," *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2135 (2025), and that the "analysis of causation and redressability" can rely on "third party behavior" and "commonsense economic realities." *Id.* at 2136.

## II.   DEFENDANTS ARE LIKELY VIOLATING THE SPENDING CLAUSE

Under the Spending Clause, U.S. Const., art. I, § 8, cl. 1, Congress may not impose conditions on federal funds that are (1) ambiguous, (2) retroactive, (3) unrelated to the federal interest in a particular program, or (4) so coercive as to compel (rather than merely encourage) States to comply. *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 576-82 (2012); *South Dakota v. Dole*, 483 U.S. 203, 206–08 (1987); s*ee also Barr*, 929 F.3d at 1176 n.6 ("[T]he principles of *Dole* and *NFIB* apply to agency-drawn conditions on grants to states and localities just as they do to conditions Congress directly places on grants."). Defendants' actions violate all four of these prohibitions.

First, if Congress desires to condition Plaintiffs' receipt of federal Medicaid funds on use of the data for immigration enforcement purposes (or other mass surveillance), it "must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Because "[t]here can, of course, be no knowing acceptance [of federal funds] if a State is unaware of the conditions or is unable to ascertain what is expected of it," *id.*, courts evaluate statutes "from the

perspective of a state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Here, substantial confusion and conflict remains between CMS confidentiality and privacy rules—which remain on the books—and CMS's actions transferring data to DHS/ICE—which expressly violate or severely undermine those same rules. The Spending Clause does not allow such an outcome.

Second, the federal government cannot "surpris[e] participating States with post-acceptance or 'retroactive' conditions." *NFIB*, 567 U.S. at 584. States accepting federal funding must "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207. Accordingly, Defendants may not "impose[] new compliance obligations on States" that "could not have been anticipated at the time States agreed to accept" HHS funding. *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 568 (S.D.N.Y. 2019). Yet Defendants have done just that by requiring Plaintiffs to produce data or risk funding penalties, without warning that this data could be (unlawfully) shared with DHS for immigration enforcement. Furthermore, in reliance on federal law and Defendants' long-standing practices, Plaintiffs have told Medicaid participants that private personal data would be protected and used only for processing claims and administering healthcare programs. Wilmot Decl. ¶ 14; Flores-Brennan Decl. ¶ 12; Hadler Decl. ¶¶ 26-27; Wilson Decl. ¶ 13; Phelan Decl. ¶¶ 21-22; Probert Decl. ¶ 12, 14; Groen Decl. ¶ 15; Connolly Decl. ¶ 17, 31; Armijo Decl, ¶ 12-13; Bassiri Decl. ¶¶ 15-18; Sandoe Decl. ¶ 12; Pono Sousa Decl. ¶ 12-13; Fotinos Decl. ¶ 17; Peterson Decl. ¶ 13; Levine Decl. ¶ 11. State residents have relied on those promises. Popat Decl. ¶¶ 13, 16; Mendoza Decl. ¶ 11; Silva Decl. ¶ 8. Defendants may not violate that trust by imposing surprise conditions that "conscript state [agencies] into the national bureaucratic army" and put the States at odds with their own residents. *NFIB*, 567 U.S. at 585 (quoting *FERC v. Mississippi*, 456 U.S. 742, 775 (1982)); *see also New York*, 414 F. Supp. 3d at 568 (HHS rule violates Spending Clause where it "may create friction between States and their citizens" and "State Plaintiffs did not agree to this . . . when they accepted their current federal funding." (citing *NFIB*, 567 U.S. at 578)).

Third, the Spending Clause requires that funding conditions "bear some relationship to the purpose of the federal spending," *New York v. United States*, 505 U.S. 144, 167 (1992), and be "reasonably calculated" to address the particular "purpose for which the funds are expended." *Dole*, 483 U.S. at 208-09. "[C]onditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207 (quotations omitted). Defendants' efforts to mine sensitive and protected data for purposes like immigration enforcement are not related to administration of the Medicaid program. *See* Cash Decl. ¶ 30. Nor is there any connection with the sound administration of the Medicaid program. Conditioning Medicaid funds on States' sharing of sensitive beneficiary data is therefore inconsistent with the Spending Clause. *See City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350, 2025 WL 1282637, at *30 (N.D. Cal. May 3, 2025) (federal funding for "critical social and public health services" cannot be conditioned on "local assistance with federal immigration enforcement" because "most of the categories of federal funding have *nothing to do* with immigration enforcement" (emphasis in original)); *California v. U.S. Dep't of Transp.*, No. 25-CV-208, 2025 WL 1711531, at *3 (D.R.I. June 19, 2025) (immigration enforcement condition "is not at all reasonably related" to federal transportation grants).

