ROB BONTA
Attorney General of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
WILLIAM BELLAMY
MARIA F. BUXTON
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU
ANNA RICH (State Bar No. 230195)
Deputy Attorneys General
  1515 Clay Street Suite 2000, P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-0296
  E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR.,** in his official capacity as Secretary of the U.S. Department of Health and Human Services; **U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM,** in her official capacity as Secretary of Homeland Security,<br><br>Defendants. | 3:25-cv-05536-VC<br><br>**DECLARATION OF JUDITH CASH IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:          August 28, 2025<br>Time:         10:00 a.m.<br>Courtroom: Courtroom 4<br>Judge:        Hon. Vince Chhabria<br>Trial Date:  Not set<br>Action Filed: July 1, 2025 |

I, Judith Cash, declare as follows:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional Background**

2. In December 2022, I retired from my career at the Department of Health and Human Services after working at the agency for 10 years across three administrations.

3. I began my career with HHS in 2012 as the Deputy Director of the Division of Children's Health Insurance Programs (CHIP). Shortly thereafter, I moved into the position of Director of the Division of Eligibility and Enrollment in the Center for Medicaid and CHIP Services at the Centers for Medicare and Medicaid Services. In that role, I was responsible for oversight of all state and territorial implementation of Medicaid eligibility, enrollment, and beneficiary protection provisions of the Affordable Care Act, including agency compliance with federal statutes and regulations, development of implementing regulations and subregulatory guidance, approval of Medicaid state plan amendments, briefing Medicaid/HHS leadership on issues related to state implementation and consumer impact, staff leadership and management, and workplan development and implementation.

4. I have held various roles in the agency including Acting Deputy Center Director of the Center for Medicaid and CHIP Services, Director of the State Demonstrations Group, and Senior Policy Advisor in the Office of the Center Director. In these roles, I was responsible for leadership, management, and oversight of Center activities, including facilitating transition to new political leadership, engaging with new policy officials to understand key Medicaid and CHIP policy priorities, and leading the Center in implementation of national priorities. I was also responsible for facilitating implementation of Presidential Executive Orders and Congressional actions related to Medicaid and CHIP, providing guidance and directions to management teams across the Center to ensure timely planning, policy development and implementation.

5. From 2017-2022, I served as the Director of the State Demonstrations Group. In this role, my responsibilities included: leadership of all national policy development, oversight, analysis and evaluation of Medicaid Section 1115 demonstrations and waivers, including eligibility, enrollment, and benefits flexibilities for 80 million children and adults enrolled in Medicaid and CHIP; expansion of coverage, delivery system reform and alternative payment models; briefing Medicaid/HHS leadership and federal partners on emerging issues; guidance and direction to state Medicaid leaders and external partners on options for advancing agency and Administration child and family health care goals; identification of key issues and development of transition-related communications for incoming administration; and staff leadership and management. I retired from this role in December 2022.

6. In 2023, the Agency asked if I would return as a Senior Policy Advisor in the Office of the Center Director. I provided statutory, regulatory and policy analysis and guidance to senior executives and political appointees in areas of Medicaid eligibility and enrollment, particularly in relation to the end of the continuous enrollment period following the end of the Covid-19 public health emergency. I also identified emerging policy and operational issues, led analysis and development of solutions and corrective actions, briefed leadership on state operations and trends in data, and led the development of state guidance. I departed this role in March 2025.

**Medicaid and Program Eligibility**

7. Medicaid is a joint federal and state program that helps cover medical costs for some people with limited income and resources. The federal government has general rules that all state Medicaid programs must follow, but each state runs its own program. Medicaid is jointly funded by state and federal expenditures. States must meet threshold federal statutory and regulatory requirements, but they may tailor their plans' eligibility standards and coverage options to meet residents' needs.

8. Eligibility for Medicaid depends in part on citizenship and immigration status. There are "qualified" and "non-qualified" immigrants. "Non-qualified" immigrants include temporary visitors, asylum seekers whose applications are still pending, recipients of Deferred

Action for Childhood Arrivals (DACA) status, holders of Temporary Protected Status (TPS), other lawfully present individuals not listed in 8 U.S.C. § 1641, as well as persons who are present in the United States without authorization from DHS.

9. Important and urgent healthcare services, including emergency medical treatment and public health assistance for immunization and testing and treatment of communicable disease, are available to all United States residents regardless of immigration status. The federal Medicaid Act provides States with funding for emergency medical treatment for serious conditions, including emergency labor and delivery. 42 U.S.C. § 1396b(v)(3).

10. States can, and some do, use state funds only to extend additional Medicaid-like benefits to a broader range of immigrants.

