Rob Bonta
Attorney General of California
Neli Palma
Senior Assistant Attorney General
Kathleen Boergers
Supervising Deputy Attorney General
William Bellamy
Maria F. Buxton
Katherine Milton
Kevin G. Reyes
Stephanie T. Yu
Anna Rich (State Bar No. 230195)
Deputy Attorneys General
  1515 Clay Street Suite 2000, P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-0296
  E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **State of California; State of Arizona; State of Colorado; State of Connecticut; State of Delaware; State of Hawaii; State of Illinois; State of Maine; State of Maryland; Commonwealth of Massachusetts; State of Michigan; State of Minnesota; State of Nevada; State of New Jersey; State of New Mexico; State of New York; State of Oregon; State of Rhode Island; State of Vermont; State of Washington,**<br><br>                    Plaintiffs,<br><br>v.<br><br>**U.S. Department of Health and Human Services; Robert F. Kennedy, Jr.,** in his official capacity as Secretary of the U.S. Department of Health and Human Services; **U.S. Department of Homeland Security; Kristi Noem,** in her official capacity as Secretary of Homeland Security,<br><br>                    Defendants. | 3:25-cv-05536-VC<br><br>**DECLARATION OF JOHN CONNOLLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:         August 28, 2025<br>Time:        10:00 a.m.<br>Courtroom:  Courtroom 4<br>Judge:       Hon. Vince Chhabria<br>Trial Date:   Not set<br>Action Filed: July 1, 2025 |

## DECLARATION OF JOHN CONNOLLY

I, John Connolly, declare as follows:

1. I am a resident of the State of Minnesota. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2. I am the Deputy Commissioner and State Medicaid Director for the Minnesota Department of Human Services ("MDHS"). I previously served as assistant commissioner for the Health Care Administration within MDHS. Prior to joining the Department, I served as chief strategist for the Los Angeles County Department of Public Health, where I focused on advancement of Medicaid-funded services and programs, regulation of health facilities, homelessness, and emergency response.

3. MDHS, through its Health Care Administration, is the single state agency responsible for administering Minnesota's Medicaid program, which is known as Medical Assistance. Medical Assistance provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. Medical Assistance's coverage includes children and families, pregnant women, adults without children, seniors, and people who are blind or have disabilities. MDHS's mission is to support all Minnesotans in living their healthiest and fullest lives.

4. Medical Assistance is the largest single source of health insurance in Minnesota. Today, Medical Assistance provides health coverage for almost 1.2 million Minnesotans, or approximately one in every five state residents. Forty-one percent of Minnesota children are enrolled in Medical Assistance. Medical Assistance also covers one-half of the cost of all long-

term care services delivered in the state to people with disabilities or who are age 65 or older. In Minnesota, 42 percent of Medical Assistance enrollees are children, 23 percent are adults without minor children residing with them, 17 percent are parents or pregnant, 9 percent are people with disabilities, and 6 percent are adults age 65 and older. Even though people with disabilities and those 65 or older account for only about 15 percent of Medical Assistance enrollment, they account for over 80 percent of all Medical Assistance expenditures.

5. Medical Assistance in Minnesota is authorized and funded in accordance with Title XIX of the Social Security Act or applicable federal waiver or demonstration authority. Medicaid is a federal-state partnership, wherein federal financial participation (FFP) or "matching" funds are secured through the expenditure of state funds in accordance with the state's "plan for medical assistance," or Medicaid State Plan, or through an approved federal Medicaid waiver or demonstration. In order to "draw down" FFP, the State Plan and current waiver or demonstration authority must be approved by the U.S. Centers for Medicare and Medicaid Services (CMS). In state fiscal year 2025, total Medical Assistance payments in Minnesota are projected to exceed $20 billion. Of that amount, 57 percent is paid by the federal government through the FFP, 42 percent is paid by the state, and 1 percent is paid by other entities including counties and school districts.

6. Minnesota also provides high-quality, low-cost, comprehensive health coverage to eligible Minnesotans through the state's Basic Health Plan, or "MinnesotaCare." Federal authority for Basic Health Plans was established through Section 1331 of the Patient Protection and Affordable Care Act of 2010. Basic Health Plans are financed through separate federal authority and do not receive Title XIX Medicaid funds.

