ROB BONTA
Attorney General of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
WILLIAM BELLAMY
MARIA F. BUXTON
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU
ANNA RICH (State Bar No. 230195)
Deputy Attorneys General
  1515 Clay Street Suite 2000, P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-0296
  E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON,**<br><br>                Plaintiffs,<br><br>**v.**<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR.,** in his official capacity as Secretary of the U.S. Department of Health and Human Services; **U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM,** in her official capacity as Secretary of Homeland Security,<br><br>                Defendants. | 3:25-cv-05536-VC<br><br>**DECLARATION OF CHARISSA FOTINOS, M.D., MSc IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        August 28, 2025<br>Time:       10:00 a.m.<br>Courtroom:  Courtroom 4<br>Judge:      Hon. Vince Chhabria<br>Trial Date:  Not set<br>Action Filed:  July 1, 2025 |

**DECLARATION OF CHARISSA FOTINOS, MD, MSc**

I, Charissa Fotinos, declare as follows:

1. I am a resident of the State of Washington. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2. I have been employed with the Washington State Health Care Authority (HCA) since October 1, 2013. I have held the position of Medicaid Director since 2022. Before then, I served as Acting Medicaid Director beginning in 2021. In addition, I have served as Deputy Chief Medical Officer since 2013 and as Behavioral Health Medical Director since 2022.

3. Before joining HCA, I served as Chief Medical Officer for Public Health-Seattle and King County for ten years, and I was a physician faculty member at the Providence Family Medicine Residency Program. I am board certified by the American Board of Family Medicine in Family Medicine and by the American Board of Preventive Medicine in Addiction Medicine. I hold a Master of Science in evidence-based health care from Oxford University, Kellogg College, in England, and an M.D. from the University of Colorado Health Sciences Center.

4. As the Medicaid Director, I am responsible for executive-level oversight and administration of Washington's Apple Health programs. The term "Apple Health" includes Medicaid and the Children's Health Insurance Program (CHIP), which are governed by federal statutes and rules and supported by federal funding but administered by the State. "Apple Health" also includes programs that are funded entirely by the State.

5.      The Washington Legislature designated HCA as the single state agency responsible for administering Medicaid. The program provides low-income individuals with access to comprehensive healthcare coverage at no or low cost. Medicaid's coverage includes medical, dental, mental health, substance use disorder treatment, and long-term care.

6.      HCA is the largest healthcare purchaser in Washington, as Medicaid and other Apple Health programs cover about 20% of the state's population. In total, Medicaid insures approximately 1.9 million people including approximately 850,000 children.

7.      Medicaid is authorized and funded in part through a federal-state partnership. HCA administers the program under broad federal requirements as well as the terms of its "State Plan for Medical Assistance," also known as a State Plan, approved by the federal Centers for Medicare and Medicaid Services (CMS). HCA receives the federal Medicaid funding contribution, known as "Federal Financial Participation" (FFP), which covers a percentage of Medicaid's expenditures for eligible enrollees.

8.      Most Apple Health enrollees are eligible for coverage paid for by joint federal and state funding. The state uses federal dollars to pay for a significant portion of its Apple Health costs—approximately 67%, with the state covering the remaining costs. Expenditures are eligible for FFP if they are related to services for enrollees who are U.S. citizens or have some other qualifying immigration status, such as lawful permanent residency. These individuals qualify for what is referred to as "full scope," federally funded Medicaid.

9.      For individuals who do not have a qualifying immigration status, federal law authorizes the use of federal funding to treat certain emergency medical conditions. HCA refers to this program as "Emergency Medicaid" (known under federal law as "Alien Emergency

Medical"). Emergency Medicaid covers medical emergencies, dialysis treatments, cancer treatment, and medications to prevent organ transplant rejection.

**Data Sharing Between HCA and CMS**

10. Under federal law, and as a condition of receiving federal Medicaid funding, HCA routinely shares certain personal information and healthcare information regarding Apple Health enrollees with the federal government, including CMS.

11. For example, HCA sends a quarterly report of its Medicaid expenditures to CMS. The report is known as the "CMS-64" and includes aggregate financial information for all services for which HCA is seeking FFP.

12. In addition, HCA submits monthly reports to CMS through the Transformed Medicaid Statistical Information System (T-MSIS). These reports include demographic and eligibility information, such as name, address, date of birth, Medicaid ID, Social Security number (if provided), and eligibility status for Apple Health members who are eligible for or have received health care services paid wholly or in part using federal funds. This includes Apple Health members enrolled in a state-contracted managed care plan as well as those receiving care without being enrolled in a managed care plan (i.e., fee for service members).

13. In Washington, managed care plans also provide coverage to people enrolled in a program called Apple Health Expansion (AHE), which is for individuals who do not qualify for Medicaid because of their immigration status. Because the predicted costs of emergency services received by recipients in AHE are pre-paid and eligible for FFP, HCA's past transfers of data to T-MSIS included information on people enrolled in AHE. HCA's most recent transfer of data to T-MSIS occurred on or about May 29, 2025.

