ROB BONTA
Attorney General of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
WILLIAM BELLAMY
MARIA F. BUXTON
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU
ANNA RICH (State Bar No. 230195)
Deputy Attorneys General
  1515 Clay Street Suite 2000, P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-0296
  E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR.,** in his official capacity as Secretary of the U.S. Department of Health and Human Services; **U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM,** in her official capacity as Secretary of Homeland Security,<br><br>Defendants. | 3:25-cv-05536-VC<br><br>**DECLARATION OF LEE CHE P. LEONG IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        August 28, 2025<br>Time:       10:00 a.m.<br>Courtroom: Courtroom 4<br>Judge:      Hon. Vince Chhabria<br>Trial Date:  Not set<br>Action Filed: July 1, 2025 |

## DECLARATION OF LEE CHE P. LEONG

I, Lee Che P. Leong, declare:

1. I am over the age of 18, competent to testify as to the matters herein and make this declaration based on my personal knowledge.

2. I am the Senior Policy Advocate for Northwest Health Law Advocates (NoHLA).

3. NoHLA is a nonprofit legal organization founded more than twenty-five years ago to promote access to comprehensive, affordable health care for Washington state residents. NoHLA has long devoted special attention to the needs of low-income health care consumers and other vulnerable individuals.

4. NoHLA has been actively involved in expanding health care to all Washingtonians throughout its history, including state-funded coverage programs for immigrants who live and work in our Washington communities but are ineligible for full-scope federal coverage programs. In the early 2000s, NoHLA worked to support a state Basic Health Program for low-income individuals, regardless of immigration status. From 2005-2007, NoHLA and coalition partners passed "Cover All Kids" legislation to expand state health coverage in Washington State to all low-income children, regardless of immigration status. In 2011, NoHLA defended immigrant access to state Basic Health through litigation. In 2019 and 2021 respectively, NoHLA helped expand state family planning coverage and pregnancy-related coverage for low-income individuals, regardless of immigration status. In 2023, NoHLA and coalition partners expanded coverage to immigrants who previously lacked coverage options via a new state Apple Health Expansion program and Section 1332 waiver program. In each wave of state health reform, NoHLA collaborated with state government and impacted communities to ensure that programs were designed to respect applicant and enrollee privacy, in accordance with

existing state and federal law. Because of these and other successful coverage initiatives, Washington has dramatically lowered its uninsurance rate, from 13.2% in 2008 to 6.3% in 2023, per KFF.

5. I have worked as an advocate with marginalized communities for more than twenty years. As Senior Policy Advocate for Northwest Health Law Advocates, I have facilitated subcommittees and workgroups of stakeholders advocating for health equity for immigrants composed of community based organizations (CBOs), advocates, providers, insurance navigators, and individuals with lived experience, since 2021. Immigrant CBOs we work with primarily serve low-income immigrants, often with limited English proficiency, in King County, Whatcom County, Skagit County, Yakima County, Grant County, and Spokane County, Washington. We engage with Latine, Asian, Arabic, African and Pacific Islander immigrant communities.

6. Additionally, I have served on two state workgroups which meet regularly to ensure that immigrant communities have both information about programs and input into their design: the Health Care Authority's Temporary Community Engagement Advisory Committee for Immigrant Health since inception and on the Health Benefit Exchange's Health Equity Technical Advisory Committee since 2022. Through those workgroups and other public state fora, the state has repeatedly assured immigrants of privacy protections under existing state and federal privacy laws, drawing upon decades of well-established understanding between the state and federal government about the limited uses of sensitive applicant and enrollee data. We have subsequently communicated that information to our broader array of community stakeholders, who have used the information to inform their community members' application and enrollment decisions.

7. I understand from public news reports that the Centers for Medicare & Medicaid Services (CMS) provided individuals' protected health data obtained from states, including Washington, to other federal agencies, including the Department of Homeland Security (DHS), which oversees deportation. This is an unprecedented departure from decades of federal laws, regulations, and guidance that protected the information individuals provide to state agencies to apply for public benefits. National and state legal advocates have relied on those legal protections and CMS assurances, and have long emphasized that the use of applicant data is strictly limited to determining eligibility. These assurances have been reflected in state Medicaid agency materials as well as in NoHLA presentations on immigrant health options. This data handover will detrimentally impact the communities we serve, health care providers, and the state of Washington in a number of ways.

