ROB BONTA
Attorney General of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
WILLIAM BELLAMY
MARIA F. BUXTON
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU
ANNA RICH (State Bar No. 230195)
Deputy Attorneys General
  1515 Clay Street Suite 2000, P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-0296
  E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR.,** in his official capacity as Secretary of the U.S. Department of Health and Human Services; **U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM,** in her official capacity as Secretary of Homeland Security,<br><br>Defendants. | 3:25-cv-05536-VC<br><br>**DECLARATION OF JAMES MANGIA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:          August 28, 2025<br>Time:         10:00 a.m.<br>Courtroom:  Courtroom 4<br>Judge:        Hon. Vince Chhabria<br>Trial Date:   Not set<br>Action Filed: July 1, 2025 |

**DECLARATION OF JAMES MANGIA**

I, James Mangia, declare as follows:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional Background**

2. I am currently employed by St. John's Community Health (St. John's) as the President and Chief Executive Officer (CEO). I have held the President and CEO position since 1993 when we were a single-site clinic serving 1,200 patients per year to one of Los Angeles County's largest nonprofit healthcare providers serving over 109,000 patients per year. As President and CEO, I am responsible for the overall management and administration of St. John's. In this role, I assure that all programs and services are effective, efficient and accessible to underserved patients. I also lead strategic planning efforts, budget development, and financial management. In addition, I maintain compliance with federal, state and local regulations. I work closely with our Board of Directors, engage in community partnership development, support fundraising efforts, and ensure St. John's mission and performance goals are achieved.

**Organizational Background**

3. St. John's is a Federally Qualified Health Center (FQHC) with a 330(e) designation to serve the general underserved community, a 330(h) designation to serve individuals experiencing homelessness, and a 330(i) designation to serve residents of public housing. As a comprehensive, community-based health center, St. John's provides a full range of primary care, dental, behavioral health (mental health and substance use counseling and treatment), and enabling/supportive services across our network of 23 brick-and-mortar health

centers (including school-based health centers) and 5 mobile clinics. Enabling services include case management, benefits counseling and enrollment assistance, housing navigation, legal aid, health education, and transportation support – offered to reduce barriers to care and address patients' broader social needs.

4. Preventive care is central to St. John's model. Our services include immunizations, cancer screenings, diabetes and hypertension management, infectious disease testing and treatment (including HIV, hepatitis C, and tuberculosis), and routine well-child and well-woman exams.

5. St. John's actively works to prevent the spread of communicable diseases through vaccination campaigns, street-based outreach, health education, and collaboration with local public health departments. For example, St. John's played a critical role in California's COVID-19 response, particularly in hard-hit communities of color. As a trusted provider, St. John's quickly mobilized its workforce, infrastructure, and mobile health clinics to expand access to COVID-19 testing, education, and vaccination in underserved neighborhoods. As another example, St. John's Street Medicine teams deliver vaccines and provide testing and medical treatment directly in encampments and other non-traditional settings, ensuring high-risk populations are reached with timely interventions that reduce disease transmission and improve community health.

6. We specialize in delivering trauma-informed, culturally competent care to populations that face significant barriers to accessing traditional health services, including people experiencing homelessness, low-income families, public housing residents, LGBTQ+ individuals, immigrants, farmworkers, and justice-involved individuals. St. John's also offers an

array of specialized programs tailored to meet the unique needs of these populations, such as Street Medicine, Transgender Health, Reentry Support, Mobile Health, and Harm Reduction.

7. With a strong focus on health equity, prevention, and addressing social determinants of health, St. John's integrates medical and social supports to promote long-term health and wellness. Through strategic partnerships and a deep commitment to community engagement, St. John's continues to deliver high-quality, accessible care to some of California's most vulnerable populations.

8. St. John's operates in some of the most underserved communities in California, with service areas spanning South, Central, and East Los Angeles as well as the Inland Empire, including the cities of San Bernardino, Indio, and San Jacinto. These communities are characterized by high levels of poverty, housing insecurity, unemployment, and limited access to healthcare. Many residents face multiple barriers to care, including language, immigration status, lack of insurance, and transportation challenges.

9. Our patient population is overwhelmingly low-income, with 82.6% of patients living at or below 100% of the federal poverty level (FPL) and 96.7% living at or below 200% FPL. The vast majority identify as people of color—primarily Latinx/Hispanic (81.7%), followed by Black/African American, White, Asian/Pacific Islander, and Native American populations. A significant portion of our patients are immigrants, including undocumented individuals and mixed-status families. Many of the communities we serve also have high concentrations of monolingual Spanish speakers, with growing representation of indigenous-language speakers.

