ROB BONTA
Attorney General of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
WILLIAM BELLAMY
MARIA F. BUXTON
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU
ANNA RICH (State Bar No. 230195)
Deputy Attorneys General
  1515 Clay Street Suite 2000, P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-0296
  E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON,** <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR.,** in his official capacity as Secretary of the U.S. Department of Health and Human Services; **U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM,** in her official capacity as Secretary of Homeland Security, <br><br> Defendants. | 3:25-cv-05536-VC <br><br> **DECLARATION OF MITESH POPAT, M.D., MPH IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: August 28, 2025 <br> Time: 10:00 a.m. <br> Courtroom: Courtroom 4 <br> Judge: Hon. Vince Chhabria <br> Trial Date: Not set <br> Action Filed: July 1, 2025 |

## DECLARATION OF MITESH POPAT, M.D., MPH

I, Mitesh Popat, declare as follows:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional Background**

2. I am currently employed by Venice Family Clinic as chief executive officer (CEO). I have held the CEO position since December 2022. As CEO I am responsible for overall leadership, strategic direction, and operational oversight of the organization. As a board-certified family physician, I also continue to care for patients one half day per week.

**Organizational Background**

3. Venice Family Clinic is a Federally Qualified Health Center that serves an area in Los Angeles County that spans from the Santa Monica Mountains through the South Bay. It has a network of 21 clinic locations and Early Head Start centers in Venice, Santa Monica, Mar Vista, Inglewood, Culver City, Redondo Beach, Carson, Gardena and Hawthorne, plus 3 mobile clinics and an expansive street medicine program to provide care to people experiencing homelessness. The Clinic's comprehensive care also includes mental health services, dental care, vision services, substance use treatment, prescription medications, domestic violence counseling, HIV services, healthy food distributions, health education, health insurance enrollment, child development services and more.

4. Venice Family Clinic provides comprehensive, high-quality health care to more than 45,000 people in need each year. 87% of our patients live at or below the federal poverty level. We serve a diverse patient population, comprised of 56% Latino/Hispanic, 21% White,

11% Black/African American, and 4% Asian. 38% of our patients are best served in a language other than English.

5. Venice Family Clinic is committed to providing compassionate, high-quality health care to all people. We do not consider a person's race, immigration status, gender identity, sexual orientation, housing status or ability to pay. We also do not collect immigration status information from those who seek care at our clinic. However, we estimate that we serve approximately 22% of people who have unsatisfactory immigration status (UIS). All programming is open to every community member regardless of immigration status and we have an immigration case manager to assist those in need of navigating the complexities of immigration.

6. Venice Family Clinic is committed to providing compassionate care in a safe and dignified environment. The Clinic has launched a series of communication campaigns to confirm our commitment to all patients and their legal rights. To address our patients' recent fears around immigration, the Clinic has made telehealth appointments and prescription deliveries available to those who fear seeking in-person medical care. Our Health Insurance Enrollment team remains available to help people enroll in benefits and answer questions to their best ability about the recent data breach. Our immigration case manager continues to assist patients with accessing legal services and provides them with the most up-to-date information regarding benefits and policy changes.

7. It is impossible to overstate the role that trust plays in making sure patients get the care they need to live healthy lives. When people trust their health care providers and systems, they're more likely to seek care when they need it, follow medical advice and continue treatment for both acute and chronic illnesses. Trust also helps patients feel respected and safe, especially

in communities that have historically experienced discrimination or neglect. When trust is strong, it improves the chances of better outcomes for patients; without it, health outcomes decline and our entire community suffers.

8. Misinformation and fear about the risks of seeking medical care, particularly fears related to data sharing and immigration consequences, have already spread quickly in our communities and will continue to have a profound impact on patients' willingness to trust and engage with the healthcare system. Even those individuals who are lawfully present and have satisfactory immigration status are affected by the uncertainty and lack of clarity around what their personal information is being used for.

We have seen significant fear and disengagement among patients with complex co-occurring conditions. Clinicians report that many of their patients are currently sheltering-in-place in their homes, face food insecurity, and have multiple urgent health needs amidst the rising chronic stress caused by current immigration enforcement threats. One patient in particular living with HIV and co-occurring cardiovascular diseases has cancelled his appointments entirely after the news of the data breach– including telephone and virtual visits. This patient, among others, has expressed fears that his calls are being monitored or recorded and that speaking openly with a medical provider could somehow be used against him, including as a justification for detainment or deportation. During this time, many patients have opted to receive telehealth visits. This is the first instance of a patient disengaging from even the telehealth model due to fear of immigration enforcement.

