Rob Bonta
Attorney General of California
Neli Palma
Senior Assistant Attorney General
Kathleen Boergers
Supervising Deputy Attorney General
William Bellamy
Maria F. Buxton
Katherine Milton
Kevin G. Reyes
Stephanie T. Yu
Anna Rich (State Bar No. 230195)
Deputy Attorneys General
  1515 Clay Street Suite 2000, P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-0296
  E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **State of California; State of Arizona; State of Colorado; State of Connecticut; State of Delaware; State of Hawaii; State of Illinois; State of Maine; State of Maryland; Commonwealth of Massachusetts; State of Michigan; State of Minnesota; State of Nevada; State of New Jersey; State of New Mexico; State of New York; State of Oregon; State of Rhode Island; State of Vermont; State of Washington,**<br><br>                              Plaintiffs,<br><br>      v.<br><br>**U.S. Department of Health and Human Services; Robert F. Kennedy, Jr.,** in his official capacity as Secretary of the U.S. Department of Health and Human Services; **U.S. Department of Homeland Security; Kristi Noem,** in her official capacity as Secretary of Homeland Security**,**<br><br>                              Defendants. | 3:25-cv-05536-VC<br><br>**DECLARATION OF EMMA SANDOE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:          August 28, 2025<br>Time:         10:00 a.m.<br>Courtroom:  Courtroom 4<br>Judge:        Hon. Vince Chhabria<br>Trial Date:   Not set<br>Action Filed: July 1, 2025 |

## DECLARATION OF EMMA SANDOE

I, Emma Sandoe, declare as follows:

1. I am a resident of the State of Oregon. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2. I am the Medicaid Director for the Oregon Health Authority (OHA). I have been serving in that role since July 2024. Prior to that I served as the Deputy Director of the Medicaid Policy for North Caolina Medicaid.

3. OHA is the single state agency responsible for administering Oregon's Medicaid program. OHA's mission is to "transform the health care system in Oregon by: Improving the lifelong health of people in Oregon; Increasing the quality, reliability, and availability of care for all people in Oregon; and lowering or containing the cost of care so it's affordable to everyone." OHA is also the largest purchaser of health coverage in Oregon.

4. OHA operates the Oregon Health Plan (OHP). OHP provides health care for certain low-income and high-needs individuals and families, and it includes Oregon's Medicaid program—a federal-state partnership funded by both federal and state dollars. OHA administers OHP pursuant to broad federal requirements and the terms of its "plan for medical assistance"— also known as a "State Plan"—which is approved by the U.S. Centers for Medicare and Medicaid Services (CMS). The federal government's Medicaid funding contribution to OHP is referred to as "Federal Financial Participation" (FFP). The FFP covers a percentage of OHP's expenditures on eligible enrollees.

5. Most OHP enrollees are eligible for coverage paid for by joint federal and state funding. OHA uses FFP funding to pay for a significant portion of OHP's insurance coverage, while Oregon covers the remaining costs. To qualify for FFP funding, an enrollee must, among other requirements, be a citizen of the United States or have some other qualifying immigration status such as lawful permanent residency. Individuals who meet that and other requirements qualify for what is referred to as "full scope" federally funded Medicaid.

6. In accordance with federal law, Oregon uses federal funding to treat emergencies for Medicaid applicants who do not have a qualifying immigration status. Emergency Medicaid covers medical emergencies including labor, delivery, and postpartum care for pregnant individuals.

7. Aside from the state's Medicaid program, OHP also includes several programs funded through state dollars. For example, as part of its Healthier Oregon Program, Oregon has elected to use state-only funds to extend OHP coverage to all state residents who meet income and other criteria regardless of their immigration status.

**Data Sharing Between DHCS and CMS**

8. Pursuant to federal law, and as a condition of receiving federal Medicaid funding, Oregon routinely shares certain categories of personal information regarding OHP enrollees with the federal government, including CMS.

