## DECLARATION OF RYAN TYLER SADWITH

I, Ryan Tyler Sadwith, declare as follows:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2. I am currently employed by the California Department of Health Care Services (DHCS) as the State Medicaid Director and Chief Deputy Director for Health Care Programs. I have held the State Medicaid Director position since March 2024. As State Medicaid Director, I represent California's Medicaid program (Medi-Cal) with federal partners at the Centers for Medicare & Medicaid Services. I am responsible for overseeing all aspects of the Medicaid and Children's Health Insurance Programs (CHIP) as governed by state and federal rules. Prior to my appointment as State Medicaid Director, I served as Deputy Director, Behavioral Health at DHCS from 2022 to 2024, and Assistant Deputy Director, Behavioral Health from 2021 to 2022. Prior to working for the Department, I worked for the Centers for Medicare & Medicaid Services from 2011 to 2018, including as a Technical Director, Center for Medicaid and CHIP Services in 2018.

3. DHCS is the single state agency responsible for administering Medi-Cal. Medi-Cal provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. Medi-Cal's coverage includes medical, dental, mental health, substance use disorder treatment, and long-term care. DHCS' mission is to improve the overall health and well-being of all Californians.

4. DHCS is the largest healthcare purchaser in California as Medi-Cal covers almost forty percent of the state's population. In total, Medi-Cal insures approximately 14.9 million people, including 5 million children—more than half of all of California's kids—2.2 million seniors and people with disabilities, and 3.4 million working Californians—nearly one in five California workers.

5. Medi-Cal is authorized and funded in part through a Medicaid federal-state partnership. California administers Medi-Cal pursuant to broad federal requirements as well as the terms of its "plan for medical assistance," also known as a State Plan, approved by the U.S. Centers for Medicare and Medicaid Services (CMS). DHCS receives the federal Medicaid funding contribution, known as "Federal Financial Participation" (FFP), which covers a percentage of Medi-Cal's expenditures on eligible enrollees.

6. Most Medi-Cal enrollees are eligible for coverage paid for by joint federal and state funding. DHCS uses FFP funding to pay for a significant portion of Medi-Cal's insurance coverage, while California covers the remaining costs. To qualify for FFP funding, among other eligibility requirements, the enrollee must either be a citizen of the United States or have some other qualifying immigration status, for example lawful permanent residents who have had their status for five years or more. These individuals qualify for what is referred to as "full scope," federally funded Medicaid.

7. Federal law requires the use of federal funding to provide "Emergency Medicaid" for Medi-Cal applicants who do not have a qualifying immigration status. "Emergency Medicaid" covers life-threatening medical emergencies, including labor and delivery services. Emergency Medicaid labor and delivery services are intended to stabilize the mother and newborn, including emergency medical services for unforeseen complications during pregnancy.

8. California has expanded its "state-only" Medi-Cal program over the last decade to provide more benefits to Californians who otherwise only qualified for "Emergency Medicaid" due to their immigration status. Beginning in 2015, California expanded full-scope Medi-Cal to include all low-income children through the age of eighteen, regardless of immigration status. Building on this expansion and its positive health outcomes, California further expanded these benefits to individuals from the ages of 19 through 26 in 2020, older adults and seniors in 2022, and all adults in 2024. DHCS finances these benefits using state funds only, using FFP funds only to pay for emergency services, including labor and delivery services.

9. DHCS also leverages Medi-Cal resources to extend meaningful services to unborn children, pregnant women, and full-scope coverage to newborn children through the Children's Health Insurance Program (CHIP), and in accordance with Titles XIX and XXI of the Social Security Act.

**Data Sharing Between DHCS and CMS**

10. Pursuant to federal law, and as a condition of receiving federal Medicaid funding, California routinely shares certain categories of personal information regarding Medi-Cal enrollees with the federal government, including CMS.

