BRETT A. SHUMATE
Assistant Attorney General
ELIZABETH SHAPIRO
Deputy Director
MICHAEL J. GERARDI (D.C. Bar No. 1017949)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW,
Washington, DC 20005
Phone: (202) 616-0680
E-mail: michael.j.gerardi@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, et al.,

    Plaintiffs,

      v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

    Defendants.

3:25-cv-05536-VC

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

**Date:**        August 7, 2025
**Time:**        10:00 AM
**Courtroom:**  Courtroom 4
**Judge:**      Hon. Vince Chhabria
**Trial Date:**  Not set
**Action Filed:** July 1, 2025

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 1

I.      Only Qualified Aliens Have A Right To Access Federal Funds For "Full Scope"
        Medicaid ........................................................................................................... 1

II.     CMS Collects Data As To The Identity and Location of Individuals Claiming
        Medicaid, Including Unqualified Aliens ........................................................... 2

III.    Federal Law Requires Federal Agencies To Cooperate In Efforts To Enforce
        Immigration Law ............................................................................................... 3

IV.     Recent Efforts By DHS And HHS To Facilitate Information Sharing ................ 6

V.      This Litigation ................................................................................................... 8

STANDARD OF REVIEW ............................................................................................ 9

ARGUMENT ............................................................................................................... 10

I.      Plaintiffs Have Not Shown A Significant Likelihood Of Standing ................. 10

II.     A Preliminary Injunction Is Unwarranted Here ............................................. 13

        A.      Plaintiffs Have Not Shown Irreparable Injury ..................................... 13

        B.      Plaintiffs are Unlikely to Succeed on the Merits of Their Claims ....... 15

                1.      Plaintiffs Cannot Succeed On Their APA Claims ..................... 15

                        a.      Plaintiffs Have Not Identified a Final Agency Action to
                                Challenge Through an APA Claim .............................. 16

                        b.      Defendants Did Not Need To Pursue Notice and Comment
                                Rulemaking To Engage In Data Sharing ...................... 18

                        c.      Defendants' Actions Are Not Arbitrary and Capricious ........... 19

                2.      Plaintiffs Cannot Succeed On Their Spending Clause Claim ........... 20

III.    The Remaining Injunction Factors Favors Defendants ................................... 24

IV.     Plaintiffs' Proposed Injunction Is Improper ................................................... 24

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*AFL-CIO v. Dep't of Labor*,
  --- F. Supp. 3d ----, 2025 WL 1129227 (D.D.C. Apr. 16, 2025) .............................................. 19

*Air Brake Sys., Inc. v. Mineta*,
  357 F.3d 632 (6th Cir. 2004) ..................................................................................................... 17

*Air Cal. v. Dep't of Transp.*,
  654 F.2d 616 (9th Cir. 1981) ..................................................................................................... 17

*Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*,
  836 F.3d 963 (8th Cir. 2016) ............................................................................................... 17, 18

*Arizona v. Yellen*,
  34 F.4th 841 (9th Cir. 2022) ...................................................................................................... 12

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................................... 16

*California v. Texas*,
  593 U.S. 659 (2021) ............................................................................................................. 11, 12

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ..................................................................................................... 14

*Centro de Trabajadores Unidos v. Bessent*,
  No. 25-cv-0677, 2025 WL 1380420 (D.D.C. May 12, 2025) ............................................... 7, 20

*Citizens Alert Regarding the Env't v. U.S. Envtl. Prot. Agency*,
  259 F. Supp. 2d 9 (D.D.C. 2003) .............................................................................................. 17

*City of Los Angeles v. Barr*,
  929 F.3d 1163 (9th Cir. 2019) ............................................................................................ *passim*

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ....................................................................................................... 10, 12, 13

*Department of Commerce v. New York*,
  588 U.S. 752 (2019) ................................................................................................................... 12

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ....................................................................................................................... 20

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ................................................................................................................... 19

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .......................................................................................... 10

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ............................................................................ 15

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) .......................................................................................... 15

*Immigr. & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*,
  510 U.S. 1301 (1993) ........................................................................................ 24

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................... 9, 10

*Lydo Enterps., Inc. v. City of Las Vegas*,
  745 F.2d 1211 (9th Cir. 1984) .......................................................................... 14

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) .......................................................................................... 13

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) .......................................................................... 23

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................ 20

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ................................................................................. 13, 14, 15

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .......................................................................................... 21

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................ 9

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) .............................................................................................. 21

*Rattlesnake Coal. v. U.S. E.P.A.*,
  509 F.3d 1095 (9th Cir. 2007) ..................................................................... 16, 17

*Sampson v. Murray*,
  415 U.S. 61 (1974) ............................................................................................ 13

*Savage v. Savage*,
  No. 19-cv-07994-DMR, 2020 WL 2525079 (N.D. Cal. May 18, 2020) ................ 15

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ................................................................................. 21

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................. 10

*Trump v. CASA, Inc.*,
    606 U.S. ---, 2025 WL 1773631 (2025) .................................................. 24

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ........................................................................... 16, 17

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................................. 11

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ................................................................................. 13

*Venetian Casino Resort, LLC v. EEOC*,
    530 F.3d 925 (D.C. Cir. 2008) ................................................................ 18

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ................................................................................. 10

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ....................................................................................... 9

**STATUTES**

5 U.S.C. § 551 ................................................................................................. 19

5 U.S.C. § 552a ................................................................................................. 4

5 U.S.C. § 553 ..................................................................................... 9, 18, 19

5 U.S.C. § 704 ................................................................................................. 15

5 U.S.C. § 706 ................................................................................................... 9

6 U.S.C. § 111 ................................................................................................... 3

6 U.S.C. § 112 ................................................................................................... 3

6 U.S.C. § 122 ........................................................................................... 4, 5, 8

6 U.S.C. § 202 ............................................................................................... 3, 4

6 U.S.C. § 251 ................................................................................................... 4

8 U.S.C. § 1229 .......................................................................................................... 7, 14

8 U.S.C. § 1229a ....................................................................................................... 7, 14

8 U.S.C. § 1306 .......................................................................................................... 7, 14

8 U.S.C. § 1360 ............................................................................................................... 4

8 U.S.C. § 1373 ............................................................................................................... 4

8 U.S.C. § 1611 ............................................................................................................... 2

42 U.S.C. § 1106 ........................................................................................................... 18

42 U.S.C. § 1306 ....................................................................................................... 5, 18

42 U.S.C. § 1320b-2 ..................................................................................................... 15

42 U.S.C. § 1396a *et seq.* ............................................................................................. 2

