UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, *et. al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY JR., in his official capacity as Secretary of Health and Human Services; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br><br>*Defendants*. | Civil Action No. 3:25-cv-05536 |

### DECLARATION OF MARCOS D. CHARLES

I, Marcos D. Charles, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Acting Executive Associate Director for Enforcement and Removal Operations (ERO) at U.S. Immigration and Customs Enforcement (ICE) within the U.S. Department of Homeland Security (DHS). In this capacity, I am responsible for leading ERO in its mission to protect the homeland through the arrest and removal of aliens who undermine the safety of our communities and the integrity of our immigration laws. I am also responsible for a budget of approximately $5.1 billion and directing the operations of more than 7,800 employees assigned to 25 ERO field offices and headquarters, in over 200 domestic locations and 30 overseas locations.

2. I began my federal career in 1992, as a Border Patrol Agent for the former Immigration

1

and Naturalization Service in Hebbronville, TX. Over time, I was promoted to Senior Border Patrol Agent, Supervisory Border Patrol Agent, and Field Operations Supervisor. I joined ICE in 2008, as the Assistant Officer in Charge. My other positions with ICE ERO included positions of Assistant Field Office Director, Chief of Staff, Deputy Field Office Director, Field Office Director, and Acting Assistant Director.

3. I provide this declaration based on my personal knowledge, belief, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

4. I am familiar with the allegations made by plaintiffs in the instant lawsuit against the U.S. Department of Health and Human Services (HHS) and DHS.

5. The Immigration and Nationality Act (INA) requires aliens to register and notify in writing of each change of address within 10 days from the date of such change. Failure to notify of the change of address is a crime,[1] and it can lead to up to 30 days of imprisonment, as well as arrest and removal. Further, aliens in removal proceedings under INA § 240 of INA have a legal obligation to provide updated contact information. Having correct address information for an alien is vital for effective immigration enforcement proceedings as the address is relied upon by ICE to issue a Notice to Appear (NTA). An NTA is a document issued by DHS to initiate removal proceedings under INA § 240. The NTA serves as the formal charging document and sets forth the reasons why DHS believes the alien is deportable or inadmissible. The NTA informs the aliens that they are required to provide DHS, in writing, with their full mailing address and telephone number. It also informs the alien that he or she must notify the Immigration Court and DHS immediately

---

[1] *See* 8 U.S.C. 1306(b).

by using Form EOIR-33 whenever they change their address or telephone number during the course of the proceedings.

6. There are significant challenges in relying on aliens to provide their current and accurate address information. Aliens have been known to misplace their NTAs, even though the form also instructs the alien that they are required to carry it with them at all times. In addition, aliens in proceedings have mistakenly believed that informing the Immigration Court of a change in address also satisfies their obligation to inform DHS.

7. There are also challenges with collecting and using address information provided by aliens upon their release from DHS custody pending removal proceedings on the Executive Office for Immigration Review's (EOIR) non-detained dockets. Although the legal requirement exists for aliens in removal proceedings to provide updated contact information, some aliens disregard this obligation and fail to keep the government up to date as to their location. Likewise, some aliens provide false contact information to ICE in an effort to evade apprehension by immigration officers in the future.

8. ICE must frequently use other means to locate and apprehend aliens who should have been keeping the government up to date about their whereabouts. ICE is aware that other agencies may have more up-to-date and accurate information as to an alien's current address, for example when a person applies for Medicaid or another type of federal benefit.

9. As mentioned above, in order to advance the immigration priorities which include enforcing immigration laws to the fullest extent, ICE has sought data from other agencies to enhance our enforcement capabilities. Additionally, because of the priority to enforce immigration laws, other agencies have approached ICE with potential data that may be beneficial to ICE. Further, aliens should have already provided this information to DHS.

10.     On June 10, 2025 HHS CMS contacted ICE, stating that it was prepared to share information with ICE and sent data HHS CMS had received from California, the District of Columbia, Illinois, and Washington. However, the data that was provided was not in a format that could be used by ICE.

11.     On June 14, 2025, ICE provided HHS CMS with spreadsheets containing biographical data from the alien population from ENFORCE Alien Removal Module (EARM) which amounted to approximately 7.6 million individuals. ICE requested HHS CMS to provide address and phone numbers for any aliens for which it had data in the Transformed Medicaid Statistical Information System, or T-MSIS. HHS CMS was able to provide ICE with a spreadsheet of approximately 2.1 million entries that CMS could determine were matches for information in T-MSIS. The spreadsheet contained contact and identifying information, but no medical or diagnostic information. Many of the entries were duplicates; approximately 1.1 million of the records CMS provided were unique.  The data received from HHS CMS was then uploaded into ICE systems to be used to support criminal and civil enforcement actions.

12.     ICE recognized the value of this data in enhancing our criminal and civil enforcement actions and determined that it would be beneficial to enter into an agreement with HHS CMS for direct access to the T-MSIS system. That agreement, signed on July 15, 2025, is attached as Exhibit A to this declaration. This agreement grants ICE direct access to certain information on the T-MSIS system, thereby increasing the efficiency and expediency of retrieving up-to-date data.  While this initial agreement was for a three-month period, ICE has requested to extend the period of the agreement as the data has been useful in identifying the locations of criminal aliens.

Executed this 25th day of July, 2025.

                                                                                               _____

Marcos D. Charles
Acting Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security