ROB BONTA
Attorney General of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
WILLIAM BELLAMY
MARIA F. BUXTON
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU
ANNA RICH (State Bar No. 230195)
Deputy Attorneys General
  1515 Clay Street Suite 2000, P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-0296
  E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON,** | 3:25-cv-05536-VC<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:  August 7, 2025<br>Time: 10:00 a.m.<br>Courtroom:   Courtroom 4<br>Judge:    Hon. Vince Chhabria<br>Trial Date:    Not set<br>Action Filed: July 1, 2025 |
| Plaintiffs, | |
| **v.** | |
| **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR.,** in his official capacity as Secretary of the U.S. Department of Health and Human Services; **U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM,** in her official capacity as Secretary of Homeland Security, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Additional Background .......................................................................................... 1

Argument ............................................................................................................... 5

    I.    Plaintiffs Have Standing Under Article III ............................................ 5

    II.    Plaintiffs Are Likely To Succeed On Their Spending Clause Claims ................... 7

    III.    Plaintiffs Are Likely To Succeed On Their APA Claims ..................................... 9

        A.    Final Agency Action ............................................................... 9

        B.    Notice ........................................................................................ 10

        C.    Arbitrary And Capricious ...................................................... 11

    IV.    Plaintiffs Have Shown Irreparable Harm ............................................. 13

    V.    Remaining Factors Weigh In Plaintiffs' Favor ................................... 15

    VI.    Scope Of Injunction .............................................................................. 15

Conclusion .......................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Air Cal. v. Dep't of Transp.*
654 F.2d 616 (9th Cir. 1981).................................................................................................. 10

*Alcaraz v. Block*
746 F.2d 593 (9th Cir. 1984).................................................................................................. 11

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block*
655 F.2d 1153 (D.C. Cir. 1981) ............................................................................................ 11

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
559 F.3d 1046 (9th Cir. 2009)................................................................................................ 14

*Arizona v. Yellen*
34 F.4th 841 (9th Cir. 2022)..................................................................................................... 5

*Bass v. First Pacific Networks, Inc.*
219 F.3d 1052 (9th Cir. 2000)................................................................................................ 15

*Biden v. Nebraska*
600 U.S. 477 (2023) .................................................................................................................. 6

*California v. Azar*
911 F.3d 558 (9th Cir. 2018).................................................................................................... 5

*Centro de Trabajadores Unidos v. Bessent*
No. 25-cv-0677, 2025 WL 1380420 (D.D.C. May 12, 2025)................................................ 13

*City and Cnty. of San Francisco v. USCIS.*
981 F.3d 742 (9th Cir. 2020).................................................................................................... 6

*City of Los Angeles v. Barr*
929 F.3d 1163 (9th Cir. 2019).................................................................................................. 7

*Clapper v. Amnesty Intern. USA*
568 U.S. 398 (2013) .................................................................................................................. 6

*Clinton v. New York*
524 U.S. 417 (1998) .................................................................................................................. 7

*Cnty. of Santa Clara v. Trump*
250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................................................. 14

*Dept. of Homeland Security v. Regents of the University of Cal.*
591 U.S. 1 (2020) .................................................................................................................... 12

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*F.C.C. v. Fox Television Stations, Inc.*
556 U.S. 502 (2009) ................................................................................................ 12

*FDA v. Wages & White Lion Investments*
145 S.Ct. 898 (2025) .............................................................................................. 12

*Gordon v. Virtumundo, Inc.*
575 F.3d 1040 (9th Cir. 2009) .............................................................................. 11

*Haaland v. Brackeen*
599 U.S. 255 (2023) ................................................................................................ 15

*Johnson v. Couturier*
572 F.3d 1067 (9th Cir. 2009) .............................................................................. 15

*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024) .................................................................................................. 7

*Maine v. Taylor*
477 U.S. 131 (1986) .................................................................................................. 5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc., v. State Farm Mut. Auto Ins. Co.*
463 U.S. 29 (1983) .................................................................................................. 12

*Municipality of Anchorage v. United States*
980 F.2d 1320 (9th Cir. 1992) .............................................................................. 10

*Pharm. Soc'y of State of New York, Inc. v. New York State Dep't of Soc. Serv.*
50 F.3d 1168 (2nd Cir. 1995) ............................................................................... 15

*Sackett v. E.P.A.*
566 U.S. 120 (2012) ................................................................................................ 10

*San Francisco Herring Ass'n v. Dep't of the Interior*
946 F.3d 564 (9th Cir. 2019) .................................................................................. 9

*San Luis & Delta-Mendota Water Auth. v. Locke*
776 F.3d 971 (9th Cir. 2014) ................................................................................ 11

*State of S.C. ex rel. Patrick v. Block*
558 F. Supp. 1004 (D.S.C. 1983) ......................................................................... 10

*Steinle v. City & Cnty. of San Francisco*
919 F.3d 1154 (9th Cir. 2019) .............................................................................. 13

**TABLE OF AUTHORITIES**
(continued)

Page

*Trump v. CASA, Inc.*
   606 U.S. --- (2025) ................................................................. 15

*U.S. Army Corps of Eng'rs v. Hawkes Co.*
   578 U.S. 590 (2016) ............................................................... 10

*United States v. California*
   921 F.3d 865 (9th Cir. 2019) .................................................. 13

