UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>    Defendants. | Case No. 25-cv-05536-VC<br><br>**ORDER RE HEARING** |

The parties should be prepared to discuss the following non-exclusive list of questions at Thursday's hearing:

- At times, the states appear to be assuming that the law categorically precludes HHS from sharing data with DHS for immigration enforcement purposes. This seems contrary to 6 U.S.C. § 122(b), 8 U.S.C. § 1360(b), 5 U.S.C. § 552a(b)(7), and possibly 8 U.S.C. § 1373(a). If the states are really making this argument, what authority do they rely on?

- For the states' APA claims, assume for the sake of discussion that it would be lawful for DHS to obtain Medicaid data from HHS for immigration enforcement purposes, so long as both agencies implemented that policy change consistent with existing procedural guardrails and obligations. The defendants appear to be arguing that HHS's decision to share data with DHS for immigration enforcement purposes, and DHS's decision to use Medicaid data for immigration enforcement purposes, are "policy statements" rather than "legislative rules." *See*, *e.g.*, *Syncor International Corp. v. Shalala*, 127 F.3d 90, 93-96 (D.C. Cir. 1997) (discussing

the differences among legislative rules, interpretive rules, and policy statements). Assuming that is the defendants' position, their arguments are pretty sparse. Why do these decisions represent policy statements rather than legislative rules, and what case law supports that conclusion? Any cases not cited in the briefs must be disclosed to the other side before the hearing.

- Why was DHS's June 10 decision to obtain the data from HHS for immigration enforcement purposes arbitrary, and what would DHS have needed to do before making such a decision? Why was HHS's June 10 decision to share the data with DHS for immigration enforcement purposes arbitrary, and what would HHS have needed to do before making such a decision? Why was each agency's decision to enter the July 15 agreement granting CMS direct access to T-MSIS arbitrary, and what would HHS and DHS, respectively, have needed to do before making such a decision? In other words, assuming the law does not categorically preclude DHS from obtaining Medicaid data from HHS for immigration enforcement purposes, what (if anything) should the Court order each agency to go back and do? Assume for purposes of this question that the decisions represent policy statements rather than legislative rules.

- The Court is struggling to conceptualize the states' Spending Clause argument. The Spending Clause is generally implicated where Congress or the executive branch tells a state that funding will be withheld unless the state is willing to do *x* or *y*. Here, the states are sharing Medicaid data with the federal government as they've always done, and as must be done for the federal-state Medicaid partnership to operate. It's just that the federal government has decided to do something different with the data it receives from the states. How does this policy change even implicate the Spending Clause? If the states have any authority for the proposition that the Spending Clause is implicated in a situation analogous to this, they should be prepared to cite and explain it (and should provide citations to

the defendants in advance of the hearing).

- Relatedly, is it the states' position that whenever the federal government lawfully makes a Medicaid-related policy change, or lawfully imposes a new Medicaid requirement on the states, this gives rise to a potential Spending Clause claim because the states were not on notice, when they began participating in the program back in the 1960s or 1970s, that the requirement would be imposed?

**IT IS SO ORDERED.**

Dated: August 6, 2025

VINCE CHHABRIA
United States District Judge