UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>　　　　Defendants. | Case No. 25-cv-05536-VC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. Nos. 43, 83, 89 |

　　　　The motion for a preliminary injunction is granted in part and denied in part. Because the issues presented by this motion are time sensitive, this ruling assumes that the reader is familiar with the facts, the applicable laws, regulations, and legal standards, the arguments made by the parties, and the transcript of the hearing.

　　　　The Center for Medicaid Services (which is part of the Department of Health and Human Services) has long adhered to a policy of not sharing data about Medicaid patients with Immigration and Customs Enforcement (which is part of the Department of Homeland Security) for purposes of immigration enforcement. Similarly, ICE has had a policy, since at least 2013 and possibly a lot longer, of not using CMS data for immigration enforcement purposes. But in June 2025, CMS began sharing data about Medicaid patients with ICE for immigration enforcement purposes. And in July 2025, CMS and ICE entered into a formal data-sharing agreement. It appears that ICE is primarily focused on obtaining current address information for people who are in the country unlawfully. But CMS appears to have granted ICE unfettered access to all information about all Medicaid patients in the United States, whether citizens or noncitizens.

A group of states, led by California, has sued the federal government, seeking to prevent DHS from using data about Medicaid patients for immigration enforcement purposes and to put a stop to the data-sharing arrangement.

At the outset, it bears noting that there does not appear to be anything categorically unlawful about DHS obtaining data from agencies like HHS for immigration enforcement purposes. Several federal statutes appear to permit, and sometimes even require, agencies to provide such information to DHS upon request. *See, e.g.*, 5 U.S.C. § 522a(b)(7); 42 U.S.C. § 1306(a)(1); 6 U.S.C. §§ 122(a)–(b); 8 U.S.C. §§ 1360(b), 1373. As discussed at the hearing, there may be limits to what DHS can receive, and there may be prerequisites DHS must satisfy to ensure data is protected and not misused. But the parties have not given the Court enough information to fully understand this complicated statutory and regulatory landscape.

Regardless, under the Administrative Procedure Act, when federal agencies make policy changes, they may not do so arbitrarily. *See* 5 U.S.C. § 706(2)(A). Such changes must be the product of a reasoned decisionmaking process and must be properly explained. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Although an agency need not demonstrate to a court's satisfaction that the new policy is better than the old one, more detailed justification is required when an agency changes a policy that "has engendered serious reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also DHS v. Regents of the University of California*, 591 U.S. 1, 30, 32–33 (2020).

As mentioned, since at least 2013, ICE has had a policy against using Medicaid data for immigration enforcement purposes.[1] This policy has been publicized to states, medical providers, and (most importantly) Medicaid patients.[2] Similarly, CMS has long maintained a policy of only using patients' personal information to run its health care programs, and has publicized that

---

[1] Clarification of Existing Practices Related to Certain Health Care Information (Oct. 25, 2013), https://www.ice.gov/doclib/ero-outreach/pdf/ice-aca-memo.pdf [https://perma.cc/C2KY-B66Y].
[2] More Information for Immigrant Households, https://www.healthcare.gov/immigrants/immigrant-families/ [https://perma.cc/MTT5-8XLM].

policy on its website.³ Given these policies, and given that the various players in the Medicaid system have relied on them, it was incumbent upon the agencies to carry out a reasoned decisionmaking process before changing them.

