1   ROB BONTA
    Attorney General of California
2   NELI PALMA
    Senior Assistant Attorney General
3   KATHLEEN BOERGERS
    Supervising Deputy Attorney General
4   WILLIAM BELLAMY
    MARIA F. BUXTON
5   KATHERINE MILTON
    KEVIN G. REYES
6   STEPHANIE T. YU
    ANNA RICH (State Bar No. 230195)
7   Deputy Attorneys General
      1515 Clay Street Suite 2000, P.O. Box 70550
8     Oakland, CA 94612-0550
      Telephone: (510) 879-0296
9     E-mail: Anna.Rich@doj.ca.gov
    *Attorneys for Plaintiff State of California*

10  *Additional Counsel Listed on Signature Page*

11

12              IN THE UNITED STATES DISTRICT COURT

13           FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15
    **STATE OF CALIFORNIA; STATE OF**          Case No. 3:25-cv-05536-VC
16  **ARIZONA; STATE OF COLORADO; STATE OF**
    **CONNECTICUT; STATE OF DELAWARE;**
17  **STATE OF HAWAII; STATE OF ILLINOIS;**
    **OFFICE OF THE GOVERNOR EX REL. ANDY**    **AMENDED COMPLAINT FOR**
18  **BESHEAR,** in his official capacity as Governor of  **DECLARATORY AND**
    the Commonwealth of Kentucky; **STATE OF**  **INJUNCTIVE RELIEF**
19  **MAINE; STATE OF MARYLAND;**
    **COMMONWEALTH OF MASSACHUSETTS;**         Date:
20  **STATE OF MICHIGAN; STATE OF**            Time:
    **MINNESOTA; STATE OF NEVADA; STATE OF**   Dept:
21  **NEW JERSEY; STATE OF NEW MEXICO;**       Judge: Hon. Vince Chhabria
    **STATE OF NEW YORK; STATE OF OREGON;**    Trial Date:
22  **STATE OF RHODE ISLAND; STATE OF**        Action Filed: July 1, 2025
    **VERMONT; STATE OF WASHINGTON;**
23  **STATE OF WISCONSIN,**
                                Plaintiffs,
24            v.
    **U.S. DEP'T OF HEALTH AND HUMAN**
25  **SERVICES; ROBERT F. KENNEDY JR.,** in his
    official capacity as Secretary of Health and Human
26  Services; **U.S. DEP'T OF HOMELAND**
    **SECURITY; KRISTI NOEM,** in her official
27  capacity as Secretary of Homeland Security,
                                Defendants.
28

---

**INTRODUCTION**

1.    In the seven decades since Congress enacted the Medicaid Act to provide medical assistance to vulnerable populations, federal law, policy, and practice has been clear: personal and private healthcare data collected about beneficiaries of the program is confidential, to be shared only in certain narrow circumstances that benefit public health and the integrity of the Medicaid program itself.  This reticence makes sense.  If members of our community cannot trust that the government will keep their medical history and other personal data safe, they will think twice about going to the doctor when needed.

2.    In June, 2025, the federal government's policy of keeping State Medicaid agencies' healthcare records confidential abruptly changed, without notice, opportunity for public input, or reasoned decision-making.

3.    Upon information and belief, the U.S. Department of Health and Human Services (HHS)'s Centers for Medicare & Medicaid Services (CMS) handed over a trove of individuals' protected health data obtained from States, including California, Illinois, and Washington, to other federal agencies, including the Department of Homeland Security (DHS).  Millions of individuals' health information was transferred without their consent, and in violation of federal law.  In doing so, the Trump administration silently destroyed longstanding guardrails that protected the public's sensitive health data and restricted its use only for purposes that Congress has authorized, violating federal laws including the requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq*.  Meanwhile, the other Plaintiff States fear the administration's intent to improperly share their States' sensitive data in the same way.

4.    HHS claims it is giving this massive amount of personal data to the DHS "to ensure that Medicaid benefits are reserved for individuals who are lawfully entitled to receive them," falsely implying the existence of widespread Medicaid beneficiary fraud.  But Congress itself extended coverage and federal funds for emergency Medicaid to all individuals residing in the United States, even those who lack satisfactory immigration status.  The States have and will continue to verify individuals' eligibility for federally funded Medicaid services using established federal systems and cooperate with federal oversight activities to ensure that the federal

Amended Complaint for Declaratory and Injunctive Relief

government pays only for those Medicaid services that are legally authorized. But never before has this oversight required the type of unauthorized interagency data sharing that is at issue in this case.

5.    Moreover, the context in which CMS shared this data with ICE casts serious doubt on the government's explanation for its actions. It has been widely reported that the Department of Government Efficiency (DOGE) has been amassing federal benefit data, such as Social Security recipient information, and individuals' tax information, to build a searchable database of Americans' information for several purposes, including to assist ICE in immigration enforcement actions.

6.    DOGE has enlisted the help of technology company Palantir to help build this searchable database that combines federal agencies' data on individuals. One former engineer at the company has sounded the alarm in the press about Palantir's project, warning that "[c]ombining all that data, even with the noblest of intentions, significantly increases the risk of misuse."[1] Palantir's product, Foundry, has already been pushed to DHS and HHS, paving the way for the administration to more easily merge information collected from these different agencies.[2]

7.    Plaintiffs bring this action to protect their State Medicaid programs, and to prevent them from being used in service of an anti-immigrant crusade, or other purposes unrelated to administration of those programs. Defendants' illegal actions carry serious consequences. States will lose federal funds as fear and confusion stemming from the disclosures cause noncitizens and their family members to disenroll, or refuse to enroll, in emergency Medicaid for which they are otherwise eligible, leaving States and their safety net hospitals to foot the bill for federally mandated emergency healthcare services. States will also ultimately bear the negative public health costs associated with reduced utilization of healthcare for childbirth and other emergency

---

[1] Sheera Frenkel and Aaron Krolif, *Trump Taps Palantir to Compile Data on Americans*, New York Times (May 30, 2025), https://www.nytimes.com/2025/05/30/technology/trump-palantir-data-americans.html
[2] *Id.*

conditions.  Meanwhile, the public will suffer irreparable damage due to increased morbidity and mortality.

8.      The Court should issue declaratory and injunctive relief to protect State data containing this highly sensitive information, and to bar the federal government from reneging on the terms of the longstanding State/federal Medicaid partnership.

**JURISDICTION AND VENUE**

9.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the California Attorney General and the State of California have offices at 455 Golden Gate Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California, and therefore reside in this district, and no real property is involved in this action.  This is a civil action in which Defendants are agencies of the United States or officers of such an agency.

11.     Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) and 3-5(b) because Plaintiffs maintain offices in the District.

**PARTIES**

*Plaintiffs*

12.     Plaintiff the State of California, by and through Attorney General Rob Bonta, brings this action.  The Attorney General is the chief law officer of the State of California and head of the California Department of Justice.  He has the authority to file civil actions to protect California's rights and interests and the resources of this State.  Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11, 12600-12; *see Pierce v. Superior Court*, 1 Cal. 2d 759, 761-62 (1934) (The Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state … and the protection of public rights and interests.").

13.     Plaintiff the State of Arizona is a sovereign state in the United States of America.  Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

Amended Complaint for Declaratory and Injunctive Relief

14.    Plaintiff the State of Colorado is a sovereign state of the United States of America. Colorado is represented by Attorney General Phil Weiser, who acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

15.    Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

16.    Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State*." Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

17.    Plaintiff the State of Hawaiʻi, represented by and through its Attorney General Anne Lopez, is a sovereign state of the United States of America. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

18.    Plaintiff the State of Illinois is represented in this action by the Attorney General of Illinois, who is the chief legal officer of the State and is authorized to pursue this action on behalf of the State under Article V, Section 15 of the Illinois Constitution and 15 ILCS 205/4.

19.    Plaintiff Office of the Governor *ex rel.* Andy Beshear brings this suit his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky. Const. § 81. In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution. Ky. Const. § 228.

20.    Plaintiff the State of Maine, represented by and through its Attorney General Aaron M. Frey, is a sovereign state of the United States of America.  As the State's chief law officer, the Attorney General is authorized to act on behalf of the State in this matter.

21.    Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

22.    Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America.  Massachusetts is represented by Andrea Joy Campbell, the Attorney General of Massachusetts, who is the chief law officer of Massachusetts and authorized to pursue this action.

23.    Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

24.    Plaintiff the State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

25.    Plaintiff the State of Nevada is a sovereign state in the United States of America. Nevada is represented by Attorney General Aaron D. Ford, who is the chief law enforcement officer of Nevada.

26.    Plaintiff the State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew J. Platkin, who is the chief law enforcement officer of New Jersey.

27.    Plaintiff State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

28.    Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America.  As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

Amended Complaint for Declaratory and Injunctive Relief

29.    Plaintiff the State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield, who is the chief legal officer of Oregon.

30.    Plaintiff State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

31.    Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State. Vt. Stat. Ann. tit. 3, § 159.

32.    Plaintiff State of Washington, represented by and through Attorney General Nicholas W. Brown, is a sovereign state of the United States of America. The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

33.    Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

***Defendants***

34.    Defendant Robert F. Kennedy, Jr., is the Secretary of the U.S. Department of Health and Human Services. He is sued in his official capacity.

35.    Defendant U.S. Department of Health and Human Services is a department of the executive branch of the United States government. The Centers for Medicare & Medicaid Services (CMS) is an agency within HHS that is responsible for administering the Medicaid Act.

36.    Defendant U.S. Department of Health and Human Services and Defendant Kennedy shall collectively be referred to as "HHS."

37.    Defendant Kristi Noem is the Secretary of the U.S. Department of Homeland Security. She is sued in her official capacity.

38.    Defendant U.S. Department of Homeland Security is a department of the executive branch of the United States government, responsible for enforcement of the nation's immigration

laws, among other programs.  Immigration and Customs Enforcement (ICE) is an agency within DHS that is responsible for interior enforcement of U.S. immigration laws.

39.    Defendant U.S. Department of Homeland Security and Defendant Noem shall collectively be referred to as "DHS."

## LEGAL BACKGROUND

### I. Overview of Federal Medicaid Act and Related Healthcare Laws

40.    Created in 1965, Medicaid is an essential source of health insurance for lower-income individuals and particular underserved population groups, including children, pregnant women, individuals with disabilities, and seniors.  *See* Social Security Amendments of 1965, Pub. L. No. 89-97, §121, 79 Stat. 286, 343-352 (codified as amended at 42 U.S.C. §1396 et seq.).

41.    States choose whether to participate in the Medicaid program.  Each participating State develops and administers its own unique health plans; so long as States meet threshold federal statutory criteria, they can tailor their plans' eligibility standards and coverage options to residents' needs.  States implement their Medicaid programs in accordance with comprehensive written plans that must be reviewed and approved by the Secretary of HHS.  *See generally* 42 U.S.C. § 1396a.

42.    Medicaid is jointly funded by state and federal expenditures.  The federal government's share of funds available for services provided to States for Medicaid beneficiaries, known as Federal Financial Participation (FFP), is calculated according to statutory formulae, the Federal Medicaid Assistance Percentage (FMAP).  The Children's Health Insurance Program (CHIP) provides health coverage to children in families with incomes too high for regular Medicaid but too low for private coverage; it is also jointly funded by state and federal expenditures.

43.    Eligibility for Medicaid depends in part on citizenship and immigration status. Federal law divides individuals who are not United States citizens into "qualified" and "non-qualified" categories for purposes of eligibility for federally funded Medicaid coverage not limited to emergencies or childbirth (also known as "full-scope" Medicaid).  63 Fed. Reg. 41,658, 41,659 (Aug. 4, 1998) (explaining that non-qualified immigrants are excluded from non-

7

emergency, federally funded Medicaid, and other federal benefits).  "Qualified immigrants"

currently include (1) lawful permanent residents (green card holders); (2) individuals granted

asylum; (3) refugees; (4) persons paroled into the United States under INA Section 212(d)(5) who

have been in the country for at least one year; (5) certain individuals subject to withholding of

removal (deportation); (6) noncitizens granted conditional entry prior to April 1, 1980; (7) certain

Cuban and Haitian entrants; and (8) individuals lawfully residing in the U.S. in accordance with a

Compact of Free Association (COFA).  8 U.S.C. § 1641(b).  Certain victims of domestic violence

or human trafficking are also "qualified."  8 U.S.C. § 1641(c).

44.    Not all qualified noncitizens are eligible for federally funded benefits like Medicaid,

however; some (such as lawful permanent residents) must wait five years before becoming

eligible.  8 U.S.C. § 1613.  Others, like asylees and refugees, do not need to wait five years before

becoming eligible for full-scope, federally funded Medicaid.

45.    Non-qualified immigrants include temporary visitors, asylum seekers whose

applications are still pending, recipients of Deferred Action for Childhood Arrivals (DACA)

status, holders of Temporary Protected Status (TPS), other lawfully present individuals not listed

in 8 U.S.C. § 1641, as well as persons who are present in the United States without authorization

from DHS.  8 U.S.C. § 1641(c).

46.    Congress has ensured that a specific set of important and urgent healthcare services

are available to all United States residents, including those in the "not qualified" category of

noncitizens.  These important and urgent services include emergency medical treatment and

public health assistance for immunization and testing and treatment of communicable disease.

8 U.S.C. § 1611(b)(1)(A), (C).  The federal Medicaid Act provides States with funding for

emergency medical treatment for serious conditions, including emergency labor and delivery.

42 U.S.C. § 1396b(v)(3).  A separate federal law, the federal Emergency Medical Treatment and

Labor Act (EMTALA), requires hospitals to provide emergency medical treatment to everyone in

need, regardless of insurance coverage or ability to pay and regardless of citizenship or

immigration status.  42 U.S.C. § 1395dd.

