# EXHIBIT B

Policy Number: 11066.2



*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

October 27, 2025

MEMORANDUM FOR:      Madison Sheahan
Deputy Director

Marcos D. Charles
Acting Executive Associate Director
Enforcement and Removal Operations

Derek W. Gordon
Acting Executive Associate Director
Homeland Security Investigations

Charles Wall
Principal Legal Advisor

FROM:                          Todd M. Lyons
Acting Director

SUBJECT:                    Use of HHS Information and Rescission of ICE Policy
Memorandum 11066.1, *Clarification of Existing Practices
Related to Certain Health Care Information* (Oct. 25,
2013).

Purpose

This memorandum establishes U.S. Immigration and Customs Enforcement (ICE) policy
governing the agency's ability to request, receive, and use information obtained from or
submitted by the U.S. Department of Health and Human Services (HHS), other federal agencies,
or other sources at any time for law enforcement purposes, including as the basis for pursuing
new and ongoing criminal investigations and immigration enforcement actions. ICE Policy
Memorandum 11066.1, *Clarification of Existing Practices Related to Certain Health Care
Information* (Oct. 25, 2013) (2013 Policy Memorandum) is now rescinded and superseded by
this policy.

Policy

It is ICE policy that the agency may, as permitted by law, request, receive, and use HHS
information that may be useful for any and all law enforcement activities that ICE is authorized
to pursue as a matter of federal law. This includes, but is not limited to, information provided to
HHS Centers for Medicare & Medicaid Services (CMS) by individuals seeking coverage under a

Use of HHS Information and Rescission of ICE Policy Memorandum 11066.1, *Clarification of Existing Practices Related to Certain Health Care Information* (Oct. 25, 2013).
Page 2

qualified health plan offered on a Health Insurance Marketplace or through an insurance affordability program (i.e., premium tax credits, cost sharing reductions, Medicaid, Children's Health Insurance Program, or Basic Health Program) about their immigration status and certain information about their household members. These law enforcement activities may include, but are not limited to, initiating criminal immigration investigations and civil immigration enforcement actions. At this time, ICE contemplates using HHS's biographical, contact, and location information, but reserves the right, in a specific case to consider other information on a case-by-case basis as permitted by law. The U.S. Department of Homeland Security is authorized to use lawfully collected information for immigration enforcement, as Congress has explicitly enabled and, in some cases, mandated interagency sharing of immigration-status information. *See* 6 U.S.C. § 122(a)–(b); 8 U.S.C. § 1360(b); 8 U.S.C. § 1373.

Although ICE does not typically discuss its reasons for forgoing notice and comment in policy documents, the district court's explicit direction to DHS in *California v. HHS*, No. 3:25-cv-05536 (N.D. Cal.), compels ICE to address it here. Without waiving or limiting its other arguments as to why notice and comment is unnecessary, ICE's decision to request HHS information is at least exempt from notice and comment because it is a "policy statement" as defined by 5 U.S.C. § 553(d)(2). *See Syncor Int'l Corp v. Shalala*, 127 F.3d 90, 94-95 (D.C. Cir. 1997). As explained in greater detail below, federal statutes already create a legal norm under which ICE can request information relevant to its enforcement operations. 6 U.S.C. § 122(a)–(b); 8 U.S.C. § 1360(b); 8 U.S.C. § 1373. Although ICE has opted, in the past, not to exercise that authority by requesting information from CMS, that exercise of enforcement discretion (like this one) has not changed the legal norm created by Congress. ICE did not go through notice and comment in exercising its discretion in the past and could change its policy in the future as circumstances warrant. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015).

This policy is effective immediately and remains in effect until superseded.[1]

Background

On October 25, 2013, ICE issued the 2013 Policy Memorandum clarifying the agency's handling of certain information that individuals provide about themselves and their household members for purposes of determining their eligibility for coverage under a qualified health plan or through an insurance affordability program under the Patient Protection and Affordable Care Act (ACA) and the Social Security Act (SSA). Consistent with ICE's operational focus during that time, the 2013 Policy Memorandum stated that ICE would not use health coverage eligibility information "as the basis for pursuing a civil immigration enforcement action," regardless of whether it was obtained from a federal agency or other source. Although the 2013 Policy Memorandum did not prohibit all uses of this data, ICE has not historically requested eligibility information from HHS that was obtained for purposes of determining health care coverage eligibility for use in its operations, for any purpose.

