ROB BONTA
Attorney General of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
WILLIAM BELLAMY
MARIA F. BUXTON
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU
ANNA RICH (State Bar No. 230195)
Deputy Attorneys General
  1515 Clay St., Floor 20
  Oakland, CA 94612-1499
  Telephone: (510) 879-0296
  E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR,** in his official capacity as Governor of the Commonwealth of Kentucky**; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,**<br><br>                                        Plaintiffs,<br>                        v.<br>**U.S. DEP'T OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY JR.,** in his official capacity as Secretary of Health and Human Services; **U.S. DEP'T OF HOMELAND SECURITY; KRISTI NOEM**, in her official capacity as Secretary of Homeland Security,<br>                                        Defendants. | Case No. 3:25-cv-05536-VC<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM AND POINTS OF AUTHORITIES**<br><br>Date:          December 9, 2025<br>Time:         2:00 p.m.<br>Dept:         Courtroom 4<br>Judge:       Hon. Vince Chhabria<br>Trial Date: Not set<br>Action Filed: July 1, 2025 |

December 2, 2025

# TABLE OF CONTENTS

Page

Notice of Motion And Motion For Preliminary Injunction ........................1

Memorandum of Points and Authorities....................................................1

Introduction...............................................................................................1

Statement of Facts and Procedural History...............................................2

Legal Standard ..........................................................................................6

Argument ...................................................................................................6

I.  The States are Likely to Succeed on the Merits of Their APA Claims ..............................................................................6

    A.  Plaintiffs Are Likely to Succeed on Their Claims that the Challenged Actions Are Arbitrary and Capricious ...............................................................6

        1.  Defendants Failed to Consider Substantial Reliance Interests ........................................7

        2.  Defendants Failed to Consider Important Aspects of the Problem ............................10

        3.  Defendants Cannot Rely on Flawed Legal Analysis to Justify Unfettered Sharing of Healthcare Data.........................................14

            a.  In Deferring to ICE, CMS Abdicated Its Own Authority and Ignored Its Obligations Under the Privacy Act 14

            b.  ICE's Legal Authorities Do Not Justify Its Action ............................16

        4.  Defendants Failed to Consider Alternatives ................................................................18

    B.  Plaintiffs Are Likely to Succeed on the Complaint's Third Cause of Action that Defendant CMS Violated the APA's Procedural Requirements ......20

        1.  CMS's new data-sharing policy is a legislative rule subject to notice and comment....................................................20

        2.  Contrary to CMS's claims, the New Data Sharing Rule Is Not a Statement of Policy 22

        3.  The Absence of Notice and Comment Severely Prejudiced Significant Reliance Interests ....................................................23

II. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction, and the Balance of Hardships Supports Continuing the Preliminary Injunction .............................24

**TABLE OF CONTENTS**
(continued)

**Page**

Conclusion ................................................................................................25

# TABLE OF AUTHORITIES

**Page**

CASES

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
  901 F.3d 1166 (9th Cir. 2018) ............................................................6

*Action on Smoking & Health v. Civil Aeronautics Bd.*
  699 F.2d 1209 (D.C. Cir. 1983) .........................................................19

*Barahona-Gomez v. Reno*
  167 F.3d 1228 (9th Cir. 1999) ..........................................................22

*Brookings Mun. Tel. Co. v. FCC*
  822 F.2d 1153 (D.C. Cir. 1987) .........................................................19

*Cap. Power Corp. v. FERC*
  156 F.4th 644 (D.C. Cir. 2025) .........................................................19

*Center for Taxpayer Rights v. Internal Revenue Service*
  2025 WL 3251044 (D.D.C. Nov. 21, 2025) ........................................14, 16, 23

*Chang v. United States*
  327 F.3d 911 (9th Cir. 2003) ...........................................................20

*City and Cnty. of San Francisco v. U.S. Citizenship and Imm. Servs.*
  981 F.3d 742 (9th Cir. 2020) ...........................................................24

*Cresote Council v. Johnson*
  555 F. Supp. 2d 36 (D.D.C. 2008) .....................................................24

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*
  591 U.S. 1 (2020).......................................................................7, 8, 18

*Encino Motorcars, LLC v. Navarro*
  579 U.S. 211 (2016).....................................................................8

*Fed.Commc'n.Comm'n. v. Fox Television Stations, Inc.*
  556 U.S. 502 (2009).....................................................................7

*Getty v. Fed. Sav. & Loan Ins. Corp.*
  805 F.2d 1050 (D.C. Cir. 1986) ........................................................10

*Hemp Industries Ass'n v. Drug Enforcement Admin.*
  333 F.3d 1082 (9th Cir. 2003) .........................................................20, 21

# TABLE OF AUTHORITIES
## (continued)

Page

*Linoz v. Heckler*
    800 F.2d 871 (9th Cir. 1986) ........................................................22

*Mada–Luna v. Fitzpatrick*
    813 F.2d 1006 (9th Cir.1987) ......................................................22

*N. Mariana Islands v. United States*
    686 F. Supp. 2d 7 (D.D.C 2009).................................................25

*Paulsen v. Daniels*
    413 F.3d 999 (9th Cir. 2005) ................................................20, 23

*SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*
    769 F.3d 1184 (D.C. Cir. 2014) ...................................................10

*Stewart v. Azar*
    313 F. Supp. 3d 237 (D.D.C. 2018)..............................................10

*United States v. California*
    921 F.3d 865 (9th Cir. 2019) .......................................................16

*Whitman v. Am. Trucking Ass'ns*
    531 U.S. 457 (2001).....................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008)...........................................................................6

**STATUTES**

U.S.C.
    § 1360.........................................................................................16

5 U.S.C.
    § 552a(a)(2).................................................................................15
    § 552a(a)(8)(A)(i).......................................................................15
    § 552a(o)......................................................................................16

6 U.S.C.
    § 122.............................................................................................16

8 U.S.C.
    §§ 1301-1306 ..............................................................................17
    § 1373...........................................................................................16

**TABLE OF AUTHORITIES**
(continued)

**Page**

42 U.S.C.
    § 1306 (a)(1) ...............................................................................21
    § 1306 (a)(2)(B) ..........................................................................21
    § 1395dd......................................................................................11
    § 1396-1 ......................................................................................11
    § 1396a(7)(A)(i)............................................................................8
    § 1396a *et seq*............................................................................13
    § 1396b(r)......................................................................................9

Administrative Procedure Act............................................................. *passim*

Administrative Procedure Act
    § 553(b) ......................................................................................20

Affordable Care Act...............................................................4, 14, 15

Emergency Medical Treatment and Labor Act..............................11, 12

Health Insurance Portability and Accountability Act .........10, 11, 16, 17

Medicaid Act............................................................................................1

Privacy Act...............................................................................15, 16

Pub. L. 104-191, 110 Stat. 1936 ...........................................10

Social Security Act ......................................................................14, 21

Social Security Act
    Title V ........................................................................................21
    Title XIX......................................................................................21

**COURT RULES**

Federal Rule of Civil Procedure 65 .......................................................1

Local Rule 7-2..........................................................................................1

**TABLE OF AUTHORITIES**
**(continued)**

Page

**OTHER AUTHORITIES**

42 C.F.R.
§ 401.101(a)(1) .................................................21
§ 401.134.........................................................22
§ 401.134(a)....................................................21
§ 401.134(c)....................................................21
§ 431.303.........................................................9
§ 435.907(e).....................................................8
§ 438.3(a).........................................................9

45 C.F.R.
§ 155.260........................................................22
§ 155.260(a)....................................................15
§ 160.............................................................10
§ 164.............................................................10
§ 164.512(f)(1)(ii)(A) .......................................17

CMS, *Implementation Guide: Citizenship and Non-citizen
    Eligibility*, available at https://www.medicaid.gov/resources-
    for-states/downloads/macpro-ig-citizenship-and-non-citizen-
    eligibility.pdf (last visited Nov. 26, 2025) .......................................6

CMS, T-MSIS Data Guide (Ver. 3.38.0),
    https://www.medicaid.gov/tmsis/dataguide/v3/................................11

Executive Order No. 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025).........................4

