Martha Jane Perkins (SBN 104784)
NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
Tel.: (919) 968-6308
perkins@healthlaw.org

Joanna Elise Cuevas Ingram (SBN 290011)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, DC 20043
Tel.: (202) 216-0261
cuevasingram@nilc.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | **3:25-cv-05536-VC** |
| Plaintiffs, | **BRIEF OF AMICUS CURIAE NATIONAL HEALTH LAW PROGRAM, COLORADO CENTER ON LAW AND POLICY, COMMUNITY LEGAL SERVICES, ESPERANZA HEALTH CENTERS, HEALTH LAW ADVOCATES, MICHIGAN POVERTY LAW PROGRAM, NEW HAVEN LEGAL ASSISTANCE ASSOCIATION, INC., NEW YORK LAWYERS FOR THE PUBLIC INTEREST, OREGON LAW CENTER, TENNESSEE JUSTICE CENTER, VIRGINIA POVERTY LAW CENTER, AND UNIDOSUS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
| Defendants. | |
| | Date: December 9, 2025 |
| | Time: 2pm |
| | Courtroom: Via videoconference |
| | Judge: Hon. Vince Chhabria |
| | Trial Date: Not set |
| | Action Filed: July 1, 2025 |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................................ ii

IDENTITY AND INTERESTS OF THE AMICI ........................................................................1

INTRODUCTION ....................................................................................................................4

ARGUMENT............................................................................................................................5

    I.   Without Notice and Comment Rulemaking, *Amici* Could Not Raise, and the Agencies
        Could Not Consider, the Significant Chilling Effect on Health Care Access the Data
        Sharing Policy Will Create.................................................................................................5

        A.  The Scope of the Data Sharing Policy Is Unclear. ......................................................5

        B. The Data Sharing Policy Will Reduce Access to Health Coverage and Services,
           Including Among Lawfully Present Immigrants and U.S.-Born Citizens ....................7

    II.  The Data Sharing Policy Is Already Causing a Substantial Chilling Effect with Serious
        Health Consequences ........................................................................................................13

CONCLUSION.......................................................................................................................20

i

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

## TABLE OF AUTHORITIES

**Cases**

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229 (9th Cir. 2001) .................................................................................................................7

*Ctr. for Taxpayer Rights v. IRS,* No. CV 25-0457, 2025 WL 3251044, (D.D.C. Nov. 21, 2025) ...................................................................................................14

*Gen. Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) .................................................7

*Make The Rd. N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) .........................................5

*M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012) ...........................................................14

*Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-2453, 2025 WL 2840318 (D.D.C. 2025) ...............................................................................7

**Statutes**

42 U.S.C. § 1396b(v)(4)(A) ...........................................................................................8

**Other Authorities**

42 C.F.R. § 457.10 .........................................................................................................8

Samantha Artiga et al., KFF, *Estimated Impacts of Final Public Charge Inadmissibility Rule on Immigrants and Medicaid Coverage* (2019), https://files.kff.org/attachment/Issue-Brief-Estimated-Impacts-of-Final-Public-Charge-Inadmissibility-Rule-on-Immigrants-and-Medicaid-Coverage ........................................................................................................................7

Randy Capps et al., *Anticipated 'Chilling Effects' of the Public-Charge Rule Are Real: Census Data Reflect Steep Decline in Benefits Use by Immigrant Families*, Migrationpolicy.Org, (Dec. 2020), https://www.migrationpolicy.org/news/anticipated-chilling-effects-public-charge-rule-are-real ............................................................................................12

Civil L.R. 3-15 ...............................................................................................................1

CMS, *Dear State Health Official Letter, SHO# 10-006, Medicaid and CHIP Coverage of "Lawfully Residing" Children and Pregnant Women* (July 1, 2010), https://www.medicaid.gov/federal-policy-guidance/downloads/SHO10006.pdf ...........8

Janet Currie & Anna Chorniy, *Medicaid and Child Health Insurance Program Improve Child Health and Reduce Poverty But Face Threats*, 21 Acad. Pediatrics S146 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC9172269/ ..................................................11

Kaanita Iyer, *US will reexamine all green cards issued to people from 19 countries as Trump administration ramps up immigration crackdown*, CNN (Nov. 28, 2025), https://www.cnn.com/2025/11/27/politics/us-reexamining-green-card-holders-19-countries ........9

Zolan Kanno-Youngs et al., *As Trump Broadens Crackdown, Focus Expands to Legal Immigrants and Tourists*, N.Y. Times (Mar. 21, 2025), https://www.nytimes.com/2025/03/21/us/politics/trump-immigration-visa-crackdown.html........9

Sarah Miller et al., *Covering Undocumented Immigrants: The Effects of a Large-Scale Prenatal Care Intervention, NBER Working Paper 30299* (2024), https://www.nber.org/papers/w30299 ...........................................................................11

Daniel G. Orenstein & Y. Tony Yang, *From Beginning to End: The Importance of Evidence-Based Policymaking in Vaccination Mandates*, 43 J.L. Med. & Ethics 99 (2015).......................11

