BRETT A. SHUMATE
Assistant Attorney General
ELIZABETH J. SHAPIRO
Deputy Director
MICHAEL J. GERARDI (D.C. Bar No. 1017949)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW,
Washington, DC 20005
Phone: (202) 616-0680
E-mail: michael.j.gerardi@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES, et al.,<br><br>    Defendants. | 3:25-cv-05536-VC<br><br>**DEFENDANTS' OPPOSITION TO<br>PLAINTIFFS' MOTION FOR<br>PRELIMINARY INJUNCTION**<br><br>**Date:**     December 9, 2025<br>**Time:**     2:00 PM<br>**Courtroom:** Virtual<br>**Judge:**    Hon. Vince Chhabria<br>**Trial Date:** Not set<br>**Action Filed:** July 1, 2025 |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

I.      Federal Agencies Are Required To Cooperate With DHS's Requests For
        Information Pertaining To Immigration Enforcement ........................................... 2

II.     CMS Possesses Information Collected By The States About Individuals With An
        Irregular Immigration Status Claiming Medicaid Benefits ................................... 4

III.    This Litigation ........................................................................................................ 5

STANDARD OF REVIEW .................................................................................................. 7

ARGUMENT ....................................................................................................................... 7

I.      Plaintiffs Have Not Shown A Significant Likelihood Of Standing .................................. 7

II.     A Preliminary Injunction Is Not Warranted Here ............................................................ 8

        A.      Plaintiffs Have Not Shown Irreparable Injury ........................................... 8

        B.      Plaintiffs are Unlikely to Succeed on the Merits of Their Claims .......................... 8

                1.      Defendants' Decisional Documents Are Not Final Agency Action ............ 8

                2.      The ICE Memo and CMS Notice Easily Overcome Arbitrary And
                        Capricious Review ....................................................................... 9

                        a.      Defendants Considered, And Appropriately Gave Little
                                Weight To, Plaintiffs' Alleged Reliance Interests ......................... 10

                        b.      Defendants Did Not Overlook Important Issues Raised By
                                The ICE Memo and CMS Notice .................................................. 14

                        c.      Plaintiffs Cannot Bootstrap A Contrary To Law Claim To
                                Their Arbitrary And Capricious Challenge .................................. 16

                        d.      Defendants Did Not Need To Consider More Limited
                                Alternatives To Their Chosen Implementation Approach ........... 19

                3.      CMS Did Not Need To Go Through Notice And Comment
                        Rulemaking To Share Data With ICE ...................................................... 20

                        a.      The CMS Notice Is A Statements Of Policy That Explains
                                How CMS Will Carry Out A Preexisting Legal Norm ................. 20

b.    The Social Security Act Does Not Require CMS To Engage
In Notice and Comment Rulemaking ........................................... 23

III.    The Remaining Injunction Factors Favors Defendants ..................................... 24

IV.    Plaintiffs' Proposed Injunction Is Improper ...................................................... 25

**CONCLUSION** ......................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*AFL-CIO v. Dep't of Labor,*
    778 F. Supp. 3d 56 (D.D.C. 2025) ........................................................................ 24

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................................... 9

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) ................................................................................ 8

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ............................................................................................... 8

*Ctr. for Taxpayer Rts. v. IRS,*
    No. 25-0457, 2025 WL 3251044 (D.D.C. Nov. 21, 2025) .................................... 17

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.,*
    591 U.S. 1 (2020) ................................................................................................. 10

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ............................................................................................. 10

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................................................. 10

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
    460 F.3d 13 (D.C. Cir. 2006) ................................................................................ 8

*Immigr. & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor,*
    510 U.S. 1301 (1993) ........................................................................................... 25

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................... 7

*Managed Pharmacy Care v. Sebelius,*
    716 F.3d 1235 (9th Cir. 2013) .............................................................................. 9

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................................... 9

*Nat'l Min. Ass'n v. McCarthy,*
  758 F.3d 243 (D.C. Cir. 2014)...................................................... 23

*Nat'l Shooting Sports Found., Inc. v. Jones,*
  716 F.3d 200 (D.C. Cir. 2013)...................................................... 20

*Nken v. Holder,*
  556 U.S. 418 (2009)...................................................................... 7

*Perez v. Mortgage Bankers Ass'n,*
  575 U.S. 92 (2015)........................................................................ 22

*Ranchers Cattlemen Action Legal Fund v. USDA,*
  499 F.3d 1108 (9th Cir. 2007) ...................................................... 9

*Syncor Int'l Corp. v. Shalala,*
  127 F.3d 90 (D.C. Cir. 1997)................................................ 21, 23

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021)...................................................................... 7

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025)...................................................................... 25

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.,*
  578 U.S. 590 (2016)...................................................................... 9

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ........................................................ 3

*United States v. Texas,*
  599 U.S. 670 (2023)...................................................................... 22

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008).......................................................................... 7

**STATUTES**

5 U.S.C. § 552a........................................................................ 4, 18

5 U.S.C. § 553................................................................................ 21

5 U.S.C. § 704.................................................................................. 8

5 U.S.C. § 706.................................................................................. 9

6 U.S.C. § 122................................................................ 3, 4, 14, 18

6 U.S.C. § 202 ................................................................................................................. 3

6 U.S.C. § 251 ................................................................................................................. 3

8 U.S.C. § 1301 ............................................................................................................... 2

8 U.S.C. § 1302 ............................................................................................................... 2

8 U.S.C. § 1303 ............................................................................................................... 2

8 U.S.C. § 1304 ............................................................................................................... 2

8 U.S.C. § 1305 ............................................................................................................... 2

8 U.S.C. § 1306 ............................................................................................................... 2

8 U.S.C. § 1360 ..................................................................................................... *passim*

8 U.S.C. § 1373 ............................................................................................................... 3

8 U.S.C. § 1611 ............................................................................................................... 4

42 U.S.C. § 1306 ............................................................................................... 18, 23, 24

42 U.S.C. § 1395dd .......................................................................................................... 14

42 U.S.C. § 1396a *et seq.* ................................................................................................ 4

42 U.S.C. § 1396b ............................................................................................................ 4

**RULES**

Fed. R. Civ. P. 65 .......................................................................................................... 25