Finally, even if Defendants could claim a lawful right to share confidential Medicaid data with DHS for immigration enforcement purposes—which they cannot—conditioning funding on Plaintiffs' willingness to accept this condition would remain unconstitutionally coercive. In *NFIB*, the Supreme Court explained that because Medicaid spending is such a substantial proportion of the average State's total budget, and because States "have developed intricate statutory and administrative regimes" in reliance on receiving that funding, the threatened loss of the funding impermissibly affords recipients "no real option but to acquiesce." *NFIB*, 567 U.S. at 581–82. Here, the unbounded, discretionary nature of HHS's reinterpretation of its "oversight" authority bootstraps serious consequences (i.e. deportation) onto a vital funding stream. Given the billions of dollars of federal funding potentially at stake, Defendants' actions constitute "economic dragooning" and the "gun to the head" prohibited by the Spending Clause. *Id.*

III.  **The States are Likely to Succeed on the Merits of their APA Procedural Claim and "Arbitrary and Capricious" Claim** [9]

A.  **Defendants' Acts are Subject to Review**

Defendants' decision to transfer individualized Medicaid data files to DHS, and any decision DHS makes to use those files, constitutes final agency action. "The APA establishes a 'basic presumption of judicial review' of agency action." *Lovo v. Miller*, 107 F.4th 199, 205 (4th Cir. 2024) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993)); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). Of relevance here: even if an agency's actions are based on a President's Executive Order (*see* Complaint ¶¶ 203, 205), this does not "insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

To be "final," an agency action must satisfy two criteria: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "[T]he finality inquiry is a pragmatic and flexible one." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (internal quotations omitted). "[I]n characterizing the inquiry as pragmatic," courts are to focus on the "concrete consequences an agency action has or does not have." *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019).

An agency's decisionmaking process is consummated when its position is "definitive." *Her Majesty the Queen in Right of Ontario v. E.P.A.*, 912 F.2d 1525, 1531 (D.C. Cir. 1990). There is nothing "tentative" or "interlocutory" about transferring data to DHS. Especially in light of their confirmations to the press, HHS and DHS's position is not in flux. Boergers Decl. Ex. A. The first *Bennett* criterion is satisfied.

---

[9] For the purposes of this preliminary motion, Plaintiffs are only moving on two of their three APA-related causes of action. Plaintiffs intend to seek prompt production of a complete administrative record as litigation proceeds so that they may move for summary judgment and further relief under the Complaint's Second Cause of Action (Violation of the APA, Contrary to Law) and Fifth Cause of Action (alleging Ultra Vires action).

Second, the transfer of Medicaid data is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177–78. HHS's data sharing with DHS was unlawful under the Medicaid Act and its implementing regulations, as well as federal laws, regulations and agency policies designed to protect data privacy, security and integrity. Compl. ¶¶ 263—283. This fully satisfies the *Bennett* test for showing "legal consequences." *See, e.g.*, *Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*, 836 F.3d 963, 969 (8th Cir. 2016) (agency decision to disclose data is "final agency action" under the *Bennett* test); *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("Adopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process,' and 'one by which [the submitter's] rights [and the agency's] obligations have been determined.'")

## B.    Plaintiffs Are Likely to Succeed on the Complaint's Third Cause of Action that Defendants Violated the APA's Procedural Requirements

Under the APA, HHS is required to follow certain procedures before amending or abandoning a legislative rule. The agency must publish in the Federal Register a notice of proposed rulemaking that includes "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). After the notice has issued, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(c). A rule is legislative when it has the "force of law;" that is, "(1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action; (2) when the agency has explicitly invoked its general legislative authority; or (3) when the rule effectively amends a prior legislative rule." *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). As such, an agency cannot circumvent the notice and comment procedure when it effectively amends a previous rule. However, HHS has attempted to do exactly that.