**Medicaid Data**

11. To enroll a person in Medicaid, States must verify an applicant's eligibility. States are required to affirmatively verify the immigration status of all applicants for federally funded, full scope Medicaid. To verify an applicant's citizenship or immigration status prior to enrolling, states use CMS's Data Services Hub, which provides access to DHS's Systematic Verification of Alien Entitlement (SAVE) System. SAVE is DHS's central repository for biographic, citizenship, and immigration status information on all individuals in the United States. SAVE responds to these verification requests by confirming the applicant's immigration status, including whether an applicant is lawfully present; a qualified noncitizen, or a naturalized or acquired citizen. States check this information with SAVE to ensure that they only enroll eligible applicants for "full scope," federally funded Medicaid.

12. States also submit monthly reports to CMS through the Transformed Medicaid Statistical Information System (T-MSIS). These reports include demographic and eligibility information, such as name, address, date of birth, Medicaid ID, Social Security number (if provided), and eligibility status, for every Medicaid member enrolled in a federally authorized plan. These reports include information on enrollees who receive only emergency Medicaid or certain state-only programs.

13. In addition to eligibility verification, the States routinely share more detailed, personally identifiable information (PII) and protected health information (PHI) with CMS for the purposes of program integrity, program oversight, and administration. This sometimes includes beneficiary claims data, quality data, and financial data.

14. It is overall the responsibility of the States to ensure that only eligible people are enrolled in Medicaid.

**Protection of Medicaid Data**

15. Throughout my time at HHS, the agency took extreme care to protect the extremely personal information that HHS collects and maintains. This was a priority of the agency.

16. Every CMS employee who handles PII and PHI undergoes a background check. They also take significant training annually in protection of information and sharing of data. This includes protection of PII, PHI, and agency records. Managers are required to ensure all staff understand and practice the highest standards of data and information protection.

17. CMS limits access to sensitive data to only what is needed for an employee to perform their assigned job responsibilities. T-MSIS data is maintained by a system administrator. To access personally identifiable T-MSIS data, the agency had a specific process to request access which included identifying the specific need for the access. Only the data necessary to accomplish the identified need would be accessible.

18. While I was employed by the Agency, I was part of the team that developed and finalized the single streamlined application for Marketplace or Medicaid coverage. We were very focused on only gathering the minimum amount of information needed for eligibility determination. We did not want any information not necessary for eligibility determinations. We did this to reduce burdens on people and on states. It was also important that CMS affirm the protection and confidentiality of data for Medicaid applicants.

19. Federal law requires states to provide "safeguards which restrict the use or disclosure of information concerning [Medicaid] applicants and recipients to purposes directly connected with the administration of the [state's Medicaid program] ..." 42 U.S.C. 1396a(a)(7)(A)(i).

Federal rules implementing these requirements reinforce states' obligations to protect applicants' and enrollees' data, with states required to impose sanctions for improper disclosures; publicize provisions governing the confidentiality of this information, and provide copies to applicants and beneficiaries; and obtain individuals' consent before providing data to an outside source for purposes other than verifying income, eligibility and payment. While at the agency, I worked to ensure states Medicaid plans complied with these requirements.

20. HHS's collection and maintenance of PHI is governed by numerous laws and policies.

21. The Health Insurance Portability and Accountability Act (HIPAA) governs the use and disclosure of individuals' PHI by covered entities. An individual's PHI may only be disclosed by a covered entity under certain circumstances.

22. CMS is a covered entity.

23. HIPAA allows for PHI disclosure to law enforcement (absent an individual's signed consent), but only under certain limited circumstances. For example, a covered entity may disclose PHI to comply with a court order or court-ordered warrant, a subpoena or summons issued by a judicial officer, or a grand jury subpoena. None of the limited law enforcement exceptions includes the wholesale transfer of large swaths of identifiable data without any particularized need and analysis or request. The Privacy Rule is balanced to protect an individual's privacy while allowing important law enforcement functions to continue.

24. CMS has confirmed in regulations and guidance that disclosures for law enforcement purposes are permissible only with respect to investigations of fraud or other violations under the Medicaid program itself. See 42 C.F.R. § 431.302(d); CMCS Informational Bulletin: Public Charge and Safeguarding Beneficiary Information (July 22, 2021) ("Under longstanding policy, sharing information with DHS about an applicant's or beneficiary's Medicaid or CHIP coverage for purposes of a public charge determination is generally not directly related to the administration of the state plan."), https://www.medicaid.gov/federal-policyguidance/downloads cib072221.pdf; Sally K. Richardson, Director, CMS, "Dear State Medicaid Director" Letter

(Dec. 17, 1997), https://downloads.cms.gov/cmsgov/archiveddownloads/SMDL/downloads/SMD121797.pdf.