7.  Most Medical Assistance enrollees are eligible for coverage paid for by joint federal and state funding. MDHS uses FFP funding to pay for a significant portion of Medical Assistance's insurance coverage, while Minnesota covers the remaining costs. To qualify for FFP funding, among other eligibility requirements, the enrollee must either be a citizen of the United States or have some other qualifying immigration status, for example lawful permanent residency. These individuals qualify for what is referred to as "full scope," federally funded Medicaid.

8.  For Medical Assistance applicants who do not have a qualifying immigration status, federal law authorizes the use of federal funding to treat life threatening emergencies. Emergency Medical Assistance covers life-threatening medical emergencies, including labor and delivery for pregnant individuals, dialysis treatments, cancer treatments, and medications to prevent organ transplant rejection.

9.  State-funded Medical Assistance is available for individuals who are between ages 21 and 65 and qualify for Medical Assistance (including immigration status requirements) but are residing in an Institution for Mental Diseases. State-funded Medical Assistance is also available to individuals who are otherwise ineligible for Medical Assistance (including due to immigration status) and who are receiving services from the Center for Victims of Torture.

**Data Sharing Between MDHS and CMS**

10. Pursuant to federal law, and as a condition of receiving federal Medicaid funding, Minnesota routinely shares certain categories of personal information regarding Medical Assistance enrollees with the federal government, including CMS.

11. For example, MDHS submits extensive person level demographic and eligibility data about all Medicaid and Children's Health Insurance Program (CHIP) enrollees to CMS each

month. The eligibility files of the Transformed Medicaid Statistical Information System (T-MSIS) data include name, date of birth, sex, address, phone number, marital status, Social Security Number (SSN), immigration status and verification indicator, income level, household size, race and ethnicity, and more. The file also includes enrollees' recipient IDs, which are used in place of an SSN for individuals who do not have an SSN, which is also indicated. MDHS most recently submitted T-MSIS production files to CMS on June 30, 2025, which contained May 2025 encounter data. MDHS submits eligibility data as a historical file, which contains eligibility information from 2015 to current.

12. MDHS also shares information with CMS through the Federal Data Services Hub. This is a CMS system serving as a single portal for exchanging information between the federally facilitated health insurance marketplace and CMS's external partners, including other federal agencies, state-based marketplaces, other state agencies, other CMS systems, and issuers of qualified health plans. Through the Data Services Hub, state-based marketplaces and Medicaid/CHIP agencies transmit queries to various external entities, including other federal agencies and commercial verification services, to verify information provided by applicants, such as immigration and citizenship data, income data, individual coverage data, and incarceration data.

13. MDHS also provides information to the federal government through the Systematic Alien Verification for Entitlements (SAVE) service. SAVE is an online service administered by U.S. Citizenship and Immigration Services (USCIS) that provides point-in-time immigration status and naturalized/acquired U.S. citizenship information to federal, state, local, territorial, and tribal agencies.

14. MDHS also routinely provides CMS with data in response to Medicaid supplemental reviews and audits for federal oversight purposes.

15. MDHS relies on CMS to protect the confidentially and security of the Medicaid data and to follow federal laws and regulations regarding redisclosure of that data, such as HHS's own prohibition on disclosure except as required for the purposes of administering the Medicaid program. For example, the Medicaid.gov T-MSIS Data Guide, which is available at https://www.medicaid.gov/tmsis/dataguide/v3/, indicates that the system is used for monitoring and oversight of Medicaid and CHIP programs and that "[u]nder the Privacy Act of 1974 any personally identifying information obtained will be kept private to the extent of the law." In a Privacy Impact Assessment published in October 2021 and available at https://perma.cc/53Q9-8JG9, CMS represented that the Federal Data Services Hub "does NOT collect, store, or maintain any personally identifiable information" and "functions solely as a data exchange 'common infrastructure.'" Similarly, in online material available at https://perma.cc/A8P6-3ZSS, USCIS represents that SAVE does not share information provided by user agencies for administrative (non-criminal) immigration enforcement purposes.