14. HCA also routinely provides CMS and the Office of the Inspector General (OIG), within the Department of Health and Human Services (HHS), with data in response to audits or reviews for federal oversight purposes. In addition to claims data from the T-MSIS system, HCA provides accounting and reporting information related to its federal expenditures. For example, on April 21, 2025, HCA provided the HHS OIG with data from HCA's accounting database, account descriptions and coding, and capitation rate reports and certifications from HCA's actuary. This information was provided for a review of Washington's process and methodologies for identifying and claiming Medicaid expenditures when there are similar state-only funded programs. Additional information including database queries and procedures, and chart of accounts and systems information, was provided on May 29, 2025, and July 2, 2025.

15. HCA relies on CMS to protect the confidentiality and security of protected health information of Apple Health clients and to follow federal laws and regulations regarding redisclosure of such information. This would include HCA's understanding that HHS prohibits disclosure except as required for the purposes of administering the Medicaid program.

16. Based on these understandings, HCA shares information and data with CMS for purposes of receiving FFP. HCA does so in compliance with the Health Insurance Portability and Accountability Act (HIPAA), the implementing regulations for HIPAA, and privacy regulations such as 42 C.F.R. Part 2, as a part of maintenance and operations of the State's Medicaid program. HCA takes these data stewardship responsibilities seriously and works to ensure that only the minimum necessary information is shared.

17. When an individual applies for Medicaid, they sign a form that allows HCA to use their confidential protected information for the sole purpose of administering the program. A true and correct copy of the paper version of this form is attached as **Exhibit A**. Substantially

similar forms are available via online application options. When the AHE program was developed, HCA met with community representatives to inform the design for the new benefit. Confidentiality in administering this program is a priority to HCA as well as to the community.

18.  Because the Medicaid program includes eligibility for emergency-only services for individuals who do not meet Medicaid's citizenship requirements, HCA designed the AHE program to include an AEM benefit, which is eligible for FFP. Designing the program in this way allowed HCA to use the existing AEM program, draw the appropriate federal match, and provide a comprehensive health care program to individuals who are not eligible for full-scope Medicaid coverage due to citizenship status. Community members supported this design because it included a known Medicaid benefit (AEM) and a more expansive set services that were not previously available to non-citizen adults.

19.  On April 7, 2025, HCA received an email from the Financial Management Group at CMS, describing their intention to perform an audit. A true and correct copy of this email and its attachments are attached as **Exhibit B**. The focus of the audit was to ensure FFP was not being inappropriately claimed for people with an Undocumented Immigration Status (UIS). In addition to a routine submission of the quarterly CMS-64, the email requested responses to twenty-four additional questions. The CMS-64 is the state's quarterly request for FFP. The data is submitted in aggregate format; individual client information is not part of the CMS-64. One of the additional questions requested client-level information, including a Medicaid ID number for all people in the file with an UIS.

20.  Given the amount of information requested and the abbreviated deadline (April 30, 2025) that CMS gave, HCA began providing information to CMS on a rolling basis as it was completed. The first submission to CMS occurred on May 18, 2025. CMS then requested

weekly meetings to review the responses and ask for additional information. The first meeting was on May 29, 2025. Weekly meetings have continued, the most recent one held on July 3, 2025.

21. In response to the April 7 inquiry, HCA shared the following information with CMS:

**May 18, 2025**:

- Medicaid Integrated Managed Care contract
- Most recently approved Washington State Health Care Authority (HCA) Public Assistance Cost Allocation Plan (PACAP) and approval letter
- HCA's cooperative agreements with the Washington State Office of Financial Management, Washington State Department of Social and Health Services (DSHS), and the Washington State Department of Children, Youth, and Families
- Automated Client Eligibility System (ACES) program codes with descriptions and fund source information
- AEM eligibility and financial process flow
- Apple Health modified adjusted gross income (MAGI) benefit eligibility approval process flow
- Eligibility, claims, premium payments, and other financial data related to 2025 federal quarter 2 CMS-64 submission (payments made during that quarter)
  - Detailed eligibility data for clients for whom AEM federal match was claimed
  - Fee-for-service medical and pharmacy claims paid for clients for whom AEM federal match was claimed
  - Managed care premiums paid for clients for whom AEM federal match was claimed

- Financial data broken out by account coding in support of the administrative portion of the CMS-64

**June 4, 2025**:

- A report prepared by Milliman, Inc., entitled "Medicaid Apple Health Expansion Emergency Managed Care for Non-Citizens Adults: July 2024-December 2025" (April 1, 2024)
- AHE managed care rates and rate development details.

**June 18, 2025**:

- Updated eligibility data, for clients for whom AEM federal match was claimed in 2025 federal quarter 2 CMS-64, identifying AEM vs. AHE eligibility segments.
- Supplemental Payment Program
- Cost allocation methodology
- Comparison of HCA's AHE and Title 19 administrative budgets
- Most recently approved DSHS PACAP
- HCA's cooperative agreement with the Washington Health Benefit Exchange

**July 2, 2025**:

- Transaction count data used in the development of HCA's Base 503 allocation for 2025 federal quarter 2
- Apple Health AEM process and workflow
- Updated medical and pharmacy claims data, for clients for whom AEM federal match was claimed in 2025 federal quarter 2 CMS-64, to include AEM authorization categories
- "Emergency Related Services Only" (ERSO) authorization segments for clients for whom AEM federal match was claimed in 2025 federal quarter 2 CMS-64

22.     I attended a national conference in early June 2025. After returning from the conference on June 13, 2025, I discovered an email from an Associated Press (AP) reporter sent on June 11, 2025, requesting information related to an article about the apparent transfer of data from CMS to the Department of Homeland Security (DHS).