8. This data release will have a chilling effect on Washington residents, communities, and families seeking health coverage and care. We have learned through over two decades of collaborating with CBOs and health navigators that assurances of privacy have been critical to enrollment in health coverage, especially for immigrant communities. Anticipating new 2024 coverage, the Latino Community Fund (LCF) and NoHLA co-authored a landscape scan of Spanish-speaking immigrants in rural Washington, highlighting barriers to health care they experience, areas for additional outreach, and recommendations to fulfill Washington's promise to provide equity in health coverage. Luzmila Freese & Lee Che P. Leong, Landscape Scan of Barriers to Obtaining Health Coverage Among Latino Immigrants, https://drive.google.com/file/d/1o-ClNcv4bmrr7RboKCpsw6cv-WCm0wx5/view (LCF & NoHLA, Google Drive) (last visited July 3, 2025). From interviews with 130 Spanish speakers in autumn of 2022, we found:

- 66% considered privacy an important consideration in accessing health coverage.
- 47% considered data security an important consideration in accessing health coverage.

9. This is especially relevant as over 80% of May 2025 Apple Health Expansion enrollees identify as Hispanic. These sentiments were echoed by the Community Health Network of Washington's 2023 landscape scan, which reported that Community Health Centers referenced both "distrust of government" and "fear of deportation" as "barriers to enrolling undocumented patients in available coverage."

10. I believe the CMS decision to transfer data to DHS will cause immigrant families fearful of the federal administration's increasingly aggressive deportation activities to withdraw from or not apply for health coverage programs for which they are eligible, further subjecting vulnerable families and individuals to both economic hardship and increased risk of adverse health consequences. Based on observations of the impact of past public charge proposals and changes, we have seen that the chilling effect of policy propositions at the intersection of immigration law and public benefits can be widespread, lasting, and extend beyond people who are directly impacted by changes to policy to include mixed-status households (that is, a household containing individuals of different immigration statuses) and others. I fully expect the fear caused by the CMS transfer of data to DHS will not be limited only to Washingtonians without federal immigration status, as many immigrants with legal status have been removed from communities and detained by ICE. Since news broke, community members and CBOs have already raised questions about how to disenroll from coverage.

11. Undocumented Washingtonians without health coverage struggle to afford care. LCF and NoHLA's landscape scan found that over 90% of undocumented respondents did not

have health coverage and 66% of undocumented respondents reported not getting care when they needed it. Of those who could not access care, 79% cited cost as a barrier.

12.     However, even without coverage, individuals seek emergency care which is more costly for families, hospitals, and our state: 37.5% of undocumented participants in LCF and NoHLA's landscape scan sought emergency care in the prior year, when programs were not yet available. 29.7% sought care in an emergency room in the prior year. Washington has robust charity care laws that require hospitals to provide this care; people with income up to 200% of the federal poverty level qualify for free care at all hospitals and up to 300% for most hospital beds, regardless of immigration status. Wash. Rev. Code § 70.170.060.

13.     Delaying care until conditions are acute requires more extensive intervention at higher physical, emotional, and financial cost—all of which increase the risk of adverse health consequences. Extensive academic literature has found hospital care tends to be significantly more expensive than medical care sought earlier or preventative care. Given Washington's charity care law, these financial costs will both expand and shift to hospitals and the state. This burden will disproportionately affect rural communities where there are already fewer providers and increase the strain on those providers who already struggle to meet needs as demand for their services grows.

14.     The impact of this data breach on disenrollment from health coverage programs will increase poverty, reduce access to preventative healthcare, and further marginalize vulnerable communities.

15.     I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

Signed this 8th day of July 2025 at _____Bellingham__, Washington.

*Lee Che P. Leong*
LEE CHE P. LEONG