10. St. John's serves nearly 110,000 patients annually: approximately 53.9% of our patients are immigrants, with an estimated 49.1% being undocumented. Recognizing the unique barriers these populations face – including fear of law enforcement or immigration enforcement,

lack of insurance, limited English proficiency, and complex social needs – St. John's has developed specific programs to address these challenges. These include our Healthcare Without Fear program that includes home medical visits, pharmacy deliveries, and a one-time food delivery; telehealth services; mobile clinics that dock in immigrant neighborhoods; a Legal Services Program, which provides legal assistance and referrals for immigrants; an Unaccompanied Immigrant Minor program, providing advocacy services to those who are victims of crime; a network of bilingual and bicultural staff trained in trauma-informed, culturally competent care; and strong partnerships with trusted immigrant-serving organizations to facilitate outreach and care coordination. All of St. John's specialized programs serve immigrants, including those who are undocumented, including our PRIME Program (HIV, viral hepatitis, and sexually transmitted disease services); reentry services; Transgender Health Program; Homeless Services Program; Street Medicine Program; and Harm Reduction Program. Additionally, St. John's has developed internal protocols to protect patient confidentiality and ensure a safe clinical environment regardless of immigration status.

11.     St. John's provides high-quality, culturally responsive care that is integrated with trusted relationships in the community, proactive outreach, and trauma-informed support to meet the unique needs of immigrants, including undocumented immigrants. This approach includes cultural humility, patient-centered care, and a focus on health equity. Over 50% of St. John's patients are immigrants and 49% are undocumented. To meet patients' needs, St. John's has also assembled a workforce that reflects the diversity of the communities we serve. All St. John's staff have received training in cultural humility and trauma-informed care.

12.     St. John's recognizes that fear of deportation and immigration enforcement may keep people from seeking care. To that end, St. John's has strong internal protocols in place to

ensure patient safety and confidentiality. This includes a strict non-disclosure of immigration status and policies and protocols to ensure that St. John's will respond lawfully and appropriately to any immigration enforcement activity at our health centers – while also protecting patient privacy and minimizing disruptions to patient care. Patients receive know-your-rights education and legal services to address immigration-related needs.     St. John's outreach is grounded in longstanding relationships with immigrant-led and immigrant-serving organizations. Our community health workers conduct culturally tailored outreach in schools, housing developments, churches, and markets – reaching patients where they are. We also work with trusted partners to engage hard-to-reach populations, build trust, and connect people to care.

13. Our enabling services include certified enrollment counselors who help uninsured immigrants – regardless of status – access available public benefits, including Medi-Cal, discounted prescriptions, and other support. St. John's does not turn anyone away due to ability to pay or immigration status. All programs and services are available to people regardless of their immigration status.

14.

15. Trust is the foundation of St. John's ability to deliver effective healthcare – especially for immigrant communities. Many of our patients, particularly those who are undocumented or from mixed-status families, face deep-seated fears and systemic barriers that prevent them from seeking medical care. These include concerns about immigration enforcement, mistrust of institutions, language and cultural barriers, and prior experiences of discrimination. St. John's has earned the trust of immigrant communities by being culturally responsive and committed to serve all patients regardless of immigration status or ability to pay. Our staff reflect the communities we serve, often speaking the same languages and sharing

similar lived experiences. This creates a welcoming, respectful environment where patients feel safe disclosing sensitive information and seeking care for themselves and their families. We further build trust by meeting people where they are. Our outreach teams go into neighborhoods to engage individuals who may otherwise be disconnected from the healthcare system. We emphasize trauma-informed care, uphold strict patient confidentiality policies, and educate patients about their rights. For immigrant communities, trust in St. John's means knowing that their health needs will be addressed without fear, stigma, or judgment. When trust exists, patients are more likely to seek care early, follow treatment plans, and return for ongoing support, ultimately leading to better health outcomes.

16.     Trust becomes even more important when providing care to immigrants who have other marginalized identities (transgender, people with substance use disorders, people living with HIV, etc.). Members of these communities often experience overlapping stigmas and discrimination and know that showing up for care can be a vulnerable act. Many have histories of trauma and being misgendered, denied care, or had their immigration or health status used against them. St. John's is intentional about building trust through culturally responsive, trauma informed and harm reduction-centered care. Our providers all receive training in cultural humility and LGBTQ+ affirming care, and we have staff who are peer navigators and case managers with lived experience. We maintain confidentiality and respect patients' identities and choices. By fostering a trusted space, St. John's helps immigrants who have other marginalized identities access care without fear and disclose the information they need to get treated and receive the wrap-around support they need.