These kinds of fears, even when they are based on incomplete or misunderstood information, are creating immediate and lasting harm in the populations we serve. The emotional toll of navigating healthcare in a climate of fear destabilizes health and well-being, particularly

for families already facing systemic barriers. Distrust and fear caused by the lack of clarity surrounding data sharing has led patients to delay and avoid medical care altogether, even in the most critical circumstances.

9. Our staff has observed similar negative impacts on healthcare access as a result of fear of immigration enforcement in the past. Notably, with the passage of the Public Charge Rule, patients with unsatisfactory immigration status became wary of applying and using Medicaid due to fear of the repercussions that using publicly funded benefits might jeopardize their future immigration status or residency. The result of this was decreased usage of Venice Family Clinic services, both medical and case management, among our immigrant patients. This deferral and pause of care can be detrimental when patients do not receive the care they need. While staff note that the passage of the Public Charge Rule led to similar refusal of services, public news of the recent data share has led to even greater fear and deferral of treatment among patients.

In the wake of public reports of the data-sharing incident, we are seeing a similar effect that mirrors past fears around the Public Charge Rule with an even greater severity. For example, a single mother recently visited the clinic with her 14-year-old daughter to ask if Venice Family Clinic had shared her personal information with the federal government. After hearing about the data-sharing issue, she became deeply distrustful and stated that she no longer felt safe seeking any kind of support from the clinic for herself or her child, who is a U.S. citizen. She explicitly stated fear that accessing services could lead the government to view them as a burden and increase their risk of detention or deportation. Fear stemming from the Public Charge Rule has already impacted vulnerable patients' access to care, and the recent data breach has not only

intensified these fears but also deepened mistrust in healthcare institutions, causing some patients to withdraw from care entirely.

**Medicaid Data Sharing & Impact**

10. On June 13th, 2025, I became aware of reporting by the Associated Press that the United States Department of Health and Human Services shared confidential California Medicaid enrollee data with the Department of Homeland Security (DHS), including names, addresses, and other identifiable information, as well as medical claims data. While I am not aware of the ultimate purpose for this data transfer, I am shocked that the Department of Homeland Security would have access to Medicaid data. I am deeply concerned the federal government will use this data to locate and deport our patients. Disclosure of personal information puts at risk the human right that people have to receive needed health care services. It would seem intended to have a chilling effect, so people are afraid to come seek services, even if their health information is still private. There is no other good reason for such a disclosure to have occurred, and it is unconscionable.

11. Venice Family Clinic has a Health Insurance Enrollment Department that is dedicated to assisting patients with enrolling in and maintaining health insurance. The health insurance enrollers in this department work primarily with assisting patients in navigating Medi-Cal/Medicaid insurance enrollment. In recent weeks after the data sharing incident, this team has seen a 40-50% decrease in insurance enrollment appointments. The team typically assists over 30 patients in one Walk-In Enrollment session. These numbers have consistently dropped to seeing about 16-18 patients in one session. The consensus among case managers is that patients are

afraid to enroll in and be a part of a federal system that is collecting and sharing their personal information with the Department of Homeland Security.

One patient presented at the clinic with a Medicaid renewal packet, confused because their coverage had previously been auto-renewed. This patient expressed fear that the federal government was trying to collect more information about her immigration status and use of public services by asking her to manually renew services. This fear of engaging with Medicaid insurance impacts patients' ability to access medical care and keeps people from enrolling in programs that offer preventative and life-saving care.

12. Venice Family Clinic has seen a 25% increase in cancellations since the reported data breach.

13. Based on my experience of treating patients and knowledge of the communities Venice Family Clinic provides services to, I believe that this action has already and will continue to create a chilling effect. Based on my experience overseeing operations, treating patients, and managing strategic directions at Venice Family Clinic, as well as my knowledge of the communities we serve, I believe that this action has already and will continue to create a chilling effect. Patients and their families are afraid to enroll in and remain enrolled in health insurance programs they are legally eligible for, even when they are in urgent need of care.

In one case, a 45-year-old male with undocumented status who had previously been enrolled in Medi-Cal/Medicaid told his primary care provider that he would not re-enroll in Medi-Cal/Medicaid insurance after learning about the release of data to immigration authorities. He was afraid that staying in the program would put him at risk of deportation. The provider was unable to reassure him that re-enrolling would be safe, and as such, the patient chose to forgo

coverage. He opted to move to a sliding scale out-of-pocket payment plan that would create an additional financial burden for receiving healthcare.