9. For example, OHA submits monthly reports to CMS through the Transformed Medicaid Statistical Information System (T-MSIS). These reports include sensitive information such as name, address, date of birth, and Social Security numbers (if provided) for every OHP member enrolled in a federally funded plan. Oregon's most recent transfer of data to T-MSIS occurred on June 18, 2025.

10. OHA also shares sensitive data with CMS through other means as well, such as the Public Assistance Reporting Information System (PARIS). PARIS is a federal-state partnership that provides state public assistance agencies like OHP with a method to compare their data with data from other sources to assist in detecting and preventing duplicative pay and improper payments. Oregon also routinely provides CMS with data in response to Medicaid supplemental reviews and audits for federal oversight purposes.

11. In sharing this information, OHA relies on CMS to protect the confidentiality and security of Medicaid data and to follow federal laws and regulations regarding redisclosure of that data. This includes HHS's own prohibition against disclosure except as required for the purpose of administering the Medicaid program.

12. Relying on CMS's and HHS's representations about nondisclosure, OHA has reassured OHP members that data they submit to the program will only be used for limited purposes consistent with all applicable laws, such as uses in connection with program administration. For example, the website Oregonians can use to apply for OHP benefits—ONE.Oregon.gov—informs applicants that their "information will be shared only with the agencies that can verify your income and other information." OHA's Notice of Privacy Practices further reassures OHP members that their data will only be disclosed for limited purposes consistent with applicable legal requirements.

13. On June 6, 2025, CMS sent an email to OHA stating that it would be "reviewing claims for FFP submitted by the state to ensure that only claims for FFP that meet all applicable statutory requirements for individuals without a satisfactory immigration status are included within the state's Form CMS-64 submissions." The email did not cite any new evidence or new concerns about improper use of federal dollars. The email requested that OHP respond with

certain specified data by July 30, 2025. While CMS does sometimes request information as part of a supplemental review or audit, this request was unusual because it sought a significant amount of individuals' personally identifiable information (PII)—or information that, combined with T-MSIS data, would yield PII—in conjunction with information about those individuals' immigration status.

14. Shortly thereafter, on June 13, 2025, an article published by the Associated Press reported that CMS had shared confidential Medicaid data with DHS, including the PII of millions of Medicaid beneficiaries. The reporting stated that two top advisers to the Secretary of Health and Human Services, Robert F. Kennedy Jr., had ordered CMS staff to provide this data to DHS over the objections of those staff members. After I learned of this data transfer, I became increasingly concerned that CMS intended to share the data it requested from OHA on June 6, 2025 in the same way.

15. On June 26, 2025, OHA staff met with CMS staff to discuss the information CMS had requested and the purpose of its review. In that meeting, CMS staff confirmed that they intend to combine any data OHA provides in response to the June 6, 2025 request with data OHA has already submitted through T-MSIS. This is significant because combining these data sources will make it easier to identify several pieces of PII that were not sought in the June 6, 2025 request, such as name and address, while also making it easier to determine both the identity and immigration status of OHP members. It will also make it easier to identify several pieces of PII that were not sought in the June 6, 2025 request, such as name and address. When asked whether CMS would transfer these data to DHS, CMS staff said they would confer with their leadership and provide an answer in a subsequent communication. As of the date of this declaration, CMS has not provided a response.

**Harms to Oregon from CMS's Improper Disclosure of Data**

16. Based on my experience, and for the reasons discussed below, I believe that the unauthorized disclosure of confidential data by CMS to DHS has already harmed the state of Oregon, and it will continue to do so unless DHS publicly agrees, or is required, to refrain from using personal Medicaid data for immigration enforcement or other purposes not consistent with administration of the Medicaid program. And if CMS ultimately shares OHP data with DHS in the same way, it will significantly compound those harms to Oregon. Specifically, CMS's past and potential improper disclosures to DHS will continue to negatively impact Oregon in the following ways:

17. CMS' disclosure will likely result in a significant chilling effect for immigrants and their family members in Oregon by instilling fear and distrust in the Medicaid program. Specifically, those who fear deportation or other adverse consequences related to their immigration status will be less willing to submit eligibility information to enroll in OHP. This chilling effect will result in individuals forgoing benefits for which they are eligible or seeking to disenroll themselves and their families from OHP.