11. For example, before enrolling an applicant in federally funded Medicaid, DHCS must first verify the applicant's citizenship or immigration status. DHCS confirms applicant eligibility via CMS's Data Services Hub, which provides access to DHS's Systematic Verification of Alien Entitlement (SAVE) system. SAVE is DHS's central repository for biographic, citizenship, and immigration status information on all individuals in the United States. SAVE responds to these verification requests by confirming the applicant's immigration status, including whether an applicant is lawfully present; a qualified noncitizen, or a naturalized

or acquired citizen. DHCS checks this information with SAVE to ensure that it only enrolls eligible applicants for "full scope," federally funded Medicaid. DHCS does not submit citizenship or immigration status requests to SAVE for applicants who indicate that they do not have a qualifying immigration status.

12. DHCS additionally submits monthly reports to CMS through the Transformed Medicaid Statistical Information System (T-MSIS). These reports include demographic and eligibility information, such as name, address, date of birth, Social Security number (if provided), and eligibility status, for every Medi-Cal member enrolled in a federally authorized plan. These plans include enrollees who receive only emergency Medicaid or state-only Medi-Cal.

13. California also routinely provides CMS with Medicaid reports and data for federal oversight purposes. For example, California submits the following to CMS: Quarterly Expenditure Reports & Data which is an accounting statement of the state's actual recorded expenditures and disposition of Federal funds; and Monthly Eligibility Determination, & Enrollment Reports & Data which reflect the state's enrollment activity for all populations receiving comprehensive Medicaid and CHIP benefits, as well as state program performance.

14. DHCS relies on CMS to protect the privacy and security of the Medicaid data of its members and to follow all applicable federal laws and regulations regarding redisclosure of that data, all applicable privacy and data protection laws and regulations, and the terms of the Interconnection Security Agreement (ISA) between DHCS and CMS which establishes responsibilities for both parties to protect the privacy and security of the data and information being transferred via T-MSIS. Additionally, on CMS's Privacy Home Page, the agency states it is committed to keeping enrollee "personal information safe with the highest level of privacy

protections possible … only sharing information with people who need to know" and that CMS will "tell [enrollees] before [CMS] collect[s] any personal information [CMS] need[s] to run [CMS'] health program, and only use it for that purpose." *CMS Privacy Home Page*, Centers for Medicare & Medicaid Servs., https://www.cms.gov/about-cms/information-systems/privacy (last updated Sept. 10, 2024).

15.     DHCS has assured members that their Medi-Cal data, including immigration status information, is only used to manage and pay for their health care treatment, to administer Medi-Cal, and for other purposes allowed by the Social Security Act, the Health Insurance Portability and Accountability Act (HIPAA) and other applicable privacy laws.

16.     On March 18, 2025, CMS sent a letter informing DHCS that CMS intended to "conduct additional oversight activities regarding [California's] claims for FFP associated with individuals without satisfactory immigration status." (Exhibit 1.)   CMS indicated it sought to confirm California is not using federally funded emergency Medicaid to pay for non-emergency services for undocumented individuals. Nothing in the letter indicated that these "oversight activities" included sharing confidential Medicaid data outside HHS.

17.     On April 7, 2025, CMS sent DHCS a follow up email, with two attachments, requesting information the agency stated was necessary to confirm California was not applying federal funding unlawfully for individuals with unsatisfactory immigration statuses. (Exhibit 2.) The Attachment A requested claim submission and enrollee data for the quarter ending on March 31, 2025, including individual enrollees' Medicaid ID, immigration status, and the period they were eligible for emergency Medicaid. The Attachment B requested narrative responses of how DHCS operates Medi-Cal, including how emergency Medicaid services are paid for, how DHCS verifies immigration status, and how DHCS defines "emergency condition." CMS required

DHCS to respond by April 30, 2025. Nothing in the request indicated that CMS would share this information outside HHS.

18.     DHCS responded to CMS's information request on April 30, 2025, and provided a substantial amount of the requested information, assuming CMS planned to use this information for routine auditing consistent with that agency's statutory authority to administer the Medicaid program.