42 U.S.C. § 1396b ................................................................................................... 2, 3, 15

**RULES**

Fed. R. Civ. P. 65 .......................................................................................................... 24

**REGULATIONS**

42 C.F.R. § 95.19 .......................................................................................................... 15

42 C.F.R. § 401.101 ........................................................................................................ 5

42 C.F.R. § 430.30 .......................................................................................................... 2

42 C.F.R. § 431.300 ........................................................................................................ 5

42 C.F.R. § 433.116 ........................................................................................................ 3

42 C.F.R. § 435.907 ........................................................................................................ 5

42 C.F.R. § 438.818 ........................................................................................................ 3

*Protecting the American People Against Invasion*,
    Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ................................ 1, 20

*Ending Taxpayer Subsidization of Open Borders*,
    Exec. Order No. 14,218, 90 Fed. Reg. 10,581 (Feb. 19, 2025) ........................... 7, 20

*Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*,
Exec. Order. No. 14,243, 90 Fed. Reg. 13,681 (Mar. 25, 2025) ................................................. 7

**U.S. CONSTITUTION**

Art. I, § 8, cl. 1 ......................................................................................................................... 20

**OTHER AUTHORITIES**

Ctrs. For Medicare & Medicaid Servs., *CMS Privacy Home Page*,
https://www.cms.gov/about-cms/information-systems/privacy ................................................. 6

Healthcare.gov, *Privacy Act Statement*, Oct. 1, 2013,
https://www.healthcare.gov/individual-privacy-act-statement/ ................................................. 6

Off. of the Director, U.S. Immigration & Customs Enforcement, Memo Re: Clarification of
Existing Practices Relating to Certain Health Care Information (Oct. 25, 2013) ...................... 6

Office of the Inspector General, Dep't of Homeland Sec'y, Report No. OIG-23-47,
*DHS Does Not Have Assurance That All Migrants Can Be Located Once Released into
the United States* (Sept. 6, 2023) ............................................................................................... 7

T-MSIS Data Guide (Ver. 3.39.0), Ctrs. For Medicare & Medicaid Servs.,
https://www.medicaid.gov/tmsis/dataguide/v3/ .......................................................................... 3

U.S. Dep't of Health & Human Servs. & U.S. Dep't of Agriculture, Letter Re. Policy
Guidance Regarding Inquiries into Citizenship, Immigration Status and Social
Security Numbers in State Applications for Medicaid, State Children's Health
Insurance Program (SCHIP), Temporary Assistance for Needy Families (TANF),
and Food Stamp Benefits, Sept. 2000, https://www.hhs.gov/civil-rights/for-
individuals/special-topics/national-origin/tri-agency/index.html ............................. 5, 6, 23

# INTRODUCTION

It is "the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens." *Protecting the American People Against Invasion*, Exec. Order No. 14,159, § 2, 90 Fed. Reg. 8443 (Jan. 20, 2025). In furtherance of this policy, the Centers for Medicare & Medicaid Services (CMS), a sub-agency within the U.S. Department of Health and Human Services (HHS), is cooperating with the Department of Homeland Security (DHS) and its sub-agency, U.S. Immigration and Customs Enforcement (ICE), to share information about non-qualified aliens who claim Medicaid benefits in order to assist ICE in its law enforcement mission. Federal law has authorized this sort of data sharing for decades. But Plaintiffs, a consortium of states, have moved to enjoin cooperation between CMS and ICE before a hearing on the merits can be had.

The Court should deny this request. Plaintiffs' alleged injuries are based on conjecture about the impact of federal policy on state finances, and fail to meet the high standard of irreparable harm or even the Article III standing requirement of an imminent injury-in-fact. The motion also fails to articulate proper claims under the Administrative Procedure Act (APA). Information sharing is not the sort of final agency action Plaintiffs can challenge in federal court. Even if it were, Defendants have not taken actions requiring notice-and-comment rulemaking, and Defendants easily satisfy the APA's requirement of rational decision-making. Finally, Plaintiffs' challenge to the actions of the Article II officials cannot be brought under Article I's Spending Clause. Accordingly, the Court should deny Plaintiffs' motion for a preliminary injunction.

# BACKGROUND

## I.    Only Qualified Aliens Have A Right To Access Federal Funds For "Full Scope" Medicaid

Medicaid is a program jointly funded by the states and the federal government that provides

health care to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults, and people with disabilities. Decl. of Kimberley Brandt ¶¶ 4–5; *see generally* 42 U.S.C. § 1396a *et seq.* Medicaid is a "federal public benefit," 8 U.S.C. § 1611(c), and as a result, those aliens who are not "qualified aliens" are only eligible for federally funded Medicaid "for care and services that are necessary for the treatment of an emergency medical condition." *Id.* §§ 1611(a), (b)(1)(A); *see also* 42 U.S.C. § 1396b(v)(2); Brandt Decl. ¶ 20. States are responsible for verifying the citizenship of applicants using the Systematic Alien Verification for Entitlements ("SAVE") —operated by U.S. Citizenship and Immigrations Services (USCIS), a sub-agency of DHS—to confirm that they do not spend "full scope" Medicaid funds on unqualified aliens. *See, e.g.*, Decl. of Judith Cash ¶ 11, ECF No. 43-8. However, some states choose to "extend coverage for medical services for individuals with [unsatisfactory immigration status] beyond the services for which the federal government will pay FFP, but only state funds can be used to cover those services." Brandt Decl. ¶ 21.

## II. CMS Collects Data As To The Identity and Location of Individuals Claiming Medicaid, Including Unqualified Aliens

As one would expect in a cooperative federal-state program, the states routinely share information with CMS about their Medicaid programs. States submit a Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program no later than thirty days after the end of each fiscal quarter. 42 C.F.R. § 430.30(c)(1); Brandt Decl. ¶ 7. CMS also conducts a variety of other targeted financial management reviews (FMRs). Brandt Decl. ¶ 10. It is not unusual for CMS to scrutinize quarterly submissions to review compliance with immigration status requirements, or to initiate FMRs specifically directed at this issue. *Id.* ¶¶ 23–27.

The states also report monthly to CMS through the Transformed Medicaid Statistical Information System (T-MSIS). *Id.* ¶¶ 11–13. These reports include "beneficiary eligibility and

enrollment data, utilization and cost data, payment data, provider participation, provider qualifications and affiliations, service delivery network and managed care plan data, and third-party liability data."[1] *Id.* ¶ 12. Immigration status "is a mandatory data element in T-MSIS," *id.* ¶ 14, and a claimant's status (or similar information) has been required as part of T-MSIS submissions since 1999, *id.* ¶¶ 15–16.