*Washington v. Trump*
   847 F.3d 1151 (9th Cir. 2017) ................................................ 14

STATUTES

5 U.S.C. § 533(a)(2) .................................................................. 11

8 U.S.C. § 1360(b) ............................................................. 3, 8, 12

8 U.S.C. § 1373(a) ................................................................. 3,13

Administrative Procedure Act ............................................... *passim*

Privacy Act ............................................................................... 11

Social Security Act .................................................................. 11

CONSTITUTIONAL PROVISIONS

U.S. Constitution ....................................................................... 1

COURT RULES

Rule 65(c) ................................................................................ 15

OTHER AUTHORITIES

42 C.F.R. § 401.134(c) .............................................................. 9

42 C.F.R. § 431.302 .................................................................. 9

## INTRODUCTION

Since Plaintiffs filed this case, Defendants have doubled down on the federal government's right to share and use Medicaid data in a manner that is both illegal and profoundly disruptive to the States' core healthcare programs. Unsatisfied with the *ad hoc* sharing of millions of Medicaid records for the unprecedented purpose of immigration enforcement, Defendants have now formalized ICE's access to the Medicaid records of more than 78 million recipients, effectively transforming a guarded medical record repository into a law enforcement dragnet. Defendants unlawfully seek to upend authorities that permit limited data sharing (such as for law enforcement, or administration of the Medicaid program) and States' longstanding and reasonable expectations regarding the federal government's treatment of their residents' private Medicaid data.

To support this abrupt rule change, Defendants rely on various executive orders that prioritize immigration enforcement and purport to authorize new standards for interagency data sharing. But executive actions and shifting immigration enforcement priorities do not allow Defendants to make an end-run around the Administrative Procedure Act (APA) or the U.S. Constitution. Yet Defendants' novel use of Medicaid data effectively re-writes the terms of federal public healthcare spending writ large, and conflicts with the purposes of those programs. Moreover, Defendants have done this without a clear acknowledgment of that change, and without regard for significant reliance interests, or examination of the costs and benefits of their actions. Because of these legal deficiencies, and in light of Plaintiffs' substantial, unrebutted evidence that Defendants' actions threaten State Medicaid programs and other State interests with imminent and irreparable harm, the Court should enter a preliminary injunction while this case is being adjudicated.

## ADDITIONAL BACKGROUND

Defendants' opposition attaches the only known public disclosure of a novel, and initially secret, interagency data sharing agreement between the Centers for Medicare & Medicaid Services (CMS) and Immigration and Customs Enforcement (ICE) agencies. *See* Information

Exchange Agreement (IEA or the Agreement).  The Agreement, which was signed and took effect *after* the filing of Plaintiffs' complaint, appears to represent an effort by Defendants to provide *post hoc* justifications for their unlawful data sharing, which (as Defendants acknowledge) began prior to the initiation of this lawsuit. *See* Brandt Decl. ¶¶ 29-32; Charles Decl. ¶¶ 10-12.  The Agreement nonetheless only confirms Plaintiffs' allegations that the federal government has reversed its prior legal interpretations and policies without engaging in a reasoned or transparent decisionmaking process.  In the words of one former CMS administrator, the Agreement is shocking and an abandonment of past assurances and longstanding CMS practices ensuring data privacy and protection.  Supplemental Declaration of Judith Cash ¶¶ 3, 7.

Section IV(A) of the Agreement provides ICE with "*direct* access to the T-MSIS [Transformed Medicaid Statistical Information System]" (emphasis added), CMS's main Medicaid dataset, which contains records on more than 78 million people enrolled in Medicaid and the Children's Health Insurance Program (CHIP) nationwide.  It allows ICE to "have direct access via the Integrated Data Repository," *see* IEA §V.B, an even larger data repository where CMS stores a mountain of data on Medicaid and Medicare beneficiaries, providers, health plans, claims, and so forth.[1]  This new Agreement proves what Plaintiffs had originally alleged: that Defendants are allowing disclosure and use of Medicaid data for purposes unrelated to administration of Medicaid, specifically to allow ICE "to retrieve information concerning the identity and location of aliens [i.e., noncitizens] in the United States."  IEA § I.

The Agreement purports to set out "conditions, safeguards, and procedures" on this new data sharing arrangement, IEA § I, but they are illusory.  The Agreement asserts that it is "executed in compliance with" the Privacy Act, the Social Security Act, "and the regulations and guidance promulgated thereunder," but only cites to penalties on States for Medicaid noncompliance, and lacks reference to other applicable HHS or DHS regulations or guidance. *Cf.* Complaint ¶¶ 56-90 (describing safeguards for privacy and confidentiality of federal data).

---

[1] *See* CMS, *Integrated Data Repository Cloud* (Dec. 5, 2023), https://security.cms.gov/pia/integrated-data-repository-cloud (last visited July 30, 2025).

The Agreement also purports to rely on immigration statutes, including 8 U.S.C. §§ 1360(b) and 1373(a), as a basis for requiring CMS to share available information "upon request" with DHS, but these statutes do not give federal agencies license to circumvent restrictions set by other healthcare and privacy laws that prohibit this use. The fact that these immigration statutes have never before been used to share this kind of Medicaid data with DHS underscores that Defendants' actions are contrary to any reasonable interpretation of the legal framework.