The record in this case strongly suggests that no such process occurred. To be sure, the Administration has made clear, through a series of Executive Orders and elsewhere, that immigration enforcement will become a higher priority in general. But using CMS data about Medicaid patients for immigration enforcement involves unique policy tradeoffs. As shown by the evidence presented by the states, using CMS data for immigration enforcement threatens to significantly disrupt the operation of Medicaid—a program that Congress has deemed critical for the provision of health coverage to the nation's most vulnerable residents. The evidence presented in this case indicates that HHS and DHS did not consider these tradeoffs before deviating from the agencies' longstanding policy of protecting Medicaid patient information from use for immigration enforcement. Nor is there any indication that the agencies considered whether to limit the scope of the data to which ICE has access (for example, allowing ICE to only access address information for people in the country illegally, rather than all private medical information about all Medicaid patients throughout the country). The agencies also implemented this policy change without communicating it to the relevant participants in the federal-state Medicaid partnership, without considering whether the states should be given time to adjust before implementation, and without considering the extent to which the states, providers, and patients relied on assurances that patient data would not be used for immigration enforcement purposes. Thus, at least on this record, the states have demonstrated a likelihood of success on their "arbitrary and capricious" claim under the APA, which means that HHS and DHS likely must go back and engage in a reasoned decisionmaking process before adopting and implementing such a significant change.

---

³ CMS Privacy Home Page (last updated Sept. 10, 2024), https://www.cms.gov/about-cms/information-systems/privacy [https://perma.cc/39KD-A8SH]. (Although, under the statutes cited above, it's not clear that CMS could maintain such a policy against DHS's wishes.)

The same evidence referenced in the preceding paragraph establishes that the states are likely to suffer irreparable harm from the way the agencies implemented this change in longstanding policy. (It also establishes that the states have Article III standing.) And for similar reasons, the states have shown that the balance of hardships and the public interest warrant preliminary injunctive relief. The interest asserted by the agencies in ramping up immigration enforcement is certainly legitimate and entitled to deference, but the harm from delaying access to this single enforcement tool until the agencies undertake a reasoned decisionmaking process is outweighed by the harm and disruption that this bolt-from-the-blue reversal has visited upon the states, providers, and patients.

The states also seek an injunction requiring the agencies to undertake notice-and-comment rulemaking before deciding whether to change their policies, under the theory that the policy change qualifies as a "legislative rule" within the meaning of the APA. That request is denied. The states have not demonstrated—at least in the current motion—that a proposal to reverse the policy of not sharing information between HHS and DHS for immigration enforcement purposes would require notice-and-comment rulemaking. This is without prejudice to re-raising the issue later because neither side provided the Court with adequate authority or argument about whether notice-and-comment rulemaking would be required. Furthermore, the agencies can consider this issue as part of the decisionmaking process required by this ruling.

The states also seek an injunction based on the claim that the decision to use Medicaid data for immigration enforcement constitutes a Spending Clause violation. As discussed at the hearing and in the pre-hearing order, the Court is somewhat skeptical of that claim. But for now, it will be denied as moot in light of the ruling under the APA that the agencies must go back and engage in a reasoned process before deciding how to handle this data. And of course, the agencies now have an opportunity to consider the Spending Clause issue as part of that process.

Accordingly, DHS is preliminarily enjoined from using Medicaid data obtained from the plaintiff states for immigration enforcement purposes. This includes data already acquired from CMS. For clarity, these states are California, Arizona, Colorado, Connecticut, Delaware, Hawaii,

4

Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington.[4] Further, HHS is preliminarily enjoined from sharing Medicaid data obtained from the plaintiff states with DHS for immigration enforcement purposes.

This preliminary injunction will remain in place until the shorter of: (1) the termination of this litigation; or (2) 14 days after both DHS and HHS have completed a reasoned decisionmaking process (or rulemaking, if necessary) that considers the matters discussed in this ruling, along with any other relevant policy tradeoffs or legal considerations. Assuming the agencies complete a reasoned decisionmaking process or rulemaking before this litigation ends, they must inform the plaintiff states within 24 hours of completing that process and must file a status report on the docket within 48 hours of completing the process.

**IT IS SO ORDERED.**

Dated: August 12, 2025

                                                                                                          VINCE CHHABRIA
                                                                                                          United States District Judge

---

[4] The states presumably could have sought a ruling temporarily setting aside the policy entirely because the authority of a district court to issue such relief under the APA is not disturbed by *Trump v. CASA*, 145 S. Ct. 2540, 2554 n.10 (2025). But they merely sought relief as to their own data.