47.    Congress also gives States the choice to cover, with regular federal matching dollars, lawfully residing children and pregnant individuals under Medicaid and CHIP during their first five years in the United States. Section 214 of the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA), Pub. L. No. 111-3, 123 Stat. 8.  States also have an option to cover prenatal services regardless of immigration status under the "From-Conception-to-the-End-of-Pregnancy" option.  *See* 42 C.F.R. § 457.10.

48.    States also may use state funds to extend additional Medicaid-like benefits to a broader range of immigrants.  *See, e.g*., 8 U.S.C. § 1621(d).

**II.    Federal Laws Authorizing Data Sharing**

**a.  Eligibility Verification**

49.    Personal data is routinely exchanged between the States and the federal government for purposes of verifying eligibility for Medicaid.  States are required to affirmatively verify the immigration status of all applicants for federally funded, full-scope Medicaid.  8 U.S.C. § 1642 (a-b); 42 C.F.R. § 435.910(a), (e)(2).

50.    States must have an income and eligibility verification system for the exchange of information regarding federally funded benefits that meets federal requirements.  42 U.S.C. § 1320b-7(a).  This system must include "adequate safeguards […] so as to assure that […] the information exchanged by State agencies is made available only to the extent necessary to assist in the valid administrative needs of the program receiving such information" and that "the information is adequately protected against unauthorized disclosure for other purposes, as provided in regulations established by the Secretary of Health and Human Services."  42 U.S.C. § 1320b-7(a)(5).

51.    Applicants without Social Security Numbers who indicate an applicable status for non-emergency, full-scope Medicaid will have that information verified with DHS, through an automated system that "protects the individual's privacy to the maximum degree possible."  *Id*. § 1320b-7(d)(3)(B).  States can comply by checking applicants' eligibility via a centralized "Data Services Hub" run by CMS that provides access to the Department of Homeland Security's Systematic Alien Verification for Entitlement (SAVE).  Operated by DHS, SAVE is the federal

9

government's central repository for biographic, citizenship, and immigration status information on all individuals in the United States.  SAVE data indicates whether an applicant is lawfully present; whether the applicant is a qualified noncitizen, or a naturalized or acquired citizen; and whether waiting periods or the Children's Health Insurance Program Reauthorization Act (CHIPRA) Section 214 exemptions for qualified noncitizens apply and have been met.

52.    Federal law exempts noncitizens applying for or receiving Medicaid for treatment of an emergency medical condition from providing Social Security Numbers and/or documenting their immigration or citizenship status.  42 U.S.C. § 1320b-7(f).

53.    If a State follows the required procedures for verification of citizenship or immigration status, the federal government is not allowed to take "any compliance, disallowance, penalty, or other regulatory action against a State" with respect to erroneous citizenship or immigration status determinations.  42 U.S.C. § 1320b-7(e).

### b.  Transformed Medicaid Statistical Information System

54.    In addition to eligibility verification, the States routinely share more detailed, protected health information with CMS.  To obtain an enhanced FMAP, States must provide "detailed individual enrollee encounter data and other information that the Secretary may find necessary and including […] data elements […] that the Secretary determines to be necessary for program integrity, program oversight, and administration, at such frequency as the Secretary shall determine." 42 U.S.C. § 1396b(r)(1)(F); 42 C.F.R. § 438.818.

55.    Using its statutory authority, CMS mandates State participation in the Transformed Medicaid Statistical Information System (T-MSIS), CMS's main Medicaid dataset.  *See* 42 C.F.R. §§ 433.116, 438.242, 438.604, and 438.818.  States must submit data to T-MSIS on at least a monthly basis.  State-reported data held by CMS in T-MSIS includes Medicaid beneficiary eligibility and demographic information, including unique identifiers, addresses, sex, race and ethnicity, etc.; records of health claims and encounters, including beneficiaries' diagnosis and treatment information; and Medicaid provider enrollment data, including identifiers and addresses.  *See* CMS, T-MSIS Data Guide (Ver. 3.38.0), https://www.medicaid.gov/tmsis/dataguide/v3/.

56.    The purpose of T-MSIS is to provide "improved program monitoring and oversight, technical assistance with states, policy implementation, and data-driven and high-quality Medicaid and CHIP programs that ensure better care, access to coverage, and improved health." *See* CMS, Notice of a Modified System of Records, 84 Fed. Reg. 2,230-02 (Feb. 6, 2019).

### c.    Quality Reviews and Audits

57.    The States also routinely provide CMS with Medicaid reports and data for federal oversight purposes.  These include (but are by no means limited to) Quarterly Expenditure Reports & Data, an accounting statement of the state's actual recorded expenditures and disposition of Federal funds; and monthly data reports on eligibility and enrollment, which reflect the state's enrollment activity for all populations receiving comprehensive Medicaid and CHIP benefits, as well as state program performance data.  For example, every quarter, States file reports with CMS containing an estimate of their Medicaid benefit costs and administrative expenses, and certifying the availability of state funds.  The States further provide responses to "such other investigation as the Secretary may find necessary" to calculate proper payments to States.  42 U.S.C. § 1396b(d)(1).

### III.    Federal Laws Limiting Data Sharing and Protecting Data Security

### a.    Social Security Act and Implementing Rules

58.    In recognition of the sensitive nature of personal data collected pursuant to the Social Security Act, Congress has authorized special guardrails that limit use of this collected data for purposes related to administration of Medicaid and other Social Security Act programs.

59.    The Social Security Act provides, *"[n]o disclosure ...* of any file, record, report, or other paper, or any information […] shall be made except as the head of the applicable agency may by regulations prescribe and except as otherwise provided by Federal law."  42 U.S.C. § 1306 (a)(1) (emphasis added); *see also id.* § 1306(a)(2) (applying this privacy provision to both HHS and the Social Security Administration).  This prohibition applies to all of the Medicaid data containing protected health information obtained by HHS in paragraphs 47-55 above.

60.     HHS has not issued regulations authorizing the unfettered transfer of Medicaid data containing protected health information to DHS (or other law enforcement agencies), nor does federal law otherwise provide for this type of transfer from CMS to other federal agencies.

61.     To the contrary, well-established HHS regulations prioritize confidentiality and limitations on disclosures of this type of data.

62.     Most Medicaid data can only be made available "when this can be done consistently with obligations of confidentiality and administrative necessity."  42 C.F.R. § 401.126(c).

63.     Most Medicare information (and by extension Medicaid information, *see* 42 C.F.R. § 401.101(a)(1) (applying this subpart to "any other information subject to" the Social Security Act's privacy mandate)) may only be released to "an officer or employee of an agency of the Federal or a State government lawfully charged with the administration of a program receiving grants-in-aid under title V and XIX [Medicaid] of the Social Security Act *for the purpose of administration of those titles*[,]" or the uniformed services civilian health program.  42 C.F.R. § 401.134(a) (emphasis added).

64.     Disclosure for purposes of investigating program integrity concerns is permitted, but again, HHS regulations impose strict limits.  Medicaid data may be shared with:

> any officer or employee of an agency of the Federal or a State government lawfully charged with the duty of conducting an investigation or prosecution with respect to possible fraud or abuse against a program receiving grants-in-aid under Medicaid, but only for the purpose of conducting such an investigation or prosecution […] provided that the agency has filed an agreement with CMS that the information will be released only to the agency's enforcement branch and that the agency will preserve the confidentiality of the information received and will not disclose that information for other than program purposes.

42 C.F.R. § 401.134(c).

65.     State Medicaid plans similarly are required by federal statute to provide "safeguards which restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with […] the administration of the plan[.]"  42 U.S.C. § 1396a(7)(A)(i); *see also, e.g.,* 42 C.F.R. Chapter IV, Subchapter C, Part 431, Subpart F ("Safeguarding Information on Applicants and Beneficiaries"), including §§ 435.907(e)(1) (limiting state agency collection of information to only what is necessary to make eligibility

determinations or administer state Medicaid plan), (e)(3) (limits on state collection of SSNs, including that non-applicant SSNs be voluntary and "used only to determine an applicant's or beneficiary's eligibility for Medicaid or other insurance affordability program or for a purpose directly connected to the administration of the State plan").

66.     State Medicaid agencies must enact their own state confidentiality protections to enforce the federal regulations for safeguarding information about beneficiaries and applicants. 42 C.F.R. § 431.303.  States must also make assurances in their Medicaid plan that they submit for approval to CMS that such protections are in place.

67.     HHS has communicated its confidentiality policy to Medicaid applicants and beneficiaries.  For example, CMS's template Medicaid application expressly states to prospective applicants, "We'll keep all the information you provide private and secure as required by law. We'll use personal information only to check if you're eligible for health coverage."[3]  States are required to use this, or similar language, in their state-specific materials.  42 C.F.R. § 435.907(b). CMS has approved the States' application language.

68.     In accord with these limits, DHS policy historically has not allowed use of Medicaid personal information for immigration enforcement purposes.  An October 25, 2013 ICE policy memorandum states:

> ICE does not use information about such individuals or members of their household that is obtained for purposes of determining eligibility for [Medicaid and other federally funded healthcare] coverage as the basis for pursing a civil immigration enforcement action against such individuals or members of their household, whether that information is provided by a federal agency to the Department of Homeland Security for purposes of verifying immigration status information or whether the information is provided to ICE by another source.

This ICE policy has been publicly available on DHS's website for years.

### b.  Privacy Act

69.     Congress enacted the Privacy Act of 1974 to "provide certain safeguards for an individual against an invasion of personal privacy," by requiring governmental agencies to

_____

[3] CMS Single Streamlined Application, OMB No. 0938-1191, expires: Sept. 30, 2027 (last visited Jun. 21, 2025), https://www.medicaid.gov/state-resource-center/mac-learning-collaboratives/downloads/single-streamlined-application.pdf.

maintain accurate records and providing individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves.  Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974).

70.    To accomplish this purpose, the Privacy Act sets forth conditions for disclosure of private information and precludes an agency from disclosing information in its files to any person or to another agency without the prior written consent of the individual to whom the information pertains.  *See* 5 U.S.C. § 552a(b).

71.    Among these instructions, the Privacy Act requires federal agencies to follow specific procedures before they "maintain, collect, use, or disseminate," any covered information.  5 U.S.C. §§ 552a(a)(3), (e)–(f).

72.    When an agency "establish[es] or revis[es]" a "system of records" containing retrievable information about individuals, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records."  *Id.* § 552a(e)(4), (a)(5) (defining "system of records").

73.    This notice, commonly referred to as a System of Records Notice ("SORN"), must identify, inter alia, the name and location of the system; the categories of individuals on whom records are maintained in the system; the purpose for which information about an individual is collected; the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of records; and the procedures by which individuals can request notification of and access to information pertaining to them.  *Id.* § 552a(e)(4).

74.    Each SORN provides the public with information regarding the relevant system of records, which is a necessary precondition for an individual to exercise their right to "gain access" to records that are "contained in the system."  *Id.* § 552a(d)(1).

75.    At least 30 days before publishing a SORN, the agency must also publish notice in the Federal Register "of any new use or intended use of the information in the system" and provide an opportunity for interested parties to submit "written data, views, or arguments to the agency."  *Id.* § 552a(e)(11).

76.     Thus, before an agency can establish or revise a system of records, it must provide notice and an opportunity for public comment at least 30 days in advance.  The Privacy Act establishes a similar notice and comment requirement for the establishment or revision of a data match with other federal, state, or local government entities.  *Id*. § 552a(e)(12).

77.     The Privacy Act further provides that "[n]o agency shall disclose any record which is contained in a system of records ... except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."  *Id*. § 552a(b) (1982 ed., Supp. V).

78.     The Privacy Act also lists exceptions to the bar on disclosure.

79.     For example, an agency may disclose the records it maintains within the agency "to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought."  *Id.* § 552a(b)(7).

80.     Additionally, an agency may disclose a record "for a routine use," defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected."  *Id.* §§ 552a(a)(7), (b)(3).  Any "routine use" must be detailed in the relevant System of Records Notice, published in the Federal Register.

**c.   Health Insurance Portability and Accountability Act (HIPAA)**

81.     The Health Insurance Portability and Accountability Act (HIPAA) is another key data privacy law that governs the use and disclosure of individuals' protected health information.  Pub. L. 104–191, 110 Stat. 1936; 45 C.F.R. pts. 160, 164.

82.     Protected health information is, in part, information (including demographic information) that relates to the provision of health care to an individual, as well as the past, present, or future payment for health services provided to an individual.  45 C.F.R. § 160.103.  Covered entities may not use or disclose protected health information unless expressly permitted or required, or at the individual's consent.  *Id*. at § 164.502.

15

83.     Covered entities include health plans, health care clearinghouses, and health care providers.  45 C.F.R. § 160.103.  CMS is a covered entity subject to HIPAA's requirements with respect to Medicaid program administration because it pays for individuals' health coverage through Medicaid.

84.     HIPAA does contain exceptions for certain types of disclosures, such as compliance with an administrative request for which response is required by law (e.g., an administrative subpoena).  45 C.F.R. § 164.512(f).  However, that exception is limited to requests that are sufficiently "specific and limited in scope."  *Id*. at § 164.512(f)(1)(ii)(C).

### d.  Federal Information Security Management Act (FISMA)

85.     The Federal Information Security Management Act ("FISMA") is a federal law enacted under Title III of the E-Government Act of 2002. Pub. L. 107-347, 116 Stat. 2933 (Dec. 17, 2002).