---

[1] ICE notes it is currently precluded from using this information due to a Preliminary Injunction. *See California v. HHS*, No. 25-05536 (N.D. Cal. filed July 1, 2025). However, when the Preliminary Injunction is lifted, ICE will proceed with this policy.

Use of HHS Information and Rescission of ICE Policy Memorandum 11066.1, *Clarification of Existing Practices Related to Certain Health Care Information* (Oct. 25, 2013).
Page 3

Beginning in January 2025, President Trump issued multiple Executive Orders (EOs) establishing his Administration's policies on immigration enforcement, preventing taxpayer-funded benefits from being provided to unqualified aliens, and expanding information sharing. EO 14,159, *Protecting the American People Against Invasion* was issued on January 20, 2025, states that the Administration's policy is "to faithfully execute the immigration laws against all inadmissible and removable aliens." 90 Fed. Reg. 8443 (Jan. 29, 2025). EO 14,165, *Securing Our Borders*, also issued on January 20, 2025, establishes as the policy of the United States to take all appropriate action to secure the borders of our nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and promptly removing all aliens who enter or remain in the United States in violation of Federal law. 90 Fed. Reg. 8467 (Jan. 30, 2025). EO 14,218, *Ending Taxpayer Subsidization of Open Borders*, directs federal agencies to faithfully carry out the immigration laws and "to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens." 90 Fed. Reg. 10581 (Feb. 25, 2025). Finally, EO 14,243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, expands interagency information sharing of government data. 90 Fed. Reg. 13681 (Mar. 25, 2025).

In accordance with these Executive Orders, in a manner consistent with the 2013 Policy Memorandum, and for the policy reasons explained in greater detail below, ICE requested and received CMS data from the Transformed Medicaid Statistical Information System (T-MSIS) for a population of aliens from a list that ICE provided to HHS CMS. The data received from HHS CMS was then uploaded into ICE systems to be used to support criminal and civil enforcement actions.

When it decided to begin requesting that information in June of 2025, ICE did so in a manner that was consistent with the 2013 Policy Memorandum. But the 2013 Policy Memorandum has been understood in ways that have caused confusion and suggested that ICE would not use HHS information at all for immigration enforcement. For example, as recently as August 27, 2025, a webpage dedicated to providing information to immigrant households on the Healthcare.gov website contained the statement, "We won't use any immigration status you share with us for immigration enforcement purposes" and provided a link to the public-facing ICE website hosting the 2013 Policy Memorandum for more information. Rescinding the policy that has been the focus of that confusion helps the agency to proactively mitigate challenges that might interfere, even temporarily, with lawfully permitted information sharing.

This memorandum revokes the 2013 Policy memorandum. It explains the type of information ICE is authorized to request and receive moving forward, sets forth the legal and policy basis for ICE's decision to begin requesting information from HHS, and addresses concerns as to how information received from HHS will be managed and used by ICE moving forward.

Discussion

As discussed previously, the 2013 Policy Memorandum stated that ICE would not use HHS's information as the basis for pursuing a civil immigration enforcement action but did not prohibit

Use of HHS Information and Rescission of ICE Policy Memorandum 11066.1, *Clarification of Existing Practices Related to Certain Health Care Information* (Oct. 25, 2013).
Page 4

all uses of this data. In fact, ICE had no prior practice of requesting this sort of information from HHS, for any purpose.

The 2013 Policy Memorandum does not align with the Administration's policies and priorities, as defined in the EOs noted previously. It unnecessarily restricts ICE's use of information that is available and functionally useful for immigration enforcement purposes. ICE is not required by law to refrain from using such HHS information as the basis for pursuing a civil immigration enforcement action; instead, ICE made a policy choice to do so in 2013. The information ICE will request from HHS will support the full and efficient execution of ICE's mission. It represents a particular set of accurate and quality data that can be used to enhance ICE's data and improve its law enforcement actions. For example, and without limitation, the data is valuable in corroborating residential addresses which are often material to criminal investigations and immigration enforcement (e.g., warrants, safe apprehensions, service of process).