Letter from Gov't Accountability Project, Protected Whistleblower
    Disclosure of Charles Borges Regarding Violation of Laws,
    Rules & Regulations, Abuse of Authority, Gross
    Mismanagement, and Substantial and Specific Threat to Public
    Health and Safety at the Social Security Administration, at 3
    (Aug. 26, 2025), https://larson.house.gov/sites/evo-
    subsites/larson.house.gov/files/evo-media-document/ssa-
    whistleblower-doge-08-28-25.pdf (last checked Dec. 2, 2025)......................13

OMB No. 0938-1191, Application for Health Coverage & Help
    Paying Costs, *available at* https://www.medicaid.gov/state-
    resource-center/maclearning-collaboratives/downloads/single-
    streamlined-application.pdf (last visited Dec. 2, 2025) ....................................8

## **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

**PLEASE TAKE NOTICE** that on December 9, 2025, at 2:00 p.m., Plaintiffs the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin, the Commonwealth of Massachusetts, and Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky (collectively, Plaintiffs or the States) will and hereby do move this Court pursuant to Federal Rule of Civil Procedure 65 and Local Rule 7-2 for a preliminary injunction against Defendants U.S. Department of Health and Human Services (HHS); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; U.S. Department of Homeland Security (DHS); and Kristi Noem, in her official capacity as Secretary of DHS; and their officers, agents, servants, employees, and any other persons who are in active concert or participation with them.

Plaintiffs respectfully move the Court to enter a preliminary injunction: (1) prohibiting Defendants from transferring the States' Medicaid and other healthcare data files containing personally identifiable, protected health information to DHS or any other federal agency; (2) prohibiting Defendants from sharing or using such data for purposes of immigration enforcement, population surveillance, or other similar purposes; and (3) any additional preliminary relief that the Court deems proper and the interests of justice may require.

This motion is based on this notice; the Amended Complaint for Declaratory and Injunctive Relief (ECF No. 108); the accompanying Memorandum of Points and Authorities; the Declaration of Anna Rich; this Court's file, including Plaintiffs' prior motion for a preliminary injunction and supporting declarations (ECF Nos. 42-43); and any matters properly before the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In the seven decades since Congress enacted the Medicaid Act to provide medical assistance to vulnerable populations, the federal government has made clear that personal and private healthcare data collected about beneficiaries of Medicaid and other governmental healthcare programs should be confidential, shared only in narrow circumstances that benefit public health and the integrity of the Medicaid program itself. These limits make sense. Historically, the government has been justifiably concerned that members of our communities might avoid going to the doctor for needed medical care if they believe doing so puts them, or their family members, at risk of persecution or deportation.

The current Administration disagrees with the wisdom of these past decisions, as is its right. But in its zeal to access and use any data at its disposal, it has repeatedly ignored guardrails imposed by Congress and prior Administrations to protect the privacy and security of Americans' most personal information. It has eviscerated Medicaid rules, policies, and procedures. And it has done so, for the most part, in secret—without opportunity for public input or consideration of States, medical providers, and Medicaid patients' reliance on existing laws and regulations. As Congress directed in the Administrative Procedure Act (APA), federal agencies must consider these interests and take necessary steps to amend existing rules and regulations before reversing them, especially when those actions come with significant negative consequences.

The preliminary record in this case established that "using CMS [Centers for Medicare and Medicaid Services] data for immigration enforcement threatens to significantly disrupt the operation of Medicaid—a program that Congress has deemed critical for the provision of health coverage to the nation's most vulnerable residents." ECF No. 98 (hereinafter "Order") at 3. Because it was arbitrary and capricious to ignore these "unique policy tradeoffs," the Court ordered Defendants to "engage in a reasoned decisionmaking process before adopting and implementing such a significant change," which included considering "whether to limit the scope

of the data to which U.S. Immigration and Customs Enforcement (ICE) has access." *Id*.
Defendants have not followed this order. Their latest actions shrug off serious reliance interests; provide ICE with even broader access to information without meaningful limitations, public process, or serious acknowledgement the numerous restrictions that federal law imposes on the government's use of personal records; and fail to consider alternative approaches that would minimize harm. The APA requires more.

Defendants should not be allowed to barrel ahead with arbitrary and capricious decisionmaking without the opportunity for thorough judicial review. The Court should preliminarily enjoin the new CMS and ICE policies pending review of the complete administrative record and final adjudication of Plaintiffs' claims.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiffs filed the original Complaint in the Northern District of California on July 1, 2025, after learning through public reporting that HHS's Centers for Medicare and Medicaid Services (CMS) had abruptly and secretively shared millions of state records containing Medicaid data with ICE for immigration enforcement purposes, abrogating longstanding policy and practice and violating the laws and regulations governing that information. *See generally* ECF No. 75 (Cash Decl.) ¶¶ 15-36, 43-52; ECF No. 108 (Am. Compl.) ¶¶ 212-236.

More details have emerged as a result of this litigation. First, on or about June 10, 2025, CMS shared four large data sets from California, the District of Columbia, Illinois, and Washington with ICE to support ICE's enforcement activities. ECF No. 83-1 (Brandt Decl.) ¶ 30; ECF No. 83-2 (Charles Decl.) ¶ 10.  States had provided CMS this data as part of ordinary Medicaid oversight procedures.  ECF No. 43-29 (Sadwith Decl.) ¶¶ 16-18; ECF No. 74 (Exhibits to Sadwith Decl.).

Second, on June 14, 2025, ICE shared a list of approximately 7.6 million individuals with CMS.  ECF No. 83-2 (Charles Decl.) ¶ 11; ECF No. 83-1 (Brandt Decl.) ¶ 31.  CMS later searched a central Medicaid data repository (the Transformed Medicaid Statistical Information System or T-MSIS) and provided ICE with data from confidential Medicaid files on

approximately 2.1 million of these individuals. *Id.*

Finally, and only *after* this massive data sharing exercise and Plaintiffs' filing of this lawsuit, the two agencies entered into an information exchange agreement. ECF No. 83-3 (Information Exchange Agreement); ECF No. 83-2 (Charles Decl.) ¶ 12; ECF No. 83-1 (Brandt Decl.) ¶ 32. This agreement purported to allow ICE agents to log directly into CMS's T-MSIS data system to retrieve nearly-unlimited information from confidential Medicaid records. ECF No. 83-3 (Information Exchange Agreement) at 1, 4.

In an order entered on August 12, 2025, on Plaintiffs' first motion for preliminary relief, the Court preliminarily enjoined DHS "from using Medicaid data obtained from the plaintiff states for immigration enforcement purposes," and HHS "from sharing Medicaid data obtained from the plaintiff states with DHS for immigration enforcement purposes." Order at 4-5. The Court observed that given long-standing policies barring this use of Medicaid data, the "unique policy tradeoffs" at stake, and the reliance of "various players in the Medicaid system" on those policies, the agencies were required "to carry out a reasoned decisionmaking process before changing them." *Id.* at 3. The Court concluded that "[t]he record in this case strongly suggests that no such process occurred." *Id.* The Court noted various factors that the agencies had failed to consider, including disruptions to the operations of Medicaid, "whether to limit the scope of the data to which ICE has access," how to communicate these drastic changes to state partners, and "the extent to which the states, providers, and patients relied on assurances that patient data would not be used for immigration enforcement purposes." *Id.* The Court accordingly granted a preliminary injunction "until the shorter of: (1) the termination of this litigation; or (2) 14 days after both DHS and HHS have completed a reasoned decisionmaking process (or rulemaking, if necessary) that considers the matters discussed in this ruling, along with any other relevant policy tradeoffs or legal considerations." *Id.* at 5.

On October 27, 2025, ICE Acting Director Todd Lyons executed a new policy memorandum in response to the Court's Order. The October 27, 2025 memo formally rescinded a 2013 ICE Policy Memorandum (*see* Declaration of Anna Rich ("Rich Decl."), Ex. A), which

stated that ICE would not use health care information for the purpose of immigration enforcement, and announced as ICE's new official policy "that the agency may, as permitted by law, request, receive, and use HHS information that may be useful for any and all law enforcement activities that ICE is authorized to pursue as a matter of federal law." *See* ECF No. 131-2 (hereinafter "ICE Memo") at 1.  Unlike the agency actions challenged in Plaintiffs' first motion for a preliminary injunction, the ICE Memo covers not just Medicaid data but *any* information provided to CMS by individuals seeking health coverage through the Affordable Care Act (ACA) marketplace, the Children's Health Insurance Program (CHIP), or any other affordable healthcare program.  *Id.* at 1-2.  Defendants disclosed this memo to Plaintiffs' counsel on November 21, 2025, minutes before the parties' case management conference.