Sarah Partridge, et al. *Inadequate Prenatal Care Utilization and Risks of Infant Mortality and Poor Birth Outcome: A Retrospective Analysis of 28,729,765 U.S. Deliveries Over 8 Years*, 29 Am. J. Perinatology 787 (2012), https://www.ncbi.nlm.nih.gov/pubmed/22836820 .............10

Drishti Pillai et al., KFF, *Children of Immigrants: Key Facts on Health Coverage and Care* (2025), https://www.kff.org/racial-equity-and-health-policy/children-of-immigrants-key-facts-on-health-coverage-and-care/................................................................12

Public Charge Ground of Inadmissibility, 87 Fed. Reg. 55472 (Sept. 9, 2022) .............................8

Shannon Schumacher et al., KFF, *KFF/New York Times 2025 Survey of Immigrants: Worries and Experiences Amid Increased Immigration Enforcement* (2025), https://www.kff.org/racial-equity-and-health-policy/kff-new-york-times-2025-survey-of-immigrants-worries-and-experiences-amid-increased-immigration-enforcement/ ......................10

State Children's Health Insurance Program; Eligibility for Prenatal Care and Other Health Services for Unborn Children, 67 Fed. Reg. 61956 (Oct. 2, 2002) .................................................8

Jennifer Tolbert et al., KFF, *Impact of Shifting Immigration Policy on Medicaid Enrollment and Utilization of Care among Health Center Patients* (2019), https://www.kff.org/medicaid/impact-of-shifting-immigration-policy-on-medicaid-enrollment-and-utilization-of-care-among-health-center-patients/ ...................................................8

Jennifer Tolbert et al., KFF, *Key Facts about the Uninsured Population* (2024), https://www.kff.org/uninsured/key-facts-about-the-uninsured-population/ ..................................11

Russell B. Toomey et al., *Impact of Arizona's SB 1070 Immigration Law on Utilization of Health Care and Public Assistance Among Mexican-Origin Adolescent Mothers and Their Mother Figures*, 104 Am. J. Pub. Health S28 (2014), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2013.301655 ...........................................12

iii

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

U.S. Citizenship & Immigration Servs., *FAQs on the Effect of Changes to Parole and Temporary Protected Status (TPS) for SAVE Agencies* (Nov. 28, 2025), https://www.uscis.gov/save/current-user-agencies/guidance/faqs-on-the-effect-of-changes-to-parole-and-temporary-protected-status-tps-for-save-agencies..........................................9

U.S. Citizenship & Immigration Servs., *Policy Memorandum: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf............................10

U.S. Dep't of Health & Human Servs., *Programs and Services*, https://www.hhs.gov/programs/index.html (last visited Nov. 29, 2025) .........................................7

Scarlett Sijia Wang et al., *Changes in the Public Charge Rule and Health of Mothers and Infants Enrolled in New York State's Medicaid Program, 2014-2019*, 112 Am. J. Pub. Health 1747 (2022), https://doi.org/10.2105/AJPH.2022.307066............................................................11

Ashley Wu & Albert Sun, *How Trump Has Targeted New Groups for Deportation*, N.Y. Times (May 30, 2025), https://www.nytimes.com/interactive/2025/05/21/us/trump-immigration-policy.html ..........................................................................................9

## IDENTITY AND INTERESTS OF THE AMICI[1]

Amici are non-profit organizations that work with and advocate for low-income immigrants across the country to ensure they can obtain the affordable, quality health care to which they are entitled.

Founded in 1969, the National Health Law Program (NHeLP) advocates, educates, and litigates at the federal and state levels to further its mission of improving access to quality health care for all low-income people, including immigrant families. NHeLP serves as a technical support center for legal aid and disability rights organizations throughout the United States, including the state-based *amici* organizations, and has worked for decades to remove barriers to health care for immigrants.

The Colorado Center on Law and Policy (CCLP) is a non-partisan statewide anti-poverty organization with a long track record advancing equitable access to Medicaid through litigation, policy reform, and community partnership. We routinely support immigrant communities and frontline service providers in interpreting rule changes affecting eligibility, public charge, and data privacy.

Community Legal Services assists indigent clients in Philadelphia with a wide variety of civil issues, including assisting individuals with enrolling in public benefits such as Medicaid and CHIP.

Esperanza Health Centers is a Federally Qualified Health Center operating on the southwest side of Chicago. It serves approximately 55,000 patients a year, primarily lower-income,

---

[1] Counsel for *Amici Curiae* states that no counsel for a party authored the brief in whole or in part, and no person other than *Amici Curiae*, their members, or their counsel made a monetary contribution to its preparation or submission. *Amici* further certify pursuant to Civil L.R. 3-15, that as of this date, there is no conflict or interest (other than the named *Amici*) to report.

Latino individuals and families.

Health Law Advocates, Inc. ("HLA") is a Massachusetts-based public interest law firm that advocates for individuals with low incomes to overcome health care barriers. HLA has provided no-cost legal services to thousands of Massachusetts health care consumers, including immigrants, in cases involving access to necessary medical services and health insurance.

Michigan Poverty Law Program works to advance the health, safety, and economic security of low-income Michiganders and advance racial justice. It does so by working in partnership with individuals, community organizations, legal aid organizations, and policymakers to make lasting, impactful systems change.