**REGULATIONS**

42 C.F.R. § 401.134 ........................................................................................................ 24

42 C.F.R. § 430.30 ............................................................................................................ 5

45 C.F.R. § 155.260 ........................................................................................................ 24

45 C.F.R. § 164.512 ........................................................................................................ 12

*Eliminating Information Silos*,
    Exec. Order. No. 14,243, 90 Fed. Reg. 13,681 (Mar. 25, 2025)................................................ 1

*Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security*,
    90 Fed. Reg. 53,324 (Nov. 25, 2025) ("CMS Notice") ....................................................*passim*

*Protecting the American People Against Invasion*,
    Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025)...................................................... 1

**OTHER AUTHORITIES**

Answering Brief, *United States v. California*,
    No. 18-16496, 2018 WL 5880015 (Nov. 5, 2018) .................................................................. 18

Centers for Medicare & Medicaid Servs., *CMS MACBIS T-MSIS Reporting Reminder: Reporting Record Types in T-MSIS* (Sept. 10, 2018), https://perma.cc/S23H-CXFM.............. 13

USCIS, Form G-325R (Mar. 5 2025),
    https://www.uscis.gov/sites/default/files/document/forms/g-325r.pdf ...................................... 2

U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* ("*APA Manual*") (1947) ........................................................................................................... 21

## INTRODUCTION

Federal law requires federal agencies to make available to immigration authorities, including U.S. Immigration and Customs Enforcement ("ICE"), "[a]ny information in any records kept" as to "the identity and location of aliens." *See, e.g.*, 8 U.S.C. § 1360(b). In light of guidance from the President to strictly enforce immigration law and to eliminate information silos between federal agencies,[1] ICE has requested limited biographical and location information from the Centers for Medicare and Medicaid Services ("CMS") about individuals without a lawful immigration status, and CMS, in accordance with federal law, is cooperating with that request. Both agencies have issued decision documents memorializing the rationale behind this change. U.S. Imm. & Customs Enf't, Policy Memo. 11066.2, *Use of HHS Information and Recission of ICE Policy Memorandum 11066.1* (Oct. 27, 2025), ECF No. 131-2 ("ICE Memo"); Ctrs. for Medicare & Medicaid Servs. ("CMS"), *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security*, 90 Fed. Reg. 53,324 (Nov. 25, 2025) ("CMS Notice"). ICE transmitted an initial, formal request for data on November 24, 2025. Letter from Marcos D. Charles to Leslie Nettles, Nov. 24, 2025, ECF No. 133-1 ("ICE Letter").

Plaintiffs seek to renew the preliminary injunction the Court entered against this policy change in August, but the two claims they raise here lack merit. First, Plaintiffs cannot demonstrate that the agencies behaved in an arbitrary and capricious manner. Defendants have provided the public with a detailed, cogent explanation of the major aspects of their decision to share this information that easily satisfies the APA's deferential standard for review of agency actions.

---

[1] *See, e.g.*, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, Exec. Order. No. 14,243 § 3, 90 Fed. Reg. 13,681 (Mar. 25, 2025); *Protecting the American People Against Invasion*, Exec. Order No. 14,159, § 2, 90 Fed. Reg. 8443 (Jan. 20, 2025).

Second, Plaintiffs are unlikely to succeed on their notice-and-comment claim against CMS because CMS is implementing a preexisting legal norm defined by Congress—the various federal statutes that provide immigration authorities with a right to receive information from other agencies—rather than defining a new legal norm through a substantive rule.

Therefore, the Court should deny Plaintiffs' renewed motion for a preliminary injunction.

## BACKGROUND

### I.    Federal Agencies Are Required To Cooperate With DHS's Requests For Information Pertaining To Immigration Enforcement

The parties in this case agree that federal law requires "certain non-citizens living in the United States to register their presence with the federal government and notify DHS of a change in address." PI Mot. 17, ECF No. 134. The current registration scheme, codified at 8 U.S.C. §§ 1301–06, requires aliens (or their parent or guardian) who are in the country for more than 30 days to register and submit to fingerprinting. 8 U.S.C. § 1302(a)–(b); *see also* ICE Memo 5. Registration typically involves collecting an alien's place of residence, along with other pertinent identifying information. *See, e.g.*, USCIS, Form G-325R (Mar. 5 2025), https://www.uscis.gov/sites/default/files/document/forms/g-325r.pdf. This is consistent with Congress's understanding of what registration requires, as aliens are also required by statute to "notify the [Secretary] in writing of each change of address and new address within ten days from the date of such change and furnish with such notice such additional information as the [Secretary] may require by regulation." 8 U.S.C. § 1305(a).

The parties' divergence begins when these requirements are *not* followed. Despite the requirements of federal law, "some aliens disregard [their] obligation" to register with immigration authorities and provide up-to-date information on their whereabouts, or "provide false information . . . to evade apprehension by immigration officers." ICE Memo 5. In addressing the enforcement

problem this information gap creates, ICE is not required to operate in a vacuum. On the contrary, Congress has long required other federal agencies to assist immigration authorities by providing information relevant to immigration enforcement activities to DHS and its predecessors.

This norm of cooperation has been in place since the 1950s, when Congress provided in the Immigration and Nationality Act ("INA") that "[a]ny information in any records kept by any department or agency of the Government as to the identity and location of aliens in the United States shall be made available to" immigration authorities. 8 U.S.C. § 1360(b).[2] President Clinton reinforced that obligation in 1996 by signing into law 8 U.S.C. § 1373. Section 1373 provides that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a). While the Ninth Circuit construed § 1373 in *United States v. California*, 921 F.3d 865 (9th Cir. 2019), as only reaching information about immigration status in the context of requests to state law enforcement officials, it cited § 1360 as an example of a statute reflecting congressional intent to reach a "broader swaths of information" than mere "immigration status." *Id.* at 892.