HHS previously promulgated rules restricting the transfer of data in accordance with the Social Security Act. The Social Security Act provides, "*[n]o disclosure ... of any file, record, report, or other paper, or any information […] shall be made except as the head of the applicable agency may by regulations prescribe and except as otherwise provided by Federal law.*" 42 U.S.C. § 1306 (a)(1) (emphasis added). Accordingly, HHS rules provide that most Medicare information and, by extension, Medicaid information[10] may only be released to "an officer or employee of an agency of the Federal or a State government lawfully charged with the administration of a program receiving grants-in-aid under title V and XIX [Medicaid] of the Social Security Act *for the purpose of administration of those titles*[,]" or the uniformed services civilian health program. 42 C.F.R. § 401.134(a) (emphasis added). The rules permit disclosure and use for investigation of program integrity concerns, but impose strict limitations. Specifically, Medicaid data may be shared with:

> any officer or employee of an agency of the Federal or a State government lawfully charged with the duty of conducting an investigation or prosecution with respect to possible fraud or abuse against a program receiving grants-in-aid under Medicaid, but only for the purpose of conducting such an investigation or prosecution […] provided that the agency has filed an agreement with CMS that the information will be released only to the agency's enforcement branch and that the agency will preserve the confidentiality of the information received and *will not disclose that information for other than program purposes*.

42 C.F.R. § 401.134(c) (emphasis added).

Without providing any public notice or an opportunity for comment, HHS has either abandoned or substantially amended those confidentiality rules. HHS has adopted a new policy and new rules that allow for the disclosure and use of personal Medicaid data for purposes unrelated to Medicaid program administration, including immigration enforcement. *See supra* Section II. These uses and disclosures of Medicaid data are not consistent with the agency's prior understanding of allowable program administration uses. Cash Decl. ¶¶ 30-36. HHS's new policy concerning data access and transfer effectively amends its previous legislative rules,

---

[10] 42 C.F.R. § 401.101(a)(1) applies the subpart to "any other information subject to" the Social Security Act's privacy mandate.

which limited the transfer of Medicaid information to federal and state agencies for the purpose of program administration and investigations into fraud or abuse. *See* 42 C.F.R. § 401.134(a), (c). Because HHS's new rules "effectively amend[]" its prior substantive rules, the new rules are subject to notice and comment. *Hemp Indus. Ass'n*, 333 F.3d at 1087. As Section IV demonstrates, this failure is not a harmless error, as significant public interests weigh against expanding the scope of permissible disclosure of Medicaid data.

### C.    Plaintiffs Are Likely to Succeed on the Complaint's First Cause of Action that the Challenged Actions Are Arbitrary and Capricious

HHS's decision to share the Plaintiff States' confidential Medicaid data with DHS for use in immigration enforcement constitutes a reversal of prior policies at both federal agencies. Defendants' actions ran roughshod over agency rules and policies and over the reasoned advice of career CMS employees. In doing so, Defendants acted without regard to Plaintiff States', and the public's, longstanding reliance on laws, regulations, and practices that protect confidential Medicaid data from this type of misuse. In short: these agency actions were textbook examples of arbitrary and capricious conduct prohibited by the APA. *See* 5 U.S.C. § 706(2)(A).

An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although Defendants may change their policies within statutory limits, the agency must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). And agencies cannot simply turn policies on their head without considering that "longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars*, 579 U.S. at 221-22 and *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). A change in administration does not authorize an

unreasoned reversal of course. *See generally Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Security.*, 908 F.3d 476, 510 (9th Cir. 2018), *rev'd in part and vacated in part*, 591 U.S. 1 2020); *see also California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d. 1106, 1123 (N.D. Cal. 2017). ("New presidential administrations are entitled to change policy positions, but to meet the requirements of the APA, they must give reasoned explanations for those changes and address the prior factual findings underpinning a prior regulatory regime." (quotation marks and brackets omitted)).[11]