25. Moreover, States must only allow access and release of data to persons and entities subject to comparable standards of confidentiality. 42 C.F.R. §§ 431.306(b) ("Access to information concerning applicants or beneficiaries must be restricted to persons or agency representatives who are subject to standards of confidentiality that are comparable to those of the agency"), 431.306(e) ("The agency's policies must apply to all requests for information from outside sources, including governmental bodies, the courts, or law enforcement officials.")

26. In addition to HIPAA, the Social Security Act provides that "[n]o disclosure ... of any file, record, report, or other paper, or any information […] shall be made except as the head of the applicable agency may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306 (a)(1) (emphasis added); see also id. § 1306(a)(2) (applying this privacy provision to both HHS and the Social Security Administration). Additionally, information may only be disclosed for the purpose of administration of the program.

27. CMS's collection and maintenance of personal data is also governed by the Privacy Act and Systems of Record Notices, and the Federal Information Security Management Act.

28. CMS does share sanitized, de-identified data on Medicaid enrollment, eligibility, and quality with policymakers, researchers, and the general public through data.medicaid.gov.

29. In my time at the Agency, we did not share PII outside the agency absent a specific, particularized request with enough information to analyze whether the disclosure would meet certain limited exceptions to our privacy protections. When disclosure of data outside CMS did occur, it was only the minimum information necessary to comply with a lawful request.

**Explicit Restrictions on Using Medicaid Data for Immigration Purposes**

30. CMS has a longstanding policy prohibiting the use of Medicaid data for immigration enforcement purposes. In my experience, use and disclosure of Medicaid data for immigration enforcement purposes is not an allowable program administration use of that data.

31. To my knowledge, CMS strictly abided by this policy and never transferred Medicaid

data files to DHS or any other agency for immigration enforcement purposes.

32. For decades, CMS has emphasized this policy to the States and the public.

33. In 2000, HHS advised states to communicate on their Medicaid applications that States would not use or share individuals' private information for purposes beyond Medicaid administration, including, explicitly, that states would not share information with federal immigration officials. Tri-Agency Guidance (Sept. 2000), https://www.hhs.gov/civil-rights/for-individuals/special-topics/national-origin/tri- agency/index.html ("States should make clear statements about the use and confidentiality of personal information collected through the eligibility process, including SSNs and immigration status, in order to address directly the fears of immigrant families. For example, if a state or local agency is collecting SSNs only to verify income and improve administration of its programs, it could add the following statements to its application form: 'We only use social security numbers to help us verify your income. We will not share social security numbers with the [Immigration and Naturalization Service].'")

34. Years later, CMS directed states to convey similar information to Medicaid applicants. Under the Affordable Care Act, states must use a CMS-designed or CMS- approved application for individuals seeking Marketplace or Medicaid coverage. CMS's template application for states (which I helped develop) —still posted on the CMS website as of June 2025—expressly states: "We'll keep all the information you provide private and secure as required by law. We'll use personal information only to check if you're eligible for health coverage." CMS Single Streamlined Application, OMB No. 0938-1191, expires: Sept. 30, 2027 (last visited July 9, 2025), https://www.medicaid.gov/state-resource-center/mac-learning-collaboratives/downloads/single-streamlined-application.pdf. States have used this or similar language in their Medicaid applications across the country, with CMS's approval.

35. To this day, CMS continues to represent to individuals that their healthcare data will not be used for immigration purposes. For example, on CMS's Privacy Home Page, the agency states it is committed to keeping enrollee "personal information safe with the highest level of privacy protections possible … only sharing information with people who need to know" and

that CMS will "tell [enrollees] before [CMS] collect[s] any personal information [CMS] need[s] to run [CMS'] health program, and only use it for that purpose." Centers for Medicare & Medicaid Servs., CMS Privacy Home Page, https://www.cms.gov/about-cms/information-systems/privacy (last updated Sept. 10, 2024) (emphasis added).

36. DHS similarly conveyed that Medicaid data would not be used for immigration enforcement purposes. In 2013, DHS issued guidance stating explicitly that information provided by individuals seeking Medicaid would not be used for purposes other than administering Medicaid. This guidance also remains on DHS's website as of June 2025. U.S. Immigrations and Customs Enforcement, Clarification of Existing Practices Related to Certain Health Care Information, Oct. 25, 2013, https://www.ice.gov/doclib/ero- outreach/pdf/ice-aca-memo.pdf. It is also linked on Healthcare.gov (where lawfully residing immigrants can apply for Medicaid and other forms of health coverage), accompanied by the phrase: "We won't use any immigration status you share with us for immigration enforcement purposes." Healthcare.gov, "More information for immigrant households," https://www.healthcare.gov/immigrants/immigrant-families/ (last visited July 9, 2025).