16. Based on these understandings, MDHS shares information and data for purposes of receiving FFP and operates its Medicaid program under the good-faith belief that data submitted to the T-MSIS and other federal systems will be used solely for Medicaid program administration and oversight. MDHS depends on CMS to maintain data integrity, privacy, and security safeguards under the Health Insurance Portability and Accountability Act (HIPAA) and the Privacy Act; to limit redisclosure of personally identifiable information to only those uses authorized under federal law; and accurately allocate federal Medicaid funding based on

enrollment and claims data submitted via T-MSIS. MDHS takes data stewardship responsibilities seriously and works to ensure that only the minimum necessary information is shared.

17. Relying on CMS's representations, MDHS has made statements to state residents and Medical Assistance enrollees about how their data will be used or shared. For example, consistent with the Minnesota Government Data Practices Act, all applications for help paying for health care in Minnesota are provided with a "Tennessen warning," which is an explanation of how the information requested will be used and with whom the information will be shared. This explanation provides no notice that their Medicaid enrollee information could be shared for purposes of non-criminal immigration enforcement.
Relying on MDHS's statements, community organizations working with Minnesota's immigrant communities have assured that applications for health coverage will not be used for purposes of non-criminal immigration enforcement.

18. On June 13, 2025, an article published by the *Associated Press* reported that CMS had shared confidential Medicaid data with DHS, including the personally identifiable information (PII) of millions of Medicaid beneficiaries in California, Illinois, Washington state, and Washington D.C. The reporting stated that two top advisers to the Secretary of Health and Human Services, Robert F. Kennedy Jr. ordered CMS staff to provide this data to DHS over the objections of those staff members. The reporting also said that CMS shared this confidential information with DHS after CMS sent California, Illinois, and Washington an information request to ensure federal funds have not been used to pay coverage for people with "unsatisfactory immigration status," and those states responded to the information request with details about non-U.S. citizens who enrolled in their state's Medicaid program. MDHS

leadership learned about these allegations shortly after publication of the *Associated Press* article.

19.    On June 6, 2025, MDHS received a similar information request from CMS. CMS sent an email to MDHS stating that it was requesting information to confirm Minnesota was not applying federal funding unlawfully for individuals with unsatisfactory immigration statuses. The email did not cite any specific evidence or concerns about improper use of federal dollars. The email requested that MDHS respond with sensitive, personally identifiable information about all Emergency Medical Assistance enrollees, and any other Medical Assistance enrollees without satisfactory immigration status by July 30, 2025.

**Harm from Disclosure of Medical Assistance PII Data to DHS**

20.    As far as MDHS is aware, CMS has not disclosed Medicaid PII data for Minnesota Medicaid enrollees to date. But, in light of recent reporting, I am concerned that CMS will share sensitive data of state Medicaid enrollees with DHS for non-criminal immigration enforcement purposes. In particular, I am concerned that CMS recently requested sensitive, personal information about the state's Medicaid enrollees—information that CMS already reportedly requested from other states and shared with DHS for non-criminal immigration enforcement purposes.

21.    Based on my experience, I believe that the unauthorized disclosure of confidential data by CMS to DHS has already harmed the State of Minnesota by creating a significant chilling effect for immigrants and their family members, discouraging them from seeking medically necessary healthcare and Medicaid enrollment. Moreover, the threat of additional, unauthorized disclosure of confidential data by CMS to DHS will continue to negatively impact the state.

22. Based on my experience, undocumented persons are unlikely to enroll in Emergency Medical Assistance if their information will be shared with immigration authorities, resulting in increases in uncompensated care. Over the last several months, the federal government has undertaken immigration enforcement actions and implemented an array of restrictive immigration policies, many in contravention of applicable law, that increase fear among lawfully present immigrants and undocumented individuals about enrolling in Medicaid and the Children's Health Insurance Program (CHIP) for which they may be eligible. The threat that their Medicaid enrollee PII could be shared with DHS for civil immigration enforcement purposes at any moment will further increase the uninsured rate among immigrant families who will delay or go without needed medical care and present in more expensive emergency room settings.

23. Additionally, a recent analysis of MDHS public benefit enrollment data for Minnesota immigrant households from 2013 to 2021 demonstrates statistically significant reductions in benefit enrollment for certain immigrant households, corroborating the existence of a public charge chilling effect. Ana Pottratz Acosta, Minnesota Journal of Law & Inequality, *An Examination of Public Benefit Enrollment Data in Minnesota Immigrant Households as Evidence of Public Charge Chilling Effect* (May 2025), https://scholarship.law.umn.edu/cgi/viewcontent.cgi?article=1721&context=lawineq. This research suggests that Minnesota's undocumented or mixed-status families may similarly withdraw from Medicaid out of fear.