23.     On June 13, 2025, an article from the AP reported that CMS had shared confidential Medicaid data with DHS, including personally identifiable information (PII) of Washington's Medicaid beneficiaries. The article stated that two top advisers to HHS Secretary Robert F. Kennedy Jr. ordered CMS staff to provide this data to DHS over the objections of those staff members.

24.     On June 24, 2025, I sent a letter and email to CMS, asking for clarification about the apparent transfer of data from CMS to DHS. As of today's date, I have not received a response. A true and correct copy of the letter is attached as **Exhibit C**.

**Harm from Disclosure of Medicaid Data to DHS**

25.     I am concerned that the apparent and unauthorized disclosure of confidential data by CMS to DHS has already harmed the State of Washington and, unless DHS publicly agrees to refrain from using this personal data for immigration or other law enforcement purposes, will continue to negatively impact the state. Related to current harms, in June 2025, 620 people voluntarily disenrolled from the AHE program. This number is almost five times higher than the average number of disenrollments seen in the first five months of 2025. These are people who had been enrolled for the previous twelve months. There have been no changes to eligibility for the program or changes in benefits that might have prompted this change. While it cannot be said with certainty that the AP story was directly responsible for the disenrollments, the timing is suggestive.

26. CMS's apparent disclosure will likely result in a significant chilling effect for immigrants and their family members, discouraging them from seeking medically necessary healthcare. Since the publishing of the Associated Press article, HCA has been meeting regularly with representatives from organizations that include legal and community advocates and community-based organizations who serve Washington's immigrant communities to discuss the impacts of this unauthorized disclosure. These organizations have confirmed that that Apple Health clients in their communities have questioned whether it is safe to seek medical care or continue to be enrolled in HCA's programs. In partnership with these organizations, HCA has developed talking points and resources for health care providers and clients informing them of their rights and legal resources within their communities. Additionally, HCA has developed a postcard that will be sent to all Apple Health enrollees, regardless of immigration status, to inform them of the apparent and unauthorized disclosure of information, provide them with the newest version of HCA's Notice of Privacy Practices, and ensure that they understand their rights should they be approached by an immigration enforcement officer.

27. This chilling effect will likely result in individuals forgoing benefits for which they are eligible or seeking to disenroll themselves and their families from AHE. Some people will likely also avoid critical preventative care and necessary medical treatment, and in some cases may even avoid emergency medical services, possibly resulting in death or serious injury. This will ultimately unwind years of investment in expanding health coverage and access.

28. The chilling effect from this apparent disclosure will also likely increase the risk of adverse health impacts for people in Washington. Deferring or delaying care can result in late-stage disease detection. In the case of infectious diseases, late detection puts other members of the community at risk of exposure and transmission. If people are afraid to seek care, increases in

unintended pregnancies, overdoses and related deaths, and increased morbidity and mortality for late-stage disease can be expected. In addition, if parents are afraid to leave their homes, children may not receive recommended health screenings or vaccinations. Missed screening could lead to delayed or missed treatments that could prevent or lessen future health impacts. Missed immunizations increase children's risk of contracting infectious diseases, at times fatal, and puts those around them at risk of exposure. Delayed or deferred care for pregnancy could lead to increased rates of premature births, low birth weight infants, missed detection of severe congenital defects and missed diagnosis of conditions in pregnancy that can result in maternal death if untreated, for example eclampsia.

29. These adverse health impacts are likely to further strain Washington's resources and budget. To the extent their treatment is left uncompensated, costs will ultimately be shifted to the broader healthcare delivery system and the state.

30. These poor health outcomes will also harm the overall health of all residents, by both straining Washington's healthcare delivery system as well as increasing the potential risks of the spread of infection and illness.

31. Hospitals must treat patients regardless of their ability to pay. If people don't apply for AEM benefits for fear their information will be shared for immigration purposes, hospitals will be forced to cover the costs of emergency medical services for eligible individuals who cannot afford to pay for services but who refuse to enroll in the emergency Medicaid program.

32. Overall, CMS's apparent disclosure undermines the Medicaid program by decreasing the trust of Apple Health clients and other stakeholders in the integrity of our program and the ability to keep their personal health information protected.

33. If CMS shared confidential Medicaid data with DHS for the purposes of immigration enforcement, such a disclosure would represent an unprecedented and grave betrayal of public trust. If true, this disclosure has likely already caused significant harm to Washington's ability to operate its healthcare programs and will cause further irreparable harm if not mitigated and repaired.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED and SIGNED this 8th day of July 2025, at Olympia, Washington.

*[signature]*
CHARISSA FOTINOS, MD, MSc
Washington State Medicaid and Behavioral Health Medical Director