17.     Misinformation regarding receiving care can be especially dangerous and may spread quickly through immigrant communities.  Rumors can keep people from seeking care

until they are in crisis. At St. John's, we have seen this fear increase during periods of immigration enforcement sweeps or public health crises. We have seen entire families avoid essential preventive care, such as vaccinations or prenatal care visits, or forgoing treatment or management of chronic conditions like diabetes and hypertension. This is due to the belief that by coming in for any services, they or their loved ones could be put in danger. Often, this results in patients delaying care until their conditions are in more advanced stages. This results in patients coming into St. John's health centers with more severe illness, unmanaged mental health conditions, or in some cases, completely preventable complications from untreated STIs. Patients may also be afraid to communicate with their providers to obtain an accurate diagnosis or treatment plan.

18.     St. John's has experienced the chilling effects on access to health care that result from fear of immigration enforcement and from immigration policies such as the Public Charge Rule. The proposed rule led to confusion and fear within immigrant communities, and even before it was finalized, we had patients who discontinued enrollment in public benefit programs out of concern that receiving such benefits could affect their immigration status or ability to adjust status in the future. Many of these patients also became very concerned about seeking health care. We experienced a decrease in clinic visits from immigrant families during this period, particularly preventive care visits. Despite being reassured by St. John's and community advocates that receiving care at a Federally Qualified Health Center would not affect immigration status, patients continued to be misinformed and fearful. These experiences have demonstrated to us the depth of the mistrust that harmful immigration rhetoric and policies can have on entire communities and the long-term impact that these have on the health and well-being of families and individuals.

**Medicaid Data Sharing & Impact**

19. On June 14, 2025, I became aware of reporting by the Associated Press that the United States Department of Health and Human Services shared confidential California Medicaid enrollee data with the Department of Homeland Security (DHS), including names, addresses, and other identifiable information, as well as medical claims data. While I am not aware of the ultimate purpose for this data transfer, I am shocked that the Department of Homeland Security would have access to Medicaid data. I am deeply concerned the federal government will use this data to locate and deport our patients.

20. St. John's has heard significant concerns from our patients about the disclosure. Many are immigrants, undocumented, or live in mixed-status families. These patients are concerned and afraid that their private data may be used to target them for immigration enforcement actions even if they have not done anything wrong. Patients have lost trust in the healthcare system and have expressed worry about seeking care, picking up medications, or even answering calls from their providers. Patients have also shared with us that they feel the system has been unclear and non-transparent about why and how this data was shared.

21. St. John's has seen a significant increase in no-shows and patient cancellations after the news of the Medicaid data disclosure. This includes patients who were previously engaged in their care, such as those in ongoing management of chronic conditions or receiving behavioral health services. Some patients have even discontinued their services with us entirely. Patients have shared that they are canceling appointments or are too afraid to update their personal information due to fears of being tracked or identified by immigration authorities. We have also seen patients that are not completing benefit renewal packets. This is not only disrupting our patients' continuity of care, but it also presents a public health concern

for those with serious medical and behavioral health conditions who need to be able to rely on regular care access.

22. Based on my experience overseeing a large network of community health centers serving nearly 110,000 patients each year – many of whom are immigrants, undocumented individuals, and other historically marginalized populations – I believe that this action has already and will continue to create a chilling effect. I am concerned that lawfully present individuals (including U.S. citizens in mixed-status families) will disenroll from Medicaid or, if eligible for full benefits, not enroll in Medicaid at all. Finally, patients may forego or delay necessary medical care (including emergency care) out of fear that use of health care services will trigger negative immigration consequences. In each of these scenarios, patients may make detrimental choices for themselves and their families, out of fear or misinformation, which will ultimately lead to negative health outcomes, increase disparities and undermine public health efforts.