This is not an isolated incident. This kind of fear leads patients to avoid enrolling themselves and family members, even when they are lawfully present or U.S. citizens and entitled to benefits, leading to a serious disruption in care. In the past, people applied for Medi-Cal/Medicaid and other publicly funded programs, disclosing personal information such as addresses and immigration statuses, under the assumption that this information would not be shared among federal departments. At this time, we cannot in good faith promise that patient information will not be shared with the Department of Homeland Security.

14. Deferring needed health care can result in cancers being diagnosed at a late stage; this leads to more human suffering and more complicated treatment courses later. People with chronic diseases may go without medications and behavioral modification approaches. As a result, they will unduly experience heart attacks, strokes, and kidney failure. The effects bring greater human suffering and health care expenditures. People not accessing prenatal services in a timely fashion have a greater likelihood of preterm and low-birthweight outcomes, which again is a very negative result. As a consequence, Venice Family Clinic has witnessed several instances of patients opting to defer their medical care. Recently, one patient with diabetes began experiencing severe abdominal pain during a weekend day when our clinic was closed. Out of fear of going to the Emergency Room, where she believed data on her immigration status might be shared with the Department of Homeland Security, she asked a friend to inspect her. Though her friend detected nothing medically wrong, the abdominal pain persisted. The client waited to seek emergency/urgent treatment until seeing her provider at Venice Family Clinic the following week. At our clinic, she was diagnosed and treated for an acute kidney infection. Her fear of data

sharing and potential involvement with Immigration and Customs Enforcement kept her from receiving proper care.

Current patient distrust in the federal government with the confidentiality of their personal information has resulted in deferral of seeking treatment. The continuation of this trend will lead to detrimental health outcomes and patients being at higher risk of needing emergency medical intervention for preventable conditions.

15. The recent data disclosure has had a profound and harmful impact on the health and well-being of vulnerable immigrant patients, creating a chilling effect that is disrupting care and worsening chronic conditions. One 54-year-old female patient with diabetes and hypertension that was typically well-controlled recently presented for a routine visit with elevated A1C and blood pressure levels. Despite having taken her medications as prescribed, she reported persistent stress related to her information being shared with Homeland Security and fears about immigration enforcement. She explained that she was avoiding going outside–including skipping work and exercise–and had not been eating well because of her constant anxiety. The patient was offered a behavioral health consultation to support her chronic disease management, but she declined, expressing hopelessness about managing this external stressor. While the provider discussed a few alternative lifestyle changes she could implement while she was sheltering at home, she reported that her heightened state of stress made these adjustments feel out of reach. Ultimately, the provider had to consider adjusting her medications—not because her underlying conditions had changed, but because of the sustained impact of stress on her health. Our clinicians report countless versions of the same story, particularly among the immigrant populations we serve. In an already vulnerable population, chronic stress has been

intensified as a result of the recent data breach, widening already present health disparities and undermining current medical efforts to keep our patients and communities healthy.

16. I have historically advised my patients that programs like Medicaid is safe. However, now I no longer feel confident in this information and advise them to speak to an immigration advocacy agency. Ultimately, unless we get some additional assurance that Medicaid data will be kept confidential and not used for immigration enforcement, our patients will now have to weigh the benefits of whether to apply for Medicaid and whether to seek necessary medical care against the risk that their data will be used to locate and deport them.

17. Even if DHS does not ultimately use this information to deport our patients, I believe the public's awareness of the data transfer has and will continue to instill fear in our patient communities, resulting in our patients avoiding seeking necessary medical care. If the Department of Homeland Security committed publicly to refrain from using patient health data to deport immigrants, this would help ameliorate my patients' fear and anxiety.

18. Moreover, we are projecting a very slim surplus of 1.2% for the fiscal year 2026. Medi-Cal/Medicaid reimbursement represents 51.5% of our total projected revenue. Given this slim operating budget, a 2% reduction in revenue would completely eliminate any surplus driving us into deficits. This would deplete any reserves and would require the elimination of programs and/or services in order to sustain ourselves financially.

I declare under the penalty of perjury under the laws of the United States the foregoing is true and correct and that this declaration was excited on July 10, 2025, in Los Angeles, California.

_____
Dr. Mitesh Popat, MD, MPH