18. Indeed, OHA has received reports that this is already occurring in Oregon. Multiple community partners and application assisters have contacted OHA to share stories of fear and confusion resulting from news stories about CMS's disclosure of data to DHS. They have described Oregon residents who have already declined to enroll in OHP, and others who are considering disenrolling, due to fears generated by CMS's action. Some community partners are now also hesitant to encourage residents to enroll in OHP. One community partner also explained that their clients have begun cancelling or postponing medical appointments due to their fear about how their data might be used by the federal government. Knowledge of CMS's

disclosures to DHS has therefore spread fear in Oregon, and as a result, Oregonians with concerns about their immigration status are foregoing enrollment and treatment to avoid the risk that their data will also be improperly disclosed.

19. The chilling effect from this disclosure will also likely increase the risk of adverse health impacts for people in Oregon. Individuals who decline to enroll or who disenroll in OHP are likely to forgo basic, routine medical care for lack of insurance coverage. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease, among other things. And decreased access to prenatal care will lead to increased rates of premature births, low birth weight infants, and congenital defects.

20. These adverse health impacts will further strain Oregon's resources and budget. OHA encourages eligible residents to enroll in OHP because membership helps them obtain essential preventative and primary care as well as ongoing care for chronic medical conditions. That kind of routine care not only helps maintain enrollees' health, but it also reduces the incidence of emergency care, hospitalization, and other treatment for severe medical conditions, which in turn leads to lower health care costs for the state overall. To the extent Oregonians experience a greater incidence of these kinds of severe outcomes after forgoing routine medical care—and to the extent the costs of such outcomes are left uncompensated—those costs will ultimately be shifted to the broader health care delivery system and the state.

21. These poor health outcomes will also harm the overall health of all Oregon residents by straining the state's health care delivery system. If patients seek emergency care from an Oregon hospital but decline to provide key eligibility information, then the hospital will ultimately bear the cost of that treatment without Medicaid reimbursement because hospitals

must treat patients regardless of their ability to pay. These uncompensated care costs would likely be picked up by private insurance and the state in order to keep hospitals in business.

22. The chilling effect from CMS's disclosure will also unwind years of Oregon's extensive investment in expanding health coverage and access. For example, OHA administers the Office of Community Health and Engagement (OCHE), which includes a network of certified community partners consisting of approximately 300 organizations and around 1,500 application assisters across Oregon. Among other things, OCHE trains, supports, and certifies community partners across the state who help Oregonians apply for, enroll in, and renew their health coverage. Such investments are undermined by the fear and distrust generated by disclosing data for an improper purpose.

23. Indeed, CMS's improper disclosure harms OHP by undermining OHA's efforts to enroll eligible individuals from a variety of backgrounds—not just immigrants who fear deportation. For example, a significant body of research demonstrated that after Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996—which imposed a five-year waiting period before new legal immigrants would become eligible for Medicaid—it depressed enrollment among a significant number of non-immigrant U.S. citizens, as well as legal immigrants who had arrived in the U.S. earlier and would not be subject to the waiting period. In other words, this change in 1996 did not just diminish Medicaid enrollment among the subpopulation it targeted; it created confusion and apprehension that diminished enrollment among other subpopulations as well.

24. CMS's disclosure to DHS is generating even more confusion and apprehension than the 1996 legislation while also undermining the public's trust in Medicaid. That, in turn,

threatens to reduce many subpopulations' enrollment in OHP—not just individuals who fear deportation.

25.     If CMS shared confidential Medicaid data with DHS for the purposes of immigration enforcement, such a disclosure would represent an unprecedented and grave betrayal of public trust. Public awareness of such disclosure has likely already caused significant harm to Oregon and will cause further irreparable harm if not mitigated and repaired.

**I declare under penalty of perjury that the foregoing is true and correct.**
EXECUTED on July 9, 2025.

_____
EMMA SANDOE