19.     On June 11, 2025, DHCS received an email from Kimberly Kindy, a reporter from the Associated Press (AP), stating that CMS was forced to share Medicaid beneficiary information with federal agencies outside of CMS for potential immigration enforcement purposes, despite some CMS officials expressing concerns that the disclosure would be illegal. On June 12, 2025, Lindy Harrington emailed two CMS officials, Drew Snyder and Anne Marie Costello, to determine if the AP's report of a data transfer of Medicaid beneficiary information to agencies outside of CMS was true. And, if true, requesting additional details regarding the scope and purpose of the data transfer, more specifically if it was intended to assist with immigration enforcement purposes. To date, DHCS has not received any response from CMS responding to these questions.

20.     On June 13, 2025, an article published by the Associated Press reporting that CMS had indeed shared confidential Medicaid data with DHS, including the personally identifiable information (PII) of millions of California Medicaid beneficiaries. The reporting stated that two top advisers to the Secretary of Health and Human Services, Robert F. Kennedy Jr. ordered CMS staff to provide this data to DHS over the objections of those staff members.

**Harm from Disclosure of Medi-Cal PII Data to DHS**

21. Based on my experience, I believe that the unauthorized disclosure of confidential data by CMS to DHS has already harmed the state of California and, unless DHS publicly agrees to refrain from using this personal data for immigration enforcement, or other mass surveillance purposes, will continue to the negatively impact the state in the following ways:

22. CMS' disclosure will likely result in a significant chilling effect for immigrants and their family members discouraging them from seeking medically necessary healthcare. Since the publishing of the Associated Press article covering the disclosure of Medicaid personal data to DHS, DHCS has received numerous inquiries from DHCS stakeholders and community partners concerned that Medicaid beneficiaries' personal information and/or personal health information had been unlawfully shared with DHS.

23. This chilling effect will result in individuals forgoing benefits for which they are eligible or seeking to disenroll themselves and their families from the Medi-Cal program. Some people will also avoid critical preventative care and necessary medical treatment, and in some cases may even avoid emergency medical services, possibly resulting in death or serious injury. This will ultimately unwind years of California's investment in expanding health coverage and access.

24. The chilling effect from this disclosure will also likely increase the risk of adverse health impacts for people in California. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Decreased access to prenatal case will lead to increased rates of premature births, low birth weight infants, and congenital defects. Deferred or avoided healthcare increases the spread of communicable diseases, impacting public health at large.

25. The brunt of these impacts will be borne by California's most vulnerable communities, including those most likely to fear prosecution from the federal government, including pregnant individuals, transgender people, and immigrants, including members of mixed-status families, legal permanent residents, unauthorized immigrants, and other noncitizens.

26. These adverse health impacts will further strain California's resources and budget. The average medical cost to Plaintiffs in the first year of life of a premature or low birth weight baby is up to 10 times higher than the cost of a full-term baby. To the extent their treatment is left uncompensated, the cost of which will ultimately be shifted to the broader healthcare delivery system and the state.

27. These poor health outcomes will also harm the overall health of all Californians, by both straining California's healthcare delivery system as well as increasing the potential risks of the spread of infection and illness.

28. Many hospitals and clinics rely on Medicaid funding, especially those operating in underserved areas, in order to meet their obligations to provide emergency care under the Emergency Medical Labor & Treatment Act (EMTALA). Some of those providers may not be able to continue operating if their patients decline coverage or avoid seeking emergency care from them. Some medical providers have already reported that many of their immigrant patients are not showing up to their appointments because of recent increases in immigration enforcement activity.

29. Overall, CMS's disclosure undermines the Medi-Cal program. Trust between California residents, and especially our immigrant communities, is essential to the functioning of healthcare safety net programs like Medi-Cal. When members of the public's privacy and

personal data are misused or entangled with federal immigration enforcement, community members will fear seeking basic health services to the detriment of public safety and the well-being of all Californians.

30. If CMS shared confidential Medicaid data with DHS for the purposes of immigration enforcement, such a disclosure would represent an unprecedented and grave betrayal of public trust. If true, this disclosure has likely already caused significant harm to DHCS's ability operate and will cause further irreparable harm if not mitigated and repaired.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __21st__ day of July 2025, in Oakland, CA

_____

Ryan Tyler Sadwith
State Medicaid Director
Chief Deputy Director for Health Care Programs
California Department of Health Care Services