Medicaid ties funding to participation in T-MSIS and incentivizes states to build up-to-date systems compatible with T-MSIS. States are eligible for federal financial participation (FFP) for costs "as are attributable to the design, development, or installation of such mechanized claims processing and information retrieval systems as the Secretary determines are likely to provide more efficient, economical, and effective administration" of state Medicaid plans. 42 U.S.C. § 1396b(a)(3)(A)(i), (r)(1)(F); *see also id.* § 1396b(a)(3)(B) (funding for operation of system); 42 C.F.R. § 433.116(a) (availability of FFP "for operation of a mechanized claims processing and information retrieval system approved by CMS"); *id.* § 438.818(a)(3) (conditioning federal funding on "full[] compl[iance] with all encounter data reporting requirements of the Medicaid Statistical Information System."); Brandt Decl. ¶ 18. Failure to submit claims to T-MSIS in a timely manner can also result in deductions to medical assistance payments. 42 U.S.C. § 1396b(i)(25); Brandt Decl. ¶ 19.

## III. Federal Law Requires Federal Agencies To Cooperate In Efforts To Enforce Immigration Law

The responsibility to enforce immigration law falls primarily to DHS and its subagencies—ICE and U.S. Customs and Border Patrol (CBP)—under the leadership of the Secretary of Homeland Security. 6 U.S.C. §§ 111, 112, 202. But federal law does not require DHS to operate

---

[1] *See also* T-MSIS Data Guide (Ver. 3.39.0), Ctrs. For Medicare & Medicaid Servs., https://www.medicaid.gov/tmsis/dataguide/v3/ (last visited July 25, 2025).

in isolation from other federal agencies. Generally speaking, the Privacy Act authorizes a federal agency to share personal records with another federal agency "for a civil or criminal law enforcement activity," even if consent has not been given. *See* 5 U.S.C. § 552a(b)(7). And Congress has elsewhere spoken specifically to the authority of immigration officials to receive information from other agencies that would aid in immigration enforcement efforts.

As early as the 1950s, the Immigration and Nationality Act ("INA") provided that "[a]ny information in any records kept by any department or agency of the Government as to the identity and location of aliens in the United States shall be made available to" immigration authorities. 8 U.S.C. § 1360(b).[2] President Clinton reinforced that obligation in 1996 by signing into law 8 U.S.C. § 1373. Section 1373 provides that, "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a). It also requires federal agencies to permit the transmission, maintenance, or exchange of such information within the federal government. *Id.* § 1373(b).

When Congress created the Department of Homeland Security in 2002, it reaffirmed this norm of cooperation. It directed that the Secretary "shall have such access as the Secretary considers necessary to all information, including reports, assessments, analyses, and unevaluated intelligence . . . that may be collected, possessed, or prepared by any agency of the Federal Government." 6 U.S.C. § 122(a)(1). The Secretary "may obtain such material upon request" or "enter into cooperative arrangements with other executive agencies to provide such material or

---

[2] Although § 1360(b) refers to "the Service" and "request made by the Attorney General," these functions have been transferred to DHS and the Secretary, respectively. 6 U.S.C. §§ 202(3), 251.

provide Department officials with access to it on a regular or routine basis, including requests or arrangements involving broad categories of materials, access to electronic databases, or both." *Id.* § 122(b)(1). In some circumstances, agencies have affirmative obligations to provide this information. *Id.* § 122(b)(2).

Plaintiffs' motion does not seek to enjoin Defendants on the grounds that HHS's decision to provide information to immigration authorities violates a statute or regulation. The motion cites many provisions of Title 42 of the Code of Federal Regulations, but they are inapposite. For instance, part 401 of Title 42 implements 42 U.S.C. § 1306(a), *see* 42 C.F.R. § 401.101(a)(1), but that confidentiality statute does not prohibit sharing as "otherwise provided by Federal law." The sections of part 431 Plaintiffs rely upon concern requirements for the states. *See* 42 C.F.R. § 431.300(a) (noting the subpart "specifies State plan requirements"). And the section of part 435 Plaintiffs cite limits states to collection "necessary to make an eligibility determination or for a purpose directly connected to the administration of the State plan," but alienage status clearly falls within the scope of "necessary" information. *See id.* § 435.907(e)(1).

Instead, Plaintiffs' primary theory appears to be that they relied upon informal "assurances" that CMS would not share information with ICE. ECF No. 42-2 at 5–6 ("PI Mot."). But some of the statements are not assurances at all. A guidance document from the Clinton Administration advised that "*if* a state or local agency is collecting SSNs only to verify income and improve administration of its programs," *then* it could tell applicants "[w]e only use social security numbers to help us verify your income. We will not share social security numbers with the INS."[3] A CMS

---

[3] U.S. Dep't of Health & Human Servs. & U.S. Dep't of Agriculture, Letter Re. Policy Guidance Regarding Inquiries into Citizenship, Immigration Status and Social Security Numbers in State Applications for Medicaid, State Children's Health Insurance Program (SCHIP), Temporary Assistance for Needy Families (TANF), and Food Stamp Benefits, Sept. 2000,

webpage most recently updated in 2024[4] states CMS's commitment to only sharing information with people who "need to know" for the purpose of "run[ning] our health care programs," PI Mot. 5, but that cannot reasonably read as an exclusion of immigration authorities given the connection between immigration status and Medicaid eligibility, as well as federal statutes authorizing information sharing with immigration authorities.

Other statements seem to reflect policy judgments rather than legal ones. For instance, ICE published an internal memorandum after the passage of the Patient Protection and Affordable Care Act stating that "ICE does not use information about such individuals or members of their household that is obtained for purposes of determining eligibility for such coverage as the basis for pursuing a civil immigration enforcement action against such individuals or members of their household." Off. of the Director, U.S. Immigration & Customs Enforcement, Memo Re: Clarification of Existing Practices Relating to Certain Health Care Information (Oct. 25, 2013) ("ICE Memo"); *see also* Healthcare.gov, *Privacy Act Statement*, Oct. 1, 2013, https://www.healthcare.gov/individual-privacy-act-statement/ ("Information provided by applicants won't be used for immigration enforcement purposes"). But federal law does not require ICE to abstain from use of this information; on the contrary, it affirmatively obligates agencies to share that information. ICE's guidance explained that its internal policy "[was] not intended to, does not, and may not be relied upon to create any rights or benefits, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." ICE Memo at 2.