States' data collected in T-MSIS and divulged to ICE includes highly sensitive Medicaid information about citizens, legal permanent residents, and others. Defendants' counsel's nonspecific claims that "[t]he agreement provides ICE with a subset of T-MSIS data that excludes protected health information about conditions or diagnoses," Opp. at 8, cannot be credited in light of Defendants' own Declarations. *See* Brandt Decl. ¶ 32 (testifying that "ICE will be given access to T-MSIS data in CMS' Integrated Data Repository after completing the necessary training and documentation" without noting any limitations on data access); Charles Decl. ¶ 12 (testifying that ICE is being given "direct access to *certain* information on the T-MSIS system" without further clarification (emphasis added)).[2] The Agreement itself seems to have been drafted to obfuscate rather than clarify: it provides a list of "Data Elements" that ICE may access, but no express language stating that ICE's access to the Integrated Data Repository will be limited to those elements. *See* IEA § V.C. This omission is especially glaring because in other circumstances where CMS has entered into a lawful, binding data sharing agreements with other agencies, these agreements have included clear and unequivocal language about the data elements being shared.[3] Nor does the Agreement expressly exclude protected health information

---

[2] Although the Charles Declaration states that CMS previously provided a massive spreadsheet with personally identifiable information (PII) from T-MSIS that contained "no medical or diagnostic information," Charles Decl. ¶ 11, no such limitations are described with regard to ICE's direct access to CMS's data systems.

[3] For example, the publicly-available HHS and DHS Computer Matching Agreements routinely define with specificity the data elements that will be transmitted between agencies. *See, e.g.,* HHS, *Computer Matching Agreements*, https://www.hhs.gov/foia/privacy/cmas/index.html (Content last reviewed July 28, 2025); DHS, *Computer Matching Programs*, https://www.dhs.gov/computer-matching-programs (last updated April 10, 2025); Data Exchange Memorandum of Agreement between HHS CMS and DHS

(continued…)

concerning conditions or diagnoses, despite Defendants' representation in their opposition brief. Opp. at 8.  Moreover, nothing in the Agreement explains how CMS and ICE will verify that the data and data matches they are using to facilitate deportations and immigration enforcement are accurate.

The Agreement on its face provides no limits on ICE's access to T-MSIS and use of states' Medicaid data, hiding behind contradictory information about its scope. Although its purpose is defined as the "disclosure of identity and location information," that explicitly includes bank account and routing information, race and ethnicity information, Medicaid ID, and "other" "relevant" information beyond that stated scope.  IEA § I.  No category of T-MSIS information is explicitly excluded from the data sharing, as noted above.  Furthermore, the Agreement gives ICE "access to T-MSIS to receive information concerning the identification and location of aliens in the United States."  IEA § IV.B.2.  While the Agreement acknowledges that ICE will use confidential Medicaid data for immigration enforcement, it does not place any limits on ICE's access to T-MSIS.

In short, nothing in the terms of this Agreement prevents ICE, once it is logged into CMS's Integrated Data Repository, from reviewing *any* data about *any* Medicaid user or provider (or any data from any of the other programs housed within the IDR) and using that information as it sees fit.  The Agreement also includes a loophole that eviscerates any purported limitations on ICE's use of this data: it permits ICE to use or disclose confidential Medicaid data for any purpose it wants, even if that purpose is not described in the Agreement, so long as CMS "consents to the use or disclosure."  IEA § VII.A.

---

USCIS for the Verification of U.S. Citizenship and Immigration Status Data for Eligibility Determinations, CMS Agreement No. 2023-10, available at https://www.hhs.gov/sites/default/files/cms-2303-dhs-data-exch.pdf, at § IV.C (defining "specific data elements used in the match" between CMS and DHS).  Although the Agreement purports that it "does not constitute a computer matching program," IEA § II, that *ipse dixit* assertion is directly undermined by Defendants' acknowledgement that their activities involve matching DHS data about individuals' immigration status with CMS Medicaid records.

# ARGUMENT

## I.    PLAINTIFFS HAVE STANDING UNDER ARTICLE III

The States have made a substantial, unrebutted showing of harm that more than meets Article III's case or controversy requirement.

First, the States have demonstrated that Defendants' actions interfere with their sovereign rights, including numerous State statutes that protect the privacy of Medicaid applicants and limit data sharing. *See* PI at 11. In response, Defendants contend that the federal government is "not forcing" States to operate their programs in accordance with State law, and that this is a "self-imposed injury." Opp. at 13. But the States "clearly have a legitimate interest" in enforcing their own statutes, and their ability to protect Medicaid participants' privacy, notwithstanding the federal government's apparent reversal of course in regard to its own similar interests. *See Maine v. Taylor*, 477 U.S. 131, 137 (1986) (holding state had standing based on sovereign interests to enforce its own statutes despite the federal government's change in litigation position).