86.     FISMA requires each federal agency to develop, document, and implement an agency-wide program to provide information security for the information and systems that support the operations and assets of the agency, including those provided or managed by another agency, contractor, or other sources. As defined in FISMA, "[t]he term 'Federal information system' means an information system used or operated by an executive agency, by a contractor of an executive agency, or by another organization on behalf of an executive agency." 40 U.S.C. § 11331(g)(1).

87.     FISMA was later amended by the Federal Information Security Modernization Act of 2014, Pub. L. 113-283, 128 Stat. 3073 (Dec. 18, 2014). As the CMS website devoted to FISMA explains, these 2014 reforms were "passed in response to the increasing amount of cyber attacks on the federal government." CMS, *Federal Information Security Modernization Act (FISMA)*, https://security.cms.gov/learn/federal-information-security-modernization-act-fisma (last visited June 25, 2025). The changes, among other things, strengthened the use of continuous monitoring in systems and increased focus on the agencies for compliance and reporting that is more targeted at the issues caused by security incidents. 44 U.S.C. § 3551.

16

88.     In support of and reinforcing FISMA, OMB through Circular A-130, "Managing Information as a Strategic Resource," requires executive agencies within the federal government to: plan for security; ensure that appropriate officials are assigned security responsibility; periodically review the security controls in their systems; and authorize system processing prior to operations and periodically thereafter, among other requirements. Off. of. Mgmt. & Budget, Exec. Off. of the President, OMB Cir. No. A-130, *Managing Information as a Strategic Response* (2016).  This includes following standards set by the National Institute of Standards and Technology ("NIST").  *See* CMS, *Federal Information Security Modernization Act (FISMA)*, https://security.cms.gov/learn/federal-information-security-modernization-act-fisma (last visited June 25, 2025) ("While FISMA sets the legal requirement for annual compliance, the National Institute of Standards and Technology (NIST) is the government body responsible for developing the standards and policies that agencies use to ensure their systems, applications, and networks remain secure.").

89.     Accordingly, under FISMA, federal agencies need to provide "information security protections commensurate with the risk and magnitude of the harm resulting from unauthorized access, use, disclosure, disruption, modification, or destruction of (A) information collected or maintained by or on behalf of an agency; [and] (B) information systems used or operated by an agency or a contractor of an agency or other organization on behalf of an agency." 44 U.S.C. § 3553(a)(2).  In addition, "federal agencies need to '*com[ply] with the information security standards'* and guidelines, and mandatory required standards developed by NIST." NIST, *NIST Risk Management Framework* (updated Sept. 24, 2024), https://csrc.nist.gov/projects/risk-management/fisma-background (emphasis in original).

90.     The information security requirements established by NIST are binding on all federal agencies. *See* NIST Special Publication 800-53 Revision 5, *Security and Privacy Controls for Information Systems and Organizations*, at 2 (Sept. 2020) ("The use of these controls is mandatory for federal information systems.").

91.     NIST requires that federal agencies have, at a minimum, policies and procedures that address the following information security risks:

a.  Access control: Each agency must establish an internal control to "[d]efine and document the types of accounts allowed and specifically prohibited for use within the system;" "[r]equire approvals by" a designated official "for requests to create accounts;" and "[m]onitor the use of accounts." *Id.* at 19. Each agency must ensure that "[u]sers requiring administrative privileges on system accounts receive additional scrutiny by organizational personnel responsible for approving such accounts and privileged access." *Id.*

b.  Information exchange: Each agency must establish an internal control to "[a]pprove and manage the exchange of information between the system and other systems," whether through memoranda of understanding or information exchange security agreements. *Id.* at 86-87. This includes any "organization-to-organization communications," such as e-mails, and requires "[a]uthorizing officials [to] determine the risk associated with system information exchange and the controls needed for appropriate risk mitigation." *Id.* at 87. Furthermore, each agency must have a process in place for responding to "information spillage," or "instances where information is placed on systems that are not authorized to process such information." *Id.* at 159-60.

c.  Insider threats: Each agency must "[i]mplement an incident handling capability for incidents involving insider threats," and must provide for intra-organization coordination of insider threat response. *Id.* at 153-54.

d.  Personnel sanctions: Each agency must "[e]mploy a formal sanctions process for individuals failing to comply with established information security and privacy policies and procedures." *Id.* at 227.

92.  CMS has implemented these requirements by establishing a set of "Acceptable Risk Safeguards" (ARS) that "provides the standard to CMS and its contractors as to the minimum acceptable level of required security and privacy controls." CMS, *CMS Acceptable Risk Safeguards* (ver. 5.1, April 22, 2022), https://security.cms.gov/policy-guidance/cms-acceptable-

18

risk-safeguards-ars. These safeguards (which can be downloaded as an Excel spreadsheet from that website) set forth detailed policies for handling CMS data, including policies governing information sharing and the processing of personally identifiable information (PII).

## FACTUAL ALLEGATIONS

### I. Background on State Medicaid Programs and Data Sharing

93.    Plaintiffs' Medicaid programs provide comprehensive healthcare benefits to tens of millions of participants.  As of January, 2025, according to CMS records, 78.4 million people were enrolled in Medicaid and CHIP nationwide.

*Arizona*

94.    The Arizona Health Care Cost Containment System (AHCCCS) is Arizona's Medicaid agency that offers healthcare programs to serve qualifying Arizona residents.  AHCCCS is Arizona's largest insurer, covering more than 2 million individuals.  AHCCCS uses federal, state, county, and other funds to provide healthcare coverage to the State's Medicaid population.

95.    Consistent with federal law, AHCCCS provides certain emergency healthcare services to uninsured qualified and nonqualified immigrants through the Federal Emergency Services Program.

96.    AHCCCS uses the federal SAVE database to verify individuals' eligibility for federally-funded Medicaid services.

97.    AHCCCS also routinely responds to CMS requests related to Medicaid auditing and oversight, including its supplemental review of reports required to determine the amount of FFP to which the Arizona is entitled.

98.    AHCCCS sends data to T-MSIS each month.  This data contains personally identifying and protected health information about all AHCCCS beneficiaries.

*California*

99.    The California Health and Human Services Agency (CHHS) is an agency within the executive branch of the State of California.  CHHS, through its sub-agency, California

1   Department of Health Care Services (DHCS), administers California's Medicaid program, known
2   as Medi-Cal.

3       100.   California's Medi-Cal program provides healthcare coverage for one out of every
4   three Californians.  In California, full-scope Medi-Cal gives beneficiaries access to primary and
5   preventative care, oral healthcare, hospitalization, prescription drugs, behavioral healthcare, and
6   other vital services.

7       101.   California has elected to use state-only funds to provide a version of the Medi-Cal
8   program to all eligible state residents, regardless of immigration status.  Cal. Welf. & Inst. Code
9   § 14007.8(a)(2)(A).  California's Medi-Cal program provides healthcare coverage for more than
10  two million noncitizens.

11      102.   DHCS has an agreement with CMS and DHS to use the federal SAVE database to
12  verify individuals' eligibility for federally funded Medicaid.

13      103.   DHCS sends data to T-MSIS each month.  This data contains protected health
14  information about all Medi-Cal enrollees.

15      104.   DHCS also routinely responds to CMS requests for supplemental review of reports
16  required to determine the amount of FFP to which the State is entitled, and other program audit
17  and oversight functions.

18      105.   On March 18, 2025, CMS sent a letter to DHCS stating that it would be reviewing
19  claims for FFP to determine whether California "is using federal money to pay for or subsidize
20  healthcare for individuals without a satisfactory immigration status."  The letter did not cite any
21  new evidence or new concerns about improper use of federal dollars.  Instead, the letter cited
22  earlier audits initiated by California itself when it informed CMS that it had erroneously claimed
23  FFP for non-emergency or non-pregnancy services to undocumented Medi-Cal enrollees, an error
24  that has been corrected and led to the return of funds back to the federal government.

25      106.   On March 31, 2025, CMS sent DHCS a follow up email requesting information the
26  agency stated was necessary to confirm California was not applying federal funding unlawfully
27  for individuals with unsatisfactory immigration statuses.  CMS requested claim submission and
28  enrollee data for the quarter ending on March 31, 2025, including individual enrollees' Medicaid

20

1  ID, immigration status, and the period they were eligible for emergency Medicaid, as well as

2  descriptions of how DHCS operates Medi-Cal, including how emergency Medicaid services are

3  paid for, how DHCS verifies immigration status, and how DHCS defines "emergency condition."

4  CMS required DHCS to respond by April 30, 2025.  Nothing in the request indicated that CMS

5  would share this information outside HHS.

6      107.  DHCS responded to CMS's information request on April 30, 2025, and provided a

7  substantial amount of the requested information, including protected health information,

8  assuming CMS planned to use this information for routine auditing consistent with that agency's

9  statutory authority to administer the Medicaid program.

10  ***Colorado***

11      108.  Colorado administers its state Medicaid program through the Colorado Department of

12  Health Care Policy and Financing (HCPF).  HCPF is Colorado's single-state agency responsible

13  for administering Health First Colorado, Colorado's Medicaid Program. C.R.S. § 25.5-1-104(1).

14  HCPF's mission is to "improve health care equity, access and outcomes for the people we serve

15  while saving Coloradans money on health care and driving value for Colorado."

16      109.  Health First Colorado is regulated by HHS and is jointly funded through both state

17  and federal dollars.

18      110.  HCPF spends considerable resources to ensure that eligibility determinations for

19  Health First Colorado are correct.  This ensures that only individuals who are eligible for

20  Medicaid are enrolled in Health First Colorado and that only those services provided to eligible

21  members are billed to the federal government.

22      111.  HCPF sends eligibility data to CMS through the T-MSIS database.  This data contains

23  sensitive, personally identifiable information about all Health First Colorado members.

24      112.  HCPF routinely responds to CMS requests for data and information to substantiate

25  the amount of FFP HCPF requests from the federal government.

26      113.  On June 6, 2025, HCPF received an email from CMS that included significant

27  requests for data related to the administration of Emergency Medicaid Services for certain

28  immigrant populations.  CMS also requested data related to Colorado's state-only health care

Amended Complaint for Declaratory and Injunctive Relief

program, Cover All Coloradans, which provides services for children and pregnant persons who otherwise would be eligible for Health First Colorado but for immigration status.

114.   CMS represented in the email that it "will be reviewing claims for FFP submitted by the state to ensure that only claims for FFP that meet all applicable statutory requirements for individuals without a satisfactory immigration status are included within the state's" claims submission to the federal government.

115.   The email does not cite any evidence or concerns about HCPF improper use of federal dollars as related to "individuals without a satisfactory immigration status."  Nor does the email city any evidence or concerns regarding Colorado state-only health care program, Cover All Coloradans.

116.   The email asks HCPF to respond to the data requests by July 30, 2025.  A meeting between HCPF and CMS is scheduled for July 2, 2025 to discuss the data requests.

***Connecticut***

117.   Connecticut's HUSKY Health is the State's program that provides comprehensive health coverage to all qualifying Connecticut residents, and it includes Connecticut's Medicaid and CHIP programs. Connecticut's Department of Social Services (DSS) is Connecticut's single state Medicaid agency and functions as one of the largest providers of health coverage in Connecticut. It is a leader in ensuring Connecticut residents have access to high-quality, affordable healthcare, and it is committed to whole-person care, integrating physical and behavioral health services for better results and healthier communities in Connecticut. DSS provides healthcare for over 1 million state residents annually through HUSKY.  Connecticut implemented the CHIP option to cover the cost of prenatal care in 2022.

118.   Connecticut has also elected to use state-only funds to provide a version of the HUSKY program to all eligible state residents up to the age of 19, regardless of immigration status.  Connecticut has also elected to use state-only funds for postpartum services for women who do not qualify for Medicaid or CHIP based on their immigration status.

119.   Connecticut DSS routinely shares protected health information concerning Connecticut residents and their use of Medicaid healthcare services with CMS. DSS sends data to

22

T-MSIS on a regular basis, and also routinely responds to CMS requests for additional information concerning Medicaid claims and the use of federal dollars.

***Delaware***

120.   The Division of Medicaid and Medical Assistance (DMMA) is an agency within the executive branch of the State of Delaware. DMMA administers the Medicaid and CHIP programs in Delaware, which provide health coverage to over 300,000 Delawareans.

121.   Delaware routinely shares protected health information concerning Delaware residents and their use of Medicaid healthcare services with CMS.  DMMA sends data to T-MSIS on a regular basis, and also responds to occasional CMS requests for additional information concerning Medicaid claims and the use of federal dollars.

***Hawai'i***

122.   Hawaii's Medicaid program, Med-QUEST, is administered by the State of State of Hawai'i Department of Human Services.  Med-QUEST provides health coverage to 400,000 low-income Hawai'i residents.  In addition, Hawai'i administers federally funded emergency Medicaid benefits that provide emergency care and services to individuals regardless of their immigration status.

123.   Med-QUEST routinely shares protected health information concerning Hawai'i residents and their use of Medicaid healthcare services with CMS.  Med-QUEST sends data to T-MSIS on a regular basis, and also responds to occasional CMS requests for additional information concerning Medicaid claims and the use of federal dollars.

***Illinois***

124.   The Illinois Department of Healthcare and Family Services (IDHFS) administers Medicaid, CHIP, and other affordable health care programs in the state of Illinois.  These programs provide critical healthcare coverage to nearly 3.5 million individuals and families across Illinois, making IDHFS the largest source of medical insurance in the state.

125.   Illinois has also significantly invested in outreach and enrollment for affordable health programs within the state.

126.   Illinois has additionally elected to use state-only funds to expand healthcare coverage for certain noncitizens.  For example, the Health Benefits for Immigrant Seniors program provides health benefits for Illinois residents 65 years and older regardless of their immigration status.  305 ILCS 5/12-4.35.  Illinois also funds and administers the All Kids program, which provides comprehensive, affordable, health insurance for all Illinois children, regardless of immigration status.