When ICE decided to begin requesting information from CMS in June of 2025, ICE did so in a manner that was consistent with the 2013 Policy Memorandum by not using HHS information as underlying information to initiate civil immigration enforcement actions. This memo rescinds that limitation on ICE's use of such information. While ICE does not anticipate that the information received from HHS will typically be used to initiate (i.e., as the basis for pursuing) a law enforcement action, it is foreseeable that the information could give rise to criminal or civil law enforcement activities. The self-imposed restriction contained in the 2013 Policy Memorandum could hamper ICE's faithful execution of immigration laws against removable aliens who are unknown to ICE or who have avoided encounters with immigration officers. Such information may, for example, be valuable in identifying removable aliens present in the United States—most commonly those who have unlawfully entered the United States without inspection and admission and who have failed to meet their obligations to register their presence with the Department of Homeland Security or be fingerprinted. The information obtained from HHS will assist ICE in holding these aliens accountable for violating the nation's immigration laws.

The 2013 Policy Memorandum also does not address when ICE can use HHS information in the context of its criminal law enforcement mission. This memo clarifies that such uses of data are not prohibited. HHS's information may be crucial in helping ICE locate and apprehend individuals who are subject to criminal investigations. Therefore, rescinding the 2013 Policy Memorandum allows ICE to more efficiently achieve its mission of preserving national security and public safety.

*Reliance Interests*

Some aliens, or individuals residing with aliens, may have relied on the 2013 Policy Memorandum or the statements other entities have made about the 2013 Policy Memorandum as part of their decision to apply for or accept health benefits. However, as explained in more detail below, ICE has the long-standing legal authority to request, receive, and use this information and has determined that the value of this information to immigration and criminal law enforcement operations outweighs any relevant reliance interests.

Use of HHS Information and Rescission of ICE Policy Memorandum 11066.1, *Clarification of Existing Practices Related to Certain Health Care Information* (Oct. 25, 2013).
Page 5

All aliens may receive certain health benefits such as emergency medical treatment and public health assistance for immunization and testing and treatment of communicable disease. 8 U.S.C. § 1611(b)(1)(A), (C). Other aliens, depending on their status may be eligible to receive additional benefits. *See, e.g.*, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193. The statutory framework that applies to information in CMS's possession does not prohibit the use of such information for lawful immigration enforcement purposes. Section 1106(a) of the SSA precludes the disclosure of certain information, "except as otherwise provided by Federal law." Accordingly, when this provision is read in conjunction with the 6 U.S.C. §§ 122(a)–(b), 8 U.S.C. § 1360(b), and 8 U.S.C. § 1373, ICE has always had authority to request and receive information for immigration enforcement purposes. Additionally, the Privacy Act authorizes a federal agency to share a record maintained in a system of records pertaining to an individual with another federal agency "for a civil or criminal law enforcement activity," even if written consent has not been given, so long as ICE makes that request in writing from a high-level official. *See* 5 U.S.C. § 552a(b)(7). Further, under 6 U.S.C. §§ 122(a)–(b); 8 U.S.C. § 1360(b); and 8 U.S.C. § 1373, ICE and DHS have myriad authorities to request and obtain data and information for law enforcement purposes.

As outlined above, the law generally permits the use of HHS's information for immigration enforcement. Rescission of the 2013 Policy Memorandum would not, therefore, represent a new legal norm, but simply represents an operational focus to maximize ICE's statutory authority for law enforcement purposes.

In fact, aliens are typically required to provide certain information to the Department of Homeland Security. The Alien Registration Act of 1940, Public Law 76-670, 54 Stat. 670, also known as the Smith Act, was enacted into law on June 28, 1940. The Act generally required all aliens in the country beyond 30 days to apply to register and to be fingerprinted. Congress later incorporated these requirements, as amended, in the Immigration and Nationality Act of 1952, Public Law 82-414, 66 Stat. 163. The registration and fingerprinting requirements currently appear, as amended, in part VII of subchapter II of chapter 12 of title 8, United States Code (8 U.S.C. §§ 1301-1306).

As part of registering, among other requirements, aliens provide their address. Furthermore, each alien required to be registered under the alien registration requirements of the INA who is within the United States must also notify DHS in writing of each change of address and new address within ten days from the date of such change and provide such additional information as the Secretary may require by regulation. 8 U.S.C. § 1305(a). Additionally, aliens in removal proceedings must provide their address under 8 CFR § 1003.15(d).