Defendants also disclosed a pre-publication CMS notice regarding data sharing (ECF No. 131-1 (hereinafter "CMS Notice")), which it published in the Federal Register four days later. The CMS Notice announces that the agency "will share certain information" with ICE and that the notice is "applicable immediately."  CMS Notice at 1.  The notice acknowledges that CMS previously stated publicly that "the information regarding individuals that it collects will only be used for administration of its programs" and that it would not use this information "for immigration enforcement purposes."  *Id.* at 2.  However, CMS asserts that these statements were made "in the context of and in reliance on" the now rescinded 2013 ICE policy.  *Id.* Accordingly, CMS's new rule states that it "will provide certain information to ICE upon request from ICE consistent with federal laws to advance administration priorities related to immigration laid out in" a series of 2025 Executive Orders.  *Id.* at 6.

The ICE Memo and the CMS Notice are both broad and vague, allowing the federal administration to pursue its goal of "unfettered access to comprehensive data from all State programs" (see Executive Order No. 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025)), while leaving Plaintiffs and the public in the dark about exactly what and whose medical information will be kept confidential, and what will be shared.  ICE states that the agency "contemplates using HHS's biographical, contact, and location information."  ICE Memo at 2; *see also* CMS Notice

at 5.  The terms "biographical," "contact," and "location information" remain undefined, leaving members of the public to wonder what the federal government may decide in the future to put in that bucket—which could hypothetically encompass anything from bank account information and medical diagnosis to race, sexual orientation, and gender identity.  Ultimately, however, definitions are not a limiting factor because ICE reserves the right to seek "other information on a case-by-case basis as permitted by law"— providing no further details on when or how it would require additional information, or what additional information it would request.  ICE Memo at 2; *see also* CMS Notice at 6 (noting with approval that ICE "reserved the right . . . to consider requesting other information on a case-by-case basis as permitted by law").

Tellingly, neither agency provides any criteria for or example of information transfer that it would consider *not* "permitted by law."  The ICE Memo simply states that the agency may obtain any information it thinks "may be useful."  ICE Memo at 1.  Neither decision contains any actual limitation on what information ICE may obtain, or protection against ICE's misuse of an individual's most private medical data.

Whose data may be shared is never clearly stated, but also appears to be unlimited.  CMS relies in part on authority that applies to "U.S. citizens and lawful permanent residents," CMS Notice at 4 (citing the Privacy Act), and contemplates generally sharing "Medicaid information or data shared with CMS by states" (*id*. at 5)—information that could include any of the 70 million U.S. residents who receive Medicaid, as well as children and other household members, regardless of citizenship or lawful status.

Defendants have already taken steps to implement these new agency decisions.  On November 24, 2025, ICE transmitted a letter to CMS requesting "Medicaid data from June 2025 to the present pertaining to the biographical, contact, and location information of individuals with unsatisfactory immigration status."  ECF No. 133-1 (hereinafter "ICE Letter").  The ICE Letter defines "unsatisfactory immigration status" as "aliens not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law," *see id.*, a definition that does not correlate to the definition of "satisfactory immigration status" used by

Medicaid programs.[1]  The ICE Letter does not define or limit the "individuals" whose

information was sought by ICE, identify the particular datafiles or systems of records to be

accessed, or define or limit the relevant data fields sought (other than to state that the "request

includes citizenship and immigration status, address, phone number, date of birth, and Medicaid

ID").  *Id.*

## LEGAL STANDARD

As set forth in more detail in Plaintiffs' first motion, to obtain a preliminary injunction, the

plaintiff must demonstrate that (1) it "is likely to succeed on the merits," (2) it "is likely to suffer

irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its]

favor," and (4) "an injunction is in the public interest," *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008), or that it has raised "'serious questions go[ing] to the merits of its claims" and

showing that the "balance of hardships . . .tips 'sharply'" in plaintiff's favor. *A Woman's Friend*

*Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (quoting *All. for the Wild*

*Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)) (internal quotation marks omitted).

## ARGUMENT

**I.    THE STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR APA CLAIMS**

**A.    Plaintiffs Are Likely to Succeed on Their Claims that the Challenged Actions Are Arbitrary and Capricious**

This Court previously held that the Defendants likely acted arbitrarily and capriciously by

failing to engage "in a reasoned decisionmaking process before adopting and implementing such

a significant change."  Order at 3; *see also* ECF No. 42-2 (hereinafter "PI Br.") at 19-20

(providing general APA arbitrary and capricious standards).  Defendants now state they have

completed the required decisionmaking process.  They are wrong.  While Defendants

acknowledge their complete reversal of existing policies in the CMS Notice and the ICE Memo,

---

[1] For example, a lawfully present and qualified non-citizen who remains subject to a five-year waiting period to access non-emergency Medicaid benefits would appear in Medicaid records as lacking a "satisfactory" immigration status. *See, e.g.*, CMS, *Implementation Guide: Citizenship and Non-citizen Eligibility*, available at https://www.medicaid.gov/resources-for-states/downloads/macpro-ig-citizenship-and-non-citizen-eligibility.pdf (last visited Nov. 26, 2025).

Plaintiffs' Mot. For Preliminary Injunction (3:25-cv-05536-VC)

they fail to remedy the defects previously identified by the Court, and instead raise new concerns regarding breadth and ambiguity. These documents fail to meaningfully consider substantial reliance interests; ignore or misapprehend important aspects of the problem; and fail to consider alternative policies that could ameliorate harms to States and their residents. Defendants refuse to grapple with pre-existing authorities limiting datasharing while insisting that ICE has a legal right to confidential healthcare data that trumps all contrary laws and interests. Defendants' actions are still arbitrary and capricious.

### 1. Defendants Failed to Consider Substantial Reliance Interests

In their first motion for a preliminary injunction, Plaintiffs detailed the significant reliance interests at stake, ranging from those of healthcare providers, to mixed-status families, to State Medicaid agencies. *See, e.g.*, PI Br. at 19-20; ECF No. 89 (PI Reply Br.) at 11-13; Order at 3 (recognizing that players in the Medicaid system "have relied on" Defendants' policies). This record established that Defendants' existing policies—which, critically, do nothing to impede ICE's immigration enforcement activities—are instrumental to Plaintiffs' efforts to promote public health on limited state budgets. The Court agreed based on this evidence that "using CMS data for immigration enforcement threatens to significantly disrupt the operation of Medicaid—a program that Congress has deemed critical for the provision of health coverage to the nation's most vulnerable residents." Order at 3. Yet, Defendants continue to summarily dismiss these interests, and instead grant ICE unfettered access to Medicaid and other federal healthcare data, in contravention of the Court's order and the APA's requirements.

When a prior rule or policy "has engendered serious reliance interests," it "would be arbitrary or capricious to ignore such matters." *Fed.Commc'n.Comm'n. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In that situation, a "reasoned explanation is needed" for disregarding the facts and circumstances "engendered by the prior policy." *Id*. at 515-16. An agency must "assess whether there were reliance interests" in the prior rule, determine whether those interests "were significant," and weigh them "against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). Importantly, a "summary

discussion" does not suffice when serious reliance interests are at stake.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

Here, the CMS Notice and ICE Memo do not properly assess reliance interests at stake and weighing the consequences of doing so.  For example, CMS acknowledges that the data it now plans to disclose was obtained from individuals who "may have relied" on federal and state assurances that the information would *not* be used for immigration enforcement purposes. CMS Notice at 6.  But CMS simply asserts that reliance on these detailed legal requirements and policies is "entitled to little to no weight," because the "biographical and location information that ICE intends to seek from CMS is information that ICE has long had a right to access." CMS Notice at 7. This analysis is backwards as a matter of law. Because CMS and ICE are reversing longstanding policies with respect to data-sharing and healthcare privacy, these agencies are not writing on a "blank slate" and they must explain their reversal. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020) (where an agency is "not writing on a blank slate," the agency must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns"). Further, the CMS Notice ignores CMS itself mandated assurances in the longstanding template application for Medicaid, which expressly stated to prospective applicants, "We'll keep all the information you provide private and secure *as required by law*. *We'll use personal information only to check if you're eligible for health coverage*."[2]  (Emphasis added.)  Existing CMS regulations require States to use this or similar language in their state-specific application materials, which CMS approves.  42 C.F.R § 435.907(e).  Furthermore, key privacy rules require State Medicaid agencies to "restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with [...] the administration of the plan," 42 U.S.C.