New Haven Legal Assistance Association is a full-service legal services program providing individual representation and policy advocacy to the residents of New Haven county, including immigrant communities, with respect to eligibility for public and private health care programs and services.

The Health Justice Program at New York Lawyers for the Public Interest leverages decades of combined expertise in immigration, public benefits, and health advocacy along with our connections to community-based organizations, lawmakers, city and state agencies, and legal and medical providers. Together, we address social determinants of health that result in poor health outcomes for some of the most marginalized communities in our city, including immigration status, TGNCI+ identity, and incarceration status.

The Oregon Law Center (OLC) is a nonprofit legal services program that serves low-income Oregonians throughout the state on civil legal matters. OLC low-income clients including immigrants in state and federal cases involving housing law, family law, employment law, and public benefits law and regularly helps clients challenge health care eligibility and denials

2

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

decisions. Oregon Law Center is a trusted resource in the state for legal advice regarding immigrants' rights to safety net programs.

Tennessee Justice Center is a nonprofit law firm and advocacy center that connects the poor and disabled to health care and nutrition programs, including Medicaid, SNAP, and WIC. For the immigrant community, this is primarily through the enrollment of pregnant women in CoverKids, our State CHIP program, or through referrals to community health programs that serve the uninsured.

Virginia Poverty Law Center advocates for health, consumer, housing, and family policies that lift Virginian families out of poverty. VPLC also provides certain direct services to Virginians, including assistance with Medicaid enrollments.

UnidosUS, the nation's largest civil rights and advocacy organization for Latinos, partners with more than 300 community-based Affiliates in 38 states, the District of Columbia, and Puerto Rico. Affiliates range from large non-profit health centers that serve Hispanic communities to organizations that help Latino families access social services. Our Affiliates report a widespread chilling effect from the administration's proposed sharing of Medicaid data, with lawfully present immigrants and even U.S. citizens going without coverage and care for which they qualify and that they desperately need. Examples include eligible pregnant women ceasing their receipt of prenatal care and U.S.-citizen children being pulled out of Medicaid, rather than have one or both parents risk possible detention and deportation.

*Amici* have an interest in the case, as the Defendants' new data sharing policy directly impacts our clients and members and the legal advice we offer.

3

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

## INTRODUCTION

Families should not be afraid to go to the doctor. But that will be the inevitable result of HHS's and ICE's new data sharing policy. *Amici* know first-hand the importance of clarity and consistency in confidentiality policies. For more than a decade, *Amici* have been able to advise clients that if they apply for Medicaid, any information that they provide is confidential and will not be used for immigration enforcement purposes.

Without giving the public notice or an opportunity to comment, HHS and ICE have adopted a new data sharing policy, dramatically disrupting the longstanding status quo. The policy announced in the HHS Notice and ICE Memorandum is vague and potentially limitless, making it impossible for *Amici* to provide clear guidance to immigrant families about the risk of participating in HHS programs.

Further, ICE and HHS failed to adequately consider the negative effects of the new policy on access to health coverage and services. While the agencies suggest that the new policy will only affect individuals who are here in an unauthorized status, that is not the case. The new data sharing policy will harm not only those individuals, but also U.S. citizen children living in mixed status households and lawfully residing children and pregnant women. In fact, as the stories from *Amici*'s clients illustrate, individuals are already forgoing coverage necessary to access prenatal care, life-saving dialysis treatment, and essential medical care for children. Others are risking family separation because their need for medical care is so great that they simply have no choice but to continue health coverage. HHS and ICE did not acknowledge these profound harms, let alone explain why they are justified or outweighed by purported benefits of the data sharing policy. Accordingly, *Amici* urge the Court to reject the new data sharing policy as arbitrary and capricious and extend the preliminary injunction.

## ARGUMENT

I.    **Without Notice and Comment Rulemaking,** *Amici* **Could Not Raise, and the Agencies Could Not Consider, the Significant Chilling Effect on Health Care Access the Data Sharing Policy Will Create.**

*Amici* have numerous serious concerns and questions about the new data sharing policy announced in the HHS Notice and ICE Memorandum. A "central purpose of notice-and-comment rulemaking is to subject agency decisionmaking to public input and to obligate the agency to consider and respond to the material comments and concerns that are voiced." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020). Had *Amici* been provided an opportunity to submit comments on the new policy, they would have identified their questions and concerns for HHS's and ICE's consideration, including at least the following:

### A.  The Scope of the Data Sharing Policy Is Unclear.

The HHS Notice and ICE Memorandum fail to adequately explain exactly what data will be shared. They provide no brightline rules whatsoever. ICE and HHS say they are "at this time" focusing on sharing "biographical, contact, and location information." ECF 131-2 (hereinafter "ICE Memo") at 2; ECF 131-1 (herein after "HHS Notice") at 6. They offer no definition of those terms. What is more, ICE "reserve[d] the right" to collect "other information on a case-by-case basis." ICE Memo at 2; *id*. at 7; HHS Notice at 6. This "other information" is not defined in any way, leaving *Amici* and our clients guessing about the nature of the personal and private health-related information that HHS will share. Does this include significant diagnoses or conditions, health care services received, or particular medical equipment that an individual uses? Could shareable data include the address of the doctor where a pregnant woman seeks prenatal care or the location of an individual who is hospitalized or resides in a nursing facility? Notably, the agencies do not disavow sharing these categories of data. Without any assurances that information

will remain confidential, individuals are forced to consider the potential that HHS will share any and all of their personal and medical information HHS has about them.