When Congress created the Department of Homeland Security in 2002, it reaffirmed this norm of cooperation. It directed that the Secretary of Homeland Security "shall have such access as the Secretary considers necessary to all information, including reports, assessments, analyses, and unevaluated intelligence . . . that may be collected, possessed, or prepared by any agency of the Federal Government." 6 U.S.C. § 122(a)(1). The Secretary "may obtain such material upon

---

[2] Although § 1360(b) refers to "the Service" and "request made by the Attorney General," these functions have been transferred to DHS and the Secretary, respectively. 6 U.S.C. §§ 202(3), 251.

request" or "enter into cooperative arrangements with other executive agencies to provide such material or provide Department officials with access to it on a regular or routine basis, including requests or arrangements involving broad categories of materials, access to electronic databases, or both[.]" *Id.* § 122(b)(1). The federal Privacy Act also supports information sharing between federal agencies for immigration enforcement purposes. It restricts disclosure of the "records" of an "individual" (defined to include "a citizen of the United States or an alien lawfully admitted for permanent residence") by federal agencies. *See* 5 U.S.C. §§ 552a(a)(2), (a)(4), (b). But under an exception to that general rule, a federal agency may, without the consent of the individual, share records "for a civil or criminal law enforcement activity." *See id.* § 552a(b)(7).

## II.    CMS Possesses Information Collected By The States About Individuals With An Irregular Immigration Status Claiming Medicaid Benefits

Medicaid is a program jointly funded by the states and the federal government that provides health care to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults, and people with disabilities. Decl. of Kimberley Brandt ("Brandt Decl.") ¶¶ 4–5, ECF No. 83-1; *see generally* 42 U.S.C. § 1396a *et seq.* Medicaid is a "federal public benefit," 8 U.S.C. § 1611(c), and as a result, those aliens who are not "qualified aliens" are only eligible for federally funded Medicaid "for care and services that are necessary for the treatment of an emergency medical condition." *Id.* §§ 1611(a), (b)(1)(A); *see also* 42 U.S.C. § 1396b(v)(2); Brandt Decl. ¶ 20. States are responsible for verifying the citizenship of applicants using the Systematic Alien Verification for Entitlements ("SAVE")—operated by U.S. Citizenship and Immigrations Services (USCIS), a sub-agency of DHS—to confirm that they do not spend "full scope" Medicaid funds on unqualified aliens. *See, e.g.*, Decl. of Judith Cash ¶ 11, ECF No. 43-8. However, some states choose to "extend coverage for medical services for individuals with [unsatisfactory immigration status] beyond the services for which the federal government will pay

. . . , but only state funds can be used to cover those services." Brandt Decl. ¶ 21.

The states routinely share information with CMS about their Medicaid programs in keeping with its scheme of cooperation between federal and state health systems. States submit a Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program no later than thirty days after the end of each fiscal quarter. 42 C.F.R. § 430.30(c)(1); Brandt Decl. ¶ 7. CMS also conducts a variety of other targeted financial management reviews (FMRs). Brandt Decl. ¶ 10. It is not unusual for CMS to scrutinize quarterly submissions to review compliance with immigration status requirements, or to initiate FMRs specifically directed at this issue. *Id.* ¶¶ 23–27.

### III.    This Litigation

As set forth in Defendants' opposition to Plaintiffs' initial motion for a preliminary injunction, Defendants began efforts to share CMS information with ICE for immigration enforcement purposes in June 2025. Defs.' Opp'n To First PI at 6–8, ECF No. 83. Plaintiffs, then a consortium of twenty states (now twenty-two), filed this lawsuit on July 1, 2025. *See* Compl., ECF No. 1; *see also* Am. Compl. ¶¶ 12–33, ECF No. 108 (adding the Governor of Kentucky and the State of Wisconsin). They moved for a preliminary injunction on July 11, 2025. ECF No. 43.

Plaintiffs' motion was granted in part, and denied in part, on August 12, 2025. First PI Order, ECF No. 98. The Court concluded there was "nothing categorically unlawful about DHS obtaining data from agencies like HHS for immigration enforcement purposes." *Id.* at 2. It also held that Plaintiffs failed to carry their burden of showing "that a proposal to reverse the policy of not sharing information between HHS and DHS for immigration enforcement purposes would require notice-and-comment rulemaking." *Id.* at 4. Nonetheless, the Court enjoined the use of "Medicaid data obtained from the plaintiff states for immigration enforcement purposes" because it found Plaintiffs were likely to succeed on their arbitrary and capricious claim. *Id.* at 2–3. The

Court held it was "incumbent upon the agencies to carry out a reasoned decisionmaking process" prior to sharing data. *Id.*

As an alternative to appeal or further merits proceedings on the record that would have existed at the time the complaint was filed, the Court held that it would lift the preliminary injunction "14 days after both DHS and HHS have completed a reasoned decisionmaking process (or rulemaking, if necessary) that considers the matters discussed in this ruling, along with any other relevant policy tradeoffs or legal considerations." *Id.* at 5. Defendants were to "inform the plaintiff states within 24 hours of completing that process and must file a status report on the docket within 48 hours of completing the process." *Id.* Following this guidance, ICE executed a memorandum addressing its practices with respect to requesting information from HHS on October 27, 2025 (the "ICE Memo"), and HHS published a notice in the Federal Register on November 25, 2025, regarding its intent to share Medicaid information with ICE (the "HHS Notice"). The agencies believe these documents are, at most, statements of policy, and as such issued them without engaging in notice and comment, just as prior policy choices not to share such information were not subjected to notice and comment. Both documents were made available to Plaintiffs and the Court on November 21, 2025, in accordance with the timetable required by the Court's preliminary injunction order. ICE sent a formal letter to CMS three days later requesting "CMS Medicaid data from June 2025 to the present pertaining to the biographical, contact, and location information of individuals with unsatisfactory immigration status (aliens not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law)," including "citizenship and immigration status, address, phone number, date of birth, and Medicaid ID." ICE Letter.