Defendants have satisfied none of these requirements. There is no indication that either HHS or DHS engaged in reasoned decision-making when they decided to break confidentiality guardrails and transfer massive Medicaid data files from CMS to DHS. To the contrary, the public reporting indicates that this was a decision made in less than an hour by HHS political appointees over the objections of career CMS staff. Boergers Decl. Ex. A. Nor is there any indication that Defendants considered the substantial reliance that Plaintiff States and their residents placed in longstanding federal policies ensuring that confidential Medicaid data—including personal data collected from immigrants who are lawfully using Medicaid benefits authorized by Congress—would *only* be used to administer health benefits and programs. *See supra*, Section I. Instead, after promising immigrant communities for decades that Medicaid would help to protect their families' health, HHS and DHS are weaponizing that trust against the neediest and most vulnerable. And Defendants have done this without any consideration of the considerable costs to the public, including the Plaintiff States.

For these reasons, the challenged final agency actions—including HHS's decision to share confidential Medicaid data with DHS, and DHS's use of that data for immigration enforcement purposes—are "arbitrary" or "capricious" and therefore invalid. 5 U.S.C. § 706(2)(1).

## IV.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Plaintiffs have already suffered significant injuries as a result of Defendants' conduct, and those injuries will only continue absent an injunction.

---

[11] While it is difficult to imagine any reasoned basis for Defendants' rushed and unlawful actions, "courts may not make up for agency deficiencies by supplying a reasoned basis for the disputed action where the agency has failed to supply one." *League of Women Voters of United States v. Harrington*, 560 F. Supp. 3d 177, 185 (D.D.C. 2021) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

A party seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction," *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22, (2008), but need not show that such irreparable harm is certain to occur, *Michigan v. U.S. Army Corps of Eng'rs*, 667 F. 3d 765, 788 (7th Cir. 2011). Nor must Plaintiffs show that Defendants' conduct is the exclusive cause of Plaintiffs' injury. *M.R. v. Dreyfus*, 697 F. 3d 706, 728-29 (9th Cir. 2012). Instead, Plaintiffs may show a "sufficient causal connection" between Defendants' conduct and Plaintiffs' injury necessitating an immediate injunction. *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1121 (N.D. Cal. 2019) (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018).

Unless the federal government immediately and publicly commits to not using Medicaid enrollee data for immigrant enforcement, or other mass surveillance purposes, CMS's disclosure of Medicaid data files will cause irreparable harm to the States.

   **A.    Defendants' Actions Will Chill Enrollment in and Access to Healthcare**

CMS's transfer of private Medicaid data to DHS has already created and will continue to create a chilling effect. Many of the States' residents will avoid Medicaid enrollment, or even avoid seeking emergency medical services they are entitled to, fearing their personal information will be used to discover, locate, and deport them or their family members. Sadwith Decl. ¶¶ 22, 23; Sandoe Decl. ¶ 17; Silva Decl. ¶ 12; Peterson Decl. ¶¶ 18, 25. These residents include both undocumented immigrants, who are legally entitled to emergency Medicaid coverage, as well as legally present noncitizens who reasonably fear their data will be used to detain and deport them given the current administration's record of error-prone immigration enforcement. Popat Decl. ¶¶ 8, 13; Mangia Decl. ¶ 22; Declaration of Timothy Dellit (Dellit Decl.), ¶¶ 8, 15. Aside from non-citizens, many individuals in mixed-status families—where one or more citizen is living with an immigrant and/or undocumented family member—will avoid applying for benefits they or their family members are eligible for to avoid placing their families at risk. Popat Decl. ¶ 13; Leong Decl. ¶ 10; Mangia Decl. ¶¶ 24-25; Silva Decl. ¶ 12.

This chilling effect is not limited to Medicaid enrollment; the States' noncitizen residents are also now more likely to avoid seeking necessary medical care—including primary and prenatal care—and even emergency services. Popat Decl. ¶¶ 8, 9, 11, 14 (narratives of patients who are now avoiding care and resulting negative health outcomes); Silva Decl. ¶ 12; Mangia Decl. ¶¶ 21, 22, 26, 29; Peterson Decl. ¶¶ 19-21. Community health clinics warn that the federal government's misuse of Medicaid data will make people less likely to seek necessary medical care. Silva Decl. ¶¶ 12, 13; Popat Decl. ¶¶ 8, 9, 11, 14; Mangia Decl. ¶ 22, 24, 29.[12]