**Program Integrity**

37. The CMS Center for Program Integrity (CPI) works to prevent, detect, and combat fraud, waste, and abuse in the Medicaid program and other federally-facilitated marketplace programs. In addition, the HHS Office of the Inspector General (OIG) may investigate concerns of fraud, waste, and abuse.

38. In my time at CMS, I never witnessed wide-scale fraud, waste, or abuse by ineligible noncitizens attempting to access federally funded Medicaid benefits.

39. CMS, in partnership with the States, works very hard to ensure that only eligible people were getting coverage. States are required to follow federal Medicaid eligibility rules and to ensure they have systems, policies, operations, staff training, and oversight practices in place that are compliant with these rules. These rules govern specific eligibility factors, as well as requirements for verification, processing changes in beneficiary circumstances, and regular

redetermination of eligibility.

40. CMS assists states in a number of ways in ensuring eligible people are enrolled in Medicaid including reviewing data, requesting review and attestations from the states, reviewing state plans to ensure consistency with rules and regulations, and providing technical assistance. CPI and OIG also regularly monitor the program for fraud, waste, and abuse. Ultimately, it is solely the responsibility of the States, in partnership with CMS, to determine eligibility for Medicaid.

41. If there were program integrity concerns involving ineligible people enrolling in Medicaid, CMS would engage with specific states in which the concern had been identified. CMS would request information from the states to determine whether state was in compliance with federal eligibility requirements and, if needed, would take action pursuant to the terms of Title XIX of the Social Security Act and applicable federal regulations. CPI and OIG could also investigate concerns.

42. Errors in Medicaid enrollment may occur for many reasons. For example, an individual's income may have changed or an individual may have moved out of the state of enrollment. When these fluctuations happen, and states become aware of them, it is up to the states to redetermine an individual's eligibility in a manner consistent with federal regulations.

**Transfer of Data**

43. On June 14, 2025, I learned through multiple news reports that CMS had transferred large sets of states' personally identifiable, personal health data to DHS.

44. To my knowledge, this sort of large-scale data transfer of identifiable information outside of the Agency has never occurred before.

45. During my time with the Agency, CMS never gave unfettered access to large amounts of PII or PHI to people outside the agency in this way. If true, this transfer of data would represent a dramatic change in its policy and practice of keeping personal Medicaid data private.

46. News reports and statements from DHS indicate that CMS and DHS are exploring an initiative to ensure that illegal aliens are not receiving Medicaid benefits that are meant for law-

abiding Americans.

47. It is unclear why DHS would need mass amounts of personally identifiable, un-anonymized or hashed data obtained by CMS through the Medicaid program if it were only "exploring" an initiative to ensure that ineligible people are not receiving benefits. The states and CMS already ensure ineligible people do not receive benefits when they verify enrollment using DHS's SAVE.

48. During my time at CMS, I was not aware of any evidence that large numbers of unauthorized persons were receiving Medicaid benefits to which they are ineligible. Fraudulent enrollment is rare. The states have detailed procedures and safeguards in place to ensure only eligible people are enrolled, included access to SAVE to verify immigration status. Oftentimes, large-scale fraud in the Medicaid program is usually attributable to providers, not individual Medicaid beneficiaries. See e.g., Alice Fordham, Fake 'sober homes' targeting Native Americans scam millions from taxpayers (Aug. 31, 2023), http:// www.npr.org/2023/08/31/1196855614/fake-sober-homes-targeting-native- americans-scam-millions-from-taxpayers (describing Medicaid fraud scheme in Arizona).

49. As discussed above, program integrity of the Medicaid program is within the expertise of CMS and the States.

50. To my knowledge, CMS has never before enlisted DHS's participation in broad "oversight" of enrollment in the Medicaid program. In my experience, HHS does not need to enlist DHS to assist with broad oversight of eligibility verification for the Medicaid program because the states already have access to the SAVE system to verify immigration status for Medicaid eligibility and CMS (including CPI and OIG) works diligently with the states to ensure the integrity of the program.

51. I find the news reports about the large-scale transfer of data from CMS to DHS very disturbing. I am deeply concerned that this will irreparably damage the partnership between the states and CMS in administering the Medicaid program. States can no longer rely on CMS's longstanding representations about how it would use resident data making states less likely to

collect and share data with CMS. Without this strong partnership, ensuring integrity of the program will become more difficult and Medicaid eligible indivudals will suffer. States may be less likely to pursue enrollment for certain eligible individuals.

52. I am also deeply concerned in the loss of public trust and confidence in CMS. If people cannot trust that CMS will protect their most sensitive health information, they will be less likely to enroll in benefits for which they are eligible.

I declare under the penalty of perjury under the laws of Califonria and the United States the foregoing is true and correct.

Executed this 10th of July, 2025 in Napa, California

Judith Cash