24. Coverage losses among immigrant parents may also lead to coverage losses for citizen children in immigrant families. Coverage declines would likely reverberate through other parts of the healthcare system, such as community health centers, which serve a disproportionate

number of immigrants, regardless of immigration status. This will ultimately unwind years of investment in expanding health coverage and access.

25. Delaying care will likely increase the risk of adverse health impacts for Minnesotans, including the potential spread of infection and illness. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Decreased access to prenatal case will lead to increased rates of premature births, low birth weight infants, and congenital defects.

26. These adverse health impacts will further strain Minnesota's resources and budget. Access to coverage through Medical Assistance enables people to access preventive care and obtain treatment earlier which prevents conditions from worsening and the need for more expensive interventions. One example is better prenatal healthcare, which leads to better birth weights and lower medical costs. Minnesota is one of 15 states selected to participate in CMS's Transforming Maternal Health model, which aims to improve maternal health care and birth outcomes while reducing overall program expenditures through improved access to care.

27. Based on information shared with MDHS, when people can no longer avoid medical care, they often seek treatment in an emergency department or hospital. Reluctance to seek care due to perceived risk of immigration enforcement will increase health risks for all Minnesotans and weaken the state's health infrastructure due to financial stress on hospitals and emergency departments.

28. Not only are costs of care increased due to failure to receive earlier medical intervention, but many individuals will likely decline to enroll in Medical Assistance or Emergency Medical Assistance services if they believe that doing so will place themselves, their

families, or communities at risk of immigration enforcement. For hospitals and other safety net health services providers who are not legally permitted to deny care to individuals who lack the means to pay out-of-pocket for their health care services, increased costs associated with care avoidance or care delay inevitably lead to increased uncompensated care costs for these providers. Those individuals will still need emergency treatment, which increases uncompensated care costs for individuals unable to afford the cost of care. To the extent their treatment is left uncompensated, these costs will ultimately be shifted to the broader healthcare delivery system and the state, including treating hospitals and emergency departments. Over time this puts critical health infrastructure particularly in rural parts of Minnesota at risk for closure.

29. The State of Minnesota also operates facilities specializing in behavioral health treatment, including the State's Forensic Mental Health Program, the Anoka Metro Regional Treatment Center, and Community Behavioral Health Hospitals. These facilities are responsible for treating individuals whose treatment is court-ordered, regardless of ability to pay. As a result, the State will likely be forced to bear the cost of treating individuals with behavioral health conditions who cannot afford to pay for services, decline to obtain care via the Medical Assistance or Emergency Medical Assistance programs, and ultimately require treatment in a state-operated facility.

30. Overall, CMS's disclosure undermines the Medicaid program. If individuals cannot trust MDHS or the federal government to safeguard their data, then they are less likely to apply for programs for which they may be eligible or seek necessary preventive care and treatment, undermining the goals of public health programs, impeding the State's ability to identify and track health trends, and increasing the risk to the general public of communicable diseases.

31. Lastly, as stated earlier, MDHS has represented to Minnesotans how their Medicaid enrollee information will be used and with whom the information will be shared. If Minnesota can no longer rely on representations made by the federal government that immigration data obtained through the ordinary course of verifying eligibility for Medicaid will not be shared for purposes of civil immigration enforcement, then Minnesota will be required to update all of its applications for help paying for health care and all other public benefits subject to the PRWORA noncitizen eligibility restrictions, as well as all bulletins, guidance, websites, etc., through which DHS provides information to the county and Tribal agencies that administer these programs. Updating these forms and updating the systems infrastructure will come at significant financial cost to Minnesota taxpayers.

32. If CMS shared confidential Medicaid data with DHS for the purposes of immigration enforcement, such a disclosure would represent an unprecedented and grave betrayal of public trust. If true, this disclosure has likely already caused significant harm to Minnesota's ability operate and will cause further irreparable harm to the state if not mitigated and repaired.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED and SIGNED this 10th day of July 2025, at Saint Paul, Minnesota.

_____
John Connolly
Deputy Commissioner and State Medicaid Director
MDHS