23. Deferring or avoiding medical care due to fear can have a number of devastating consequences to both individual and population health. The impact of deferred care in our patient population has included rising rates of presentation at later stages of disease when disease is much more difficult and expensive to treat — including cancer, diabetes, hypertension, and HIV/AIDS, as well as unintended pregnancies and maternal morbidity and mortality in reproductive health. For pregnant patients, loss of access to prenatal care increases the risk of premature birth, low birth weight infants, congenital defects, and other negative outcomes that could have been prevented with proper care. In the population of patients with substance use disorders, deferred care can mean higher risk of overdose, relapse, and death. When patients avoid or delay preventive care — like vaccines, cancer screenings, and STI testing — we also

lose our ability to identify and contain communicable disease. We know, on the other hand, that when individual patients, families, and entire communities have trust in their providers, they are far more likely to seek care, to follow through on recommended treatments, and to participate in public health interventions like vaccination and contact tracing. Trust is critical to both individual and population health — and when it is eroded by fear of immigration enforcement or data-sharing, the impact is felt throughout the community.

24. The chilling effects of the release of sensitive Medicaid information to DHS has been acutely felt by special and vulnerable populations who face systemic and other barriers to care, such as children, seniors, and people with disabilities. At St. John's, we have seen fear and confusion about the DHS/Medi-Cal disclosure raised among these populations and their families, especially those who are immigrants or who live in mixed-status households, leading to missed appointments and delays in care.

25. Children are one of the most impacted populations. Parents who fear that their information will be turned over to immigration enforcement may be afraid to enroll their children in Medi-Cal, even if they are U.S. citizens who are fully eligible for benefits. Infants and children have been particularly at risk for not getting immunizations, not having access to well-child visits, or not having their chronic conditions managed – all vital for a child's health and development.

26. Seniors and people with disabilities, who rely on Medicaid-funded services, may avoid the program fearing repercussions from disclosing their data. They risk losing critical services such as prescription medications, home care services, durable medical equipment, and chronic disease management which can quickly aggravate their condition and drive emergency room visits.

27. At St. John's, we have historically advised our patients that it is safe to use our services. We use multilingual messaging that assures people we will protect their personal information, including Know Your Rights materials. We hold community forums to address community concerns. We train our front desk staff and benefits enrollment teams on how to overcome immigration enforcement related fears and objections. We do this to reassure our patients that they, and their family members, are safe to seek treatment and enroll in health coverage, even if they are undocumented or live in a mixed-status household.

28. However, now I can no longer truthfully reassure our patients that they can use our services without fear. My staff must now inform patients afraid of applying for Medi-Cal or seeking treatment because they do not want to provide their addresses that we don't know whether that can lead to immigration enforcement against them or their families. We don't know what information the federal government will use or how it will use it. We can no longer confidently reassure our patients they can safely access care and enroll in coverage or that we can protect their personal information. We are now shifting our messaging from one that conveys safety to one that acknowledges that there is a risk we cannot quantify or fully understand. We will continue to encourage patients to seek care and to not delay treatment from fear, but now both patients and providers are in an untenable situation. Ultimately, unless we receive reassurance that Medicaid data will be kept confidential and not used for immigration enforcement, our patients will have to weigh the benefits of whether to apply for Medi-Cal and seek necessary medical care against the risk that their data will be used to locate and deport them.

29. Even if DHS does not ultimately use this information to deport our patients, I believe the public's awareness of the data transfer has and will continue to instill fear in our

patient communities, resulting in our patients avoiding seeking necessary medical care. If the Department of Homeland Security committed publicly to refrain from using patient health data to deport immigrants, this would help ameliorate my patients' fears and anxiety, and give us a more assured foundation to advocate that accessing care is safe.

30. Moreover, as a FQHC, St. John's operates with thin margins – the majority of our patients are uninsured, underinsured, or publicly insured through the Medicaid program. Ensuring that we have enough funding is an ongoing struggle because the cost of providing high-quality, comprehensive care—including medical, dental, behavioral health, and enabling services—is much greater than the limited reimbursements we receive. Any cuts to Medicaid funding would have a crippling effect on our operations. It would compromise our ability to hire and retain staff, maintain clinic infrastructure, and continue critical programs for the most vulnerable. We may have to cut back on our services, shorten our hours, lay off staff, or close health center sites depending on the severity of the cuts. For our patients who rely on St. John's as their single point of care, this could mean losing access to care entirely. Stable Medicaid funding is the foundation of our ability to serve our mission. Periods of funding uncertainty, or reduced funding puts an incredible strain on our financial viability, and the health and lives of the patients and communities we serve.

I declare under the penalty of perjury under the laws of the United States the foregoing is true and correct and that this declaration was excited on July 8, 2025, in Los Angeles, California.

James Mangia