## IV.    Recent Efforts By DHS And HHS To Facilitate Information Sharing

The Administration has directed federal agencies to faithfully carry out the immigration

---

https://www.hhs.gov/civil-rights/for-individuals/special-topics/national-origin/tri-agency/index.html (emphasis added).
[4] Ctrs. For Medicare & Medicaid Servs., *CMS Privacy Home Page*, https://www.cms.gov/about-cms/information-systems/privacy (last visited July 25, 2025).

laws and "to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go

to unqualified aliens." *Ending Taxpayer Subsidization of Open Borders*, Exec. Order No. 14,218

§ 2, 90 Fed. Reg. 10,581 (Feb. 19, 2025). Part of that effort is simply improving ICE's awareness

of where individuals who have been charged with unlawful entry into the United States are located.

When the government initiates removal proceedings against an alien by serving a Notice to Appear,

he or she is required to provide an up-to-date telephone number and address, and to keep providing

both the immigration court and DHS with up-to-date information. 8 U.S.C. § 1229(a)(1)(F); *id.* §§

1229a(b)(5)(A)–(B); Decl. of Marcos Charles ¶ 5. Knowing or intentional failure to do so is a

crime punishable by up to thirty days in prison. 8 U.S.C. § 1306(b); Charles Decl. ¶ 5. Despite

these legal requirements, "[t]here are significant challenges in relying on aliens to provide their

current and accurate address information" in practice. *Id.* ¶ 6. The gaps in information can be

significant.[5] Data sharing with other agencies that may have more up-to-date contact information

for aliens, such as CMS, is one way in which ICE is trying to fill gaps created by failures by aliens

to properly update their information. *See, e.g.*, *Stopping Waste, Fraud, and Abuse by Eliminating

Information Silos*, Exec. Order. No. 14,243 § 3, 90 Fed. Reg. 13,681 (Mar. 25, 2025); *Centro de

Trabajadores Unidos v. Bessent*, No. 25-cv-0677, 2025 WL 1380420, at *8 (D.D.C. May 12, 2025)

(denying preliminary challenge to memorandum of understanding permitting sharing of address

and name information by Internal Revenue Service with immigration authorities); Charles Decl.

¶¶ 8–9. Without this information, it is difficult for DHS to find reliable addresses to ensure its

officers can properly implement the law. *See* Charles Decl. ¶¶ 6–7.

---

[5] *See also* Office of the Inspector General, Dep't of Homeland Sec'y, Report No. OIG-23-47, *DHS Does Not Have Assurance That All Migrants Can Be Located Once Released into the United States*, at 4 (Sept. 6, 2023) (summarizing results of audit that found "more than 177,000" out of 981,671 CBP alien encounter records had missing or incorrect address data).

Initially, on or about June 10, CMS provided DHS information it had received from California and other states pursuant to CMS' financial oversight review of CMS-64s related to individuals with UIS. Brandt Decl. ¶ 30; Charles Decl. ¶ 10. However, ICE was unable to use this data for the purposes for which it was shared. Brandt Decl.¶ 30; Charles Decl. ¶ 10. On or about June 14, ICE sent a request to HHS to cross-reference spreadsheets of data about individuals know to immigration authorities against Medicaid data to see if it could obtain information regarding the location of those individuals. Brandt Decl. ¶ 31; Charles Decl. ¶ 11. After cross-referencing the spreadsheets with the T-MSIS database, CMS returned a spreadsheet containing biographical information (but no health information) from T-MSIS on or about June 18. Brandt Decl. ¶ 31; Charles Decl. ¶ 11. Of the approximately 7.6 million cases ICE sought to cross-reference against CMS's data, CMS provided approximately 2.1 million records in response, of which about half were duplicates. Brandt Decl. ¶ 31; Charles Decl. ¶ 11.

Encouraged by this, CMS and ICE then entered a cooperative agreement, as contemplated by 6 U.S.C. § 122(b)(1), in order to provide ICE with direct access to the T-MSIS database. Chales Decl. ¶ 12 & Ex. A, T-MSIS Cooperative Agreement ("Agreement"); Brandt Decl. ¶ 32. The Agreement was signed on July 15, 2025, and runs until September 15. Agreement at 9–11. It relies upon many of the immigration law authorities discussed herein, including § 1360(b), § 1373, and Title 6. *Id.* at 2. The agreement provides ICE with a subset of T-MSIS data that excludes protected health information about conditions or diagnoses. *Id.* at 4. As of this writing, the preliminary steps to enable ICE's access have not been completed. Brandt Decl. ¶ 32. ICE has requested to extend the Agreement. Agreement at 7; Charles Decl. ¶ 12.

## V.    This Litigation

Plaintiffs are a consortium of twenty states. They filed suit on July 1, 2025, ECF No. 1, Compl., and lodged their preliminary injunction motion on July 11, 2025. Plaintiffs assert that they

"have relied upon CMS rules, procedures, and practices designed to protect data privacy and security" in offering their state programs. *Id.* ¶ 199. They then allege federal actions that have "dramatically changed" the government's "policy and practice of keeping personal Medicaid data private and refraining from weaponizing healthcare data and systems for immigration and other federal policy purposes." *Id.* ¶ 201.

The complaint raises five claims: (1) an "arbitrary and capricious" claim under the APA, 5 U.S.C. § 706(2)(A); (2) a "contrary to law" claim under the APA, *id.* § 706(2)(A), (C), (D); (3) a procedural APA claim, *id.* § 553(b); (4) an Article I Spending Clause claim based on "lack of clear notice"; and (5) an ultra vires claim. Compl. ¶¶ 255–305. Plaintiffs' preliminary injunction motion only advances claims (1), (3), and (4). The motion seeks to enjoin "Defendants from transferring the States' Medicaid data files containing personally identifiable, protected health information to DHS, the Department of Government Efficiency (DOGE), or any other federal agency," and to "prohibit[] Defendants from using such data for purposes of immigration enforcement, population surveillance, or other similar purposes." ECF No. 43 at 2.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Id.* at 20. When "the Government is the opposing party," the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs also bear the burden of showing subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "standing is not dispensed in gross," Plaintiffs must

"demonstrate standing for each claim that they press and for each form of relief that they seek."