In fact, it is Defendants' position that States could be liable for noncompliance with the data sharing requirements (or otherwise at risk for administrative costs and penalties), despite Plaintiffs' strong objections to new federal policies to disclose and use that data for immigration enforcement. *See* IEA § II (G, H) (describing data sharing obligations on States and consequences for noncompliance, including withholding of federal funds); Brandt Decl. ¶¶ 7-19 (same); *see also Arizona v. Yellen*, 34 F.4th 841, 845, 852 (9th Cir. 2022) (state established standing based on threat of financial penalty in the face of alleged Spending clause violation). The States are thus forced to choose between fulfilling their own programs' laws and policies that separate Medicaid administration from immigration enforcement, or risking profound economic injury. Such harm to the States' sovereign authority and finances is anything but "self-inflicted." *See, e.g., California v. Azar*, 911 F.3d 558, 573-74 (9th Cir. 2018) (holding that a federal regulation that would require California to change state laws providing funding for contraceptive care or suffer economic injuries from increased use of those programs is not a

"self-inflicted" injury).

Nor are those financial consequences (which impact both sovereign and proprietary interests) the type of attenuated, speculative harms that are insufficient to establish standing. Plaintiffs have introduced substantial evidence that individuals are *already* starting to avoid programs for which they are eligible, including federally funded Medicaid services, because of reports of Defendants' new policies on data sharing and immigration enforcement.  Bassiri Decl. ¶ 26; Fotinos Decl. ¶¶ 25-26; Groen Decl. ¶ 20; Probert Decl. ¶ 17; Sandoe Decl. ¶ 18; Popat Decl. ¶¶ 8-9, 11-15; Mangia Decl. ¶¶ 20-21; Silva Decl. ¶ 11; Mendoza Decl. ¶¶ 9-14; Leong Decl. ¶ 10.  Harm to state Medicaid programs, which are part of the States' "essential public function" for their residents, is a type of propriety harm that is clearly sufficient for Article III purposes.  *See Biden v. Nebraska*, 600 U.S. 477, 490-91 (2023) (holding that financial harm to state student loan agency was sufficient to establish state standing).  Moreover, Defendants underplay the direct, non-speculative harms that their actions are causing to the States' proprietary interests in their state Medicaid programs, which are not only financial, but also concern damage to public trust, a valuable element of the States' public healthcare delivery systems.  Cash Decl ¶ 52; Probert Decl. ¶ 21; Connolly Decl. ¶ 24; Dellit Decl. ¶¶ 15-16; Mendoza Decl. ¶¶ 6-7; Silva Decl. ¶¶ 8, 11-12, 16; Mangia Decl. ¶¶ 20-23; Popat Decl. ¶¶ 8-9, 11-15.  And Defendants' well-known, draconian immigration enforcement policies are far from the consequence-free hypotheticals courts have found insufficient to support standing.[4] Similarly, the public health costs associated with those proprietary harms cause direct harm to the States, *see, e.g.*, Silva Decl. ¶¶ 14, 16, Mangia Decl. ¶ 23, and are more than sufficient to establish Article III standing.  *See City and Cnty. of San Francisco v. USCIS.*, 981 F.3d 742, 754

---

[4] Defendants cite to *California v. Texas*, which involved an extraordinary attempt by certain states to challenge a federal law that nominally required individuals to obtain health coverage, yet charged those individuals no penalty.  Understandably, the handful of relevant declarations submitted by the plaintiff states in that case were unable to establish actual fiscal harms to states flowing from a law that only created an unenforceable mandate on individuals. *See* 593 U.S. 659, 676 (2021); *see also Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 416 (2013) (rejecting private plaintiffs' attempts to "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm").

(9th Cir. 2020) (holding States had standing due to "reduced Medicaid revenue and federal funding" leading to *inter alia* "an overall increase in healthcare costs […] borne by public hospitals").

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR SPENDING CLAUSE CLAIMS

Defendants' new policies to use Medicaid data for immigration enforcement violate the Spending Clause because they are ambiguous, imposed retroactively, unrelated to the federal interests in the Medicaid program, and so coercive as to compel States to go along with them. Defendants' arguments to the contrary are unavailing.

Defendants first argue that it would be a "categorical error" to find a violation of the Spending Clause because the challenged actions were undertaken by agencies—not Congress itself—pursuant to their general statutory authority. But Defendants cannot discard the Ninth Circuit's clear admonition that Spending Clause limitations "apply to agency-drawn conditions on grants to states and localities just as they do to conditions Congress directly places." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175, n.6 (9th Cir. 2019). Defendants point to no authority to support their argument, and the Court should reject it.[5]

Next, Defendants argue that no new or surprise condition has been retroactively placed on federal Medicaid funds because the agencies are not requiring any change from the States, they are "simply using the data Plaintiffs have provided in the past in ways that are consistent with statutory authority that has been on the books for decades." Opp. at 21. This specious claim is an about-face from past federal administrations, including the ICE administrators who concluded in 2013 that immigration-status related information collected for determining Medicaid, CHIP, and ACA subsidies could not be used for civil immigration enforcement actions because the

---

[5] Defendants are also simply wrong to argue that the Court should not consider whether an agency action that relies on delegated authority from Congress must comply with the Spending Clause's limits on that same legislative authority. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024) ("[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it.").

agency was constrained by "the [Affordable Care Act's], the [Social Security Act's], and implementing regulations['] limitations on the use of information provided by individuals for such coverage."[6]  It reportedly came as a great surprise to the career CMS staff, over whose objections HHS transferred the States' Medicaid audit data to DHS.  Boergers Decl., Ex. A.  And it certainly comes as a great surprise to the States' Medicaid administrators, all of whom have testified that Defendants' decision to share Medicaid data broadly with DHS for immigration enforcement purposes is an unprecedented betrayal of public trust.  *See, e.g.*, Flores-Brennan Decl., ¶ 25; Fotinos Decl., ¶ 33; Probert Decl., ¶ 22; Sandoe Decl., ¶ 25.