127.   Applications for Illinois benefits, including affordable health programs, in the state of Illinois are handled through a single web-based application portal called ABE, the Application for Benefits Eligibility.  Applications may also be completed in person at certain locations, by mail, or initiated by telephone with Illinois caseworkers.

128.   ABE can be used by anyone seeking Illinois Medicaid coverage, including new groups covered as a result of national health care reform under the Affordable Care Act.

129.   Illinois uses an Integrated Eligibility System (IES) to determine eligibility for benefits programs including affordable healthcare benefits.  This program interfaces with state and federal data sources to verify certain financial and nonfinancial information to assist in determining eligibility for various benefits programs.

130.   Illinois verifies USCIS status of noncitizens applying for federally-supported medical benefits through the federal SAVE database.

131.   Illinois sends extract data to T-MSIS on a monthly basis as required and full data on an annual basis.

132.   Illinois also responds to CMS requests for information and data when CMS reviews Illinois' claims for reimbursement of expenditures, and when CMS performs other program audit and oversight functions.  Given CMS's role in jointly administering the Medicaid program with Illinois, IDHFS complies with all routine requests for information.

***Kentucky***

133.   The Kentucky Cabinet for Health and Family Services administers the Kentucky Medicaid program. As of August 11, 2025, 1,436,949 Kentucky residents were enrolled in Kentucky Medicaid, of which 616,797 were children. Of the more than 600,000 children,

24

1  approximately 109,000 were enrolled in the Kentucky Children's Health Insurance Program

2  ("KCHIP").

3      134.  Kentucky Medicaid provides comprehensive healthcare coverage for a wide range of

4  services, including, but not limited to: primary care; hospitalization; laboratory tests; x-rays;

5  prescriptions; mental health care, including substance use disorder or addiction treatment; dental

6  care; hearing care; vision care; and preventive screenings.

7      135.  The Kentucky Emergency Time-Limited Medicaid Program ("ETLMP") provides

8  limited emergency Medicaid coverage that is partially federally-funded to children, pregnant

9  women, parent/caregivers and adults ages 19 or older regardless of citizenship or immigration

10  status if they meet all other eligibility requirements.  ETLMP covers labor and delivery services

11  for undocumented women giving birth in Kentucky but does not cover post-delivery health care

12  for them.  Their newborn children have, until now, been deemed eligible for Kentucky Medicaid

13  for the first 12 months after birth under 42 C.F.R. § 435.117, based on being U.S. citizens born in

14  Kentucky to mothers who were state residents receiving Medicaid coverage at the time of

15  delivery.

16      136.  Kentucky routinely shares certain categories of personal information regarding

17  Kentucky Medicaid to CMS. For example, Kentucky uses the CMS Portal, T-MSIS, through its

18  DMS Medicaid Management Information System to submit and verify Medicaid data, such as

19  data related to enrollment, claims, and demographics. Kentucky Medicaid submits monthly T-

20  MSIS files to CMS that include demographic and eligibility information, such as name, address,

21  date of birth, Medicaid ID, Social Security number (if provided), and eligibility status, for every

22  Kentucky Medicaid enrollee, including those receiving Emergency Time-Limited Medicaid.

23  DMS's most recent transfer of data to T-MSIS occurred on August 11, 2025.

24      137.  Kentucky Medicaid also routinely provides CMS with data in response to Medicaid

25  supplemental reviews and audits for federal oversight purposes.

26  ***Maine***

27      138.  Maine's Medicaid program is operated by the Maine Department of Health and

28  Human Services (Me. DHHS).  Maine's Medicaid program, known as MaineCare, provides

25

healthcare coverage for approximately 400,000 residents in Maine.  This includes 38,000 people with disabilities and 5,000 children with special health care needs.

139.  In certain circumstances and consistent with federal law, non-qualified noncitizens who live in Maine are eligible for Medicaid coverage.  For example, as with all Maine residents—regardless of immigration status—non-qualified noncitizens are eligible for Emergency Services Only Medicaid, which covers emergency medical services.

140.  Consistent with federal law, non-qualified pregnant women are eligible for federal CHIP coverage for medical care during pregnancy and for twelve months after delivery.

141.  Maine has elected to use state-only funds to provide a version of MaineCare to all eligible state residents under the age of 21 who are not qualified to receive federal match due to their immigration status.  22 M.R.S. § 3174-FFF.

142.  MaineCare participants' personal data is available to CMS through T-MSIS.

143.  Me. DHHS has an agreement with CMS and DHS to use the federal SAVE database to verify individuals' eligibility for federally funded MaineCare.

144.  Me. DHHS also routinely responds to CMS requests for supplemental review of reports required to determine the amount of FFP to which the State is entitled, and other program audit and oversight functions.

***Maryland***

145.  Maryland's Medicaid program (also known as the "Maryland Medical Assistance Program") is operated by the Maryland Department of Health (MDH).  The Medicaid program provides healthcare coverage for approximately 1.5 million Maryland residents.

146.  Consistent with federal law, Maryland affords emergency Medicaid coverage for immigrants who are otherwise eligible for Medicaid.  Coverage extends from when the individual enters the hospital until the individual's emergency medical condition is stabilized.  Under the state's Healthy Babies Equity Act of 2024, Maryland Medicaid provides comprehensive medical care and other health care services to noncitizen pregnant individuals who would be eligible for Medicaid but for their immigration status.  Those individuals have full Medicaid benefits up to 4 months postpartum.  *See* Md. Code. Ann. Health-Gen. §15-103(a)(2)(xviii).

147.  MDH maintains the personal data of Medicaid enrollees through the Medicaid Management Information System ("MMIS"), while the Maryland Health Benefit Exchange ("MHBE") maintains the integrated eligibility system and statewide eligibility information database of Medicaid enrollees through the Health Benefit Exchange ("HBX").  Maryland Medicaid enrollees' personal data is available to CMS through the T-MSIS.

***Massachusetts***

148.  Massachusetts administers Medicaid and CHIP through the MassHealth program, which is administered by the Massachusetts Executive Office of Health and Human Services ("EOHHS").

149.  EOHHS's MassHealth and CHIP programs provide healthcare coverage for over 1,600,000 Massachusetts residents.

150.  EOHHS maintains personal data of MassHealth enrollees, including eligibility information.  Massachusetts MassHealth enrollees' personal data is available to CMS through the T-MSIS system used by CMS to collect and standardize Medicaid and CHIP data across states.

151.  EOHHS additionally at times provides CMS with data in response to Medicaid supplemental reviews and audits for federal oversight purposes.

***Michigan***

152.  Michigan's Medicaid program is operated by the Michigan Department of Health and Human Services (MDHHS).  Michigan Medicaid provides healthcare coverage for approximately 2.6 million residents in Michigan.

153.  In certain circumstances and consistent with federal law, undocumented noncitizens who live in Michigan are eligible for Medicaid coverage.  For example, Michigan residents—regardless of immigration status—are eligible for Emergency Services Only Medicaid, which covers emergency medical services.  And undocumented pregnant women are eligible for Medicaid and CHIP coverage for limited maternity-related care during pregnancy and for two months after delivery.

154.  MDHHS maintains personal data of Medicaid enrollees through Bridges, MDHHS' integrated eligibility system, and the MDHHS Data Warehouse, a statewide database with

information pertinent to the programs administered by MDHHS, including eligibility information. Michigan Medicaid enrollees' personal data is available to CMS through T-MSIS.

***Minnesota***

155.  Minnesota's Medicaid program, Medical Assistance, provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. The Minnesota Department of Human Services (MDHS), through its Health Care Administration, is the single state agency responsible for administering Minnesota's Medicaid program, which is known as Medical Assistance.  Today, Medical Assistance provides health coverage for over one million Minnesotans, or approximately one in every five state residents.  MDHS administers federally funded emergency Medicaid benefits that provide emergency care and services to individuals regardless of their immigration status.

156.  MDHS works to ensure that eligibility determinations are made correctly, including by ensuring that only individuals who are eligible for federally funded Medicaid are billed to the federal government.

157.  MDHS has an agreement with CMS and DHS to use the federal SAVE database to verify individuals' citizenship or immigration status to determine eligibility for federally funded Medicaid.

158.  MDHS routinely shares protected health information concerning Minnesotans and their use of Medicaid healthcare services with CMS.  MDHS sends data to T-MSIS each month. This data contains sensitive, personally identifiable information about all MDHS enrollees. MDHS also routinely responds to CMS requests for additional information, including audits, concerning Medicaid claims and the use of federal dollars.

159.  On June 6, 2025, CMS sent an email to MDHS stating that it was requesting information to confirm Minnesota was not applying federal funding unlawfully for individuals with unsatisfactory immigration statuses.  The email did not cite any specific evidence or concerns about improper use of federal dollars.  The email requested that MDHS respond with sensitive, personally identifiable information about all MDHS enrollees by July 30, 2025.

160.   MDHS also administers MinnesotaCare, which provides comprehensive healthcare coverage for uninsured Minnesota residents who are not eligible for Medical Assistance and have income at or below 200% of the Federal Poverty Guidelines.  Minnesota has elected to use state-only funds to provide a version of MinnesotaCare coverage to all eligible state residents up to the age of 18, regardless of their immigration status.

***Nevada***

161.   Nevada Health Authority[4] works in partnership with CMS to assist in providing quality medical care for eligible individuals and families with low incomes and limited resources. The Medicaid program in Nevada is authorized by statute.

162.   Nevada's Medicaid program provides health care coverage for many people including low-income families with children whose family income is at or below 133% percent of poverty, Supplemental Security Income (SSI) recipients, certain Medicare beneficiaries, and recipients of adoption assistance, foster care and some children aging out of foster care. The DHCFP also operates five Home or Community-Based Services waivers offered to certain persons throughout the state.  Nevada Check Up provides health care benefits to uninsured children from low-income families who are not eligible for Medicaid but whose family income is at or below 200% of the Federal Poverty Level.

163.   The Medicaid Services Manual (MSM) along with the Medicaid Operations Manual (MOM) is the codification of regulations adopted by Nevada Medicaid.

164.   MSM Chapter 100.2 provides that "all individuals have the right to a confidential relationship with DHCFP.  All information maintained on Medicaid and CHIP applicants and recipients ("recipients") is confidential and must be safeguarded." DHCFP, Medicaid Services Manual, p 5.  "Disclosures of identifiable information are limited to purposes directly related to State Plan administration." *Id*. at p 6.  Further, "[e]xcept as otherwise provided in these rules, no person shall obtain, disclose, use, authorize, permit, or acquiesce the use of any client information that is directly or indirectly derived from the records, files, or communications of DHCFP, except

---

[4] Prior to July 1, 2025, the Division of Health Care Financing and Policy administered the Medicaid program in Nevada (DHCFP).

for purposes directly connected with the administration of the Plan or as otherwise provided by federal and state law." *Id*. at 7.

***New Jersey***

165.   New Jersey's Medicaid program is operated by the New Jersey Department of Human Services (NJDHS).  NJDHS provides healthcare coverage for approximately 1.9 million residents in New Jersey.

166.   NJDHS maintains personal data of Medicaid enrollees, including eligibility information.  New Jersey Medicaid enrollees' personal data is available to CMS through the T-MSIS system.

167.   NJDHS additionally routinely provides CMS with data in response to Medicaid supplemental reviews and audits for federal oversight purposes.

***New Mexico***

168.   New Mexico's Medicaid program provides healthcare coverage for approximately 840,000 New Mexicans, over 40% of the state population.  In New Mexico, full-scope Medicaid gives beneficiaries access to primary and preventive care, dental health care, inpatient and outpatient hospital treatment, prescription drugs, behavioral health care, home health care, and other vital services.

169.   In addition, New Mexico funds more limited scope healthcare programs that offer more targeted services to specific populations.  For example, New Mexico provides access to family planning services, including contraceptives and reproductive health exams, under the state's Family Planning Program; and helps low-income New Mexicans who qualify for Medicare with out-of-pocket costs, such as premiums, deductibles, and co-insurance.

170.   New Mexico also administers federally and state-funded emergency Medicaid benefits that provide emergency care and services to individuals regardless of their immigration status.

171.   The New Mexico Medicaid program is administered by the New Mexico Health Care Authority (HCA), a state agency.

Amended Complaint for Declaratory and Injunctive Relief

172.  New Mexico's HCA works diligently to ensure that Medicaid eligibility determinations are made correctly and that claims billed to the federal government cover only individuals and services eligible for federally funded Medicaid. The state agency has an agreement with CMS and DHS to use the federal SAVE database to verify individuals' eligibility for federally funded Medicaid.

173.  New Mexico's HCA sends data to T-MSIS each month.  This data contains sensitive, personally identifiable information about all Medicaid enrollees.

174.  New Mexico's HCA also routinely responds to CMS requests for supplemental review of reports required to determine the amount of FFP to which the State is entitled, and other program audit and oversight functions.

175.  For instance, because New Mexico receives an enhanced FMAP, the state is required by federal law to provide detailed enrollee data that is "necessary for program integrity, program oversight, and administration." 42 C.F.R. § 438.818.

***New York***

176.  New York's Medicaid program provides health coverage to approximately 7 million low-income New Yorkers.  New York has elected to use state-only funds to provide Medicaid health coverage to certain New Yorkers aged 65 and over and postpartum care for 12 months to pregnant individuals, regardless of their immigration status.  In addition, New York administers federally funded emergency Medicaid benefits that provide emergency care and services to individuals regardless of their immigration status as well as prenatal care up to labor and delivery for pregnant individuals, regardless of their immigration status.