In the immigration enforcement context, there are significant challenges in relying on aliens to provide their current and accurate address information. Although the legal requirement exists for aliens to provide updated contact information, some aliens disregard this obligation and fail to keep the government informed of their current location. Likewise, some aliens provide false contact information to ICE to evade apprehension by immigration officers. By cross-referencing HHS's information with other data sources, ICE is able to build a more complete picture of an individual's location, which is critical for operational planning and decision-making. Similarly,

Use of HHS Information and Rescission of ICE Policy Memorandum 11066.1, *Clarification of Existing Practices Related to Certain Health Care Information* (Oct. 25, 2013).
Page 6

having access to additional data points for address corroboration can help law enforcement confirm the whereabouts of criminal aliens, suspects, witnesses, or victims, ensuring that ICE resources and investigative efforts are focused on the right locations. Information requested by ICE from HHS is limited to only those data elements which are relevant to ICE's criminal and civil enforcement mission. For example, an alien's contact information (address and phone number) and other data elements relevant to location and corroborating the identity of the subject.

Given that having the correct location information for aliens is vital for effective immigration enforcement, and ICE must frequently use other means than the addresses provided by aliens to immigration authorities to locate and apprehend aliens who are generally required to keep the government up to date about their whereabouts, leveraging HHS's information is necessary as it may at times be more up-to-date and accurate than other information available to ICE. Some aliens may have applied for benefits relying on representations made pursuant to the 2013 memo, but that reliance is diminished by longstanding legal requirements under the INA to apprise immigration authorities of their whereabouts.

Aliens who are evading DHS's registration requirements but who are attempting to receive or are receiving health care through federal emergency Medicaid or a state-funded program that are concerned about their personal information being shared with ICE are not in compliance with the law. Whatever reliance they have placed on Medicaid information not being shared with immigration authorities is entitled to little to no weight. Although some state Medicaid agencies and health care providers claim that data confidentiality is important to establishing trust in the doctor-patient relationship and providing quality health care, that privacy interest is greatly diminished as to information that aliens already have an obligation to provide to immigration authorities. This memo is concerned with the sort of biographical and location information ICE already has a right to access, such that sharing of that information should not significantly diminish reasonable privacy interests as between patients and physicians. Accordingly, any potential reliance interests here are outweighed by ICE's legitimate law enforcement interests.

Likewise, the reliance of the state Medicaid agencies on prior policy decisions by ICE not to request health coverage information from HHS are also entitled to little weight. The statutory provisions that both give ICE the right to request this information, and that require aliens to affirmatively provide that information to ICE upon request, are longstanding, and there is no exception to their application under Medicaid. Brief of Appellee State of California in *United States v. California*, No. 18-16496, 2018 WL 5880015 (9th Cir. Nov. 5, 2018) ("When Congress has intended to reach broad swaths of information, or specifically a person's address, it has used different words. For example . . . the INA requires federal agencies to communicate to ICE, upon request, '[a]ny information in any records . . . as to the identity and location of aliens, [8 U.S.C. § 1360(b).]").

Some state agencies that operate Medicaid programs, as well as health care providers, contend that unless HHS information is not shared with ICE, aliens will not take advantage of federal emergency Medicaid or state-funded Medicaid for which they are eligible, leading to potential health complications due to a lack of preventive care or untreated medical emergencies. They

Use of HHS Information and Rescission of ICE Policy Memorandum 11066.1, *Clarification of Existing Practices Related to Certain Health Care Information* (Oct. 25, 2013).
Page 7

also express funding concerns arising from the fact that they are required to provide emergency medical treatment under the Emergency Medical Treatment and Labor Act, 42 U.S.C. §§ 1395dd(a), (b)(1), (c)(1), and may not be able to receive compensation for that treatment if aliens are unwilling to apply for emergency Medicaid. Rural health care providers as well as clinics with a significant base of patients reliant on Medicaid have further noted concerns about closing facilities if they are unable to recoup funds for providing services through emergency Medicaid. As noted above, the reliance interest of aliens who have not properly informed immigration authorities of their whereabouts is very attenuated because of their preexisting obligations to keep those authorities informed as to their whereabouts. Moreover, legal requirements regarding information sharing between federal agencies, such as § 1360(b) were on the books for decades when Congress authorized aliens to receive emergency Medicaid in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 8 U.S.C. § 1611(b)(1)(A). Congress could have made such information exempt from § 1360(b) or precluded it from being shared under the Social Security Act, but it chose not to do so. The States' concerns are entitled to little weight because they simply reflect the scheme that Congress created, which provides benefits to aliens under certain limited circumstances and gives immigration authorities the right to access information that arises from the conferral of those benefits.