---

[2] Health Ins. Marketplace, Dep't of Health & Hum. Servs., OMB No. 0938-1191, Application for Health Coverage & Help Paying Costs at 1, *available at* https://www.medicaid.gov/state-resource-center/maclearning-collaboratives/downloads/single-streamlined-application.pdf (last visited Dec. 2, 2025).

Plaintiffs' Mot. For Preliminary Injunction (3:25-cv-05536-VC)

§ 1396a(7)(A)(i), and to enact confidentiality plans to safeguard information about applicants and beneficiaries, 42 C.F.R. § 431.303.  .

Further, both ICE and CMS make note of the reliance interests of state Medicaid agencies on prior ICE policy decisions, but they do not engage in reasoned consideration of those interests.  The ICE Memo dismisses them as having "little weight" because ICE is now invoking "longstanding" statutory provisions for which "there is no exception . . . under Medicaid."  ICE Memo at 7.  This circular reasoning fails to consider the content of the prior 2013 ICE policy or its rationales, on which States and others relied.  In 2013, ICE did not invoke any right to Medicaid data and instead referred to their actions as "[c]onsistent with" "law and implementing regulations" that *prohibited* such sharing.  Rich Decl., Ex. A at 1; *see* Section I(A)(4).  CMS also finds that States' reliance interests with respect to the confidentiality of state-only healthcare program data are entitled to little or no weight because such reporting is supposedly voluntary. *See* CMS Notice at 8.  This explanation is flawed.  States do not "voluntarily" share state-only enrollee data; they share that data because CMS requires all ACA-authorized Medicaid managed care plans to report to T-MSIS, including those that enroll both federally-funded and state-only members, or because CMS demands comprehensive plan information as part of its oversight activities.  *Id.*; *see, e.g.*, 42 U.S.C. § 1396b(r); 42 CFR § 438.3(a) (requiring that managed care plan contracts be submitted in the form and manner established by CMS).

To the extent Defendants claim that sharing of "biographical, contact, and location" information is narrow enough to dispel reliance interests, that argument is also unavailing.  As described in the Statement of Facts, nothing in CMS's new rule limits sharing of any particular type of medical data with ICE.  Terms like "biographical" are undefined, and the agency may obtain any other information it thinks "may be useful."  ICE Memo at 2-3.  ICE's decision to place no meaningful limitation to what information it may obtain, or protections against ICE's misuse of an individual's most private medical information—and CMS's acquiescence to ICE's limitless demands despite the plain conflicts with prior HHS regulations and policies—makes clear the agencies' failure to consider reliance interests.

### 2.    Defendants Failed to Consider Important Aspects of the Problem

Defendants also failed to consider a number of key issues and policy tradeoffs in adopting the CMS Notice and ICE memo.  Specifically, they failed to consider (1) the need to protect patient privacy, (2) the impact of the change in policy on participation and trust in the Medicaid program, (3) the harm to individual and public health, (4) the harm to States' Medicaid program that could result from disclosures; and (5) the increased data privacy and security risks associated with the transfer of Medicaid data.

Simply "[s]tating that a factor was considered […] is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).  Failure to address serious harms presented to the agency—and widespread impact on affected parties—constitutes arbitrary decisionmaking. *See, e.g., Stewart v. Azar*, 313 F. Supp. 3d 237, 263 (D.D.C. 2018) (vacating HHS Secretary's waiver of several requirements of expanded Medicaid because "[f]or starters, the Secretary never once mentions the estimated 95,000 people who would lose coverage, which gives the Court little reason to think that he seriously grappled with the bottom-line impact on healthcare"); *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184, 1188 (D.C. Cir. 2014) (vacating agency order where agency failed even to consider potential harms of its changes to an airport advertising program).  An agency's statement "must be one of 'reasoning'; it must not be just a 'conclusion'; it must 'articulate a satisfactory explanation for its action." *SecurityPoint Holdings, Inc*, 769 F.3d at 1188 (quoting *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir.2010)).  Defendants' failure to engage in this type of reasoning renders the policy arbitrary and capricious.

#### *Patient Privacy*

Patients have a right to keep their protected health information private.  *See* Pub. L. 104–191, 110 Stat. 1936 (Health Insurance Portability and Accountability Act of 1996 (HIPAA)); 45 C.F.R. pts. 160, 164 (HHS Administrative Data Security and Privacy Standards).

CMS houses data on individuals that not only includes their immigration status and address, but also protected health information including diagnoses, providers, and treatment

locations and dates.  *See* CMS, T-MSIS Data Guide (Ver. 3.38.0),

https://www.medicaid.gov/tmsis/dataguide/v3/.  CMS, a HIPAA covered entity, has long

recognized this privacy right.  See ECF No. 75 (Cash Decl.) ¶¶ 22-24.  Yet, CMS has now

departed from this requirement without any consideration of patient privacy.  The CMS Notice

places no affirmative limits on what data it will share (beyond a vague reference to "as permitted

by law").  CMS Notice at 5.  It also does not limit whose information will be shared – leaving

information on citizens, legal permanent residents, and people with legal status all available to

ICE's whims.  *Id.* at 5-6. *CMS* never explains further what policy tradeoffs might be involved

with this decision, or how to protect patients' sensitive information.  *Cf.* PI Order at 3.

### Harm to Participation in and Trust of the Medicaid Program

Medicaid provides healthcare for some of the nation's most vulnerable people.  *See* 42

U.S.C. § 1396-1.  CMS and ICE acknowledge that their new policy may cause loss of federally

funded emergency Medicaid or state-funded healthcare coverage (CMS Notice at 7-8; ICE

Memo at 6-7), but make no effort to quantify, weigh, or otherwise consider this harm.  Instead,

CMS asserts that any harms resulting from declining Medicaid use are "entitled to little to no

weight because they reflect the scheme that Congress created." CMS Notice at 8-9. This

assessment further fails to consider Congress's preexisting scheme for the provision of healthcare

to noncitizens.  To do so would require consideration of other significant legislation enacted by

Congress that expands access to healthcare, such as the Emergency Medical Treatment and

Labor Act (EMTALA), which requires coverage of emergency medical treatment to everyone in

need, regardless of citizenship or immigration status.  *See* 42 U.S.C. § 1395dd.

Furthermore, CMS contemplates sharing more information than just that of "aliens," which

will cause chilling effects and other harms to U.S. citizens as well.  *See e.g.*, ECF No. 43-20

(Mangia Decl.) ¶¶ 20-22 (warning U.S. citizens and mixed-status families will disenroll or

forego Medicaid), 23 ("Deferring or avoiding medical care due to fear can have a number of

devastating consequences to both individual and population health"); ECF No. 43-16 (Groen

Decl.) ¶ 26.

Despite these foreseeable issues, neither agency explicitly addresses the impacts of their decisions on the implementation of EMTALA, or on U.S. citizens' access to healthcare.

### *Public Trust and Public Health*

As Plaintiffs explained in their first motion for a preliminary injunction, in any healthcare system, patient trust is critical to ensuring successful health outcomes. *See, e.g*., ECF No. 43-27 (Popat Decl.) ¶¶ 7-8 ("It is impossible to overstate the role that trust plays in making sure patients get the care they need[.]"); ECF No. 43-20 (Mangia Decl.) ¶ 15. For years, Plaintiffs *and Defendants* have told Medicaid participants that their private personal data would be protected and used only for processing claims and administering healthcare programs. *See, e.g*., ECF 43-32 (Wilmot Decl.) ¶¶ 13-14. Now, CMS is deliberately destroying trust built over decades, without considering how this breach will impact participation in the Medicaid system and the states' healthcare systems in the future. It is undoubtable that this new policy will cause harm to individuals and the public health. *See, e.g.*, ECF No. 43-11 (Flores-Brennan Decl.) ¶¶ 20-22; ECF No. 43-27 (Popat Decl.) ¶¶ 11-13.