Nor is the data sharing policy clear about the extent to which household members' personal information will be shared. The ICE Memo indicates it will use information about individuals who seek coverage, as well as "certain information about their household members," without offering additional explanation. ICE Memo at 2. As worded, the policy means ICE could request information regarding Medicaid-enrolled U.S. citizen children to pursue enforcement action against their non-citizen household members who have never applied for or received Medicaid coverage.

Finally, neither the ICE Memo nor the HHS Notice specify which programs are affected by the policy change. At its outset, the ICE Memo refers only very broadly to what it calls "HHS information," noting this "includes, but is not limited to," information provided by individuals seeking coverage through Medicaid, the Children's Health Insurance Program (CHIP), a Basic Health Program (BHP), or a qualified health plan on a Health Insurance Marketplace. ICE Memo at 1-2. Yet, later in its cursory discussion of reliance interests, the ICE Memo for the first time mentions "state-funded program[s]" and "state-funded Medicaid," suggesting that the policy is in fact broader. *Id.* at 6. While the HHS Notice claims that states are not required to provide data from their state-funded programs to CMS, it also appears to imply that CMS will share data states have already provided (despite the prior policy ensuring confidentiality). *See* HHS Notice at 9. Nor does the new policy state that any HHS programs are off limits from HHS's data-sharing efforts. This is significant because HHS programs encompass a vast array of data and divisions: "HHS administers more than 100 programs across its operating divisions," including Medicare, Head Start, the Low Income Home Energy Assistance Program (LIHEAP), and numerous programs for

6

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

individuals with disabilities. *See* U.S. Dep't of Health & Human Servs., *Programs and Services*, https://www.hhs.gov/programs/index.html (last visited Nov. 29, 2025).

Because the agencies did not provide a public comment period, *Amici* and other members of the public had no opportunity to explain that the new policy will leave immigrant families guessing about the extent of information HHS will share with ICE. That vagueness renders the policy arbitrary and capricious. *See, e.g.*, *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1250-51 (9th Cir. 2001) (finding agency issuance of vague terms and conditions arbitrary and capricious); *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (holding that if "a regulated party acting in good faith" cannot identify agency standards with "ascertainable certainty," the agency did not provide fair notice); *Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-2453, 2025 WL 2840318 at *23-26 (D.D.C. 2025) (finding "fatally vague" policy notice arbitrary and capricious). What is more, that vagueness will cause even larger numbers of individuals, including U.S. citizens, to avoid participating in Medicaid and other HHS programs essential to health and wellbeing, as described below.

**B.    The Data Sharing Policy Will Reduce Access to Health Coverage and Services, Including Among Lawfully Present Immigrants and U.S.-Born Citizens.**

The new data sharing policy will cause widespread fear among immigrant families, preventing individuals from receiving health care coverage and services that Congress has decided they are eligible to receive. Evidence demonstrates that policies that threaten immigration consequences from health coverage or health care use cause a widespread "chilling effect," including among individuals who are not the asserted target of the policies. *See, e.g.*, Samantha Artiga et al., KFF, *Estimated Impacts of Final Public Charge Inadmissibility Rule on Immigrants and Medicaid Coverage* (2019), https://files.kff.org/attachment/Issue-Brief-Estimated-Impacts-

of-Final-Public-Charge-Inadmissibility-Rule-on-Immigrants-and-Medicaid-Coverage;     Jennifer

Tolbert et al., KFF, *Impact of Shifting Immigration Policy on Medicaid Enrollment and Utilization*

*of Care among Health Center Patients* (2019), https://www.kff.org/medicaid/impact-of-shifting-

immigration-policy-on-medicaid-enrollment-and-utilization-of-care-among-health-center-

patients/. DHS has acknowledged as much. *See* Public Charge Ground of Inadmissibility, 87 Fed.

Reg. 55472, 55579, 55505 (Sept. 9, 2022) (finding that the 2019 public charge rule caused a

widespread chilling effect among U.S. citizen children and lawful permanent residents (LPRs) who

were not subject to the rule).

Here too, the chilling effect will not be limited to individuals who ICE is purporting to

target. *See* ICE Memo at 6 (incorrectly and without basis asserting that only individuals who "are

not in compliance with the law" will be "concerned about their personal information being shared

with ICE"). ICE and HHS entirely ignored the chilling effect of the policy on both immigrants

who are in full compliance with the law and U.S.-born citizens.