Plaintiffs' renewed preliminary injunction motion seeks relief on two of the five claims in

the amended complaint: an "arbitrary and capricious" claim under the APA, Am. Compl. ¶¶ 266–73, and an APA procedural claim for failure to engage in notice and comment rulemaking, *id.* ¶¶ 295–300. The motion seeks to "prohibit[] Defendants from transferring the States' Medicaid data files containing personally identifiable, protected health information to DHS or any other federal agency" and "prohibit[] Defendants from sharing or using such data for purposes of immigration enforcement, population surveillance, or other similar purposes." PI Mot. at 1.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Id.* at 20. When "the Government is the opposing party," the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs also bear the burden of showing subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "standing is not dispensed in gross," Plaintiffs must "demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

## ARGUMENT

### I.    Plaintiffs Have Not Shown A Significant Likelihood Of Standing

In opposing Plaintiffs' first request for a preliminary injunction, Defendants argued that Plaintiffs had failed to establish Article III standing because the feared potential injuries to the States as a result of Defendants' change in policy are too attenuated to serve as the necessary injury-in-fact. Defs.' Opp'n to First PI 10–13, ECF No. 83. Defendants reassert those arguments here. Plaintiffs' theory of injury is based on unfounded conjecture as to how unknown third parties

to this litigation will react to the proposed policy changes, and how those policy changes will impact the cost and quality of health care in their jurisdictions. As such, their purported injuries lack imminence and fall short of the standard required by Supreme Court precedent. *See Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013) (citation omitted).

## II.    A Preliminary Injunction Is Not Warranted Here

### A.  Plaintiffs Have Not Shown Irreparable Injury

"A plaintiff must do more than merely allege imminent harm sufficient to establish standing" to meet the irreparable harm prong of the preliminary injunction test. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Rather, a plaintiff must "*demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.*" *Id.* Defendants argued that Plaintiffs failed to demonstrate irreparable injury in their initial motion. Defs.' Opp'n to First PI 13–15. They recognize that the Court ruled against Defendants on this issue in connection with the initial preliminary injunction proceedings. Nonetheless, Defendants stand on their prior arguments. Plaintiffs cannot demonstrate that (1) Defendants' policies will create a "chilling effect" due to Defendants policies that will cause immigrants to avoid healthcare; (2) Defendants' policies will cause a loss of crucial federal funding for state health programs; or (3) Plaintiffs can vindicate interests in "public health and safety of the states' residents" in a way that does not constitute an improper *parens patriae* claim.

### B.  Plaintiffs are Unlikely to Succeed on the Merits of Their Claims

#### 1.    Defendants' Decisional Documents Are Not Final Agency Action

The APA does not permit "judicial review over everything done by an administrative agency." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (citation omitted). Rather, judicial review is limited to "final agency action[s]." 5 U.S.C. § 704. Plaintiffs have failed to allege such action here. Agency action is final—and therefore reviewable

in a judicial action brought pursuant to the APA—only when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Defendants' initial preliminary injunction opposition argued that sharing of information was not "final agency action" at all because such sharing did not satisfy the two-part *Bennett* test and was a way station on the road to some enforcement action facilitated by the information at issue. Defs.' Opp'n to First PI 16–18. Although the Court disagreed with that reasoning, Defendants' reassert here that data sharing is, by its nature, an interlocutory act which has no legal consequences for Plaintiffs, and as such, APA review of a decision to share data is not appropriate.

### 2. The ICE Memo and CMS Notice Easily Overcome Arbitrary And Capricious Review

In light of the reasoned decision-making process Defendants have now engaged in, they are highly likely to succeed on the merits of Plaintiffs' arbitrary-and-capricious claim. Judicial review under 5 U.S.C. § 706(2)(A)'s arbitrary-and-capricious standard "is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund v. USDA*, 499 F.3d 1108, 1115 (9th Cir. 2007) (citation omitted). This deferential standard for assessing an agency's reasoning reflects a norm of democratic accountability for lawful policy choices: "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs[.]" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part). As such, Plaintiffs must bear a "heavy burden" in order to enjoin a policy on this basis. *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1244 (9th Cir. 2013).

Plaintiffs have failed to meet that burden here. As explained below, Defendants' actions easily satisfy judicial review under this deferential standard. Previously, the Court faulted Defendants for taking up presumptively lawful information sharing policies because it held that no reasoned decision-making process had occurred at all. Defendants have now availed themselves of the opportunity to explain how they reached the conclusion that ICE should have recourse to information collected by CMS to assist its immigration enforcement mission. Plaintiffs' brief fails to engage appropriately with these explanations, and falls well short of showing that they are likely to succeed on the merits on their claim that the challenged actions cannot survive this deferential form of judicial review.

### a. Defendants Considered, And Appropriately Gave Little Weight To, Plaintiffs' Alleged Reliance Interests

The Supreme Court has recognized that agencies must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Although an agency cannot shirk the duty to at least consider reliance interests, it has "considerable flexibility" in how it addresses them. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 32 (2020). For instance, an agency can conclude "that reliance on forbearance and benefits was unjustified," or that "reliance interests . . . that it views as unlawful are entitled to no or diminished weight." *Id.* And even if an agency concludes a reliance interest is serious, it "may determine, in the particular context before it, that other interests and policy concerns outweigh any reliance interests." *Id.*

In their previous motion for a preliminary injunction, Plaintiffs asserted that Defendants failed to consider a panoply of reliance interests arising from the belief that CMS would not share information about Medicaid beneficiaries with ICE for immigration enforcement purposes. Pls'

First PI Mot. 5–7, 19–20, ECF No. 42-2. The agencies have addressed these supposed deficiencies. ICE Memo 4–7; 90 Fed. Reg. at 53,326. ICE formally revoked a 2013 memorandum that stated "ICE would not use health coverage information as the basis for pursuing a civil immigration enforcement action, regardless of whether it was obtained from a federal agency or another source." ICE Memo 3 (quotation omitted). HHS will likewise be updating guidance it provides to the public "to reflect that federal laws authorize CMS to share certain information with DHS." 90 Fed. Reg. at 53,326.

In response to the suggestion that aliens seeking health care have relied upon ICE's forbearance as part of their decision to apply for or accept health benefits, ICE explained that aliens are already under legal obligations to provide accurate, up-to-date information about themselves to immigration authorities, including their address. ICE Memo 5. The information ICE is interested in, as relevant here, is "the sort of biographical and location information ICE *already has a right to access*, such that sharing of that information should not significantly diminish reasonable privacy interests as between patients and physicians." *Id.* at 6 (emphasis added). As such, ICE did not give the reliance interest in CMS not disclosing this information to immigration authorities significant weight. ICE likewise did not give significant weight to the interests of other participants in the healthcare system, such as healthcare providers and state Medicaid agencies, all of which are downstream from concerns that aliens will not seek healthcare benefits to which they are entitled under federal and state law if they are concerned some of their information will be passed on to immigration authorities. *Id.* at 6–7.