The chilling effect from CMS's disclosure is not remote or speculative; it is already here and only likely to worsen. *Winter*, 555 U.S. at 22 (applicant must demonstrate that irreparable injury is "likely" in the absence of a preliminary injunction, not just a mere "possibility"). The public's knowledge of CMS's disclosure has already caused widespread fear and confusion. States' Medicaid agencies have already received numerous inquiries from enrollees and community organizations representing enrollees concerned that their information was shared, or will be shared, leaving them at risk for deportation. *See* Sadwith Decl. ¶ 22; Sandoe Decl. ¶ 18; Flores Brennan Decl. ¶ 18. Medical providers and community health workers will start advising noncitizens regarding the risk of disclosing their personal information on Medicaid applications and to weigh those risks against the benefits of seeking necessary medical care. Silva Decl. ¶ 13; Popat Decl. ¶¶ 13, 16; Mangia Decl. ¶ 28.[13]

Aside from creating fear and panic, CMS's disclosure interferes with the States' sovereign prerogatives to administer their State Medicaid programs as they see fit. CMS's disclosure threatens to unwind years of investments in building trusting relationships with the public—including lawfully present people generally concerned with privacy—who have relied on the confidentiality and security of their personal health information in the Medicaid program.

---

[12] *See also* Kristen Hwang, *Gov. Newsom Lambasts Trump for Giving Immigrants' Health Data to Deportation Officials*, CalMatters (June 13, 2025), https://calmatters.org/health/2025/06/newsom-trump-immigrant-data-deportation-medicaid/.
[13] Claudia Boyd-Barrett, *California Immigrants Weigh Health Coverage Against Deportation Risk*, KFF (July 1, 2025), https://kffhealthnews.org/news/article/california-immigrants-medi-cal-medicaid-health-insurance-raids-fears/view/republish/.

Sadwith Decl. ¶ 23; Sandoe Decl. ¶¶ 21, 23-24; Peterson Decl. ¶ 19.

Ultimately, this disclosure undermines the States' Medicaid programs. Even if the federal government does not use this information for immigration enforcement purposes, awareness of the data transfer has already, and will continue to, create a chilling effect. Popat Decl. ¶ 17; Mangia Decl. ¶ 29; Peterson Decl. ¶¶ 19-20. The States need a preliminary injunction to assure the public that their private health data is safe and to avoid the irreparable harm of a permanent and irreversible chilling effect.

### B.    Loss of Federal Medicaid Funding from Chilling Effect

As States' residents forgo or disenroll from federally funded Medicaid, the States will lose access to crucial federal funding for their health insurance programs. *See* Fotinos Decl. ¶¶ 25 (discussing recent disenrollments), 31; Flores-Brennan Decl. ¶ 21; Sadler Decl. ¶¶ 35-36; Wilson Decl. ¶¶ 19-21; Phelan Decl. ¶ 32; Moran Decl. ¶ 18; Probert Decl. ¶ 19-20; Connolly Decl. ¶¶ 28-29; Armijo Decl. ¶ 23; Adelman Decl. ¶ 24; Bassiri Decl. ¶¶ 28-30. This type of "budget uncertainty," and the steps required to mitigate it, constitutes an irreparable harm. *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017). In addition to reducing enrollment in preventive care, many residents will, understandably, refuse to apply for Medicaid when seeking emergency treatment, shifting the costs of any uncompensated care to the States. Adleman Decl. ¶ 24; Armijo Decl. ¶¶ 19-21; Bassiri Decl. ¶ 32; Connolly Decl. ¶ 22; Flores-Brennan Decl. ¶ 21; Fotinos Decl. ¶ 29; Groen Decl. ¶ 23; Hadler Decl. ¶ 34; Moran Decl. ¶ 18; Peterson Decl. ¶ 21; Phelan Decl. ¶ 32; Probert Decl. ¶ 19; Sandoe Decl. ¶¶ 19-20; Peterson Decl. ¶¶ 21, 23; Wilmot Decl. ¶ 19. States will be forced to choose between ensuring continued access to crucial Medicaid funding and preserving the trust and confidences of their residents that their Medicaid agencies will keep their sensitive data confidential.