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

## ARGUMENT

### I.    Plaintiffs Have Not Shown A Significant Likelihood Of Standing

As an initial matter, Plaintiffs are not likely to demonstrate that they have Article III

standing. At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as

the party invoking the Court's jurisdiction, to show: (1) a concrete and particularized injury-in-

fact, either actual or imminent, (2) a causal connection between the injury and defendants'

challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable

decision. *Lujan*, 504 U.S. at 560. To establish injury in fact, a plaintiff must show that the

defendant's action affects him or her in a "personal and individual way," *id.* at 560 n.1, rather than

being a "generalized grievance," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367,

381 (2024). A plaintiff must demonstrate more than a "possible future injury"; he or she must show

that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149,

158 (1990) (citation omitted); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)

(citation omitted). Plaintiffs allege that Defendants' actions interfere with their ability to operate

their Medicaid programs in a variety of ways, but none amount to the sort of imminent, concrete

harm necessary to give rise to Article III standing.

Plaintiffs focus on indirect financial consequences arising from Defendants' actions. As

they tell it, Defendants' actions will deter individuals from signing up for Medicaid benefits for

which they are eligible under state law or from seeking emergency treatment when they are in a

life-threatening situation, depriving them of needed care and leading to diminished health

outcomes. *See, e.g.*, Decl. of Adela Flores-Brennan ¶¶ 18–21, ECF No. 43-11. (Plaintiffs do not

claim that their injuries are materially different from each other, and so Colorado's declaration is

being used here for illustrative purposes.) They fear Defendants' actions will "unwind years of investment," *id.* ¶ 19, and "adverse health impacts will further strain [Plaintiffs'] resources and budget," *id.* ¶ 21. "[T]he resulting healthcare costs" from these populations refusing Medicaid "will ultimately be shifted to the broader healthcare delivery system and the state." *Id.*

This is not a sound basis for Article III standing. Many "federal policies . . . generate indirect effects on state revenues or state spending," and a state's standing assertions are "more attenuated" when federal action "produce[s] only these kinds of indirect effects." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). Indeed, Plaintiffs' theory is two steps further removed from the one a different set of state plaintiffs advanced in *California v. Texas*, 593 U.S. 659 (2021), that similarly relied upon conjecture about impact to state finances. In *California,* a consortium of states alleged that the minimum essential coverage provision of the ACA would lead to increased enrollment in Medicaid, CHIP, and state employee health plans, giving them standing to challenge that provision. *Id.* at 674–75. The Supreme Court rejected this theory because there was no sound evidence that more people would sign up for these state programs because of the ACA's requirement. *Id.* at 675–76. The standing theory of this case is even more attenuated. It assumes: (1) individuals will *not* sign up for certain, restricted forms of Medicaid for which they are eligible once they are aware of Defendants' new information sharing practices, even though federal law has long facilitated such information sharing and many such individuals are under legal obligations to keep immigration authorities up to date on their whereabouts; (2) those individuals will continue to require state assistance for health care; and (3) the failure to provide preventive care at an appropriate time will result in higher health care costs when those individuals suffer adverse health conditions down the line that could have been prevented by earlier interventions. Plaintiffs assertions of injury arising from a chilling effect on individuals who *are* qualified for federal

Medicaid but are afraid of an erroneous enforcement action require still more conjecture. *See* Flores-Brennan Decl. ¶ 18.

This "highly attenuated chain of possibilities" is not a sound basis for invoking district court jurisdiction. *Clapper*, 568 U.S. at 410. *Clapper* also forecloses Plaintiffs' efforts to frame this injury as a "coercive choice," PI Mot. 12. Without an imminent injury to avoid, Plaintiffs' purported dilemma about cooperation with CMS is "simply the product of their fear of" the second order effects of immigration policies on their fiscs, and that "fear is insufficient to create standing." *Clapper*, 568 U.S. at 417. In *California*, the Supreme Court also considered, and rejected, an analogy to *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019), and here, too, "[n]either logic nor intuition," *California*, 593 U.S. at 676, suggests that the Plaintiffs' hypothetical fears are equivalent to a "certainly impending" injury. *Dept. of Com.*, 588 U.S. at 768. Even if that were not the case, the plaintiffs in *Dep't of Commerce* actually proved at trial "that noncitizen households have historically responded to the census at lower rates than other groups" and "that the discrepancy is likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." *Id.* No similar proof has been introduced here.

The authority Plaintiffs rely upon to support standing are thin and easily distinguished. *Arizona v. Yellen* was a challenge by Arizona to a statutory prohibition on using COVID relief funds to subsidize a tax cut or otherwise offset a reduction in state tax revenue. 34 F.4th 841, 845 (9th Cir. 2022). The Ninth Circuit found an injury to Arizona's "sovereignty" from this provision that sufficed for standing purposes, *id.* at 851–53, but that case involved a direct financial penalty on the state for engaging in conduct proscribed by Congress, and was thus far more direct than the injury alleged here. Likewise, in *City of Los Angeles v. Barr*, the plaintiff municipality alleged that its policy not to cooperate with immigration officials diminished its competitiveness for federal

grants. 929 F.3d 1163, 1173–74 (9th Cir. 2019). Plaintiffs have alleged, at most, a "risk of potential disallowance of Medicaid funding," PI Mot. 12, but the only reason that risk will come to pass is if Plaintiffs choose to withdraw from T-MSIS and financial oversight reviews based on their fear of financial hardship if ICE and CMS engage in information sharing. *Clapper* prohibits standing based on self-imposed harm arising from fear of speculative injury.

Plaintiffs' preliminary injunction motion suggests two further standing theories, but neither has merit. First, they allege Defendants' information sharing policies constitute an interference in their ability to operate their programs as they see fit under state law. *See Id.* at 11 (citing state statutes "that protect the privacy of Medicaid applicants and recipients and limit the sharing of data except for purposes of administration of the program"). But Defendants are not forcing States to operate their programs in this way, so this allegation is yet another type of self-imposed injury. *Clapper*, 568 U.S. at 417. Second, the States' concerns about their citizens' health, *see* Flores-Brennan Decl. ¶ 22, are simply *parens patriae* claims that do not provide a basis to challenge Defendants' actions. *Murthy v. Missouri*, 603 U.S. 43, 76 (2024); *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923). Neither theory makes up for Plaintiffs' failure to show they are likely to establish standing in this case.

## II.    A Preliminary Injunction Is Unwarranted Here

### A.  Plaintiffs Have Not Shown Irreparable Injury

A preliminary injunction is an extraordinary tool that should only be used "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). It follows from the purposes of such injunctions that a plaintiff must demonstrate "irreparable harm and inadequacy of legal remedies" to obtain one. *Sampson v. Murray*, 415 U.S. 61, 88 (1974). To make that showing, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate

threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Plaintiffs advance three different theories of irreparable harm which closely track their arguments regarding standing. PI Mot. 21–24. And like their standing arguments, none has merit.