Nor can Defendants claim that the States should have anticipated that ICE could be given unfettered access to core Medicaid data files based on generic provisions in the INA, such as 8 U.S.C. §§ 1360(b) or 1373.  To Plaintiffs' knowledge, the INA has never before been invoked to grant ICE (or its predecessors) direct access to sensitive Medicaid files for civil immigration enforcement purposes.  By Defendants' own acknowledgment, the Agreement does not cover the unlawful activities that took place before the agreement was signed.  *See* Brandt Decl. ¶¶ 29-31; Charles Decl. ¶¶ 10-11; Opp. at 8.  And regardless of the authority Defendants may have to adjust immigration enforcement policies and practices, they cannot violate the Spending Clause by changing the terms of the federal government's Medicaid contract with the States retroactively and without notice.  To be clear: Plaintiff States and others have always understood the potential risk that confidential Medicaid data (and other personal data gathered by the federal government) could be misused for immigration enforcement and other purposes.  But that is why the decades of assurances by the federal government that it would *not* use this data for these purposes are so important, and why the reliance interests at the heart of Plaintiffs' Spending Clause and APA claims are so critical.

Defendants argue that their sharing of Medicaid data for civil immigration purposes is somehow reasonably related to Medicaid (or EMTALA, which requires States and their

---

[6] U.S. Immigrations and Customs Enforcement, Clarification of Existing Practices Related to Certain Health Care Information (Oct. 25, 2013), *available at* https://www.ice.gov/doclib/ero-outreach/pdf/ice-aca-memo.pdf.

providers to offer emergency care to all in need, regardless of immigration status).  Defendants

rely on the undisputed fact that citizenship and immigration status are related to Medicaid

eligibility verification, but this common-sense point fails to show how immigration enforcement

activities are related to the purposes of the Medicaid program.  Plaintiffs' evidence shows these

activities are not only unrelated, they are actually inimical to, the provision of healthcare.  This

law, and implementing regulations at 42 C.F.R. § 401.134(c), run contrary to the IEA's broad

release of data for ICE to determine "the identity and location of aliens in the United States."

Finally, Defendants argue that their new policy is not impermissibly coercive because

"Medicaid eligibility has long been connected to immigration status."  Opp. at 23.  But this

argument again conflates eligibility verification—a well-established use of Medicaid data that

the States agree is proper—with immigration enforcement, which is anything but.  *See* 42 C.F.R.

§ 431.302 (defining "purposes directly related to State [Medicaid] plan administration" to

include eligibility, while limiting relevance of investigations, prosecutions, or civil criminal

proceedings to those "related to the administration of the plan").

## III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR APA CLAIMS

### A.    Final Agency Action

If there were any doubt about whether the APA's jurisdictional requirement for final

agency action was satisfied, it was resolved by the statements and evidence Defendants offered

in support of their opposition.  HHS's transfer of some of the States' audit data, the Agreement,

and any other similar agreements or actions that have yet to be revealed to the States or the

public, are final agency actions.  When an agency states a definitive position in a notice,

confirms that position orally,[7] and sends forth officials to execute that decision, then the

agency's "decisionmaking processes are clearly consummated."  *San Francisco Herring Ass'n v.*

*Dep't of the Interior*, 946 F.3d 564, 579 (9th Cir. 2019).  The Agreement states a definitive

position and requires ICE to execute that directive ("ICE will be provided access to the CMS

---

[7] *See* Camilo Montoya-Galvez, *ICE head says he won't block agents from wearing masks, confirms use of Medicaid data*, CBS NEWS, July 18, 2025, https://www.cbsnews.com/news/ice-todd-lyons-interview-masks-medicaid/.

Integrated Data Repository to retrieve information concerning the identity and location of aliens in the United States."). IEA § I. It is of no moment that the steps to grant ICE access to the CMS Integrated Data Repository "have not yet been completed." Brandt Decl. ¶ 32; *see Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) ("[t]he mere possibility that an agency might reconsider [its decision]. . . does not suffice to make an otherwise final agency action nonfinal."). Moreover, as Defendants acknowledge, HHS has already shared State Medicaid data for ICE to use "to support criminal and civil enforcement actions." Charles Decl. ¶ 11. The Agreement simply formalizes this arrangement after the fact. While there may be some situations in which interagency data sharing is provisional in nature, such as in *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) or *Air Cal. v. Dep't of Transp.*, 654 F.2d 616, 621-22 (9th Cir. 1981), Defendants offer no persuasive explanation why the decisions challenged here should be treated as non-final. The harms and legal consequences for the States, described in Section I, *supra*, flow from CMS's disclosure and ICE's planned use, not from any particular ICE enforcement proceedings. *See, e.g.*, Bassiri Decl. ¶ 26 (describing harms resulting from news of data sharing), Fotinos Decl. ¶¶ 25-26; Groen Decl. ¶ 20; Probert Decl. ¶¶ 17, 21; Sandoe Decl. ¶ 18.