177.  The New York State Department of Health (NYSDOH) works diligently to ensure that Medicaid eligibility determinations are made correctly, and that claims billed to the federal government cover only individuals and services eligible for federally funded Medicaid.

178.  NYSDOH routinely shares protected health information concerning New Yorkers and their use of Medicaid healthcare services with CMS.  NYSDOH sends data to T-MSIS on a regular basis, and also responds to occasional CMS requests for additional information concerning Medicaid claims and the use of federal dollars.

31

*Oregon*

179.    The Oregon Health Authority (OHA) is the designated state agency responsible for administering Oregon's Medicaid program. ORS 413.032(1)(e). OHA's mission is to "transform the health care system in Oregon by: improving the lifelong health of people in Oregon; increasing the quality, reliability, and availability of care for all people in Oregon; and lowering or containing the cost of care so it's affordable to everyone."

180.    OHA operates the Oregon Health Plan (OHP), Oregon's Medicaid program regulated by the U.S. Department of Health and Human Services. This program is jointly funded by both state and federal dollars, though at different rates.

181.    Oregon has also elected to use state-only funds to extend OHP coverage to all state residents who meet income and other criteria regardless of their immigration status.

182.    Oregon has significantly invested in outreach and enrollment for OHP.  For example, OHP certifies a network of community partners that includes approximately 300 organizations and around 1,500 application assisters across Oregon. Among other things, community partners provide culturally and linguistically responsive outreach and health coverage application assistance.

183.    OHA works to ensure that eligibility determinations are made correctly, including by ensuring that only individuals who are eligible for federally funded Medicaid are billed to the federal government.

184.    OHA has an agreement with CMS and DHS to use the federal SAVE database to verify individuals' eligibility for federally funded Medicaid.

185.    OHA sends data to T-MSIS each month.  This data contains sensitive, personally identifiable information about all OHP enrollees.

186.    OHA also routinely responds to CMS requests for supplemental review of reports required to determine the amount of FFP to which the State is entitled as well as other program audit and oversight functions.

187.    On June 6, 2025, CMS sent an email to OHA stating that it would be "reviewing claims for FFP submitted by the state to ensure that only claims for FFP that meet all applicable

32

statutory requirements for individuals without a satisfactory immigration status are included within the state's Form CMS-64 submissions." The email did not cite any new evidence or new concerns about improper use of federal dollars. The email requested that OHA respond with certain specified data by July 30, 2025.

188. On June 26, 2025, OHA staff met with CMS staff to discuss the information CMS requested and the purpose of its review. In that meeting, CMS staff confirmed that they intend to combine any data OHA provides in response to the June 6, 2025 request with data OHA has already submitted through T-MSIS. Combining these data sources will make it easier to determine both the identity and immigration status of OHP members. When asked whether CMS would transfer these data to DHS, CMS staff indicated they would confer with their leadership and provide an answer in a subsequent communication. As of the date of this Complaint, CMS has not provided a response.

***Rhode Island***

189. Rhode Island's Medicaid program provides health coverage to more than 300,000 Rhode Islanders. Rhode Island has elected to use state-only funds to provide Medicaid coverage to all children (individuals up to nineteen (19) years of age), regardless of their immigration status. Rhode Island also extends Medicaid coverage to pregnant people who otherwise meet requirements for Medicaid, regardless of their immigration status. In addition, Rhode Island administers federally funded Medicaid benefits that provide coverage for individuals that require treatment for an emergency health condition regardless of their immigration status.

190. The Rhode Island Executive Office of Health & Human Services (RI EOHHS) serves as the Single State Agency for Medicaid. RI EOHHS has delegated authority to the Rhode Island Department of Human Services (RI DHS) to determine Medicaid eligibility. RI EOHHS and RI DHS work to ensure that Medicaid eligibility determinations are made correctly, and that claims billed to the federal government cover only individuals and services eligible for federally funded Medicaid.

191. RI DHS uses an integrated eligibility system known as RIBridges to determine eligibility for various benefit programs, including Medicaid. RI EOHHS routinely shares

Medicaid data containing personally identifiable, protected health information with CMS. RI EOHHS sends data to T-MSIS on a routine basis and routinely responds to CMS requests for additional information concerning Medicaid claims and the use of federal funds.

**Vermont**

192.   Vermont's Medicaid program is operated by the Department of Vermont Health Access (DVHA) within the Vermont Agency of Human Services.  The mission of DVHA is "to improve Vermonters' health and well-being by providing access to high-quality, cost-effective health care."

193.   In limited circumstances and consistent with federal law, undocumented noncitizens who live in Vermont are eligible for Medicaid coverage.  For example, Vermont residents—regardless of immigration status—are eligible for Emergency Services Only Medicaid, which covers emergency medical services.  Vermont also provides coverage to legal resident non-citizen children and teenagers under age 19 and pregnant women through the Dr. Dynasaur program.

194.   Vermont regularly shares protected health information concerning Vermonters and their use of Medicaid healthcare services with CMS.  DVHA sends data to T-MSIS and also routinely responds to CMS requests for additional information concerning Medicaid claims and the use of federal dollars.

195.   Vermont shares this protected health information with the understanding that it is being safeguarded by CMS rules and procedures designed to protect data privacy and security, and that this data is only being used to administer Medicaid benefits and to further the healthcare goals and priorities of the Medicaid program.

**Washington**

196.   In Washington State, the Health Care Authority ("Washington HCA") administers the Medicaid program, the Children's Health Insurance Program, and other healthcare programs under the umbrella term "Apple Health."  The Washington Legislature designated Washington HCA as the "single state agency" for purposes of the Medicaid program.  *See* Wash. Rev. Code § 74.09.530(1)(a).  HCA is responsible for assuring the federal Centers for Medicare and Medicaid Services ("CMS") that the state will comply with federal Medicaid law.

197.   There are more than 1.9 million Apple Health clients in Washington, including about 49,000 whose immigration status makes them ineligible for federal programs.  Apple Health covers a range of healthcare services, including inpatient and outpatient hospital care, primary and preventative care, long-term services and supports, and behavioral health.  Each year, Washington HCA receives nearly $70 million from CMS for emergency medical services provided to clients who are "not qualified" noncitizens.

198.   In 2023, the Washington Legislature directed Washington HCA to create a new program for certain individuals who are not eligible for Medicaid because of their immigration status.  *See* Engrossed Substitute Senate Bill ("ESSB") 5187, § 211(83).  The Legislature appropriated about $45.6 million of state funds to Washington HCA for the program for state fiscal year ("SFY") 2025. HCA named the program "Apple Health Expansion."  The Legislature directed that the program provide services comparable to the "categorically needy" Medicaid program.  In 2024, the Legislature increased the budget for the program to about $71 million for SFY 2025. *See* ESSB 5950, § 211(82).  In 2025, the Legislature appropriated about $71.3 million for the program for SFY 2026 and about $70.9 million for SFY 2027. *See* ESSB 5167, § 211(52).

199.   In creating Apple Health Expansion, Washington HCA adopted a managed care delivery system, for the purpose of facilitating whole-person care to enrollees and for ease of administration.  Washington HCA entered into contracts with four managed care organizations ("MCOs"), also called "health plans," who are responsible for ensuring the provision of healthcare services to Apple Health Expansion enrollees.  Washington HCA also includes emergency services funded by CMS in this managed care model, again to facilitate whole-person care and for ease of administration.

200.   The Apple Health Expansion program began offering services to enrollees as of July 1, 2024, through the MCO contracts.  This was preceded by many months of meetings with advocacy groups and other stakeholders, for the purpose of helping to define the parameters of the program, encouraging outreach to potential enrollees, and creating rules under the Washington Administrative Code.

35

201.  Washington HCA, through a contractor known as Acentra, sends data to the federal government's T-MSIS system each month, using a secure portal.  This data contains sensitive, personally identifiable information about all Apple Health enrollees.  Washington HCA's most recent submission of T-MSIS data occurred on or around May 27, 2025.

202.  Washington HCA routinely responds to CMS requests for supplemental review of reports required to determine the amount of FFP to which the State is entitled, and other program audit and oversight functions.

203.  On March 31, 2025, CMS sent Washington HCA an email requesting information the agency stated was necessary to confirm Washington was not applying federal funding unlawfully for individuals with unsatisfactory immigration statuses.  This request was represented to Washington HCA as a routine audit in line with previous requests for information made to Washington HCA from CMS.  Nothing in the request indicated that CMS would share this information outside HHS.

204.  Washington HCA responded to CMS's information request, as it would for other routine audits of Washington HCA.  Nothing indicated that CMS planned to use this information for anything other than routine auditing consistent with the agency's statutory authority to administer the Medicaid program.

205.  Washington HCA learned through media reporting on June 13, 2025, that CMS had apparently, and improperly, transferred confidential data regarding its Apple Health clients to the Department of Homeland Security ("DHS").  On June 24, 2025, Washington HCA sent a letter to CMS seeking information on this reported data transfer.  As of the date of this filing, Washington HCA has not received a response.

***Wisconsin***

206.  Wisconsin's Medicaid program is operated by the Wisconsin Department of Health Services (DHS). Wisconsin Medicaid provides healthcare coverage for approximately 1.26 million residents in Wisconsin.

Amended Complaint for Declaratory and Injunctive Relief

207. Wisconsin is not among the states that have expanded Medicaid coverage to non-citizens through use of state funds. Therefore, only in certain circumstances and consistent with federal law may non-citizens who live in Wisconsin be eligible for Medicaid coverage.

208. Wisconsin residents regardless of immigration status are federally eligible for Emergency Services Only Medicaid, which covers emergency medical services. And undocumented pregnant women are eligible for Medicaid and CHIP coverage for limited maternity-related care during pregnancy and for two months after delivery. DHS maintains personal data of Medicaid enrollees through an integrated eligibility system, and a data warehouse with information pertinent to the programs administered by DHS, including eligibility information.

209. Wisconsin regularly shares protected health information concerning Wisconsin resident use of Medicaid healthcare services with CMS. DHS data is available to CMS through T-MSIS and DHS routinely responds to CMS requests for additional information concerning Medicaid claims and the use of federal dollars.

*All Plaintiff States*

210. In all of the sharing of protected health information described above, the States have relied upon CMS rules, procedures, and practices designed to protect data privacy and security, and the understanding that this data is only being used to administer Medicaid benefits and to further the healthcare goals and priorities of the Medicaid program.

211. This policy and practice has been communicated to the public as well. For example, in its online privacy policy statement, CMS promises Medicaid enrollees and their family members that the agency is "committed to keeping your personal information safe with the highest level of privacy protections possible," including "only sharing information with people who need to know." CMS further assures the public that it will "tell you before we collect any personal information we need to run our health care programs, and only use it for that purpose."[5]

---

[5] CMS Privacy Home Page (last checked June 26, 2025), https://www.cms.gov/about-cms/information-systems/privacy.

1

2

## II.    Federal Actions Undermining Privacy, Security, and Confidentiality of Medicaid Data

3    212.   Through a series of federal executive actions, the federal government has—without

4    formal acknowledgment—dramatically changed its policy and practice of keeping personal

5    Medicaid data private and refraining from weaponizing healthcare data and systems for

6    immigration and other federal policy purposes.

7    213.   In early February, CMS confirmed reports in the Wall Street Journal that DOGE

8    representatives were accessing CMS systems and technology.[6]

9    214.   On February 19, 2025, President Trump signed an Executive Order titled "Ending

10   Taxpayer Subsidization of Open Borders."  Exec. Order No. 14,218, 90 Fed. Reg. 10,581 (Feb.

11   19, 2025) (hereinafter the "Borders EO").  It purported to give DOGE new authority to "enhance

12   eligibility verification systems" for public benefits.

13   215.   On February 28, 2025, HHS announced it was abandoning a long-time memorandum,

14   referred to as the "Richardson Waiver," pursuant to which HHS had previously committed to

15   (1) follow the notice-and-comment rulemaking procedures in the Administrative Procedure Act

16   (APA) for most rules issued by HHS; and (2) invoke the APA's good-cause exception to public

17   rulemaking only "sparingly."  HHS, Policy on Adhering to the Text of the Administrative

18   Procedure Act, 90 Fed. Reg. 11,029 (Mar. 3, 2025).

19   216.   On March 20, 2025, President Trump signed an Executive Order titled "Stopping

20   Waste, Fraud, and Abuse by Eliminating Information Silos," which calls on agencies to

21   "remov[e] unnecessary barriers," including rescission or modification of existing agency

22   guidance, to ensure "unfettered access to comprehensive data from all State programs" in

23

24   _____

[6] *See* Anna Wild Mathews & Liz Essley Whyte*, DOGE Aides Search Medicare Agency Payment Systems for Fraud*, (Feb. 5, 2025), https://www.wsj.com/politics/elon-musk-doge-medicaremedicaid-fraud-e697b162; CMS, *CMS Statement on Collaboration with DOGE*, https://www.cms.gov/newsroom/press-releases/cms-statement-collaboration-doge (Feb. 5, 2025); Riley Griffin & Madison Muller, *Musk's DOGE Team Mines for Fraud at Medicare, Medicaid*, (Feb. 5, 2025), https://www.bloomberg.com/news/articles/2025-02-05/musk-s-dogeteam-mines-for-fraud-at-medicare-and-medicaid-agency; Alan Condon, *DOGE Sets Sights on Medicaid*, New York Times (Feb. 3, 2025) (noting that DOGE has been provided access to key payment and contracting systems at CMS).

furtherance of the Administration's goals.  Exec. Order No. 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025) (hereinafter the "Information Silos EO").  The Executive Order does not—and cannot—excuse agencies from acting "consistent with law." *Id*.