*Safeguarding Information*

ICE intends to request, receive, and use HHS data only to the extent necessary for law enforcement purposes and as permitted by law. This includes using information for criminal investigations and immigration enforcement. Information requested by ICE and received from HHS will be limited to that information which ICE deems relevant to its criminal and civil law enforcement mission. At this time, the information that ICE intends to request and receive from HHS will be limited to biographical information about aliens, location information, and contact information. Although ICE does not foresee, at this time, using other information, ICE reserves the right to revisit this issue at an appropriate time if it begins to encounter factual situations in which information beyond those categories becomes relevant to its criminal and civil law enforcement mission.

The law enforcement uses of this information require compliance with applicable laws and regulations governing privacy and data security. ICE has internal safeguards to ensure compliance with all federal statutory and regulatory requirements related to the handling, maintenance, and use of information, including: the requirements of the Federal Information Security Management Act (FISMA), 44 U.S.C. Chapter 35, as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. 113-283); the Privacy Act of 1974, 5 U.S.C. § 552a; related Office of Management and Budget (OMB) circulars and memoranda; National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations; and any applicable amendments published in the future. Notably, the Health Insurance Portability and Accountability Act and HHS CMS's current regulations do not govern or prohibit this data sharing.

These laws, directives, and regulations include requirements for safeguarding Federal information and information systems and personally identifiable information used in Federal

Use of HHS Information and Rescission of ICE Policy Memorandum 11066.1, *Clarification of Existing Practices Related to Certain Health Care Information* (Oct. 25, 2013).
Page 8

agency business processes, as well as related reporting requirements. ICE has systems in place to process the data in a manner that will protect the confidentiality of the data, so that unauthorized persons cannot retrieve any data by computer, remote terminal, or other means.

Data shared will be protected as required by applicable law, including through the establishment of appropriate administrative technical and physical safeguards to protect the integrity, security, and confidentiality of the data, and to prevent unauthorized use or access to it.

ICE will restrict access to the data exchanged and to any data created by the exchange to only those authorized employees and officials who need it to perform their official duties. Further, ICE will advise all personnel who have access to the data exchanged and to any data created by the exchange of the confidential nature of the data, the safeguards required to protect the data, and the civil and criminal sanctions for noncompliance contained in the applicable Federal laws.

ICE will store the data exchanged and any data created by the exchange in an area that is physically and technologically secure from access by unauthorized persons at all times. ICE will establish appropriate safeguards for such data, as determined by a risk-based assessment of the circumstances involved.

ICE will process the data exchanged and any data created by the exchange under the immediate supervision and control of authorized personnel in a manner that will protect the confidentiality of the data, so that unauthorized persons cannot retrieve any data by computer, remote terminal, or other means. Systems personnel must enter personal identification numbers when accessing data on the agencies' systems. ICE will strictly limit authorization to those electronic data areas necessary for the authorized employee to perform his or her official duties.

Information obtained from HHS will be retained only as long as necessary to carry out the purposes for which it was provided and in accordance with applicable law, regulation, and policy, and will be disposed of thereafter, in accordance with the applicable National Archives and Records Administration (NARA) General Records Schedule(s) or NARA-approved agency-specific records retention schedule(s). If no applicable retention schedule exists, the records are retained indefinitely or until NARA approves a schedule(s). If a litigation hold is in place, the records are retained until no longer needed in the litigation and the hold is lifted.

<u>No Private Right</u>

This policy memorandum provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this policy memorandum on the otherwise lawful enforcement or litigative prerogatives of ICE.

Use of HHS Information and Rescission of ICE Policy Memorandum 11066.1, *Clarification of Existing Practices Related to Certain Health Care Information* (Oct. 25, 2013).
Page 9

<u>Severability</u>

ICE intends its request for various categories of HHS's information to be severable from each other. For instance, ICE's request for biographical information about aliens is severable from its request to receive location information about aliens or from its request to receive other types of information that ICE does not presently intend to use for immigration enforcement purposes. In the event a court finds that ICE does not have a right to access a specific type of data, ICE intends that requests for specific categories of data be severable from each other.