CMS acknowledges that States and providers contend "it would be detrimental to public health if *aliens* do not partake in federal health benefits for which they are eligible." CMS Notice at 8-9 (emphasis added). CMS does not actually consider the effects of this impact; it does not even mention the role of patient trust in public health. Instead, it reiterates its legal position and states that public health concerns are entitled to little or no weight. Plaintiffs have demonstrated that even the limited Medicaid data sharing initially contemplated by this lawsuit will have devastating public health effects, and will undermine goals dictated by Congress through Medicaid and other programs. *See, e.g*., ECF No. 43-27 (Popat Decl.) ¶¶ 12-14. Defendant's summary dismissal of these significant harms does not suffice.

### *Harm to State Medicaid Programs*

Relying on CMS and ICE's representations, the States offered confidentiality to applicants and recipients for federally-funded emergency services and state-specific benefits. *See, e.g*., ECF No. 43-32 (Wilmot Decl.) ¶¶ 13-14; ECF No. 43-11 (Flores-Brennan Decl.) ¶¶ 11-

12. Based upon these protections, the States communicated promises of privacy to residents and encouraged broad-based enrollment in affordable insurance programs, furthering public policy goals like improving population health.

Defendants have failed to consider how their new rules will undermine these State policies and the Medicaid program as a whole. Medicaid relies on partnership with the States, and the CMS Notice damages that relationship. *See* ECF No. 75 (Cash Decl.) ¶ 51; *see also* 42 U.S.C. § 1396a *et seq.* Plaintiffs' ability to maintain their programs will suffer as they lose funding from declines in Medicaid participation and face increased uncovered healthcare costs. *See, e.g.*, ECF No. 43-1 (Adelman Decl.) ¶ 24. Plaintiffs will bear the costs of abruptly changing all of their communications and application materials to reflect new and unexpected federal policies. *See, e.g.,* ECF No. 43-9 (Connolly Decl.) ¶ 31. Program integrity may also suffer as CMS's actions impede States' ability to maintain a close and trusting partnership with CMS. *See* ECF No. 75 (Cash Decl.) ¶ 51. CMS's failure to address serious harms presented to the agency about administration of the program for which it is responsible—with the potential for widespread impacts on a highly regulated industry—constitutes arbitrary and capricious decisionmaking.

### *Data Security Risks*

Finally, CMS entirely failed to consider the increased data security risks that come with transferring massive amounts of State healthcare data outside of CMS.

Data breaches at the federal government are not uncommon and pose significant risks to not only individuals, but to national security as well. The Administration has thus far shown insufficient attention to these critical issues, as evidenced by such lapses as a recent whistleblower report alleging that a DOGE employee created "a live copy of the country's Social Security information in a cloud environment that circumvents oversight."[3] Providing only vague

---

[3] *See* Letter from Gov't Accountability Project, Protected Whistleblower Disclosure of Charles Borges Regarding Violation of Laws, Rules & Regulations, Abuse of Authority, Gross Mismanagement, and Substantial and Specific Threat to Public Health and Safety at the Social Security Administration, at 3 (Aug. 26, 2025), https://larson.house.gov/sites/evo-

(continued…)

assurances that CMS is going to handle the information "in a secure manner and establish appropriate safeguards," with nothing more, does not demonstrate that CMS considered this aspect of the problem.   CMS Notice at 6.

### 3. Defendants Cannot Rely on Flawed Legal Analysis to Justify Unfettered Sharing of Healthcare Data

#### a. In Deferring to ICE, CMS Abdicated Its Own Authority and Ignored Its Obligations Under the Privacy Act

CMS's new data policy is also arbitrary and capricious because the agency has failed to consider the "complicated statutory and regulatory landscape," *see* Order at 2, that a federal agency must navigate before sharing confidential information with another party.

CMS's primary explanation for the rule set forth in its Notice is that, now that the 2013 ICE policy has been rescinded, CMS has no choice but to provide healthcare data however ICE requests.  Yet the 2013 ICE policy memo itself belies this conclusion.  When DHS promulgated that policy, it did so in acknowledgment that *healthcare authorizing statutes and HHS's own implementing regulations* –including the ACA and the Social Security Act (SSA)—prohibited use of federal healthcare data for immigration enforcement purposes.  As the 2013 ICE policy memo states, "*Under the laws and implementing regulations*, information provided by individuals for such coverage *may not* be used for purposes other than ensuring the efficient operation of the Marketplace or administering the program or verifying certain eligibility determinations[.]"  Rich Decl., Ex. A at 1 (emphasis added).  CMS cannot now reasonably claim that ICE can obtain this information without constraint, when ICE itself had previously stated that HHS privacy and confidentiality rule *did* apply.  *See Center for Taxpayer Rights v. Internal Revenue Service*, 2025 WL 3251044, *30 (D.D.C. Nov. 21, 2025) (holding that IRS's conclusion that it was required to share confidential taxpayer information with ICE was arbitrary and capricious).

---

subsites/larson.house.gov/files/evo-media-document/ssa-whistleblower-doge-08-28-25.pdf (last checked Dec. 2, 2025).

CMS's failure to acknowledge ICE's inclusion of ACA marketplace information (see ICE Memo at 1-2 (authorizing receipt and use of information on "individuals seeking coverage under a qualified health plan offered on a Health Insurance Marketplace or through an insurance affordability program") further confirms that CMS has abdicated its responsibility to engage in reasoned decisionmaking that considers its own statutory authority and regulations. Current HHS regulations state that personal information collected for ACA enrollment and eligibility can only be shared if necessary for specific purposes relating to administration of a health exchange, or with the individual's consent. *See* 45 C.F.R. § 155.260(a). Yet CMS makes no reference to this limit in its new rule. The CMS Memo's decisionmaking also contradicts its own, longstanding, mandatory template application for both Medicaid and ACA, and CMS regulations requiring States to ensure that beneficiaries' data can only be used for healthcare purposes. *See supra*, p. 9. CMS does not acknowledge any these legal requirements as substantive constraints, much less provide a reasoned analysis for a new rule that undermines them.

The cursory CMS Notice also demonstrates that the agency has failed to consider other key issues relating to compliance with the Privacy Act and data protection laws. CMS recognizes that the Privacy Act, which applies to citizens and Legal Permanent Residents, "does not provide authority for a disclosure." *See* CMS Notice at 4; 5 U.S.C. § 552a(a)(2). Yet the CMS Notice places no specific obligations for compliance with the Privacy Act for these individuals (as well as for any U.S. citizens whose data is caught up in these sweeps) by asserting that CMS may share their personal data without prior written consent based on a statutory exception for "civil or criminal law enforcement activity," CMS Notice at 4 (citing 5 U.S.C. § 552a(b)(7)), even though, by definition, there is no reasonable basis for CMS to share the private information of citizens and lawful permanent residents to support ICE deportation efforts. The CMS Notice similarly fails to consider how to determine whether ICE requests meet the Privacy Act's criteria for "matching programs," *see* 5 U.S.C. § 552a(a)(8)(A)(i), even though Congress has subjected such programs to detailed procedural and substantive requirements to protect data privacy and

security, *see* 5 U.S.C. § 552a(o).  CMS's extraordinarily vague and high-level references to disclosure "as permitted by law" do not suffice for reasoned decisionmaking.[4]