First, the agencies ignored the effect of the new policy on lawfully residing children and

pregnant women. Under federal statute, states have the option of providing Medicaid coverage to

lawfully residing children and/or pregnant women who are otherwise ineligible for full-scope

Medicaid coverage due to their immigration status.[2] 42 U.S.C. § 1396b(v)(4)(A). This group

includes LPRs (who are not yet eligible for full-scope Medicaid coverage due to the five-year

waiting period), and individuals in various other immigrant and non-immigrant statuses. *See* CMS,

*Dear State Health Official Letter, SHO# 10-006, Medicaid and CHIP Coverage of "Lawfully*

---

[2] In addition, federal law gives states the option in CHIP to provide prenatal and pregnancy related
services to certain pregnant individuals regardless of their immigration status. *See* 42 C.F.R. §
457.10 (defining "child as "an individual under the age of 19 including the period from conception
to birth"); State Children's Health Insurance Program; Eligibility for Prenatal Care and Other
Health Services for Unborn Children, 67 Fed. Reg. 61956 (Oct. 2, 2002) (explaining the option).

8

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

*Residing" Children and Pregnant Women* (July 1, 2010), https://www.medicaid.gov/federal-policy-guidance/downloads/SHO10006.pdf (listing covered statuses).

Many individuals who are eligible for this coverage, although they are here lawfully, are nonetheless currently facing increased scrutiny and historically unprecedented threats of immigration enforcement. This administration has targeted LPRs, refugees, persons granted parole, those with Temporary Protected Status (TPS), those with valid non-immigrant visas, and other non-citizens for immigration enforcement, and has even declared its intent to denaturalize some U.S. citizens. *See* Ashley Wu & Albert Sun, *How Trump Has Targeted New Groups for Deportation*, N.Y. Times (May 30, 2025), https://www.nytimes.com/interactive/2025/05/21/us/trump-immigration-policy.html; Zolan Kanno-Youngs et al., *As Trump Broadens Crackdown, Focus Expands to Legal Immigrants and Tourists*, N.Y. Times (Mar. 21, 2025), https://www.nytimes.com/2025/03/21/us/politics/trump-immigration-visa-crackdown.html. For example, TPS for many designated groups has been revoked recently – for some in advance of the prior expiration date. *See* U.S. Citizenship & Immigration Servs., *FAQs on the Effect of Changes to Parole and Temporary Protected Status (TPS) for SAVE Agencies* (Nov. 28, 2025), https://www.uscis.gov/save/current-user-agencies/guidance/faqs-on-the-effect-of-changes-to-parole-and-temporary-protected-status-tps-for-save-agencies. And, just days ago, the administration announced a plan to reexamine the LPR status of every individual from one of 19 targeted countries (the vast majority of them on the African continent and/or with large Muslim populations). Kaanita Iyer, *US will reexamine all green cards issued to people from 19 countries as Trump administration ramps up immigration crackdown*, CNN (Nov. 28, 2025), https://www.cnn.com/2025/11/27/politics/us-reexamining-green-card-holders-19-countries; U.S. Citizenship & Immigration Servs., *Policy Memorandum:*

9

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

*Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf.

As a result of this perilous immigration environment, survey data show that half of lawfully present immigrants worry that they or a family member could be detained or deported, and over one-third of lawfully present immigrants are avoiding activities outside the home, including seeking health care. *See* Shannon Schumacher et al., KFF, *KFF/New York Times 2025 Survey of Immigrants: Worries and Experiences Amid Increased Immigration Enforcement* (2025), https://www.kff.org/racial-equity-and-health-policy/kff-new-york-times-2025-survey-of-immigrants-worries-and-experiences-amid-increased-immigration-enforcement/.

Thus, it is foreseeable and inevitable that many lawfully residing children and pregnant women will forgo Medicaid coverage. Because Medicaid serves low-income families who cannot otherwise afford care, forgoing coverage means forgoing critical health care services. Prenatal care is, of course, essential to infant and maternal health outcomes. A cohort study examining nearly 29 million deliveries found inadequate prenatal care significantly increased the odds of preterm birth, stillbirth, and neonatal death. Sarah Partridge, et al. *Inadequate Prenatal Care Utilization and Risks of Infant Mortality and Poor Birth Outcome: A Retrospective Analysis of 28,729,765 U.S. Deliveries Over 8 Years*, 29 Am. J. Perinatology 787 (2012), https://www.ncbi.nlm.nih.gov/pubmed/22836820. Research demonstrated that expanding Medicaid eligibility during pregnancy to previously uncovered immigrants increased use of prenatal care and supported more regular prenatal visits. In turn, this resulted in improved birth outcomes, as measured by increased average gestational length (*e.g.*, fewer premature births) and

10

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

higher birth weight among infants born to immigrant mothers. Sarah Miller et al., *Covering Undocumented Immigrants: The Effects of a Large-Scale Prenatal Care Intervention, NBER Working Paper 30299* (2024), https://www.nber.org/papers/w30299. On the other hand, a study using New York State Medicaid data from 2014-2019 found that the initial leak of a new public charge rule in 2017 was associated with a significant delay in prenatal Medicaid enrollment and a significant decrease in birth weight among their newborn babies. Scarlett Sijia Wang et al., *Changes in the Public Charge Rule and Health of Mothers and Infants Enrolled in New York State's Medicaid Program, 2014-2019*, 112 Am. J. Pub. Health 1747 (2022), https://doi.org/10.2105/AJPH.2022.307066.