Defendants also determined that these supposed reliance interests are outweighed by a substantial countervailing interest in enforcing immigration law. The parties agree that privacy rules, even as to health care, are not absolute. Rather, as Plaintiffs put it, "privacy laws generally

contain exceptions allowing access to otherwise-confidential records in specific circumstances, such as when the law requires disclosure, or when an agency must comply with a properly issued court order, warrant, subpoena, or summons." PI Mot. 17 (citing 45 C.F.R. § 164.512(f)(1)(ii)(A)). And although immigration authorities would, in an ideal world, not need recourse to information from other agencies, "there are significant challenges in relying on aliens to provide their current and accurate address information." ICE Memo 5. Congress, recognizing this problem, gave immigration authorities the right to seek the assistance of other federal agencies in filling those gaps. *Id.* at 5–6. Accessing this information gives ICE "a more complete picture of an individual's location, which is critical for operation planning and decision-making." *Id.* It also "help[s] law enforcement confirm the whereabouts of criminal aliens, suspects, witnesses, or victims, ensuring that ICE resources and investigative efforts are focused on the right locations." *Id.* at 6. Therefore, ICE rationally concluded that the benefits of supplementing its own information collection with information from CMS would enhance its enforcement operations, while not seriously damaging the legitimate privacy interests of aliens seeking emergency medical care.

Plaintiffs' motion does not fully engage with Defendants' efforts to address their reliance interests. They allege that Defendants did not acknowledge they were not writing on a "blank slate," PI Mot. 8, but that is false: both agencies acknowledged their prior statements on this issue and stated they were changing course, explaining why the reliance interests created by the prior policy were not a sufficient reason to keep it in place. There is also nothing "circular" about Defendants' treatment of the reliance arguments. *Id.* at 9. ICE is not requesting information simply because it can, but because it addresses gaps in its own data that impede its ability to enforce immigration law effectively. ICE Memo 5–6. Plaintiffs also assert that the ICE Memo and CMS Notice do not sufficiently define what sort of information ICE is seeking and places "no

meaningful limitation" on what ICE can obtain.  PI Mot. 9, 23 n.7. Plaintiffs can only reach that conclusion by taking language out of context.  ICE's statement explains it "is concerned with the sort of biographical and location information ICE already has a right to access" and that is "relevant to ICE's criminal and civil enforcement mission," such as "contact information" and "data elements relevant to location and corroborating the identity of the subject." ICE Memo 6. Its initial request reflects this more circumscribed approach. ICE Letter. CMS further explains that, in response to requests from ICE, it "will share the minimum required information," including "citizenship and immigration status, location, and phone numbers." 90 Fed. Reg. 53,325.

Plaintiffs also question CMS's assertion that reliance interests are not entitled to much weight as to state-funded benefits programs because states are only required by law "to submit data associated with beneficiaries who receive federally funded Medicaid services" to CMS. 90 Fed. Reg. 53,326; *see* PI Mot. 9. But Plaintiffs provide no sound basis for questioning CMS's understanding of the obligations of states with respect to the Transformed Medicaid Statistical Information System ("T-MSIS"), which CMS maintains. CMS has long told T-MSIS data providers that they should "report only records for beneficiaries who receive services that are funded through Title XIX and Title XXI," and exclude those "enrolled in programs that are solely state funded or have a different source of Federal funding." Centers for Medicare & Medicaid Servs., *CMS MACBIS T-MSIS Reporting Reminder: Reporting Record Types in T-MSIS* (Sept. 10, 2018), https://perma.cc/S23H-CXFM. The CMS Notice merely reaffirms that principle.

Agencies must consider and address reliance interests, but they are not obligated to agree with them. Defendants have undertaken the necessary consideration of the issues here, and Plaintiffs' motion should be denied as it relates to a reliance theory.

###### b. Defendants Did Not Overlook Important Issues Raised By The ICE Memo and CMS Notice

Plaintiffs next contend that Defendants did not consider five specific issues that were relevant to the policy change at issue here. PI Mot. 10–14. None of these contentions has merit.

*Patient Privacy*. Plaintiffs note that "CMS houses data on individuals" that includes "protected health information" protected by various federal laws (none of which Plaintiffs allege, for purposes of this motion, CMS is violating). *Id.* at 10. Plaintiffs then criticize CMS for departing from the norm of protecting health information without explaining why it is doing so, or limiting the information to be shared. PI Mot. 10–11. Federal law puts the decision about whether to request data in the hands of immigration authorities, so CMS is not in a position to make policy trade-offs about what data to provide. *See, e.g.* 8 U.S.C. §1360(b) (information "shall be made available" to immigration authorities); 6 U.S.C. §122(a)(2). Nonetheless, CMS's stated approach of sharing "the minimum required information with ICE, giving due consideration" to ICE's requests, and its acknowledgement of "federal laws that govern the provision of information to DHS and the CMS information requested," adequately accounts for these concerns. 90 Fed. Reg. at 53,325. Likewise, ICE also addressed the need to comply with federal statutes regarding the collection and handling of the information at issue here, including HIPAA.  ICE Memo 7–8.

*Loss of Medicaid Funding*. Defendants recognized that the states may lose some of their Medicaid funding as a result of their new policy. ICE was entitled to conclude, as it did, that this risk was attenuated because of the preexisting legal obligations aliens are under to apprise immigration authorities of their whereabouts, and because the risks were outweighed by the benefits of sharing the information. ICE Memo 7. Plaintiffs suggest that this choice is in tension with the obligations of the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, but Plaintiffs do not make a contrary to law claim with respect to EMTALA in their

complaint or in their motion for a preliminary injunction, nor is there a reason to suppose that EMTALA implicitly abrogates longstanding federal law that permits information sharing with immigration enforcement agencies.  Plaintiffs also allege that CMS "contemplates sharing more information than just that of 'aliens,'" PI Mot. 11, but that is flatly contradicted by the ICE Memo and its initial request letter to CMS. ICE Memo 7 ("At this time, the information that ICE intends to request and receive from HHS will be limited to biographical information *about aliens*, location information, and contact information." (emphasis added)); ICE Letter (seeking information about "*aliens* not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law" (emphasis added)).