### C.    Harms to Public Health and Safety from Chilling Effect

Defendant's unlawful transfer of confidential Medicaid data threatens irreparable harm to the public health and safety of States' residents. *See State v. Bureau of Land Mgmt.*, 286 F.Supp.3d 1054, 1074 (N.D. Cal. 2018) (finding irreparable harm from agency rule that "will

have irreparable consequences for public health").

The chilling effect from CMS's data disclosure, and the resulting reduction in State's residents utilizing necessary healthcare services will cause direct, permanent, and irreparable harm to health of the States' residents. Many of States' residents will avoid seeking necessary medical care, including preventative, and even emergency medical services, possibly resulting in death or serious injury. Adleman Decl. ¶ 20, 22-23; Armijo Decl. ¶¶ 18-20; Bassiri Decl. ¶¶ 25-28, 33; Berliner Decl. ¶¶ 16-17; Fotinos Decl. ¶ 28; Flores-Brennan Decl. ¶¶ 18-20; Groen Decl. ¶¶ 21-22; Hadler Decl. ¶¶ 34; Leong Decl. ¶ 13; Moran Decl. ¶¶ 16-19; Peterson Decl. ¶¶ 19-20; Phelan Decl. ¶¶ 28, 31; Probert Decl. ¶¶ 17-18; Sandoe Decl. ¶¶ 19-20; Sadwith Decl. ¶¶ 23-24; Peterson Decl. ¶¶ 19-20; Wilmot Decl. ¶¶ 16-18; Wilson Decl. ¶¶ 16-18. The potential negative health impacts stemming from this deferment of care include late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Berliner Decl. ¶ 17; Connolly Decl. ¶ 25. Decreased access to prenatal care will lead to increased rates of premature births, low birth weight infants, and congenital defects. *Id*. In addition to their obvious benefits to beneficiaries, the preventive health care services at risk because of this disclosure are an essential tool for the States to prevent, prepare for, and respond to the spread of serious but preventable communicable diseases, such as measles, polio, and sexually transmitted infections, ultimately impacting the health of the state as a whole. *See* Mangia Decl. ¶¶ 4, 5; Silva Decl. ¶ 14.

These type of harms to the States' mission of facilitating broad-based access to healthcare and other services constitute serious, irreparable harm. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (finding irreparable harm where "organizational plaintiffs have shown ongoing harms to their organizational missions as a result of the statute").

## V.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST SUPPORTS A PRELIMINARY INJUNCTION

The remaining *Winter* factors weigh decidedly in favor of granting the requested preliminary relief. "In exercising their sound discretion, courts of equity should pay particular

regard for the public consequences in employing the extraordinary remedy of injunction."
*Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The balance of equities tips in the States' favor. The States already face imminent, irreparable harms as a result of Defendants' actions. Many of those harms also implicate the broader public interest, which also weighs in favor of an injunction. *See City and Cnty. of San Francisco v. U.S. Citizenship & Imm. Servs.*, 981 F.3d 742, 762 (9th Cir. 2020) (balance of equities and public interest were in plaintiffs' favor where federal policy caused financial burden to states and adverse effects on health and welfare of immigrant and general populations).

Where Plaintiffs establish "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). "There is generally no public interest in the perpetuation of an unlawful agency action." *Open Communities All. v. Carson,* 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id*. There is also a "general public interest in open and accountable agency decision-making." *Cresote Council v. Johnson*, 555 F. Supp. 2d 36, 40 (D.D.C. 2008); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").

It is not in the public's interest for HHS to give DHS unfettered access to Medicaid recipients' non-anonymized data before its entitlement to such access has been established, especially when the HHS's own employees have long been subject to restrictions meant to protect such data. Notably, the States do *not* seek to prevent HHS itself from collecting and analyzing Medicaid data in pursuit of program oversight activities. They merely seek to avoid unnecessary, unprecedented transfer and misuse of that data.

## CONCLUSION

The Court should issue a preliminary injunction.