First, Plaintiffs assert a "chilling effect" resulting from Defendants' decisions, claiming that both "undocumented immigrants" and "legally present noncitizens" will be deterred from seeking services they are entitled to under federal or state law because of the fear of enforcement actions. *Id.* at 21–22. But Plaintiffs are not primarily asserting the claims of residents who are afraid of seeking Medicaid as *parens patriae* (which they have no standing to do, *see Murthy*, 603 U.S. at 76), but an indirect injury to their fiscs resulting from the downstream effects of residents choosing not to avail themselves of state social services. Additionally, aliens are already required by law to provide this information to DHS. 8 U.S.C. § 1229(a)(1)(F); *id.* § 1229a(b)(5)(A)–(B); 8 U.S.C. § 1306(b); Charles Decl. ¶ 5. As discussed above, that purported injury is highly speculative, and since it would not even suffice for purposes of standing, it cannot be a basis for irreparable injury that would permit issuance of an injunction.

Second, Plaintiffs argue that they "will lose access to crucial federal funding for their health insurance programs" due to Defendants' alleged actions. PI Mot. 23. But at this time, Plaintiffs have yet to withhold any such information from Defendants, and Defendants have not acted to revoke funding from Plaintiffs for failing to comply with their data sharing requirements. In any event, "[p]urely monetary injuries are not normally considered irreparable." *Lydo Enterps.*, *Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984). For example, if CMS withholds funds from Plaintiffs for claims processing system improvements due to its failure to share data with T-MSIS, and the Court ultimately concluded that withholding was improper, HHS would be authorized by

statute to increase a quarterly payment to make up for the discrepancy. 42 U.S.C. 1396b(d)(2)(A); *see also* 42 U.S.C. § 1320b-2(a) (states may claim federal financial participation for Medicaid within two years of the date of the expenditure); 42 C.F.R. § 95.19 (noting exceptions to time limits, including "[a]ny claim resulting from a court-ordered retroactive payment"). Defendants should not be enjoined based on the possibility of a funding dispute.

Third, Plaintiffs allege threats to "public health and safety of the States' residents" as a result of Defendants' actions. PI Mot. 23–24. This is a "thinly veiled attempt to circumvent the limits on *parens patriae* standing" that the Supreme Court has rejected on multiple occasions in recent years. *Haaland v. Brackeen*, 599 U.S. 255, 295 n.11 (2023); *see also Murthy*, 603 U.S. at 76. This Court should therefore reject this form of irreparable harm as well.

### B. Plaintiffs are Unlikely to Succeed on the Merits of Their Claims

The Court need not consider the merits of Plaintiffs' claims, or its likelihood of success thereon, to deny Plaintiffs' motion. *Savage v. Savage*, No. 19-cv-07994-DMR, 2020 WL 2525079, at *7 (N.D. Cal. May 18, 2020) (denying motion for preliminary injunction after concluding that the Court lacked subject matter jurisdiction over the dispute). But if the Court does reach the merits, it should decline to grant the relief requested both as to Plaintiffs' APA claims and as to their claim arising under the Spending Clause of Article I.

### 1. Plaintiffs Cannot Succeed On Their APA Claims

Plaintiffs raise an "APA procedural claim" and an "arbitrary and capricious" claim in their motion for preliminary relief. PI Mot. 16–20. But the APA does not permit "judicial review over everything done by an administrative agency." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (quotation omitted). Rather, judicial review is limited to "final agency action[s]." 5 U.S.C. § 704. Plaintiffs have failed to allege such action here. Even if Plaintiffs overcome this hurdle, they have not shown a likelihood of success on the merits of these

claims. Defendants' actions are not a "rule" such that they needed to go through notice and comment procedures to carry them out. And far from being arbitrary and capricious, their actions reflect reasonable judgments about the need to assist immigration authorities in carrying out their work and are tailored to those needs.

### a. Plaintiffs Have Not Identified a Final Agency Action to Challenge Through an APA Claim

Agency action is final—and therefore reviewable in a judicial action brought pursuant to the APA—only when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Plaintiffs allege that "transferring data to DHS" is such a reviewable action. PI Mot. 16. They argue that Defendants' position on engaging in this data-sharing "is not in flux" and that it "was unlawful under the Medicaid Act and its implementing regulations, as well as federal laws, regulations and agency policies designed to protect data privacy, security, and integrity." *Id.* at 16–17.

Even when an agency's course of action does not appear to be "in flux," to use Plaintiffs' phrase, courts often find that "final agency action" is lacking for failure to meet the precise requirements of § 705. Sometimes, the agency's process is not fully complete, even if the outcome seems certain. For instance, in *Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095 (9th Cir. 2007), plaintiffs sued the EPA in an attempt to stop a grant from being awarded to a particular project selected by Congress. The Ninth Circuit held that even though Congress had decided that the project should go forward, "the EPA does not take a final agency action until it completes its review of the grant application and decides to disburse the appropriated funds." *Id.* at 1104. Even when funding is "likely," the Court held that the process must be completed before the APA confers a

cause of action. *Id.* (quoting *Citizens Alert Regarding the Env't v. U.S. Envtl. Prot. Agency*, 259 F. Supp. 2d 9, 20 (D.D.C. 2003)). In other situations, the agency may have consummated its decision-making process, but the consequences of the decision are not "legal consequences." For instance, a decision to "[i]nitiat[e] an enforcement proceeding against a company" might be viewed as the consummation of a decision-making process, and it "may have a devastating effect on the company's business, but that does not make the agency's action final." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004) (collecting cases); *see also Air Cal. v. Dep't of Transp.*, 654 F.2d 616, 621–22 (9th Cir. 1981) (holding that a legal interpretation contained in a letter from the general counsel of the FAA to a local airport was non-final, despite serious indirect effects on plaintiff's business).

Plaintiffs' assertions satisfy neither of the *Bennett v. Spear* prongs. First, sharing between agencies does not "consummat[e]" a decisionmaking process in any formal sense. *Hawkes Co.*, 578 U.S. at 597. Deciding to share information about an alien's whereabouts is one of a variety of steps in a process that may lead to, for instance, an immigration enforcement proceeding, but it is not the "consummation" of that process. Second, allegations that data-sharing violates numerous laws (and Plaintiffs' motion fails to demonstrate that any such laws have been violated) does not mean that any rights or obligations of a regulated party have been determined as a result of the action, or that legal consequences will flow from the action. Those would only come after the data is used in some fashion. The alleged practical and monetary consequences on Plaintiffs' state Medicaid programs arising from the act of sharing do not fit the bill, even if they are theoretically significant. *See Air Cal.*, 654 F.2d at 621–22.