## B. Notice

Plaintiffs are also likely to succeed on their claim that Defendants' change in policy failed to comply with APA notice and comment requirements. Defendants do not deny that their new policy determinations, as reflected in the Agreement, are substantive rules regarding data sharing that bind federal agencies and govern the data submitted by the States. Because the federal government purports to have established a new "binding norm," it should have complied with the APA's notice-and-comment procedures. *See Municipality of Anchorage v. United States*, 980 F.2d 1320, 1324-25 (9th Cir. 1992). It is "manifestly unfair for the defendants to announce [a new agency policy] in a way that does not give notice to those who are affected, such as in briefs in litigation." *State of S.C. ex rel. Patrick v. Block*, 558 F. Supp. 1004, 1013 (D.S.C. 1983).

Instead, Defendants argue that the States (and by extension the public) should already have

understood that Medicaid files could be handed over to ICE based on pre-existing exemptions in the Privacy and Social Security Acts, such as 42 U.S.C. § 1306(a)(1)'s exception for disclosures of information "as otherwise provided by Federal law," and their implementing regulations.  But the States cannot be expected to anticipate the federal government's unprecedented reliance on previously un-used authorities, or its reinterpretation of established routine uses like "law enforcement" or "related to program administration."  If the federal government could excuse any transfer of information under its own conception of the law enforcement exemption, the exemptions would "swallow[] the rule and undermine[] the regulatory balance that Congress established."  *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1063 (9th Cir. 2009) (quoting *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 356 (4th Cir. 2006)).  Defendants cannot pretend that nothing has changed in order to evade the APA.[8]

### C.    Arbitrary And Capricious

Defendants' new policy of allowing unfettered use of Medicaid data by ICE is arbitrary and capricious because, as explained in Plaintiffs' motion, Defendants failed to consider: consequences on Medicaid programs and beneficiaries; the ability of Medicaid to implement Congress's mandates; the States' and others' significant reliance interests; or any other costs to the decision.  Defendants dispute none of these points.

Instead, Defendants argue that their change in policy is owed deference because it was the result of a change in administration, and because Defendants' actions fall within a "zone of reasonableness."  But deference to changing executive preferences is neither "unlimited" nor "automatic."  *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).  Rather, where, as here, the agency "has relied on factors which Congress has not

---

[8] The argument that Defendants' actions are not subject to notice-and-comment requirements because it relates to a "benefit" is similarly unavailing. While the APA does exempt regulations relating to "agency management or personnel or to public property, loans, grants, benefits, or contracts," 5 U.S.C. § 533(a)(2), these subject matter exceptions are "narrowly construed and only reluctantly countenanced."  *Alcaraz v. Block,* 746 F.2d 593, 612 (9th Cir. 1984) (quoting *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)).  Moreover, the "more expansive the regulatory reach of these rules, of course, the greater the necessity for public comment." *Am. Fed'n of Gov't Emp., AFL-CIO,* 655 F.2d at 1156.

intended it to consider, entirely failed to consider an important aspect of the problem," or failed to "set forth the reasons for its decision," then courts will deem the action arbitrary and capricious. *See, e.g.*, *Dept. of Homeland Security v. Regents of the University of Cal.*, 591 U.S. 1 (2020) (DHS's attempted rescission of Deferred Action for Childhood Arrivals program was reviewable and arbitrary and capricious in part based on agency's failure to consider reliance interests); *Motor Vehicle Mfrs. Ass'n of U.S., Inc., v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (agency cannot "entirely fail[] to consider an important aspect of the problem").

Nor do Defendants have the "discretion" to impose new conditions on "policy grounds" without, as Defendants admit, "display[ing] awareness that it *is* changing [its] position" and "show[ing] that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original); *see also FDA v. Wages & White Lion Investments*, 145 S.Ct. 898, 917 (2025). Doing neither, Defendants simply cite old statutes and exemptions that were previously considered inapplicable, without acknowledging any of the countervailing authorities (including Defendants' own regulations and authorized public communications), not to mention the important reliance interests of the States and Medicaid applicants and beneficiaries. *See* PI at 6-7, 14; Leong Decl. ¶¶ 6-7; Mendoza Decl. ¶ 8; Silva Decl. ¶ 8; Popat Decl. ¶ 13.

For example, as legal authority for their unprecedented disclosure of confidential Medicaid data, Defendants cite 8 U.S.C. § 1360(b), which provides that any information in any records "as to the identity and location of aliens in the United States" shall be made available to DHS. IEA § II.E. This statute has been in place since 1952, and yet, to the best of Plaintiffs' knowledge, it has never been invoked as a justification for using confidential Medicaid data for the purpose of immigration enforcement. Meanwhile, the Agreement fails to acknowledge (or at best gives lip service to) the numerous federal statutes, regulations and formal policies that have for decades assured the States and their communities that sensitive Medicaid data would not be used for immigration enforcement purposes. *See, e.g.*, Compl. ¶¶ 56-82. And the Agreement seems to contradict statutory authority that has otherwise been strictly construed. *See, e.g.*,

*United States v. California*, 921 F.3d 865, 891–92 (9th Cir. 2019) (holding that Section 1373 applies only to immigration status and does not extend to information like addresses or whether a given alien may be removed or detained); *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019) (holding that Section 1373(a) clearly does not include information not referenced in the statute).  None of these authorities justify agency actions that otherwise violate basic APA tenets regarding reasoned rulemaking.