217.  In a May 27, 2025, announcement to California and other states, CMS stated that it was reviewing state Medicaid enrollees to ensure that federal funds had not been used to pay for coverage of people with "unsatisfactory immigration status" (UIS).  This letter was purportedly an implementation of the February 19 Borders EO.  Nothing in the letter mentioned interagency data sharing.

218.  Around this same time, multiple media outlets reported that DOGE had enlisted the technology company Palantir to build a massive repository of data pulled from multiple federal agencies, including the IRS, SSA, and HHS, among others, for the purpose of immigration enforcement.[7]  It has also been reported that DHS and HHS have already adopted a key Palantir product called Foundry, which would streamline the implementation of such a project.[8]

219.  On June 13, 2025, the Plaintiffs learned that HHS has transferred *en masse* California, Illinois, and Washington's Medicaid data files, containing personal health records representing millions of individuals, to DHS.[9]  According to a news report, senior HHS political appointees ordered that the data be shared immediately, over the objections of career staff who advised that such a transfer of information would violate federal law, and CMS officials were given just 54 minutes to comply with the directive.  This data was personally identifiable, not anonymized or hashed, and it included Medicaid beneficiaries' immigration status and addresses, among other details.

---

[7] *See* Priscilla Alvarez, et al., *DOGE is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (April 25, 2025), https://www.cnn.com/2025/04/25/politics/doge-building-master-database-immigration; Makena Kelly & Vittoria Elliott, *DOGE Is Building a Master Database to Surveil and Track Immigrants* (April 18, 2025), https://www.wired.com/story/doge-collecting-immigrant-data-surveil-track/
[8] *See* Sheera Frenkel & Aaron Krolic, *Trump Taps Palantir to Compile Data on Americans*, New York Times (May 30, 2025), https://www.nytimes.com/2025/05/30/technology/trump-palantir-data-americans.html
[9] *See* Kimberly Kindy & Amanda Seitz, *Trump Administration Gives Personal Data of Immigrant Medicaid Enrollees to Deportation Officials*, AP News (June 14, 2025), https://apnews.com/article/medicaid-deportation-immigrants-trump-4e0f979e4290a4d10a067da0acca8e22?utm_source=copy&utm_medium=share.

220. CMS recently sent to some Plaintiff States additional requests for data concerning the use of federal and state funds to provide Medicaid services to immigrant communities. In light of recent news reports, these Plaintiff states are concerned that HHS is preparing to transfer a similar collection of those states' Medicaid data files to DHS for the purpose of mass surveillance and immigration enforcement.

221. HHS provided no warning or notice to California, Illinois, or Washington, or to the Medicaid beneficiaries whose data was transferred. HHS has not identified the legal authority under which it transferred this personal Medicaid data.

222. To date, HHS has not responded to inquiries from state Medicaid agencies requesting confirmation of the data transfer and details about its scope or purpose.

223. An HHS spokesperson acknowledged to the Associated Press that the mass data transfer had indeed occurred. HHS claimed that "HHS acted entirely within its legal authority—and in full compliance with applicable laws," but without identifying any such authority. HHS stated that the purpose of the data transfer was "to ensure that Medicaid benefits are reserved for individuals who are lawfully entitled to receive them."

224. A DHS spokesperson also confirmed receipt of the mass personal Medicaid data transfer from HHS. In its statement to the Associated Press, DHS claimed that "Joe Biden flooded our country with tens of millions of illegal aliens," and that therefore "CMS and DHS are exploring an initiative to ensure that illegal aliens are not receiving Medicaid benefits that are meant for law-abiding Americans."

225. The DHS spokesperson's narrative that the number of persons residing unlawfully in the United States increased by "tens of millions" during the Biden administration is not supported by any evidence, nor is there evidence to support the implication that unauthorized residents are engaged in some sort of theft of Medicaid benefits for which they are ineligible.

226. Despite Defendants' program integrity justifications, transfer of large amounts of personal Medicaid information to DHS is unnecessary for administration of the Medicaid program. HHS's disclosure of Medicaid personal data to DHS was far broader than would be needed for the identification and prevention of waste, fraud, and abuse, and inconsistent with best

practices for such activities.  HHS has never before enlisted DHS's participation in "oversight" of the Medicaid program in such a manner.

227.  To the extent that the federal government claims that DOGE needs vast quantities of personal Medicaid data to upgrade technology or improve detection of waste, fraud, and abuse, that justification is also not credible.  Program integrity investigations typically start with access to high-level, anonymized data based on the least amount of data the analyst or auditor would need to know, and only if suspicious entries appear do auditors gain access to a limited amount of more granular, non-anonymized data.  This is consistent with FISMA's requirement as promulgated by NIST that agencies "[e]mploy the principle of least privilege, allowing only authorized accesses for users … that are necessary to accomplish assigned organizational tasks." NIST Special Publication 800-53 Revision 5 at 36.

228.  Instead, upon information and belief, the federal government has adopted a new policy that purports to allow for wholesale re-disclosure and use of State residents' personal Medicaid data to pursue aims that are unrelated to Medicaid program administration, including immigration enforcement.  Put a different way, circumstantial evidence strongly suggests that the federal government intends to punish individuals who receive emergency medical care for themselves or their children using Medicaid, *as those individuals are legally permitted to do*, by using the data collected from their hospital visit to locate and deport them.

229.  Upon information and belief, the federal government has additional plans for this data.  DHS, with the assistance of DOGE and external entities, such as ICE contractor Palantir, are combining federal, state, and local databases of information into a single interoperable database for the purpose of "mass deportations" and other large-scale immigration enforcement and mass surveillance purposes.[10]  This effort reportedly includes databases of personal information that have never before been used for immigration enforcement or other purposes unrelated to the agencies' primary missions.  In addition to CMS, impacted federal agencies reportedly include the Internal Revenue Service, the Supplemental Nutrition Assistance Program,

---

[10] *See* Muzaffar Chishti & Colleen Putzel-Kavanaugh, *Seeking to Ramp Up Deportations, the Trump Administration Quietly Expands a Vast Web of Data*, Migration Policy Institute (May 29, 2025), https://www.migrationpolicy.org/article/trump-ice-data-surveillance.

1  the Social Security Administration, the U.S. Department of Housing and Urban Development, the

2  U.S. Department of Veterans Affairs, the U.S. Education Department, and the U.S. Postal

3  Service.[11]

4       230.   Upon information and belief, DOGE engineers responsible for implementing these

5  plans are handling sensitive HHS data, including data provided by Plaintiff States, "in a manner

6  that disregards important cybersecurity and privacy considerations, potentially in violation of the

7  law."[12]  For example, a letter sent by the ranking member of the House Oversight and

8  Government Reform Committee to the Social Security Administration (SSA) included

9  whistleblower allegations that "DOGE engineers have tried to create specialized computers for

10  themselves that simultaneously give full access to networks and databases across different

11  agencies.  Such a system would pose unprecedented operational security risks and undermine the

12  zero-trust cybersecurity architecture that prevents a breach at one agency from spreading across

13  the government.  Information obtained by the Committee also indicates that individuals

14  associated with DOGE have assembled backpacks full of laptops, each with access to different

15  agency systems, that DOGE staff is using to combine databases that are currently maintained

16  separately by multiple federal agencies."  If true, these allegations represent a shocking misuse of

17  data provided by the Plaintiff States that illegally puts the security and integrity of that data at

18  risk. Plaintiff States' concerns about the security of their data are well-founded given other

19  whistleblower testimony reporting that DOGE's databases are being targeted for infiltration by

20  foreign hackers.[13]

21

22

23  [11] *Id.*

[12] Letter from Ranking Member Gerald E. Connolly, House Committee on Oversight and
Government Reform, to SSA Assistant Inspector General for Audit Michelle L. Anderson (Apr.

24  17, 2025), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-
oversight.house.gov/files/evo-media-document/2025-04-17.gec-to-ssa-oig-master-data.pdf; *see*

25  *also* Natalie Alms, *DOGE is Building a "Master Database" of Sensitive Information, Top
Oversight Democrat Says*, NextGov/FCW (Apr. 18, 2025), https://www.nextgov.com/digital-

26  government/2025/04/doge-building-master-database-sensitive-information-top-oversight-
democrat-says/404693/.

27  [13] *See* Letter from Whistleblower Aid Chief Legal Counsel Andrew P. Bakaj to Senate Select
Committee on Intelligence Chairman Tom Cotton (Apr. 14, 2025), 2025_0414_Berulis-

28  Disclosure-with-Exhibits.s.pdf.

231.  Defendants initiated the personal Medicaid data transfer "just as the Trump administration was ramping up its immigration enforcement efforts in Southern California." Order Granting TRO, ECF No. 64, *Newsom v. Trump*, No. 25-cv-04870 (N.D. Cal., June 12, 2025).

232.  Defendants have not published a new SORN or other notice in the Federal Register relating to this change in practice, depriving Plaintiffs, and members of the public, of information such as planned routine uses of this system of records, and the opportunity for comment.

233.  Defendants have not withdrawn or revised any of their statements and policies to the States and members of the public advising that Medicaid data containing personal and protected information shall only be used for purposes of administration of the Medicaid program.

234.  Upon information and belief, Defendants' rushed transfer of this data from HHS to DHS over the objections of career staff, who reportedly questioned whether the transfer violated federal law and ethics, raises concerns that Defendants failed to comply with FISMA's requirements concerning controls and limitations on access to and transfer of secure information, as well as CMS policies and procedures promulgated to comply with FISMA and protect the privacy, security and integrity of sensitive government data.

235.  Even if Defendants had published a SORN describing immigration enforcement and mass surveillance as intended uses for the collected Medicaid data, the Privacy Act would nonetheless prohibit them from using the data for such purposes, because immigration enforcement and mass surveillance are not compatible with the purpose for which the data was collected—to administer the Medicaid program.

236.  Upon information and belief, in making their decision to change longstanding policy and transfer mass quantities of personal Medicaid data from HHS to DHS, Defendants have failed to consider or grapple with the clear negative ramifications (described in paragraphs 226-254 below) of allowing DHS unfettered access to sensitive health records.

Amended Complaint for Declaratory and Injunctive Relief

III.   **Defendants' Actions Will Cause Harm**

a.   **Defendants Actions Will Interfere with State Medicaid Programs**

237.   In the absence of the requested relief, Defendants' actions will cause serious, irreparable harm to Plaintiff States and their Medicaid programs.

238.   Defendants' actions imminently and irreparably threaten Plaintiffs' sovereign interests by interfering with State authority to administer the Medicaid program, and reducing the State's ability to access federal support for that program as Congress has authorized.

239.   As California's state legislature has explained, "[a] relationship of trust between California's immigrant community and state and local agencies is central to the public safety of the people of California," and this "trust is threatened when state and local agencies are entangled with federal immigration enforcement, with the result that immigrant community members fear […] seeking basic health services […] to the detriment of public safety and the well-being of all Californians." Cal. Gov't. Code § 7284.2(c).

240.   In administering their Medicaid and other healthcare programs, the States have relied on the federal government's assurances that it will follow the law and protect confidentiality. This includes the States' provision of federally funded Medicaid for health emergencies and childbirth to millions of patients who would otherwise not be Medicaid eligible. Defendants' actions undermine those reliance interests and interfere with the terms and conditions under which the States have agreed to operate their Medicaid programs.

241.   Patients, in turn, have also relied on the government's representations of confidentiality. Individuals provide the most sensitive data to the States through the Medicaid program, because they trust that neither the State nor the federal government will use that protected health information for any purpose other than the administration of the program, as required by federal law.  *See* 42 U.S.C. § 1306(a); 42 C.F.R. § 401.101(b).

242.   If CMS is permitted to transfer participants' Medicaid data to DHS for general immigration enforcement purposes, that trust will likely be irreparably damaged, especially for the families (including U.S. citizens) of undocumented immigrants, who risk deportation as a result of lawfully seeking Medicaid coverage for emergency medical treatment.

44

243.  As a result, Defendants' mass transfer of sensitive Medicaid data will cause a predictable chilling effect on individuals' willingness to enroll in Medicaid programs for which they are legally eligible.  This chilling effect will be most acute among marginalized groups, such as:  immigrants, transgender individuals, people with mental illness, and those seeking of reproductive and gender affirming care.

244.  Already, advocates who advise noncitizens are recommending that individuals and families balance the value of seeking healthcare against the possible risks that their information may be shared with ICE for immigration enforcement purposes.

245.  Many residents of the States are likely to avoid enrolling in healthcare programs for which they are eligible as a result of CMS's data sharing with DHS, fearing their data will be used to initiate immigration enforcement actions against them or their family members.  This includes both undocumented immigrants, who are legally entitled to Medicaid coverage for emergency medical services including childbirth, and legal residents, who reasonably fear that DHS will initiate immigration enforcement actions against them, given this administration's track record of haphazard and error-prone immigration enforcement.[14]

246.  As a result of CMS sharing personal information with DHS, uninsured immigrants will be more likely to avoid going to the emergency room or calling an ambulance to seek life-saving treatment—for themselves or for their children—for fear that doing so will make them a target for deportation.

247.  Indeed, the public reporting of data sharing between CMS and DHS has already caused widespread confusion and fear that Medicaid data will be used to locate and target immigrants for deportation.

248.  This fear is well-founded.  DHS has rescinded a longstanding directive that had prohibited ICE from conducting immigration enforcement operations at "sensitive locations" such as hospitals and clinics.  The administration has been outspoken about its goal of aggressive

---

[14] *See, e.g.*, Kyle Cheney, *Trump Administration Acknowledges Another Error in a High Profile Deportation*, Politico (May 16, 2025), https://www.politico.com/news/2025/05/16/trump-administration-another-error-high-profile-deportation-00355377.