### b.  ICE's Legal Authorities Do Not Justify Its Action

Even if immigration statutes give ICE some limited authority to request information held by other federal agencies, that does not support ICE's maximalist claim to unfettered disclosure of federal healthcare records. Of the three laws Defendants cited as legal authority in support of disclosure of federal healthcare records, *see* CMS Notice at 3-4, none provides such a mandate. As the Ninth Circuit held in *United States v. California*, 921 F.3d 865, 892 (9th Cir. 2019), 8 U.S.C. § 1373 is a narrow statute that pertains *only* to prohibitions on sharing of information about "citizenship or immigration status."  Neither the CMS Notice nor the ICE Memo is limited to immigration status.  Section 1360 is broader than 1373 because it covers "identity *and* location of aliens," but those terms can hardly be stretched to require transfer of all "biographical" and "contact" information, much less the unspecified "other information" that ICE has "reserved the right" to access.  CMS Notice at 5.  The Homeland Security Act, 6 U.S.C. §122, provides more recent authority, but any reasonable interpretation and implementation of this statute would consider it alongside other laws and regulations relating to privacy and confidentiality (such as the Privacy Act and HIPAA), as the federal government apparently did up until 2025.  Any other interpretation would transform a vague subsection about "other information" into an extraordinary, DHS-specific exempption from all federal privacy laws.  But Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Plaintiffs do not dispute that ICE has discrete legal authority and tools at its disposal to locate targets of valid immigration enforcement activities. For example, federal law requires

---

4 This is particularly true here considering Defendant DHS has already been found to engage in data sharing that is *not* permitted by law. *Cf. Center for Taxpayer Rights*, 2025 WL 3251044 at *35 (rejecting IRS's reliance on "strict limitations" on the use of confidential information provided by statute and a written agreement with ICE, because IRS and ICE had "exhibited material noncompliance with those safeguards" (internal quotations omitted)).

certain non-citizens living in the United States to register their presence with the federal

government and notify DHS of a change in address. *See* ICE Memo at 5; 8 U.S.C. §§ 1301-

1306. And privacy laws generally contain exceptions allowing access to otherwise-confidential

records in specific circumstances, such as when the law requires disclosure, or when an agency

must comply with a properly issued court order, warrant, subpoena, or summons. *See, e.g.*, 45

C.F.R. § 164.512(f)(1)(ii)(A). But ICE's authority to use and enforce these laws, on its own,

does not justify a massive shift in the federal government's handling of sensitive healthcare

records. As noted above, Congress has long sought to balance the government's interests in

enforcing immigration laws and protecting public health, and has restricted the use of private

healthcare information to make that balancing act work. None of this impedes ICE's ability to

enforce immigration law. But the regulatory and statutory scheme reflects broad agreement that

ICE may not exploit the Medicaid program for immigration enforcement, so that the program

can serve its goals effectively.

      ICE ignores all of this. Instead, it asserts that its new data policy supports "an operational

focus to maximize ICE's statutory authority for law enforcement purposes." ICE Memo at 5.

Plaintiffs disagree with Defendants' reading of the scope of ICE's statutory authority, and look

forward to comparing the complete administrative record against the array of potentially

applicable statutory authority.[5] But for purposes of this emergency motion, as ICE itself stresses:

the relevant authority is nothing new. Plaintiffs have relied for years on the federal government's

assurances that ICE's immigration enforcement activities would not impede their Medicaid

programs. It is arbitrary and capricious for ICE to ignore that long-standing reliance without any

---

5 The ICE Memo, standing alone, is too vague for meaningful judicial review of its compliance
with applicable laws. For example. it claims that ICE has "internal safeguards to ensure
compliance with all federal statutory and regulatory requirements" relating to a long list of
relevant statutes pertaining to privacy, but does not explain what those safeguards are, or how
they will be applied to healthcare data. Similarly, it asserts that "the Health Insurance Portability
and Accountability Act and HHS CMS's current regulations do not govern or prohibit this data
sharing," but provides no further explanation or analysis. ICE Memo at 7.

reasoned explanation of how its new maximalist policy could be changed to avoid undermining other important federal and state laws and interests.

### 4. Defendants Failed to Consider Alternatives

In light of Defendants' failure to meaningfully consider reliance interests and failure to consider important aspects of the problem, it is not surprising that their actions also fail to consider alternatives that could help mitigate some of the significant harms caused by their data sharing, while still allowing the administration to advance its objectives in other ways. "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Dep't of Homeland Security*, 591 U.S. at 30 (quoting *Manufacturers Ass'n of the United States, Inc.*, 463 U.S. at 51).

For example, ICE fails to explain why a narrower scope of data sharing would not be sufficient for its purposes. ICE could define "individuals" – which is currently undefined in the memorandum and therefore sweeps in citizens, legal permanent residents, and immigrants with legal status – so as to tailor its data requests to HHS more specifically to its operations. Elsewhere in the ICE Memo, the agency refers to information being "crucial in helping ICE locate and apprehend individuals who are subject to criminal investigations," but provides no explanation why it would need information about individuals who do not fall into this category, or why the current tools available to criminal investigators—including subpoenas and search warrants—fail to suffice. *Cf.* ICE Memo at 4.

Both agencies entirely fail to explain why they cannot delay implementation of their new data-sharing in order to give affected parties time to communicate with stakeholders and adjust their operations. Instead, both the ICE Memo and the CMS Notice are effective "immediately" and ICE states its intention to use information obtained from HHS as soon as the preliminary injunction issued by this Court is lifted. ICE Memo at 2; CMS Notice at 1. However, a "wind-down" on the prior policy, *see Dep't of Homeland Security*, 591 U.S. at 32, would, at the very least, give state agencies, healthcare providers, and other affected parties time to adapt by developing new guidance to advise the public of possible uses of the data Medicaid applicants

submit.  Relatedly, as described in Section I(A)(4) above, States may need substantial time to update their programs in a manner that respects patient privacy and informed consent.  *See* Order at 3.  Providers and people who enroll people in Medicaid will need to change their communications with patients and beneficiaries moving forward in light of past representations. ECF No. 43-10 (Dellit Decl.) ¶ 16; ECF No. 43-18 (Leong Decl.) ¶¶ 6-7; ECF No. 43-31 (Silva Decl.) ¶ 8; ECF No. 43-20 (Mangia Decl.) ¶ 28.  Yet, CMS does not explain why the immediate elimination of long standing privacy protections is reasonable.  *See, e.g.*, *Cap. Power Corp. v. FERC,* 156 F.4th 644, 653 (D.C. Cir. 2025).

To the extent CMS claims that the States can simply separate state-only from federally funded emergency Medicaid data, CMS also fails to consider the time that would be required to make such a policy change.  CMS recently considered this issue in a different context when changing its policy regarding the enrollment of state-funded individuals in managed care plans. There, the agency acknowledged that these types of complicated Medicaid policy choices may require State agencies to undertake new "state plan amendments, section 1915(b) waivers, managed care plan,  PCCM [primary care case management] or PCCM entity contract actions, rate certifications, and state directed payment preprints," and "recognize[d] that states may need time to implement revisions to their program operations, including states' managed care contract arrangements (as states utilize a 12-month rating period), and FFP [federal financial participation] claiming practices."  Rich Decl. Ex B at 6.  Therefore, CMS initially gave States a year or more to adjust their practices.  *Id*.  Here, in contrast, CMS shows no sign that it considered any alternatives, such as a delayed implementation date, that might have given States an opportunity to make informed choices of how to handle their residents' data moving forward, and adequate time to implement the change.  This failure alone is grounds for a preliminary injunction.  *See Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 & n.46 (D.C. Cir. 1987) ("[T]he failure of an agency to consider obvious alternatives has led uniformly to reversal."); *Action on Smoking & Health v. Civil Aeronautics Bd*., 699 F.2d 1209, 1216, 1218 (D.C. Cir. 1983) (agency's decision failed to give sufficient consideration to narrower alternatives).

Finally, Defendants failed to consider whether a non-retroactive policy would mitigate harms to public trust and patient privacy. Defendants could have limited use of healthcare information for immigration enforcement purposes until after communicating and reaching out to prospective patients and their families and giving them the opportunity to make an informed decision regarding their needs for healthcare and personal privacy. While such an option could not cure all the harms described above, it might be a better alternative than the current rush forward. A prospective change in policy might avoid the arbitrary and capricious imposition of retroactive conditions, and loss of privacy for people who acted in accordance with and in reliance on CMS's explicit promises. *See Chang v. United States*, 327 F.3d 911, 928 (9th Cir. 2003) (applying multi-factor test to prohibit retroactive application of new agency rule where the new rule represented an "abrupt departure from well established practice" and parties had "relied on the former rule").