Similarly, health care coverage, and Medicaid coverage in particular, is essential to favorable child health outcomes. Compared with children enrolled in private insurance or Medicaid, uninsured children are less likely to have seen a doctor in the past year and are more likely to go without needed care due to cost. Jennifer Tolbert et al., KFF, *Key Facts about the Uninsured Population* (2024), https://www.kff.org/uninsured/key-facts-about-the-uninsured-population/. By contrast, the positive effects of Medicaid coverage are significant. Medicaid is a primary source of coverage for childhood vaccines against communicable diseases, and childhood vaccination has been identified as perhaps the most successful evidence-based tool in combating many epidemics. *See* Daniel G. Orenstein & Y. Tony Yang, *From Beginning to End: The Importance of Evidence-Based Policymaking in Vaccination Mandates*, 43 J.L. Med. & Ethics 99 (2015). Medicaid coverage is associated with numerous additional positive outcomes for children, including better self-reported health, lower mortality, and lower hospitalization rates, as well as higher educational attainment and higher earnings in adulthood. Janet Currie & Anna Chorniy, *Medicaid and Child Health Insurance Program Improve Child Health and Reduce Poverty But*

*Face Threats*, 21 Acad. Pediatrics S146 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC9172269/ (summarizing the relevant research).

Second, ICE and HHS ignored the effect of the new data sharing policy on U.S. citizen children living in mixed-status families. One in four children in the U.S. – 19 million children – are U.S. citizens and have a non-citizen parent. Drishti Pillai et al., KFF, *Children of Immigrants: Key Facts on Health Coverage and Care* (2025), https://www.kff.org/racial-equity-and-health-policy/children-of-immigrants-key-facts-on-health-coverage-and-care/. As noted above, it is unclear whether ICE will request and receive information about the household members of U.S. citizen children who have applied for or enrolled in Medicaid coverage. That vagueness will cause many immigrants to forgo coverage for their citizen children. Research supports this conclusion. *See, e.g.*, Randy Capps et al., *Anticipated 'Chilling Effects' of the Public-Charge Rule Are Real: Census Data Reflect Steep Decline in Benefits Use by Immigrant Families*, Migrationpolicy.Org, (Dec. 2020), https://www.migrationpolicy.org/news/anticipated-chilling-effects-public-charge-rule-are-real (finding that after proposed changes to the public charge rule, the share of children receiving public benefits, including Medicaid, fell twice as fast for U.S. citizen children in a household with noncitizens as for U.S. citizen children in a household with citizens); Russell B. Toomey et al., *Impact of Arizona's SB 1070 Immigration Law on Utilization of Health Care and Public Assistance Among Mexican-Origin Adolescent Mothers and Their Mother Figures*, 104 Am. J. Pub. Health S28 (2014), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2013.301655 (finding passage of a state law empowering police to detain individuals who could not prove U.S. citizenship upon request was associated with decreased use of routine health care among Mexican-origin adolescent mothers, even those born in the U.S., as well as among their young children).

12

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

Finally, ICE did not acknowledge the chilling effect of its statement that HHS information could be used "as the basis for pursuing . . . criminal or civil law enforcement activities." ICE Memo at 4. The ICE Memo raises the specter that immigrants will be targeted *because* of their use of health care—whether it is because they have simply accessed public benefits, are high-utilizers of health care, or receive health care that is otherwise politically disfavored by this administration. And, as described above, it is unclear whether ICE will collect information about immigrants' health conditions or the medical services they have received. This vagueness about the government's planned uses for such deeply personal and private information will likely cause many immigrants who are in the country lawfully and who are eligible for full-scope coverage to forgo enrollment in coverage or avoid receiving necessary health care services for fear of being targeted by ICE merely for accessing medical care.

In sum, while ICE cursorily acknowledged the concern that the new data sharing policy will cause individuals to forgo "emergency Medicaid or state-funded Medicaid . . . leading to potential health complications," *Id*. at 6-7; *see* HHS Notice at 8-9, the agency failed to recognize that the same concern exists for immigrants who are in the country lawfully and eligible for full-scope coverage, as well as for U.S.-born citizen children. Thus, the agencies did not and could not have reasonably weighed the substantial, widespread, and serious individual and public health harm caused by the policy against its purported benefits.

**II.     The Data Sharing Policy Is Already Causing a Substantial Chilling Effect with Serious Health Consequences.**

The inevitable, predictable result of the new data sharing policy is to generate widespread fear and health care avoidance. *Amici* have already begun receiving questions and concerns from individuals currently enrolled in Medicaid or considering enrollment, as well as from service providers counseling such individuals. Many individuals and families are making risk calculations

13

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

under the specter of this policy and its broad threats to their personal privacy, attempting to weigh the importance of medical care against an increased risk of immigration enforcement for themselves or family members. Both forms of harm—forgoing health care and bearing a heightened risk of immigration enforcement—are irreparable. *See M.R. v. Dreyfus*, 697 F.3d 706, 732 (9th Cir. 2012) (noting the Ninth Circuit has "several times held that beneficiaries of public assistance may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule 'may deny them needed medical care.") (internal citation omitted); *Ctr. for Taxpayer Rights v. IRS,* No. CV 25-0457, 2025 WL 3251044, at *38-39 (D.D.C. Nov. 21, 2025) (finding risk of immigration enforcement from data sharing irreparable injury and collecting cases). Below, *Amici* highlight stories from individuals who are already experiencing harm from the data sharing between HHS and ICE.