*Public Trust*. Plaintiffs next argue that "CMS is deliberately destroying trust built over decades" in the public health system because, after telling Medicaid participants for many years that their data would only be used for certain purposes, Defendants are now changing course. PI Mot. 12. This assertion is derivative of Plaintiffs' reliance arguments, which Defendants have already addressed. Plaintiffs' position effectively boils down to an argument that Defendants cannot take a new position on this issue because some in the public believed Defendants would never change their position. But agencies are entitled to change policies even in these circumstances, so long as the change is lawful and rationally explained.

*Harm to State Medicaid Programs*. Plaintiffs next contend Defendants "failed to consider how their new rules will undermine" policies within their state that depended on "promises of privacy to residents and encouraged broad-based enrollment in affordable insurance programs," included loss of funding from declining participation and additional compliance costs. *Id.* at 13. Defendants acknowledged the possibility of these concerns, which, again, are derivative of Plaintiffs' reliance-based arguments, and addressed them. ICE Memo 6–7. Defendants were

entitled to conclude that these risks to state Medicaid programs, which apply to all state programs and not just those operated by Plaintiffs, were not outweighed by the need to bolster ICE's law enforcement efforts, particularly in light of the limited nature of the data requested.

*Data Security*. Plaintiffs also raise highly speculative concerns about risks to data security as a result of the proposed information sharing between CMS and ICE. PI Mot. 13–14. ICE thoroughly addressed concerns about safeguarding information in its memorandum. ICE Memo 7–8. CMS, likewise, acknowledged these concerns and committed to "transfer[ring] any information to ICE in a secure manner" and to "establish appropriate safeguards for the information provided." 90 Fed. Reg. at 53,325.

### c. Plaintiffs Cannot Bootstrap A Contrary To Law Claim To Their Arbitrary And Capricious Challenge

Next, Plaintiffs argue that the ICE Memo and CMS Notice rest on a "flawed legal analysis" that does not justify its conclusions. PI Mot. 14–18. At the outset, these arguments suffer from a procedural shortcoming. If, indeed, Defendants' new position is based on a flawed legal analysis, then one would have expected Plaintiffs to contest that analysis by raising a "contrary to law" claim in their preliminary injunction motion. Plaintiffs have not done so. With this procedural limitation in mind, Plaintiffs' arguments are easily brushed aside.

*CMS's Analysis Complied With The Law*. Plaintiffs first argue that ICE's 2013 policy memorandum somehow constrains CMS from sharing information with ICE, because ICE stated in the memorandum that unspecified "laws and implementing regulations" meant that "information provided by individuals for such coverage may not be used for purposes other than ensuring the efficient operation of the Marketplace or administering the program, or making or verifying certain eligibility determinations." Rich Decl. Ex. A at 1, ECF No. 134-2. But ICE has now *withdrawn* this memorandum, which, from the start, was "not intended to, does not, and may not be relied

upon to create any rights or benefits, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 1–2. And the agencies have explained why, in fact, federal law not only authorizes, but requires, this sort of information sharing. *Ctr. for Taxpayer Rts. v. IRS*, No. 25-0457, 2025 WL 3251044 (D.D.C. Nov. 21, 2025), which addressed specific information sharing rules related to taxpayer information that are not at issue here, is clearly distinguishable because of the explanations the agencies have now provided. Both Defendants have shown awareness of a change of position on information sharing, based on a fresh look at the law and a different weighing of the relevant equities at stake.

Plaintiffs next argue that CMS's "failure to acknowledge ICE's inclusion of ACA marketplace information" represented an "abdicat[ion]" of "its responsibility to engage in reasoned decision-making that considers its own statutory authority and regulations." PI Mot. 15. But Plaintiffs are not challenging whether CMS complied with its own statutory authority and regulations. And even if they were, this argument misses the mark. The CMS Notice states that it "applies to data collected by CMS in connection with its role in the Medicaid program," as opposed to Marketplace data. 90 Fed. Reg. 53,324. And ICE's initial request for information is, in turn, limited to "CMS Medicaid data." ICE Letter.

Plaintiffs also take CMS's comments about the Privacy Act out of context. The CMS Notice underscored that the Privacy Act "only applies to U.S. citizens and lawful permanent residents," 90 Fed. Reg. at 53,325 n.2, whereas ICE is seeking information about "aliens *not* lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law."  ICE Letter (emphasis added).  Nonetheless, Plaintiffs appear to have extrapolated from CMS's notice that CMS intends to share *all* Medicaid data with ICE under the Privacy Act, PI Mot. 5, but CMS's notice applies only to Medicaid data. 90 Fed. Reg. at 53,324. Plaintiffs also assert

that CMS "fail[ed] to consider how to determine whether ICE requests meet the Privacy Act's criteria for 'matching programs'" under 5 U.S.C. § 552a(a)(8)(A)(i), *id.* at 15, but that would only be relevant if Plaintiffs were alleging that Defendants had violated the Privacy Act. That contrary-to-law type of claim is not at issue here, and rightly so. Plaintiffs' Privacy Act claim on this theory would fail for a number of reasons, not least because ICE's use of CMS data to assist its immigration enforcement operation is not "for the purpose of" verifying eligibility for a "Federal benefit program," which is limited to programs "providing cash or in-kind assistance in the form of payments, grants, loans, or loan guarantees." 5 U.S.C. §§ 552a(a)(8)(A)(i)(I), (a)(12).