Dated:  July 11, 2025                    Respectfully submitted,

                                         ROB BONTA
                                         Attorney General for the State of California
                                         NELI PALMA
                                         Senior Assistant Attorney General
                                         KATHLEEN BOERGERS
                                         Supervising Deputy Attorney General
                                         WILLIAM BELLAMY
                                         MARIA F. BUXTON
                                         KATHERINE MILTON
                                         KEVIN G. REYES
                                         STEPHANIE T. YU


                                         /s/  *Anna Rich*_____
                                         ANNA RICH
                                         Deputy Attorneys General

                                         *Attorneys for Plaintiff State of California*

*Additional Counsel*

KRISTIN K. MAYES
Attorney General for the State of Arizona
ALEXA G. SALAS
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Alexa.Salas@azag.gov
ACL@azag.gov

*Attorneys for the State of Arizona*

PHILIP J. WEISER
Attorney General for the State of Colorado
RYAN LORCH
Senior Assistant Attorney General
SAM WOLTER
Assistant Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Ryan.lorch@coag.gov
samuel.wolter@coag.gov

*Attorneys for the State of Colorado*

KWAME RAOUL
Attorney General for the State of Illinois
HARPREET KHERA
Bureau Chief, Special Litigation
SHERIEF GABER
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(773) 590-7127
sherief.gaber@ilag.gov
harpreet.khera@ilag.gov

AARON M. FREY
 Attorney General for the State of Maine
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
brendan.d.kreckel@maine.gov

*Attorneys for the State of Maine*

WILLIAM TONG
Attorney General of Connecticut
JANELLE MEDEIROS
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5450
Janelle.Medeiros@ct.gov

*Attorneys for Plaintiff State of Connecticut*

AARON M. FREY
Attorney General for the State of Maine
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
brendan.d.kreckel@maine.gov

*Attorneys for Plaintiff State of Maine*

KATHLEEN JENNINGS
Attorney General for the State of Delaware
IAN R. LISTON
Director of Impact Litigation
JENNIFER KATE AARONSON
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

ANNE E. LOPEZ
Attorney General for the State of Hawai'i
KALIKO'ONĀLANI D. FERNANDES
Solicitor General
DAVID D. DAY
Special Assistant to the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

ANTHONY G. BROWN
Attorney General for the State of Maryland
MICHAEL DREZNER
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us

*Attorneys for the State of Maryland*

ANDREA JOY CAMPBELL
Attorney General for the State of Massachusetts
KATHERINE DIRKS
Chief State Trial Counsel
ETHAN W. MARKS
Assistant Attorney General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

DANA NESSEL
Attorney General for the State of Michigan
NEIL GIOVANATTI
BRYAN BEACH
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
BeachB@michigan.gov

*Attorneys for the State of Michigan*

LETITIA JAMES
Attorney General for the State of New York
MARK LADOV
Special Counsel
RABIA MUQADDAM
Special Counsel for Federal Initiatives
ZOE LEVINE
Special Counsel for Immigrant Justice
NATASHA KORGAONKAR
Special Counsel

KEITH ELLISON
Attorney General for the State of Minnesota
KATHERINE J. BIES (CA Bar No. 316749)
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Attorneys for the State of Minnesota*

AARON D. FORD
Attorney General for the State of Nevada
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Attorneys for the State of Nevada*

MATTHEW J. PLATKIN
Attorney General of New Jersey
ESTEFANIA PUGLIESE-SAVILLE
ELIZABETH R. WALSH
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5289
elizabeth.walsh@law.njoag.gov

*Attorneys for the State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico
AMY SENIER
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
(505) 490-4060
asenier@nmdoj.gov

*Attorneys for the State of New Mexico*

28

28 Liberty St. New York, NY 10005
(929) 638-0447
mark.ladov@ag.ny.gov

*Attorneys for the State of New York*

PETER F. NERONHA
Attorney General for the State of Rhode Island
LEE B. STALEY
Chief, Health Care Unit
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
lstaley@riag.ri.gov

*Attorneys for the State of Rhode Island*

CHARITY R. CLARK
Attorney General for the State of Vermont
RYAN P. KANE
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802)828-3171
Ryan.kane@vermont.gov

*Attorneys for the State of Vermont*

DAN RAYFIELD
Attorney General State of Oregon
BRIAN S. MARSHALL
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov

*Attorney(s) for Plaintiff State of Oregon*

NICHOLAS W. BROWN
Attorney General of Washington
ZANE MULLER
WILLIAM MCGINTY
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

*Attorneys for Plaintiff State of Washington*