Plaintiffs cite out-of-circuit case law for the proposition that data sharing or disclosure can be "final agency action," but these authorities are distinguishable. In *Am. Farm Bureau Fed'n v.*

*U.S. Env't Prot. Agency*, 836 F.3d 963 (8th Cir. 2016), the injury was public disclosure of information that was exempt from disclosure under the Freedom of Information Act. *Id.* at 965, 969. Similarly, *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), concerned a policy of disclosing confidential information, including trade secrets, to potential plaintiffs in employment disputes without providing notice to the submitter. *Id.* at 929-30. Neither dealt with disclosure within the federal executive branch to a federal law enforcement agency with statutory rights to the information in question, in a context where the information in question is supposed to be disclosed to the law enforcement agency in the first place.

### b. Defendants Did Not Need To Pursue Notice and Comment Rulemaking To Engage In Data Sharing

Turning to the merits, Plaintiffs' first theory is that HHS did not follow the procedures required by 5 U.S.C. § 553 prior to agreeing to share information with DHS. PI Mot. 17–19. Under this theory, Plaintiffs allege that Defendants actions are inconsistent with 42 U.S.C. § 1106(a)(1) and regulations implementing it, which proscribe disclosure of certain information "except as the head of the applicable agency may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1). Plaintiffs then assert that "HHS has either abandoned or substantially amended those confidentiality rules" without going through the procedures required by § 553, and without cause for opting out of those procedures. PI Mot. 18. Plaintiffs' argument all but ignores the "otherwise provided" clause of § 1306(a), and it would be unreasonable to interpret HHS's regulations as limiting the ability of DHS and its sub-agencies to request information relevant to its law enforcement mission under its various statutory authorities, as discussed earlier. But critically, Plaintiffs' motion does not actually bring forward the argument that Defendants have acted contrary to these regulations. Instead, they allege that Defendants' actions constitute a new "rule," requiring notice and comment.

This analysis should be rejected, for three reasons. First, Defendants have not purported to take any action that would set aside or modify any of its preexisting regulations regarding data privacy. All of the relevant regulations Plaintiff cite remain in effect. Second, a "rule," for APA purposes, "means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). None of Defendants' actions, including their cooperative agreement regarding T-MSIS and prior actions intended to facilitate data sharing, are "rules." They are efforts to implement the preexisting statutory and regulatory authorities available to the Defendants, not attempts to create a whole new set of legal standards within a statutory framework dictated by Congress. Third, even if the Court concludes these actions are a "rule," it is not subject to notice and comment because it relates to "benefits." *See* 5 U.S.C. § 553(a)(2).

In *AFL-CIO v. Dep't of Labor*, --- F. Supp. 3d ----, 2025 WL 1129227 (D.D.C. Apr. 16, 2025), the district court rejected a similar procedural APA claim to the one Plaintiffs advance here because there was no suggestion that Defendants had withdrawn their regulations. *Id.* at *21. So too here. Plaintiffs have not brought a "contrary to law" claim in this motion, PI Mot. 16 n.9 (disclaiming this theory), and cannot bring such a challenge through the back door by recasting Defendants' actions as wholesale changes to regulations. As such, this claim should be rejected.

### c. Defendants' Actions Are Not Arbitrary and Capricious

Should the Court conclude it must assess the likelihood of success on Plaintiffs' arbitrary and capricious claim, Defendants are highly likely to prevail. "[R]eview under [this] standard is deferential," requiring a "court simply [to] ensure[] that the agency has acted within a zone of reasonableness and … reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This deferential standard

for assessing an agency's reasoning reflects a norm of democratic accountability: "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs[.]" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (Rehnquist, J., concurring in part and dissenting in part).

Defendants' actions fall well within this "zone of reasonableness." The President has directed his Administration to faithfully carry out the immigration laws, Exec. Order No. 14,159, 90 Fed. Reg. at 8443, and to curtail spending of federal taxpayer dollars on unqualified aliens to the greatest extent possible consistent with the law, Exec. Order No. 14,218, 90 Fed. Reg. at 10,581. Plaintiffs allege reliance on assurances made by past administrations that they would not seek to use information shared with CMS for this purpose. But these assurances did not categorically prohibit the sharing of T-MSIS data, and "the Administration's decision to use certain statutorily authorized tools" that were previously not used is not a change in position, particularly since aliens are legally required to keep ICE informed of their location in any event. *Centro*, 2025 WL 1380420, at *6–8 (rejecting prior internal memoranda as a basis for an arbitrary and capricious claim). Even if it were deemed a change in position, "this type of policy change is not actionable" because the sources Plaintiffs cite are not binding. *Id.* To the extent Plaintiffs believed that CMS *could not* share such information with ICE, Defendants were entitled to "conclude that reliance interests in [policies] that it views as unlawful are entitled to no or diminished weight." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32 (2020).

### 2. Plaintiffs Cannot Succeed On Their Spending Clause Claim

Article I of the Constitution confers expansive authority on Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." Art. I, § 8, cl. 1. The Supreme Court has recognized some

"general restrictions" on that power. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 576–82 (2012); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The Ninth Circuit recently distilled those decisions in an opinion rejecting a municipality's Spending Clause claim. *City of L.A.*, 929 F.3d at 1174–76. Recognizing such a claim here would mark an unsound expansion of Spending Clause doctrine, as there are at least two serious threshold issues with Plaintiffs' claim.

First, the Ninth Circuit has applied the framework of *Dole* and *NFIB* to "agency-drawn conditions" as well as ones drawn by Congress simply because it saw "no reason why the addition of an agency middleman either expands or contracts Congress's" spending power. *City of L.A.*, 929 F.3d at 1175 n.6. But this significant decision to "bridge" a "gap in existing Spending Clause precedent" was unnecessary because the panel concluded there was no Spending Clause violation under current doctrine. It was also erroneous. The Spending Clause is one of *Congress's* enumerated powers found in Article I; it does not restrict (or empower) the President or the Executive Branch, whose powers are conferred by Article II. If Congress has conditioned spending on a delegation so broad that the Executive Branch's discretion is an unconstitutional condition, that *statute* can be struck down under the Spending Clause. But it is a categorical error to strike down executive action to carry out statutory delegations of authority under the Spending Clause.