The fact that a diverse array of potentially applicable statutory authorities exist is all the more reason why Defendants' past assurances regarding the applicability of those authorities, and their view of the scope of various exemptions, were so important to the States and their communities.  Notably, some of those past policies, such as the 2013 ICE policy directive, are considerably more definitive than the IRS manuals considered by the D.C. district court in *Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677, 2025 WL 1380420, *8 (D.D.C. May 12, 2025), which were found to be merely nonbinding policy statements that set forth procedures rather than directed agency action.

## IV.     PLAINTIFFS HAVE SHOWN IRREPARABLE HARM

Defendants' arguments that Plaintiffs have not shown irreparable harm are unavailing.

First, they repeat the claim that Plaintiffs seek to assert the privacy rights of their residents as *parens patriae.  See* Opp. at 14 (citing *Murthy v. Missouri*, 603 U.S. 43 (2024)).  As described in Section I, however, Plaintiffs' claims are independent of the privacy rights of their residents and, instead, are based on direct harms caused by Defendants to their budgets, public health, and ability to administer their Medicaid programs.  PI at 22-24.

Second, Defendants' argument that Plaintiffs' injuries are "indirect," "down-stream," and "speculative" ignores the wealth of evidence that Defendants' actions have already caused direct and immediate harm to the States.  Opp. at 14.  Plaintiffs' residents are already voluntarily disenrolling from health coverage for which they are eligible.  *See* Fotinos Decl. ¶ 25 (620 state-only Medicaid enrollees disenrolled in June 2025, five times higher than average of previous five months); *see also* Sandoe Decl. ¶ 18 ("community partners and application assisters ... have

described Oregon residents who have already declined to enroll … and others who are considering disenrolling"); Leong Decl. ¶ 10 ("Since news broke, community members and CBOs have already raised questions about how to disenroll from coverage."). Similarly, States' residents are already refusing to seek necessary medical care. *See* Silva Decl. ¶ 11 (patient fears are "leading to hesitation or refusal to seek care, including critical follow-up care, or to enroll for health coverage"); Mangia Decl. ¶ 21 (medical provider "has seen a significant increase in no-shows and patient cancellation … [s]ome patients have even discontinued their services … entirely"); Popat Decl. ¶¶ 8-9, 11 ("Distrust … has led patients to delay and avoid medical care," and health insurance enrollers have seen a "40-50% decrease in insurance enrollment appointments"). Reduced access to healthcare will exacerbate States' residents existing medical conditions. For example, one California patient with HIV and co-occurring cardiovascular diseases recently cancelled all future appointments for fear of ICE monitoring. Popat Decl. ¶ 8.

Finally, Defendants' argument that HHS has not acted to revoke any funding ignores the fact that the States must share confidential Medicaid data with CMS on an ongoing basis in order to receive crucial federal Medicaid funding, even though the States are now aware that the federal government is unlawfully using this data in a manner that harms the States and their residents. Forcing the States to choose between a loss of Medicaid funding and agreeing to unconstitutional funding terms constitutes a basis for irreparable harm. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537–38 (N.D. Cal. 2017); s*ee also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (Plaintiffs "should not be required to adhere to various unconstitutional provisions … and are likely to suffer irrevocably if forced to do that or give up their businesses."). Significant funding cuts and resulting budget uncertainty constitute irreparable harm. *See*, *e.g.*, *Cnty. of Santa Clara*, 250 F. Supp. 3d at 537 (finding irreparable harm where uncertainty caused by executive action "interfere[d] with [plaintiffs'] ability to budget, plan for the future, and properly serve their residents"); *see also Washington v. Trump*, 847 F.3d 1151, 1168-69 (9th Cir. 2017) (federal Executive Order caused injury to students and faculty subject to restrictions but also caused budgetary uncertainty and harm to

14

plaintiff universities' mission). And, as described in Section I, it is the States themselves, not only their residents, that bear the consequences of long-term public health harms. *Cf. Haaland v. Brackeen*, 599 U.S. 255, 295, n.11 (2023) (rejecting state's attempt to assert third-party standing on behalf of some residents).

## V.    REMAINING FACTORS WEIGH IN PLAINTIFFS' FAVOR

For the reasons described above, as well as those set forth in the States' motion, the public interest and balance of equities also weigh decidedly in favor of a preliminary injunction.

## VI.    SCOPE OF INJUNCTION

With respect to the scope of the proposed relief, Plaintiffs note that their initial notice of motion sought a preliminary injunction prohibiting transfer of "the States'" Medicaid data files. PI at 1. Thus, the preliminary injunction sought by Plaintiffs does not implicate *Trump v. CASA, Inc.*, 606 U.S. ---, 2025 WL 1773631 (2025).

Defendants also request an injunction bond (without specifying an amount or articulating any particular costs). "Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation omitted). Moreover, "[a]lthough the rule speaks in mandatory terms, an exception to the bond requirement has been crafted for […] cases involving the enforcement of 'public interests' arising out of 'comprehensive federal health and welfare statutes.'" *Pharm. Soc'y of State of New York, Inc. v. New York State Dep't of Soc. Serv.*, 50 F.3d 1168, 1174 (2nd Cir. 1995) (citation omitted). And Defendants should not be allowed to collect appellate litigation fees via a bond. *See Bass v. First Pacific Networks, Inc.*, 219 F.3d 1052, 1055 (9th Cir. 2000) (noting that attorney's fees are not recoverable upon an injunction bond). The Court should exercise its discretion to waive a bond or require one in a nominal amount. Likewise, the Court should deny Defendants' request for a stay, as they do not address and cannot meet the stay factors.