Amended Complaint for Declaratory and Injunctive Relief

immigration enforcement, promising "millions and millions of deportations."[15]  Between January and April of this year, ICE has deported over 142,000 U.S. residents, at least 25% of whom had no convictions or pending criminal charges.[16]  Despite this aggressive enforcement campaign, news outlets have reported that the administration is still unhappy with the pace of deportation numbers, and ICE is under pressure from the President to arrest 1,200-3,000 people per day.[17]

249.  Exacerbating the fear of deportation among immigrants is the fact that, under this administration, "deportation" no longer necessarily means being sent back to one's home country.  For example, DHS has "deported" nearly 300 U.S. residents to a Centre for Terrorism Confinement (CECOT) prison in El Salvador,[18] including at least one individual who was mistakenly "deported," despite being legally present in the United States.[19]  This has prompted the United Nations High Commissioner to call for changes in U.S. policy to avoid serious human rights concerns, including the risk of "torture or other irreparable harm" that may be suffered at CECOT.[20]  The administration has also announced that an undisclosed number of U.S. residents are now being detained at Guantanamo Bay due to immigration enforcement efforts.[21]

250.  Healthcare providers and groups, including the California Medical Association, warn that the federal government's failure to adhere to patient privacy protections and misuse of Medicaid data for immigration enforcement purposes will make people less likely to seek medically necessary healthcare.[22]

---

[15] *See, e.g.,* Rebecca Santana et al., *Trump Rolls Out His Blueprint on Border Security, But His Orders Will Face Challenges*, AP NEWS (Jan. 20, 2025), https://apnews.com/article/trump-deportation-immigration-homan-asylum-inauguration-ac10480dc636b758ab3c435b974aeb19.

[16] Dep't of Homeland Security Press Release, "*100 Days of Making America Safe Again* (April 29, 2025) https://www.dhs.gov/news/2025/04/29/100-days-making-america-safe-again.

[17] *See* Welker, Kristen et al., Trump is 'Angry' that Deportation Numbers are not Higher, (Feb. 7 , 2025), https://www.nbcnews.com/politics/national-security/trump-angry-deportation-numbers-are-not-higher-rcna191273.

[18] *See* Dep't of Homeland Security Press Release, *supra*, n. 15.

[19] *See Id.;* Bustillo, Ximena, *Trump Administration Admits Maryland Man Sent to El Salvador Prison By Mistake*, NPR (April 1, 2025) https://www.npr.org/2025/04/01/nx-s1-5347427/maryland-el-salvador-error.

[20]  UN News, *US Deportations Raise Serious Human Rights Concerns*, (May 13, 2025) https://news.un.org/en/story/2025/05/1163181#:~:text=13%20May%202025%20Human%20Rights,to%20El%20Salvador%20remain%20unclear.

[21] *See* Dep't of Homeland Security Press Release, *supra,* n. 15.

[22] *See* Kristen Hwang, *Gov. Newsom Lambasts Trump for Giving Immigrants' Health Data to Deportation Officials*, CalMatters (June 13, 2025), https://calmatters.org/health/2025/06/newsom-trump-immigrant-data-deportation-medicaid/.

Amended Complaint for Declaratory and Injunctive Relief

1

2

### b. Chilling Effects on Public Health Program Participation Will Cause Further Harm

3

251.  The chilling effects caused by Defendants' actions will, in turn, harm both State

4

finances, operation of State programs, and the public health.

5

252.  Individuals who are eligible for federally funded Medicaid but choose not to apply

6

due to concerns about data security and privacy will reduce the amount of federal funding with

7

which the State can provide healthcare to its residents.  This will cause direct financial harm to

8

the States, which otherwise receive 50 percent or more in federal matching funds for qualified

9

Medicaid expenditures, including emergency Medicaid.

10

253.  Instead of securing federal funding for providing healthcare services to otherwise

11

Medicaid-eligible individuals, Plaintiffs will incur increased uncompensated costs for hospital

12

care in which a treatment or service is not paid for by an insurer or patient, yet is still mandated to

13

be provided by EMTALA.

14

254.  This economic harm will be particularly acute for those hospitals and other healthcare

15

facilities that serve a disproportionate share of low-income individuals and noncitizens.  Such

16

facilities already operate on thin margins.  If public funding drops, and uncompensated care rises,

17

these hospitals will be less able to serve all patients in need.

18

255.  In the absence of requested relief, State healthcare providers (including those

19

facilities owned and operated by the State and its political subdivisions) will also face increased

20

administrative costs and burdens, as they will need to devote considerable time and resources to

21

educating frontline and clinical staff regarding new patient privacy risks and rebuilding trust and

22

overcoming objections resulting from confusion and fear.

23

256.  To the extent Defendants' actions chill noncitizens and individuals in mixed-status

24

families from accessing publicly funded health insurance options for which they are eligible, this

25

will result in their being more likely to defer primary or preventive healthcare.  Deferred care

26

leads to more complex medical conditions in the future that are more expensive to treat.

27

28

257.  This chilling effect will have dire health consequences.  Not seeking emergency medical care when it is needed is likely to cause serious health consequences, and even death, not only for undocumented immigrants but also for their children, regardless of immigration status.

258.  For example, those chilled from accessing federally funded emergency Medicaid for prenatal care will be more likely to experience adverse health effects during pregnancy and childbirth.  Decreased access to prenatal care will lead to increased rates of premature births, low birth weight infants, and congenital defects, all of which produce considerable harm to Plaintiffs, in addition to worse health outcomes for the child and parent. The average medical cost to Plaintiffs in the first year of life of a premature or low birth weight baby is up to 10 times higher than the cost of a full-term baby.

259.  Overall, Defendants' actions will push more people into the ranks of the uninsured, straining the budgets of state, local, and private health systems and programs.

260.  As the primary funder for all their low-income residents' healthcare services, Plaintiffs' publicly funded healthcare programs will ultimately bear the cost of both financial pressure on safety net providers and the increased public health harms.

261.  In addition, to the extent Defendants' actions make noncitizens and other individuals more reluctant to enroll in federally-funded health care programs, Plaintiffs will incur greater costs and burdens to conduct statutorily-required outreach efforts to enroll families and children in those federally-funded programs. *See, e.g.*, 42 U.S.C. § 1397bb.

262.  Defendants' actions will also make noncitizens and other individuals more reluctant to enroll in fully state-funded public health insurance programs, undermining the efficacy of those programs.

263.  Moreover, the States also have a quasi-sovereign interest in protecting the safety and well-being of their residents.  This interest is particularly strong when it comes to emergency Medicaid, which includes childbirth.

264.  Defendants' actions will undermine the progress that many States have made as a result of Medicaid expansion, which has helped in reducing rates of individuals without health

insurance to historic lows.  For example, in California, 96 percent of children now have private or public health insurance.

265.  While Plaintiffs do not seek to assert the States' residents' own interests in this litigation, those interests are considerable.  All residents have a right to access emergency medical care.  Those who already received federally funded emergency Medicaid face irreparable harm to their privacy interests if Medicaid information and other PII is improperly accessed or disseminated.  Going forward, individuals and families will be forced to choose between those privacy interests and accessing emergency healthcare services for which they are eligible under both federal and state law.

## CLAIMS

### FIRST CAUSE OF ACTION
### Violation of the APA – Arbitrary and Capricious

266.  Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

267.  The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

268.  HHS's decision to transfer Medicaid data containing protected health information to other federal agencies, and DOGE and DHS's collection of that data, are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA.  5 U.S.C. § 704.

269.  An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

270.   Defendants failed to engage in reasoned decision-making as required by the APA. Among other deficiencies, Defendants failed to consider the important privacy and public health consequences of their unprecedented transfer and use of state Medicaid data.  Defendants have failed to consider the impact their actions will have on their ability to fulfill the Medicaid Act's purpose of providing medical assistance to those in need.

271.   Defendants additionally ignored substantial reliance interests in the federal government's well-established rules and policies regarding the privacy, security, and confidentiality of personal Medicaid healthcare data.

272.   Although Defendants may change their policies within statutory limits, the agency must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Defendants have not even provided notice of their change in policy, much less the necessary "satisfactory explanation" for their about-face on Medicaid confidentiality rules. *See State Farm*, 463 U.S. at 43.

273.   Defendants' actions are arbitrary and capricious in violation of § 706(2)(A) of the APA.

**SECOND CAUSE OF ACTION**
**Violation of the APA, Contrary to Law**

274.   Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

275.   HHS's transfer of Medicaid data containing personal health information to other federal agencies, and DOGE and DHS's collection of that data, are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. *See* 5 U.S.C. § 704.

276.   These final agency actions are unlawful, and should be set aside by the court, because they are not in accordance with law, *id*. § 706(2)(A); were taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C); and fail to observe "procedure required by law," *id*. § 706(2)(D).

Amended Complaint for Declaratory and Injunctive Relief

277.  As set forth in paragraphs 58-68, *supra*, the Social Security Act provides, *"[n]o disclosure ...* of any file, record, report, or other paper, or any information […] shall be made except as the head of the applicable agency may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306 (a)(1) (emphasis added); *see also* 42 U.S.C. § 1306(a)(2) (applying this privacy provision to both HHS and the Social Security Administration).

278.  Far from authorizing this transfer of data, federal regulations caution that Medicaid records should only be disclosed for "purposes directly connected with the administration" of the State's Medicaid plan.  42 C.F.R. § 431.300(a).

279.  Immigration enforcement, population surveillance, or other similar federal policy objectives are not permissible grounds for disclosure of Medicaid data.

280.  Defendants' actions contravene the Social Security Act and are therefore not in accordance with law in violation of the APA.

281.  Defendants' actions also trespass federal statutes enacted to protect the privacy, integrity, and security of data held by the government.

282.  As set forth in paragraphs 69-80, *supra*, the Privacy Act sets strict procedural requirements before an agency can create or revise a system of records and collect individuals' data. 5 U.S.C. § 552a(e).

283.  By collecting and transferring personal Medicaid data, without publishing a notice required by 5 U.S.C. § 552a(e), Defendants failed to comply with the Privacy Act's informational and procedural requirements.

284.  Additionally, Section 552a(b) of the Privacy Act further prohibits disclosure of records from systems of records absent certain conditions.

285.  Disclosure from HHS systems of records to DOGE or DHS employees would not meet any of the conditions enumerated in 5 U.S.C. § 552a(b), and is therefore inconsistent with the Privacy Act.

286.  Specifically, disclosure of personal Medicaid data to agencies outside HHS for the purpose of immigration enforcement is not "a purpose which is compatible with the purpose for

51

which [the data] was collected." *Id.* § 552a(a)(7).  Therefore, even if CMS and DHS have published a SORN describing immigration enforcement as a "routine use," the agencies would nevertheless be in violation of the Privacy Act. *Id.* § 552a(b)(3); 5 U.S.C. § 552a(a)(7).

287.  Defendants' actions contravene the Privacy Act and are therefore not in accordance with law in violation of the APA.

288.  As set forth in paragraphs 81-84, *supra*, HIPAA limits the use and disclosure of individuals' protected health information, including information transferred from CMS, which is covered entity under HIPAA, to DHS.

289.  Upon information and belief, none of the impacted individuals consented to the transfer of their Medicaid data, and CMS is neither expressly permitted nor required to transfer records to DHS.

290.  To the extent DHS provided a written request for the data, that request was not sufficiently specific and limited in scope to qualify for HIPAA's law enforcement exception.

291.  Defendants' actions contravene HIPAA and are therefore not in accordance with law in violation of the APA.

292.  As set forth in paragraphs 85-92, *supra*, to comply with FISMA, CMS has developed, documented, and implemented an agency-wide program to provide information security for the information and systems that support the operations and assets of the agency, including those provided or managed by another agency, contractor, or other sources. CMS was required to do so to comply with standards implementing FISMA set out by NIST.

293.  Upon information and belief, by transferring Plaintiff States' Medicaid data files to DHS in a rushed manner and over the objections of career staff, Defendants likely failed to comply with CMS's own policies for complying with FISMA, and for sharing and protecting sensitive data in a manner that ensures the security and integrity of that data.

294.  Defendants' actions violate privacy and data security law and are therefore in violation of the APA because they are not in accordance with law, 5 U.S.C. § 706(2)(A), in excess of statutory authority, limitations, and right, 5 U.S.C. § 706(2)(C), and without observance of procedure required by law, 5 U.S.C. § 706(2)(D).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THIRD CAUSE OF ACTION**
**Violation of the APA – Rulemaking Without Proper Procedure**
**(Against HHS)**

295.  Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

296.  Under the APA, an agency must provide the public with notice of a proposed rule, 5 U.S.C. § 553(b), and give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).  Agencies cannot evade the APA's requirements merely by declining to publish a rule for comment.

297.  Upon information and belief, as alleged in the First and Second Causes of Action above, HHS has abandoned or substantially amended well-established confidentiality requirements that limit transfer of data via policy and regulation, which may be released only under identified and limited circumstances.

298.  HHS did so without the opportunity for notice and comment, without amending any otherwise applicable Medicaid rules and agreements with the States, and without any prior notice to the public whatsoever.

299.  HHS's rescission of the Richardson Waiver does not excuse HHS from compliance with the APA as applied to this kind of substantive change in policy.

300.  Defendants' actions are not in accordance with law because they violate the APA's procedural requirements.

**FOURTH CAUSE OF ACTION**
**Spending Clause: Lack of Clear Notice**
**U.S. Const. art. I, § 8, cl. 1**

301.  Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

302.  As explained in the prior Causes of Action above, to the extent that Defendants intend to create a novel expansion of the scope of allowable sharing of Medicaid data, their conduct is unlawful.  Their conduct is also unconstitutional because Plaintiff States did not have clear notice that this was a condition of federal Medicaid funding.