Defendants have not met their obligation to engage in reasoned decisionmaking.

### B.     Plaintiffs Are Likely to Succeed on the Complaint's Third Cause of Action that Defendant CMS Violated the APA's Procedural Requirements

Section 553(b) of the APA requires agencies to proceed through the notice-and-comment process before issuing or amending certain types of rules. *Paulsen v. Daniels*, 413 F.3d 999, 1004 (9th Cir. 2005). Here, Defendant CMS violated the APA by failing to provide the required opportunity for interested parties to comment on its new data sharing policy, prejudicing not only Plaintiffs, but Medicaid stakeholders at large.

#### 1.     CMS's new data-sharing policy is a legislative rule subject to notice and comment.

An agency must provide notice and opportunity for comment before issuing a legislative rule. *Hemp Industries Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). In determining whether a rule is legislative, a court "need not accept the agency characterization at face value." *Id.* instead, the court must assess whether the rule has the "force of law"; that is, "(1) when, in the absence of the rule, there would not be an adequate legislative basis for

enforcement action; (2) when the agency has explicitly invoked its general legislative authority; or (3) when the rule effectively amends a prior legislative rule." *Id.*

Here, the data-sharing policy is a legislative rule because CMS must exercise its statutory authority under the Social Security Act to start sharing federal healthcare data for purposes of immigration enforcement. Additionally, the CMS Notice is a legislative rule for the distinct and separate reason that it effectively amends a prior legislative rule limiting data sharing to program administration.

The Social Security Act provides, "*[n]o disclosure* ... of any file, record, report, or other paper, or any information [...] shall be made except as the head of [Department of Health and Human Services] may by regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306 (a)(1) (emphasis added); *see also* 42 U.S.C. § 1306 (a)(2)(B). In accordance with this statute, HHS previously promulgated rules providing that most Medicare information and, by extension, Medicaid information[6] may only be released to "an officer or employee of an agency of the Federal or a State government lawfully charged with the administration of a program receiving grants-in-aid under title V and XIX [Medicaid] of the Social Security Act *for the purpose of administration of those titles*[,]" or the uniformed services civilian health program. 42 C.F.R. § 401.134(a) (emphasis added). The rules also permit disclosure and use for investigation of program integrity concerns, but impose a prohibition on disclosure "for other than program purposes." 42 C.F.R. § 401.134(c).

The new CMS Notice expressly permits use of federal healthcare data for immigration enforcement in contravention of these existing rules. It states that "[...] CMS *will provide* certain information to ICE upon request from ICE consistent with federal laws to *advance administration priorities related to immigration.*" CMS Notice at 5. In the absence of this new rule, there would be no basis for HHS to share Medicaid data with ICE for purposes of immigration enforcement in the manner contemplated by the new policy, especially in light of

---

[6] 42 C.F.R. § 401.101(a)(1) applies the subpart to "any other information subject to" the Social Security Act's privacy mandate.

prior HHS rules limiting data sharing to program administration. Therefore, the CMS Notice constitutes a new legislative rule.

Additionally, the CMS Notice effectively amends 45 C.F.R. § 155.260 and 42 C.F.R. § 401.134 by allowing routine data sharing for the purpose of immigration enforcement. Where a new rule carves out a per se exception to a pre-existing rule, the new rule is legislative. *See Linoz v. Heckler*, 800 F.2d 871, 877 (9th Cir. 1986) ("instead of simply clarifying a pre-existing regulation, section 2120.3F carved out a per se exception to the rule that ambulance service to the 'nearest institution with appropriate facilities' [….] was covered under Part B of the Medicare program" and thus was a legislative rule). That is precisely the case here. Formerly, 42 C.F.R. § 401.134 prohibited data sharing outside of program administration; now, however, the data sharing policy creates a new per se exception, where CMS "*will provide* certain information to ICE *upon request from ICE*" for purposes related to immigration enforcement. *See* CMS Notice at 6. As such, the data sharing policy goes far beyond merely interpreting the prior rule but effectively amends it. Thus, the policy is a legislative rule subject to the APA's notice and comment requirement.

### 2. Contrary to CMS's claims, the New Data Sharing Rule Is Not a Statement of Policy

CMS attempts to evade APA notice and comment obligations by characterizing its notice as a mere statement of policy; however, this argument fails because the new rule clearly limits agency discretion and establishes a new binding norm.

"Determining whether a directive is a substantive rule or a general policy requires the reviewing court to examine the amount of discretion retained by the recipients of the directive." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1235 (9th Cir. 1999); *Mada–Luna v. Fitzpatrick,* 813 F.2d 1006, 1014 (9th Cir.1987) (a rule is legislative where it "'narrowly limits administrative discretion' or establishes a '*binding norm*;'" policy statements leave officials "free to consider the individual facts in the various cases that arise").

Here, the notice makes clear that the new rule will *require* data sharing with ICE, in a manner that CMS has never heretofore allowed.  The CMS Notice states that CMS "*will provide* certain information to ICE *upon request from ICE*"; "*will share* the minimum *required* information with ICE, giving due consideration to the information requested by ICE, the federal laws that govern the provision of information to DHS and the CMS information requested, the capabilities of CMS systems, and the CMS resources available to respond to ICE information requests"; and "CMS *will respond to requests made by ICE* and *will* transfer any information to ICE in a secure manner." [7]  *See* CMS Notice at 5-7.  As such, the new rule limits administrative discretion and imposes a new binding norm.  For this reason, it constitutes a legislative rule, not a policy statement.

### 3.   The Absence of Notice and Comment Severely Prejudiced Significant Reliance Interests

The APA's notice and comment requirement reflects Congress's judgment that "notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment." *Paulsen*, 413 F.3d at 1004 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979)).  This is particularly important where, as here, longstanding policies have created significant reliance interests.  *See* Section I(A)(1), *supra*.

The absence of a notice and comment process in this instance has prevented stakeholders, including State Medicaid agencies, from raising these reliance interests.  Other State agencies, like those that run ACA-sponsored exchanges, are also impacted in light of Defendants' new, much broader policies that apply across the board to all healthcare programs.  States also relied on the prior rule in choosing to integrate their state-only healthcare programs with federally

---

[7] CMS's new rule also fails to define any clear circumstances where CMS will limit data sharing in response to an ICE request. CMS already transferred state Medicaid data submissions to ICE over the objections of career staff; traded spreadsheets with ICE that included sensitive information on millions of individuals; and agreed to give ICE agents seemingly-unfettered access to its T-MSIS database. The Court can reasonably interpret CMS's new rule to contemplate similarly unrestricted data sharing in response to future ICE requests. *Cf. Center for Taxpayer Rights*, 2025 WL 3251044 at *76-77 (relying on past agency conduct to construe safeguards purportedly imposed by datasharing agreement).

Plaintiffs' Mot. For Preliminary Injunction (3:25-cv-05536-VC)

authorized Medicaid managed care plans.  ECF No. 43-12 (Fotinos Decl.) ¶¶ 13, 18.  There are health care providers whose patients have lost trust and avoided medical care due to fears over the data sharing. ECF No. 43-20 (Mangia Decl.) ¶¶ 19-21.  Similarly, non-profit organizations who provide guidance to benefit applicants are losing trust with their clients, and will be harmed further by their inability to provide clear guidance in light of irreconcilable conflicts between the new policies and prior rules that remain on the books.  ECF No. 43-21 (Mendoza Decl.) ¶¶ 13-15; ECF No. 43-18 (Leong Decl.) ¶¶ 7-9; ECF No. 43-27 (Popat Decl.) ¶¶ 6-8. And there are Medicaid beneficiaries who applied for the program believing their sensitive personal data would be protected and have had no chance to voice concerns over the sharing of such data.  CMS's failure to provide notice and an opportunity for comment in violation of the APA has severely prejudiced these affected parties.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION, AND THE BALANCE OF HARDSHIPS SUPPORTS CONTINUING THE PRELIMINARY INJUNCTION

Plaintiffs have already suffered significant injuries as a result of Defendants' conduct that will continue if the injunction is lifted during the pendency of litigation.  *See* Order at 4; PI Br. at 20-24; ECF No. 89 (Reply Br.) at 13-15 (setting forth applicable legal standard and evidence of harm). Defendants' latest round of decisionmaking does nothing to address the harms that the Court identified in its order and, by expanding the scope of potential data sharing, stands to inflict even greater harm on the States.