*Amicus* **Virginia Poverty Law Center** has advised multiple individuals who are forgoing health coverage, despite their eligibility, and as a result are unable to access the medical care they need. Two undocumented pregnant women, one in western Virginia and one in Northern Virginia, approached VPLC in November for assistance obtaining health coverage. Both women were eligible to receive prenatal care through Virginia's from-conception-to-birth Children's Health Insurance Program. Each declined to apply for coverage when she learned about the data sharing between HHS and ICE. These women are uninsured and will not have access to other health coverage during their pregnancy. VPLC also assisted a community partner working to renew Medicaid coverage for U.S. citizen children. Because the children's parents are undocumented, they decided not to renew their children's Medicaid once they learned about the data sharing.

In Tennessee, M.T. is a refugee from Venezuela who entered the country legally and who faces a high risk of persecution if she is returned to her country of origin. M.T. sought help from

14

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

*Amicus* **Tennessee Justice Center (TJC)** to enroll in Medicaid in 2024. The administration has recently ordered a review of all immigrants admitted as refugees, placing her status at risk. As critical as health care coverage is, had TJC known that M.T.'s status would be reviewed, that her personal information would be shared, and that her health care use could make her a target for immigration enforcement, they would have considered advising her to utilize free or sliding scale clinics rather than obtain the Medicaid benefits to which she was entitled. Indeed, the attorney who advised M.T. on her Medicaid application relied on the prior ICE and HHS policy to inform the legal advice she provided to M.T. and other clients. The TJC attorney repeatedly counseled pregnant immigrants on the importance of receiving prenatal care. She is herself the adoptive mother of a child born outside of the U.S. who has significant lifelong disabilities because the child's biological mother could not safely access prenatal and delivery services. The idea that her advice to M.T. and other clients to enroll in health care coverage could place them at risk of deportation and serious harm is causing the attorney emotional distress, sleepless nights, and mental anguish.

In Chicago, Illinois, when the data sharing was first reported in July, patients at *Amicus* **Esperanza Health Center** started choosing to forgo Medicaid coverage given their concerns about data privacy. A domestic violence survivor refused to apply for Medicaid for her child, a U.S. citizen, because she believed that seeking benefits would allow immigration authorities to locate her. She repeatedly asked whether her information would end up in the hands of immigration enforcement and her fear prevented her from accessing services her child needed. Another patient, a parent, recently disenrolled their U.S. citizen child from Medicaid after hearing from neighbors that using public benefits might expose the immigration status of other family members and put them at risk. As a result, they chose to go without coverage for their child. Still other patients are

delaying care because of the data sharing policy. A pregnant patient delayed her first prenatal visit until her third trimester because she believed enrolling in Medicaid could expose her immigration status to immigration enforcement. She said she had heard that the government is checking health records and did not want to put her husband at risk of deportation. By the time she obtained medical care, she was experiencing complications that could have been addressed had she obtained medical attention earlier.

*Amicus* **Health Law Advocates (HLA)** in Massachusetts represents the parents of two minor children with disabilities who are deathly afraid of being targeted for immigration enforcement but whose children have no choice but to continue their enrollment to access health care. Their 11-year-old daughter has cognitive and physical disabilities and is enrolled in state-funded Medicaid. The mother has an approved application for Medical Deferred Action (MDA), based on their daughter's disabilities, and has employment authorization. The daughter's and father's MDA applications, however, are still pending. The 6-year-old son, a U.S. citizen, is enrolled in Medicaid; he needs health care to address his autism diagnosis. They cannot afford the intensive medical treatments their children require without Medicaid. HLA also collaborated with a hospital social worker to help a mother and two-year-old child with extensive health care needs due to a genetic disorder causing heart problems and developmental delays. The child was able to enroll in state-funded Medicaid as a person residing under color of law (PRUCOL). The mother fears that deportation would imperil her daughter's life, yet she has kept her daughter enrolled in coverage because there is no other way to ensure access to needed care. Finally, application assisters at a close partner organization to HLA are reporting that individuals are choosing not to follow through with Medicaid updates and renewals because they fear data sharing. A pregnant woman enrolled in Medicaid abandoned her call to update her information after learning about the

16

Amicus Brief of National Health Law Program et al. (3:25-cv-05536-VC)

data sharing policy. Her decision was driven purely by fear that her personal information would be accessed by immigration enforcement. In another call, a lawfully present immigrant learned that he was eligible for Medicaid, but after hearing about the data-sharing agreement, he stated he was "afraid to give too much information to the government" and declined to apply for benefits despite needing treatment for high blood pressure. Fearing personal information would be shared, yet another individual decided not to help his father reapply for Medicaid despite his father's eligibility and need for chemotherapy.

In Pennsylvania, a medical legal partnership attorney with *Amicus* **Community Legal Services** previously informed social workers at his health clinic site that information gathered for Medicaid purposes could not be used for immigration enforcement. The social workers informed many patients of that fact. After the change in policy, an immigrant mother of three children cancelled her children's medical appointments and told the social worker she was not going to renew their Medicaid coverage due to her and her husband's immigration concerns. Her three children are all U.S. citizens, while she and her husband are not. She was afraid that ICE would use her children's Medicaid data to separate their family. The attorney offered the cold comfort that because her children had already enrolled in Medicaid, ICE could access their information no matter whether she renewed their coverage or not. She ultimately decided to renew their coverage, making the agonizing choice to prioritize her children's health over the increased risk that her family would be targeted for utilizing Medicaid coverage.