*ICE's Analysis Complied With The Law*. Plaintiffs next suggest that various federal laws authorizing the sharing of information with immigration authorities do not in fact do so. PI Mot. 16–17. Again, this is a contrary-to-law claim masquerading as an arbitrary-and-capricious claim, and the Court should reject it out of hand for that reason alone. But even if the Court were to consider it, Plaintiffs are wrong. By its terms, section 1360(b) reaches "any information in any records . . . as to the identity and location of aliens," and Plaintiffs give no support for their argument that this language does not reach the categories of information ICE seeks to access here. As Plaintiff California argued before the Ninth Circuit in *United States v. California*, 8 U.S.C. § 1360(b) was an example of how Congress could write a statute "intended to reach broad swaths of information" about aliens. Answering Brief, *United States v. California*, No. 18-16496, 2018 WL 5880015, at *26 (Nov. 5, 2018). The norm established by § 1360(b) is consistent with the Homeland Security Act's broad provisions for data access, as well. 6 U.S.C. § 122. Congress could have opted Medicaid data out of this general rule of disclosure, but 42 U.S.C. §1306(a)(1) expressly permits disclosures of such information "as otherwise provided by Federal law," and contains no exception for requests brought pursuant to statutes like § 1360(b).

Plaintiffs' argument boils down to a contention that it was "arbitrary and capricious for ICE to ignore" their "long-standing reliance" on "the federal government's assurances that ICE's immigration enforcement activities would not impede their Medicaid programs." PI Mot. 17. But Defendants have the legal authority, conferred by Congress, to pursue a different set of policy priorities than the ones Plaintiffs would prefer, so long as they reasonably explain why those policy priorities are changing.  Defendants have discharged those obligations here.

### d.  Defendants Did Not Need To Consider More Limited Alternatives To Their Chosen Implementation Approach

Finally, Plaintiffs take ICE to task for not considering a variety of alternative approaches to the data-sharing policy. First, they query whether ICE could have defined "a narrower scope of data sharing," PI Mot. 18, but, as explained above, a fair reading of the record shows ICE is tailoring its request to HHS for information about individuals who are not U.S. citizens, lawful permanent residents, or otherwise permanently residing in the United States under color of law. ICE Letter. Nor is Plaintiffs' attempt to limit information to individuals subject to "criminal investigations" a valid one, as ICE conducts both "criminal immigration investigations and civil immigration enforcement actions." ICE Memo 2.  The "[i]nformation requested by ICE from HHS is limited to only those data elements which are relevant to ICE's criminal and civil enforcement mission," *Id.* at 6, and CMS is committed to taking a minimalist approach in answering such requests, 90 Fed. Reg. at 53,325.

Plaintiffs also fault the agencies for not explaining "why they cannot delay implementation . . . to give affected parties time to communicate with stakeholders and adjust their operations." PI Mot. 18–19. Plaintiffs claim they are not able to "simply separate state-only from federally funded emergency Medicaid data," but as discussed above, they have long been required to do this when submitting data to T-MSIS. Plaintiffs instead discuss changes to the use of managed care to provide

emergency Medicaid that CMS gave states "a year or more to adjust their practices." *Id.* at 19. Defendants' new policies change the way ICE and CMS interact, but they impose no new requirements or restrictions on Plaintiffs. Plaintiffs do not explain what other actions, besides communication changes, would be necessary to comply with Defendants change in policy, or why those changes would take substantial additional time to complete.

Finally, limiting information sharing to individuals who avail themselves of Medicaid on a prospective basis only is not a reasonable alternative to Defendants' policy. *Id.* at 20. As explained before, individuals impacted by this policy have long been under an obligation to register with immigration officials and to keep that information up-to-date. In light of those obligations, there is no sound reason why only people who avail themselves of federal emergency Medicaid prospectively should be subject to a data-sharing requirement. Defendants "need not consider every alternative proposed" in order to satisfy arbitrary and capricious review, and Plaintiffs have not shown that additional delay in implementation would do anything other than forestall a policy Plaintiffs disfavor. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013).

### 3. CMS Did Not Need To Go Through Notice And Comment Rulemaking To Share Data With ICE

#### a. The CMS Notice Is A Statements Of Policy That Explains How CMS Will Carry Out A Preexisting Legal Norm

Plaintiffs assert that CMS, but not ICE, "violated the APA by failing to provide the required opportunity for interested parties to comment on its new data sharing policy." PI Mot. 20. Defendants previously argued that data sharing was not a reviewable agency action at all, or, to the extent that it is, such action does not constitute a "rule," for APA purposes, both of which would be sufficient bases on which to conclude Plaintiffs lack a likelihood of success on the merits on this claim. Defs.' Opp'n to First PI 18–19. Nonetheless, in light of this Court's indication in the prior preliminary injunction hearing that Defendants' actions constituted a type of "rule" under the

APA, Defendants will focus their argument here on why, assuming Defendants' actions constitute a a type of APA "rule," notice and comment was still not required.

Under the APA, a rulemaking generally must be subjected to notice and comment procedures. 5 U.S.C. § 553(b). But these requirements do not apply "to interpretative rules [or] general statements of policy[.]" *Id.* § 553(b)(A). A leading case, *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997), distinguishes between these two types of rules and "substantive rules" that require the agency to engage in notice and comment. Although policy statements and interpretive rules are not identical, they are alike insofar as neither seeks to create, or modify, a legal norm, and are thereby exempt from notice and comment procedures. A "statement of policy" "merely represents an agency position with respect to how it will treat—typically enforce—the governing legal norm." *Id.* at 94. Because it is the preexisting legal norm that governs, policy statements are often thought of as non-binding on the public and the agency. *Id. See also* U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* ("*APA Manual*") 30 n.3 (1947) (defining "general statement of policy" as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power"). An "interpretive rule . . . typically reflects an agency's construction of a statute that has been entrusted to the agency to administer," and, as is true with a statement of policy, "the agency does not purport to modify that norm, in other words, to engage in lawmaking." *Syncor*, 127 F.3d at 94. It "advise[s] the public of the agency's construction of the statutes and rules which it administers." *APA Manual* at 30 n.3. By contrast, a "substantive rule" requiring notice and comment "modifies or adds to a legal norm based on the agency's own authority," which "flows from a congressional delegation to promulgate substantive rules, to engage in supplementary lawmaking." *Syncor*, 127 F.3d at 95.