Second, Defendants actions here are not a new "condition" on the receipt of funds by Plaintiffs. Plaintiffs do not purport to challenge the requirement to report claims data to CMS that includes information about the immigration status of individuals, which have long been connected to federal reimbursement. Defendants are simply using the data Plaintiffs have provided in the past in ways that are consistent with statutory authority that has been on the books for decades. What

Plaintiffs are being asked to do—report claims data to CMS— has not changed. As such, Plaintiffs have identified no new conditions on receiving funding that could even be challenged.

These threshold concerns significantly diminish Plaintiffs' likelihood of success on this claim. But even if these concerns were ignored, the claim is unlikely to succeed. Plaintiffs arguments track categories of potential Spending Clause violations that the Ninth Circuit identified in *City of L.A.* in rejecting the Spending Clause claims in that case. None has merit.

First, Plaintiffs argue that the requirement is "ambiguous" because of the "substantial confusion and conflict . . . between CMS confidentiality and privacy rules . . . and CMS's actions . . . which expressly violate or severely undermine those same rules." PI Mot. 13–14. Yet just two pages later, they argue that Defendants' "position is not in flux" in order to bring this case within the APA's "final agency action" framework. *Id.* at 16.  Plaintiffs cannot persuasively suggest that decades-old guidance documents from prior administrations are creating serious confusion in light of the recent policy directives of the current Administration, explicit actions to authorize more robust data sharing between ICE and CMS, and longstanding federal statutory law. Should they submit Medicaid data, their conduct will be voluntary and knowing.

Second, Plaintiffs assert Defendants have imposed a "post-acceptance" or "retroactive" condition, and that Plaintiffs have relied on Defendants' past assurances regarding the use of Medicaid data to counsel their residents that their information would be shielded from immigration officials. PI Mot. 14–15. But Plaintiffs, not Defendants, created this dilemma. Federal law has long authorized, if not required, the sharing of information Defendants are now seeking to engage in. Indeed, the INA predates Medicaid itself by over a decade. Rather than acknowledge the sorts of disclosure federal law allows to their residents, Plaintiffs relied on guidance documents to counsel their residents that there was no possibility information shared with CMS might someday be used

for immigration enforcement purposes. The Spending Clause is not a safety valve for Plaintiffs if they promise something to residents federal law does not guarantee.

Third, Plaintiffs contend that Defendants' "efforts to mine sensitive and protected data for purposes like immigration enforcement are not related to" administering Medicaid and therefore fail the "germaneness" requirement of the Spending Clause. PI Mot. 15. This criteria is "not demanding," and Defendants' actions easily clear it. *City of L.A.*, 929 F.3d at 1175. Even if federal law did not include express instructions to the executive branch permitting information sharing for immigration enforcement purposes, immigration status has long been pertinent to Medicaid because it determines what services an individual is eligible to receive. And while federal law authorizes emergency Medicaid for unqualified aliens, reducing the amounts spent[6] on such services through more effective enforcement of immigration law would "bear[ ] some relationship to the purposes of the federal spending" on Medicaid. *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (quoted in *City of L.A.*, 929 F.3d at 1175).

Fourth, Plaintiffs contend that Defendants' actions are "unconstitutionally coercive" because "HHS's reinterpretation of its 'oversight' authority bootstraps serious consequences (i.e. deportation) onto a vital funding stream." PI Mot. 15. That is wrong. To start, it misapprehends Plaintiffs' own alleged injuries for standing, which are based on financial harms, not "deportation." Moreover, Medicaid eligibility has long been connected to immigration status, and Plaintiffs are not being asked to deviate in any significant way from their past data-sharing practices. Federal statutory law authorizes the use of data maintained by other agencies for purposes of immigration

---

[6] Letter from Phillip L. Swagel, Congressional Budget Office, to the Hon. Jodey Arrington, Chairman, Committee on the Budget, U.S. House of Representatives, Oct. 2, 2024 at 3 (estimating $26.5 billion in combined emergency Medicaid expenditures on unqualified aliens by federal and state governments in fiscal years 2017 through 2023).

enforcement. Plaintiffs relied upon what were, at best, informal assurances from prior Executive Branch officials to design their programs. But the Spending Clause of Article I does not prevent the Executive Branch, organized under Article II, from exercising discretion in a different way.

Just as the Ninth Circuit held in *City of L.A.*, 929 F.3d at 1176, none of the traditional Spending Clause limitation theories prohibits the information sharing Plaintiffs challenge here. Plaintiffs have therefore failed to establish they are likely to succeed on this claim.

## III.    The Remaining Injunction Factors Favors Defendants

Although there is no need to consider the remaining preliminary injunction factors, they too favor Defendants. A preliminary injunction would impinge on Defendants ability to lawfully share information and allocate law enforcement resources as they see fit. An injunction in this circumstance would therefore represent "an improper intrusion by a federal court into the workings of a coordinate branch of the Government" that is highly inequitable to Defendants and the public. *Immigr. & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers).

## IV.    Plaintiffs' Proposed Injunction Is Improper

For the reasons above, the Court should deny Plaintiffs' motion in its entirety. But even if the Court determines that a preliminary injunction is appropriate, it should limit the injunction in two ways. First, it should limit relief to the Plaintiffs and refrain from issuing a universal injunction as to the Medicaid data of all states who submit information to T-MSIS. An order preventing the sharing of information of all states would "likely exceed the equitable authority that Congress has granted to federal courts." *Trump v. CASA, Inc.*, 606 U.S. ---, 2025 WL 1773631, at *4 (2025). Second, because the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," Fed. R. Civ. P. 65(c), Plaintiffs should be required

to post an injunction bond that will cover the reasonable costs of ICE foregoing legitimate enforcement actions and of DOJ seeking appellate review of the injunction, if applicable. Alternatively, the Court should stay any injunction it enters pending potential appellate review.

## CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: July 25, 2025                                    Respectfully submitted,

                                                        BRETT A. SHUMATE
                                                        Acting Assistant Attorney General
                                                        Civil Division

                                                        ELIZABETH SHAPIRO
                                                        Deputy Director
                                                        Civil Division, Federal Programs Branch

                                                        */s/Michael J. Gerardi*
                                                        Michael J. Gerardi
                                                        Senior Trial Counsel (DC Bar No. 1017949)
                                                        United States Department of Justice
                                                        Civil Division, Federal Programs Branch
                                                        1100 L St. NW
                                                        Washington, DC 20005
                                                        Tel: (202) 616-0680
                                                        Fax: (202) 616-8460
                                                        E-mail: Michael.J.Gerardi@usdoj.gov

                                                        *Counsel for Defendants*