## CONCLUSION

The Court should issue a preliminary injunction.

Dated:  July 30, 2025                              Respectfully submitted,

LETITIA JAMES                                        ROB BONTA
Attorney General for the State of New York           Attorney General for the State of California
MARK LADOV                                           NELI PALMA
Special Counsel                                      Senior Assistant Attorney General
RABIA MUQADDAM                                       KATHLEEN BOERGERS
Chief Counsel for Federal Initiatives                Supervising Deputy Attorney General
ZOE LEVINE                                           WILLIAM BELLAMY
Special Counsel for Immigrant Justice                MARIA F. BUXTON
NATASHA KORGAONKAR                                   KATHERINE MILTON
Special Counsel                                      KEVIN G. REYES
28 Liberty St. New York, NY 10005                    STEPHANIE T. YU
(212) 416-8240mark.ladov@ag.ny.gov
*Attorneys for the State of New York*

                                                     /s/  *Anna Rich*_____
                                                     ANNA RICH
                                                     Deputy Attorneys General
                                                     *Attorneys for the State of California*

*Additional Counsel*

KRISTIN K. MAYES
Attorney General for the State of Arizona
ALEXA G. SALAS
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Alexa.Salas@azag.gov
ACL@azag.gov
*Attorneys for the State of Arizona*

PHILIP J. WEISER
Attorney General for the State of Colorado
RYAN LORCH
Senior Assistant Attorney General
SAM WOLTER
Assistant Attorney General
1300 Broadway, #10
Denver, CO 80203
Ryan.lorch@coag.gov
samuel.wolter@coag.gov
*Attorneys for the State of Colorado*

KWAME RAOUL
Attorney General for the State of Illinois
HARPREET KHERA
Bureau Chief, Special Litigation
SHERIEF GABER
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
sherief.gaber@ilag.gov
harpreet.khera@ilag.gov
*Attorneys for the State of Illinois*

AARON M. FREY
Attorney General for the State of Maine
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
brendan.d.kreckel@maine.gov
*Attorneys for the State of Maine*

ANTHONY G. BROWN
Attorney General for the State of Maryland
MICHAEL DREZNER
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor

WILLIAM TONG
Attorney General of Connecticut
JANELLE MEDEIROS
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
Janelle.Medeiros@ct.gov
*Attorneys for the State of Connecticut*

AARON M. FREY
Attorney General for the State of Maine
BRENDAN KRECKEL
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
brendan.d.kreckel@maine.gov
*Attorneys for the State of Maine*

KATHLEEN JENNINGS
Attorney General for the State of Delaware
IAN R. LISTON
Director of Impact Litigation
JENNIFER KATE AARONSON
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*

ANNE E. LOPEZ
Attorney General for the State of Hawaiʻi
KALIKOʻONĀLANI D. FERNANDES
Solicitor General
DAVID D. DAY
Special Assistant to the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
*Attorneys for the State of Hawaiʻi*

KEITH ELLISON
Attorney General for the State of
Minnesota
KATHERINE J. BIES
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101

Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us
*Attorneys for the State of Maryland*

ANDREA JOY CAMPBELL
Attorney General for the State of
Massachusetts
KATHERINE DIRKS
Chief State Trial Counsel
ETHAN W. MARKS
Assistant Attorney General
Office of the Massachusetts Attorney
General
1 Ashburton Place Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*

DANA NESSEL
Attorney General for the State of Michigan
NEIL GIOVANATTI
BRYAN BEACH
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
BeachB@michigan.gov
*Attorneys for the State of Michigan*

PETER F. NERONHA
Attorney General for the State of Rhode
Island
LEE B. STALEY
Chief, Health Care Unit
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
lstaley@riag.ri.gov
 *Attorneys for the State of Rhode Island*

DAN RAYFIELD
Attorney General State of Oregon
BRIAN S. MARSHALL
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201

(651) 300-0917
Katherine.Bies@ag.state.mn.us
*Attorneys for the State of Minnesota*

AARON D. FORD
Attorney General for the State of Nevada
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov
*Attorneys for the State of Nevada*

MATTHEW J. PLATKIN
Attorney General of New Jersey
ESTEFANIA PUGLIESE-SAVILLE
ELIZABETH R. WALSH
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5289
elizabeth.walsh@law.njoag.gov
*Attorneys for the State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico
AMY SENIER
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
asenier@nmdoj.gov
*Attorneys for the State of New Mexico*

CHARITY R. CLARK
Attorney General for the State of Vermont
RYAN P. KANE
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802)828-3171
Ryan.kane@vermont.gov
*Attorneys for the State of Vermont*

NICHOLAS W. BROWN
Attorney General of Washington
ZANE MULLER
WILLIAM MCGINTY
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

Tel (971) 673-1880      *Attorneys for Plaintiff State of Washington*
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov
*Attorney(s) for Plaintiff State of Oregon*

Plaintiffs' Reply ISO Mot. For Preliminary Injunction (3:25-cv-05536-VC)