303.   Article I of the U.S. Constitution specifically grants Congress the power "to pay the Debts and provide for the common Defense and general Welfare of the United States."  U.S. Const., art. I, § 8, cl. 1.

304.   Incident to the spending power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). However, any conditions must be imposed "'unambiguously'" to enable "'States to exercise their choice knowingly, cognizant of the consequences of their participation.'"  *Id*. at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

305.   There is no statute that clearly states that Medicaid funds provided by Defendants are conditioned on consent for unfettered transfer of that Medicaid data to agencies other than HHS for purposes of immigration enforcement, or any other purposes unrelated to the Medicaid program.

306.   Therefore, conditioning federal Medicaid funding on unfettered access to state and residents' personal healthcare data would violate this limitation on the spending power, because, inter alia, Plaintiffs did not have "clear notice" of such a condition.  *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

307.   Moreover, conditions on federal grants must be related to the national program for which the grant monies are provided. *Dole* at 207 (citing *Massachusetts* v. *United States*, 435 U.S. 444, 461 (1978)).  Defendants' efforts to mine sensitive and protected beneficiary data for purposes like immigration enforcement is not related to Medicaid's programmatic goals of "provid[ing] health coverage to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults and people with disabilities" and "provid[ing] an important foundation for maintaining the health of our nation." Medicaid, https://www.medicaid.gov/medicaid and https://www.medicaid.gov/about-us (last visited Jun. 25, 2015).  Nor is there any connection between this type of sharing of beneficiary data and the sound administration of the Medicaid program.  Conditioning Medicaid funds on States' sharing of sensitive beneficiary data is therefore inconsistent with the Spending Clause.

308.   Additionally, to the extent that Defendants are attempting to create a new Medicaid data sharing condition on federal Medicaid funding, such a condition is unlawful because it was issued after Plaintiffs accepted federal funds, and Defendants cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

309.   Pursuant to 28 U.S.C. § 2201(a), Plaintiffs are entitled to a declaration that their receipt of federal Medicaid funds is not conditioned on consent to unfettered waiver of Medicaid beneficiaries' privacy and confidentiality rights.

310.   Plaintiffs are also entitled to a preliminary and permanent injunction barring Defendants from suspending funds or otherwise taking enforcement action against Plaintiffs on the basis of such a purported consent to waiver.

**FIFTH CAUSE OF ACTION**
**Ultra Vires**

311.   Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set forth herein.

312.   No administrative agency can take any action that exceeds its statutory authority.

313.   Defendants have acted ultra vires in disclosing the States' Medicaid data files, including records containing millions of individuals' personal health information, to DHS. Such disclosure is prohibited by statute and not within any exception permitting disclosure.

314.   Defendants have acted ultra vires in using the States' Medicaid data files for immigration enforcement and other purposes other than those expressly provided by statute.

315.   Defendants have acted in excess of their legal authority contrary to specific prohibitions present in law and regulations governing the treatment and protection of the States' Medicaid data files obtained and maintained by the federal government.

316.   For these reasons, Plaintiffs are also entitled to a declaration that Defendants' actions are unlawful, and the Court should preliminarily and permanently enjoin Defendants from the unlawful disclosure and use of this data except as provided by law and as necessary for the administration of the Medicaid program.

Amended Complaint for Declaratory and Injunctive Relief

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court enter a judgment against Defendants and award the following relief:

1. A declaration that HHS's transfer of Medicaid data containing personally identifiable, protected health information to DHS was unauthorized and contrary to the laws of the United States;

2. A declaration that any actions implementing the Information Silos EO are contrary to the laws of the United States to the extent they are applied to interagency transfers of Medicaid data containing personally identifiable, protected health information;

3. Preliminarily and permanently enjoin HHS from further transferring Medicaid data containing personally identifiable, protected health information to DOGE, DHS, or any other federal agency, except as allowed under federal law;

4. Preliminarily and permanently enjoin DOGE, DHS, or any other federal agency from using Medicaid data containing personally identifiable, protected health information for purposes of immigration enforcement, population surveillance, or other similar purposes;

5. Ordering the impoundment, disgorgement, and destruction of all copies of any Medicaid data containing personally identifiable, protected health information that has already been unlawfully disclosed to DHS and DOGE;

6. Award the Plaintiffs costs and reasonable attorneys' fees; and

7. Grant such additional relief as the Court deems proper and the interests of justice may require.

56

Dated:  August 28, 2025

Respectfully submitted,

LETITIA JAMES
Attorney General for the State of New York

ROB BONTA
Attorney General for the State of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
WILLIAM BELLAMY
MARIA F. BUXTON
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU

/s/    Mark Ladov
MARK LADOV*
Special Counsel
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
ZOE LEVINE*
Special Counsel for Immigrant Justice
NATASHA KORGAONKAR*
Special Counsel
28 Liberty St. New York, NY 10005
mark.ladov@ag.ny.gov
*Attorneys for the State of New York*
*Admitted pro hac vice

/s/  Anna Rich
ANNA RICH
Deputy Attorneys General
*Attorneys for the State of California*

57

1    *Additional Counsel*

2    KRISTIN K. MAYES                          PHILIP J. WEISER
     Attorney General for the State of Arizona    Attorney General for the State of Colorado

3

4    /s/    *Alexa G. Salas*                    /s/  *Ryan Lorch*
     ALEXA G. SALAS*                            RYAN LORCH*
5    Assistant Attorney General                Senior Assistant Attorney General
     2005 North Central Avenue                  SAM WOLTER*
6    Phoenix, Arizona 85004                     Assistant Attorney General
     Alexa.Salas@azag.gov                       1300 Broadway, #10
7    ACL@azag.gov                               Denver, CO 80203
     *Attorneys for the State of Arizona*       Ryan.lorch@coag.gov
8    *Admitted pro hac vice                     samuel.wolter@coag.gov
                                                *Attorneys for the State of Colorado*
9                                               *Admitted pro hac vice

10   WILLIAM TONG                               KATHLEEN JENNINGS
     Attorney General of Connecticut           Attorney General for the State of Delaware

11

12   /s/  *Janelle Medeiros*                    /s/    *Vanessa L. Kassab*
     JANELLE MEDEIROS*                          IAN R. LISTON
13   Special Counsel for Civil Rights          Director of Impact Litigation
     165 Capitol Ave                           JENNIFER KATE AARONSON
14   Hartford, CT 06106                        VANESSA L. KASSAB*
     Janelle.Medeiros@ct.gov                   Deputy Attorney General
15   *Attorneys for the State of Connecticut*  Delaware Department of Justice
     *Admitted pro hac vice                    820 N. French Street
16                                             Wilmington, DE 19801
                                               vanessa.kassab@delaware.gov
17                                             *Attorneys for the State of Delaware*
                                               *Admitted pro hac vice
18
     ANNE E. LOPEZ                             KWAME RAOUL
19   Attorney General for the State of Hawai'i    Attorney General for the State of Illinois

20

21   /s/    *Kaliko'onālani D. Fernandes*      /s/    *Harpreet Khera*
     KALIKO'ONĀLANI D. FERNANDES*              HARPREET KHERA*
22   Solicitor General                         Bureau Chief, Special Litigation
     DAVID D. DAY*                             SHERIEF GABER*
     Special Assistant to the Attorney General Assistant Attorney General
23   425 Queen Street                          Office of the Illinois Attorney General
     Honolulu, HI 96813                        115 S. LaSalle St.
24   david.d.day@hawaii.gov                    Chicago, IL 60603
     kaliko.d.fernandes@hawaii.gov             sherief.gaber@ilag.gov
25   *Attorneys for the State of Hawai'i*      harpreet.khera@ilag.gov
     *Admitted pro hac vice                    *Attorneys for the State of Illinois*
26                                             *Admitted pro hac vice

27

28

Amended Complaint for Declaratory and Injunctive Relief

1  S. TRAVIS MAYO                          AARON M. FREY
   General Counsel                         Attorney General for the State of Maine
2  Office of the Governor of Kentucky

3  /s/      S. Travis Mayo                 /s/   Brendan Kreckel
   S. Travis Mayo*                         BRENDAN KRECKEL*
4  General Counsel                         Assistant Attorney General
   Taylor Payne*                           Office of the Attorney General
5  Chief Deputy General Counsel            6 State House Station
   Laura C. Tipton*                        Augusta, ME  04333-0006
6  Deputy General Counsel                  brendan.d.kreckel@maine.gov
   Office of the Governor                  *Attorneys for the State of Maine*
7  700 Capitol Avenue, Suite 106           *Admitted pro hac vice
   Frankfort, KY 40601
8  travis.mayo@ky.gov
   taylor.payne@ky.gov
9  laurac.tipton@ky.gov
   *Attorneys for Plaintiff Governor of Kentucky,*
10 *Andy Beshear*
   *Pro hac vice forthcoming

11
   ANTHONY G. BROWN                        ANDREA JOY CAMPBELL
12 Attorney General for the State of Maryland   Attorney General for the State of
                                           Massachusetts
13
   /s/   Michael Drenzer
14 MICHAEL DREZNER*                        /s/   Katherine Dirks
   Senior Assistant Attorney General       KATHERINE DIRKS
15 Office of the Attorney General          Chief State Trial Counsel
   200 Saint Paul Place, 20th Floor        CHLOE CABLE
16 Baltimore, Maryland 21202               ETHAN W. MARKS*
   Mdrezner@oag.state.md.us                Assistant Attorneys General
17 *Attorneys for the State of Maryland*   Office of the Massachusetts Attorney
   *Admitted pro hac vice                  General
18                                         1 Ashburton Place Boston, MA 02108
                                           Katherine.Dirks@mass.gov
19                                         Chloe.Cable@mass.gov
                                           Ethan.W.Marks@mass.gov
20                                         *Attorneys for the Commonwealth of*
                                           *Massachusetts*
21                                         *Admitted pro hac vice

22

23

24

25

26

27

28

1
2
DANA NESSEL
Attorney General for the State of Michigan

KEITH ELLISON
Attorney General for the State of Minnesota

3
/s/   Neil Giovanatti
NEIL GIOVANATTI*
4
BRYAN BEACH*
Assistant Attorneys General
5
Michigan Department of Attorney General
525 W. Ottawa
6
Lansing, MI 48909
GiovanattiN@michigan.gov
7
BeachB@michigan.gov
Attorneys for the State of Michigan
8
*Admitted pro hac vice

/s/   Katherine J. Bies
KATHERINE J. BIES
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
Katherine.Bies@ag.state.mn.us
Attorneys for the State of Minnesota

9
AARON D. FORD
Attorney General for the State of Nevada
10

MATTHEW J. PLATKIN
Attorney General for the State of New
Jersey

11
/s/   Heidi Parry Stern
HEIDI PARRY STERN* (Bar. No. 8873)
12
Solicitor General
Office of the Nevada Attorney
13
General
555 E. Washington Ave., Ste. 3900
14
Las Vegas, NV 89101
HStern@ag.nv.gov
15
Attorneys for the State of Nevada
*Admitted pro hac vice
16

/s/   Elizabeth R. Walsh
ESTEFANIA PUGLIESE-SAVILLE*
ELIZABETH R. WALSH*
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Estefania.Pugliese-Saville@law.njoag.gov
elizabeth.walsh@law.njoag.gov
Attorneys for the State of New Jersey
*Admitted pro hac vice

17
RAUL TORREZ
Attorney General of New Mexico
18

DAN RAYFIELD
Attorney General State of Oregon

19
/s/  Amy Senier
AMY SENIER*
20
Senior Counsel
New Mexico Department of Justice
21
P.O. Drawer 1508
Santa Fe, NM  87504-1508
22
asenier@nmdoj.gov
Attorneys for the State of New Mexico
23
*Admitted pro hac vice

/s/   BRIAN SIMMONDS MARSHALL
BRIAN S. MARSHALL
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Brian.S.Marshall@doj.oregon.gov
Attorneys for the State of Oregon

24
25
26
27
28

60

1    PETER F. NERONHA                          CHARITY R. CLARK
     Attorney General for the State of Rhode    Attorney General for the State of Vermont
2    Island

3                                               /s/   Ryan P. Kane
     /s/  Lee Staley                            RYAN P. KANE*
4    LEE B. STALEY*                             Deputy Solicitor General
     Chief, Health Care Unit                    109 State Street
5    150 South Main Street                      Montpelier, VT 05609
     Providence, RI 02903                       Ryan.kane@vermont.gov
6    lstaley@riag.ri.gov                        Attorneys for the State of Vermont
     Attorneys for the State of Rhode Island    *Admitted pro hac vice
7    *Admitted pro hac vice

8    NICHOLAS W. BROWN                          JOSHUA L. KAUL
     Attorney General of Washington             Attorney General for the State of Wisconsin
9

10   /s/   Zane Muller                          KARLA Z. KECKHAVER*
     ZANE MULLER, WSBA 63777*                   Assistant Attorney General
11   WILLIAM MCGINTY, WSBA #41868*              Wisconsin Department of Justice
     Assistant Attorneys General                Post Office Box 7857
12   800 Fifth Avenue, Suite 2000               Madison, Wisconsin 53707-7857
     Seattle, WA 98104-3188                     karla.keckhaver@wisdoj.gov
13   Attorneys for the State of Washington      Attorneys for Plaintiff State of Wisconsin
     *Admitted pro hac vice                     *Pro hac vice forthcoming
14

15   OK2025900292
     92027248
16

17

18

19

20

21

22

23

24

25

26

27

28

Amended Complaint for Declaratory and Injunctive Relief