Likewise, the balance of equities continues to tip strongly in Plaintiffs' favor.  Plaintiffs already face imminent, irreparable harms as a result of Defendants' actions.  Many of those harms implicate the broader public interest, which also weighs in favor of an injunction.  *See City and Cnty. of San Francisco v. U.S. Citizenship and Imm. Servs*., 981 F.3d 742, 762 (9th Cir. 2020) (finding that balance of equities and public interest weighed in plaintiffs' favor where federal policy caused financial burden to states and adverse effects on health and welfare of immigration communities and general population).  There is also a "general public interest in open and accountable agency decision-making." *Cresote Council v. Johnson*, 555 F. Supp. 2d

36, 40 (D.D.C. 2008); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").  Lifting the preliminary injunction will lead to losses of public trust that will be very difficult to repair.  And neither the CMS Notice nor the ICE Memo contain any specific factual findings showing that the data in this case is crucial ongoing immigration enforcement efforts.

**CONCLUSION**

The Court should grant Plaintiffs' motion and issue a preliminary injunction as requested in the motion.

Dated:  September 4, 2025

Respectfully submitted,

| | |
|---|---|
| LETITIA JAMES | ROB BONTA |
| Attorney General for the State of New York | Attorney General for the State of California |
| MARK LADOV* | NELI PALMA |
| Special Counsel | Senior Assistant Attorney General |
| RABIA MUQADDAM* | KATHLEEN BOERGERS |
| Chief Counsel for Federal Initiatives | Supervising Deputy Attorney General |
| ZOE LEVINE* | WILLIAM BELLAMY |
| Special Counsel for Immigrant Justice | MARIA F. BUXTON |
| NATASHA KORGAONKAR* | KEVIN G. REYES |
| Special Counsel | ANNA RICH |
| 28 Liberty St. New York, NY 10005 | STEPHANIE T. YU |
| mark.ladov@ag.ny.gov | |
| *Attorneys for the State of New York* | |
| *Admitted pro hac vice | /s/ Anna Rich_____ |
| | ANNA RICH |
| | Deputy Attorneys General |
| | *Attorneys for the State of California* |

| | |
|---|---|
| *Additional Counsel* | PHILIP J. WEISER |
| KRISTIN K. MAYES | Attorney General for the State of Colorado |
| Attorney General for the State of Arizona | RYAN LORCH* |
| ALEXA G. SALAS* | Senior Assistant Attorney General |
| Assistant Attorney General | SAM WOLTER* |
| 2005 North Central Avenue | Assistant Attorney General |
| Phoenix, Arizona 85004 | 1300 Broadway, #10 |
| Alexa.Salas@azag.gov | Denver, CO 80203 |
| ACL@azag.gov | Ryan.lorch@coag.gov |
| *Attorneys for the State of Arizona* | samuel.wolter@coag.gov |
| *Admitted pro hac vice | *Attorneys for the State of Colorado* |
| | *Admitted pro hac vice |

| | |
|---|---|
| WILLIAM TONG | KATHLEEN JENNINGS |
| Attorney General of Connecticut | Attorney General for the State of Delaware |
| JANELLE MEDEIROS* | IAN R. LISTON |
| Special Counsel for Civil Rights | Director of Impact Litigation |
| 165 Capitol Ave | JENNIFER KATE AARONSON |
| Hartford, CT 06106 | VANESSA L. KASSAB* |
| Janelle.Medeiros@ct.gov | Deputy Attorney General |
| *Attorneys for the State of Connecticut* | Delaware Department of Justice |
| *Admitted pro hac vice | 820 N. French Street |
| | Wilmington, DE 19801 |
| | vanessa.kassab@delaware.gov |
| | *Attorneys for the State of Delaware* |
| | *Admitted pro hac vice |

ANNE E. LOPEZ
Attorney General for the State of Hawaiʻi
KALIKOʻONĀLANI D. FERNANDES*
Solicitor General
DAVID D. DAY*
Special Assistant to the Attorney General
425 Queen Street
Honolulu, HI 96813
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
*Attorneys for the State of Hawaiʻi*
*Admitted pro hac vice


S. TRAVIS MAYO
General Counsel
Office of the Governor of Kentucky
S. Travis Mayo*
General Counsel
Taylor Payne*
Chief Deputy General Counsel
Laura C. Tipton*
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Governor of Kentucky,
Andy Beshear*
* Admitted pro hac vice


ANTHONY G. BROWN
Attorney General for the State of Maryland
MICHAEL DREZNER*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Mdrezner@oag.state.md.us
*Attorneys for the State of Maryland*
*Admitted pro hac vice


KWAME RAOUL
Attorney General for the State of Illinois
HARPREET KHERA*
Bureau Chief, Special Litigation
SHERIEF GABER*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
sherief.gaber@ilag.gov
harpreet.khera@ilag.gov
*Attorneys for the State of Illinois*
*Admitted pro hac vice


AARON M. FREY
Attorney General for the State of Maine
BRENDAN KRECKEL*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
brendan.d.kreckel@maine.gov
*Attorneys for the State of Maine*
*Admitted pro hac vice


ANDREA JOY CAMPBELL
 Attorney General for the State of
Massachusetts
KATHERINE DIRKS
Chief State Trial Counsel
CHLOE CABLE
ETHAN W. MARKS*
Assistant Attorneys General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
Katherine.Dirks@mass.gov
Chloe.Cable@mass.gov
Ethan.W.Marks@mass.gov
*Attorneys for the Commonwealth of
Massachusetts*
*Admitted pro hac vice

DANA NESSEL
Attorney General for the State of Michigan
NEIL GIOVANATTI*
BRYAN BEACH*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
GiovanattiN@michigan.gov
BeachB@michigan.gov
*Attorneys for the State of Michigan*
*Admitted pro hac vice

KEITH ELLISON
Attorney General for the State of Minnesota
KATHERINE J. BIES
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
Katherine.Bies@ag.state.mn.us
*Attorneys for the State of Minnesota*

AARON D. FORD
Attorney General for the State of Nevada
HEIDI PARRY STERN* (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov
 *Attorneys for the State of Nevada*
*Admitted pro hac vice

MATTHEW J. PLATKIN
Attorney General for the State of New Jersey
ESTEFANIA PUGLIESE-SAVILLE*
ELIZABETH R. WALSH*
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Estefania.Pugliese-Saville@law.njoag.gov
elizabeth.walsh@law.njoag.gov
*Attorneys for the State of New Jersey*
*Admitted pro hac vice

RAUL TORREZ
Attorney General of New Mexico
AMY SENIER*
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
asenier@nmdoj.gov
*Attorneys for the State of New Mexico*
*Admitted pro hac vice

DAN RAYFIELD
Attorney General State of Oregon
BRIAN S. MARSHALL
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Brian.S.Marshall@doj.oregon.gov
*Attorneys for the State of Oregon*

PETER F. NERONHA
Attorney General for the State of Rhode
Island
LEE B. STALEY*
Chief, Health Care Unit
150 South Main Street
Providence, RI 02903
lstaley@riag.ri.gov
*Attorneys for the State of Rhode Island*
*Admitted pro hac vice

CHARITY R. CLARK
Attorney General for the State of Vermont
RYAN P. KANE*
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
Ryan.kane@vermont.gov
 *Attorneys for the State of Vermont*
*Admitted pro hac vice

Plaintiffs' Mot. For Preliminary Injunction (3:25-cv-05536-VC)

NICHOLAS W. BROWN
Attorney General of Washington
ZANE MULLER, WSBA 63777*
WILLIAM MCGINTY, WSBA #41868*
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
*Attorneys for the State of Washington*
*Admitted pro hac vice

JOSHUA L. KAUL
Attorney General for the State of Wisconsin
KARLA Z. KECKHAVER*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*