Since the new policy was announced, *Amicus* **Michigan Poverty Law Program (MPLP)** has been receiving questions and calls from concerned navigators and legal aid providers asking for more details about what information HHS might share with ICE. For instance, a health care navigator contacted MPLP about an immigrant in the Grand Rapids area who requires regular

dialysis treatment and who is seriously considering disenrolling from Medicaid coverage, despite the resulting significant, potentially emergent, risks to his health. MPLP has also heard from service providers, including navigators and health care providers, working with clients who are considering disenrolling from Medicaid or not enrolling in the first place out of fear that ICE will receive their data.

Like other *Amici,* **Oregon Law Center (OLC)** relied on the ICE and HHS prior policy to advise clients that data submitted to apply for health care coverage would only be shared for purposes of administering the benefits they applied for or received. Now, OLC has been forced to change their advice and written materials and to face the fact that their previous advice may be hurting people who sought their help and applied for health care. OLC is counseling current clients who are avoiding health care. Jose is a father with a degenerative genetic disease who has serious health issues and is currently enrolled in Oregon's state-funded Medicaid program. He has applied to adjust his status to become an LPR, but that application remains pending. Jose's condition is deteriorating, and he needs health care. His family is extremely afraid of him accessing care. They fear that his information will be shared with immigration officials and that will make him more of a target for immigration enforcement. OLC is collaborating with community partners and individuals serving clients from a cancer support group for Spanish-speaking immigrants. Several women from that support group are considering dropping their state-funded Medicaid coverage, even though they badly need treatment. One woman, who left her home country to escape domestic violence, is already skipping medical appointments for fear that she will face immigration enforcement.

*Amicus* **New York Lawyers for the Public Interest (NYLPI)** represents many clients who rely on medical services provided under emergency Medicaid and who have no safe option to opt-

out of the coverage or care. In most of those cases, returning to their country of origin for care would be impossible due to their advanced state of illness or the lack of specialized medical care in their country of origin. When discussing their concerns about continuing their medical care, I.O., a person with End Stage Renal Disease, shared that they fear attending medical appointments but continue because they know their survival depends on treatment. L.L. admitted to avoiding medical care altogether out of fear of immigration repercussions, despite having a life-threatening condition requiring frequent monitoring. For decades, NYLPI has provided representation and assistance to non-citizens living with serious, life-threatening health conditions, including end-stage organ failure and HIV. Many entered the country lawfully but were unable to return home after falling ill. A substantial number belong to mixed-status households and remain primary providers for U.S. citizens. NYLPI relied on the government's prior policies assuring that enrollment or claims data from CMS and similar agencies would not be used for immigration enforcement. In some cases, clients might have chosen not to enroll in full-scope Medicaid or emergency Medicaid if they had known the current risk. Moreover, the changes in the data sharing policy have been abrupt, leaving clients and attorneys little time to assess and prepare for the heightened risk of having data shared with ICE. This burden is particularly acute for organizations like NYLPI, which have practiced in this area for over a decade and have represented hundreds of clients. Many former clients have not been in contact for years, making it extremely difficult to locate and notify them of the increased enforcement risk.

Since the federal policy change was announced, *Amicus* **Colorado Center on Law and Policy (CCLP)** has been receiving reports and inquiries from immigrant Coloradans, community organizations, and service partners expressing fear and confusion about whether information provided for Medicaid could be shared with immigration enforcement; many immigrants are

considering disenrolling or avoiding care. A young Medicaid beneficiary living in Colorado, a U.S. citizen, recently shared that their family now questions whether it is safe to seek medical care. Their grandmother, who is undocumented, suffers from severe vertigo and relies on accessing emergency Medicaid for treatment. They fear that if her or her family members' Medicaid data is shared with ICE, it could expose her to ICE targeting or surveillance and are now considering whether to avoid care as a result. Another individual is afraid for her family due to the data sharing policy. Her younger brother is a U.S. citizen; her mother is undocumented. Her brother relies on Medicaid for medical and behavioral health care. Their father recently passed away, and Medicaid coverage has given him access to the care he needs to navigate his grief and mental health pressures. Now, her family faces a Scyllian choice—continuing Medicaid coverage could harm her mother and break the family apart, but terminating Medicaid coverage will harm her brother.

## CONCLUSION

In light of the harms already flowing from the new data sharing policy announced in the ICE Memo and HHS Notice and the agencies' failure to provide an opportunity for public comment, we urge the Court to grant Plaintiffs' Motion.

Dated: December 3, 2025

Respectfully submitted

/s/ *Martha Jane Perkins*

NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
Tel.: (919) 968-6308
perkins@healthlaw.org

*Counsel of Record for Amici*

Joanna Elise Cuevas Ingram (SBN 290011)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, DC 20043
Tel.: (202) 216-0261
cuevasingram@nilc.org