The central reason CMS did not have to engage in notice and comment rulemaking in this case is because it is not modifying to, or adding, to a legal norm by engaging in supplementary lawmaking. Rather, the legal norm at issue here is contained in the various federal statutes reflecting Congress's judgment that federal agencies must share certain types of information at the request of immigration authorities. The clearest expression of this norm is 8 U.S.C. § 1360(b), which requires "[a]ny information in any records kept by any department or agency of the Government as to the identity and location of aliens in the United States" to be "made available" to immigration authorities.

In the past, immigration authorities chose not to request information about Medicaid beneficiaries from CMS pursuant to these authorities, a choice they had the right to make as an exercise of their enforcement discretion. *See United States v. Texas*, 599 U.S. 670, 680 (2023) ("In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies."). They made this discretionary choice without engaging in notice and comment. Defendants have now chosen to exercise their enforcement discretion in a different way after reweighing the relevant factors.  But the legal norm in the backdrop of both decisions—the right of DHS and its sub-agencies to request, and receive, information from other federal agencies—is the same today as it has been for decades. And just as the discretionary choice *not* to request such information under these authorities did not require notice and comment, so too does Defendants' decision to start requesting such information. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015) ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.")

Because the underlying legal norm has not changed, CMS's action is not a "legislative" or "substantive rule." Rather, it is, at most, a statement of policy, because it explains how CMS "will treat"—that is, "enforce—the governing legal norm" provided by Congress. *Syncor*, 127 F.3d at 94. Plaintiffs' brief effort to rebut CMS's position that its actions are, at most a statement of policy, PI Mot. 22–23, falls flat. Plaintiffs argue that the CMS Notice "clearly limits agency discretion," but as explained above, it is federal statutory law and ICE's decision to exercise its rights under that law that circumscribes CMS's discretion, not the CMS Notice. Likewise, the CMS Notice does not "establish[] a new binding norm," *id.*; it merely implements a binding norm that already exists as a matter of federal law. "An agency action," like the one at issue here, "that merely explains . . . how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy," and Plaintiffs' request for a preliminary injunction on this theory must be denied. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (concluding "final guidance" document was a "general statement of policy").

### b. The Social Security Act Does Not Require CMS To Engage In Notice and Comment Rulemaking

The Social Security Act's data security statute creates a norm that "no disclosure" of Medicaid data "shall be made [1] except as the head of the applicable agency may by regulations prescribe and [2] *except as otherwise provided by Federal law*." 42 U.S.C. § 1306(a)(1). Plaintiffs argue that this statute obligated CMS to promulgate a regulation permitting the sharing of Medicaid information with ICE. PI Mot. 21. But Plaintiffs' analysis of this question improperly muddles the two exceptions to the rule of "no disclosure" in § 1306(a)(1), and must be rejected.

Defendants do not dispute that when CMS wishes to rely upon the first prong of this exception language to make disclosures, it must promulgate "regulations" to do so. Those regulations, such as the ones Plaintiffs discuss in their brief, PI Mot. 21, are necessarily

"substantive" in nature because CMS is defining the legal norm of disclosure through an exercise of delegated lawmaking authority. But in this case, disclosure does not depend upon the first prong of § 1306(a)(1). Rather, this disclosure is one "otherwise provided by Federal law"—namely, the various federal statutes cited in the ICE Memo and the CMS Notice. The CMS Notice explains how CMS intends to respond to ICE's request for information it is entitled to receive by virtue of federal statutory law, but the "basis for HHS to share Medicaid data with ICE for purposes of immigration enforcement" is not, as Plaintiffs argue, derived from CMS's own authority to define information sharing norms. *Id.*

Plaintiffs next argue Defendants engaged in legislative rulemaking because the CMS Notice "effectively amends 45 C.F.R. § 155.260 and 42 C.F.R. § 401.134 by allowing routine data sharing for the purpose of immigration enforcement." PI Mot. 22. But this apparent contradiction is easily explained by the structure of § 1306(a)(1). Assuming Plaintiffs are correct that CMS's regulations do not authorize the proposed data sharing at issue in this case, the point is irrelevant because § 1306(a)(1) also permits disclosures that are "otherwise provided by Federal law." The fact that other sources of law supplement CMS's disclosure regulations does not work an amendment of those provisions. Absent a plausible basis for concluding CMS withdrew or amended a regulation, Plaintiffs are unlikely to succeed on their procedural APA claim. *AFL-CIO v. Dep't of Labor*, 778 F. Supp. 3d 56, 87–88 (D.D.C. 2025).

## III.    The Remaining Injunction Factors Favors Defendants

Although there is no need to consider the remaining preliminary injunction factors, they too favor Defendants. A preliminary injunction would intrude on Defendants' ability to lawfully share information with each other. To continue to bar Defendants from exercising these statutory authorities after they undertook good faith efforts to further explain their policies in light of the concerns raised by Plaintiffs and the Court would mark "an improper intrusion by a federal court

into the workings of a coordinate branch of the Government" that is inequitable to both Defendants and the public at large. *Immigr. & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers).

## IV.    Plaintiffs' Proposed Injunction Is Improper

For the reasons above, the Court should deny Plaintiffs' motion in its entirety. But even if the Court determines that a preliminary injunction is appropriate, it should limit the injunction in two ways. First, it should limit relief to the Plaintiffs and refrain from issuing a universal injunction as to the Medicaid data of all states who submit information to CMS. An order preventing the sharing of information of all states would "likely exceed the equitable authority that Congress has granted to federal courts." *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). Second, to the extent the Court rules on arbitrary and capricious grounds, it should limit the scope of what is enjoined to actual identified deficiencies in the notice.  For instance, if the Court were to agree that the notice adequately explains the disclosure of some categories of information, but not all, it should limit its injunction to those categories of information that are not adequately explained, rather than enjoining all sharing of information. Finally, because the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," Fed. R. Civ. P. 65(c), Plaintiffs should be required to post an injunction bond that will cover the reasonable costs of ICE foregoing legitimate enforcement actions and of DOJ seeking appellate review of the injunction, if applicable. Alternatively, the Court should stay any injunction it enters pending potential appellate review.

## CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: December 4, 2025

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Civil Division, Federal Programs Branch

*/s/Michael J. Gerardi*
Michael J. Gerardi
Senior Trial Counsel (DC Bar No. 1017949)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: Michael.J.Gerardi@usdoj.gov

*Counsel for Defendants*