BRETT A. SHUMATE
Assistant Attorney General
ELIZABETH J. SHAPIRO
Deputy Director
MICHAEL J. GERARDI (D.C. Bar No. 1017949)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW,
Washington, DC 20005
Phone: (202) 616-0680
E-mail: michael.j.gerardi@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., <br><br> Defendants. | 3:25-cv-05536-VC <br><br> **DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> **Date / Time:** TBD <br> **Time:** 2:00 PM <br> **Courtroom:** Virtual <br> **Judge:** Hon. Vince Chhabria <br> **Trial Date:** Not set <br> **Action Filed:** July 1, 2025 |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1

DISCUSSION ................................................................................................................................... 2

I.      The ICE 2025 Memo Complies With The APA's Reasoned Decision-Making Requirement ......................................................................................................................... 2

II.     The Court Should Deny Plaintiffs' Motion In Full, Or, At A Minimum, Tailor Plaintiffs' Relief To Their Injury ............................................................................................ 7

CONCLUSION ................................................................................................................................ 11

## TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
   458 U.S. 592 (1982) ................................................................................................................ 9

*Appalachian Power Co. v. EPA*,
   208 F.3d 1015 (D.C. Cir. 2000) .............................................................................................. 8

*Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. Env't Prot. Agency*,
   72 F.4th 284 (D.C. Cir. 2023) ............................................................................................... 10

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................................ 8

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002) .................................................................................................. 5

*Catholic Legal Immigration Network, Inc. v. Exec. Off. for Immigration Review*,
   513 F. Supp. 3d 154 (D.D.C 2021) ....................................................................................... 10

*City of Columbus v. Kennedy*,
   796 F. Supp. 3d 123 (D. Md. 2025) ...................................................................................... 10

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................................................ 8

*Dist. of Columbia v. Dep't of Agric.*,
   444 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................................... 10

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) .............................................................................................................. 10

*Town of Southold v. Wheeler*,
   48 F.4th 67 (2d Cir. 2022) ...................................................................................................... 8

*Lewis v. Casey*,
    518 U.S. 343 (1996) .................................................................................................. 11

*Nasdaq Stock Mkt. LLC v. SEC*,
    38 F.4th 1126 (D.C. Cir. 2022) ................................................................................. 10

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ...................................................................................................... 8

*Pulsifer v. United States*,
    601 U.S. 124 (2024) .................................................................................................... 9

*Trump v. Am. Fed'n of Gov't Emps.*,
    145 S. Ct. 2635 (2025) ................................................................................................ 5

**Statutes**

5 U.S.C. § 551 ................................................................................................................ 10
5 U.S.C. § 552a ................................................................................................................ 6
5 U.S.C. § 704 .............................................................................................................. 8, 9
5 U.S.C. § 705 ........................................................................................................ *passim*
5 U.S.C. § 706 .................................................................................................................. 8
8 U.S.C. § 1360 ............................................................................................................ 6, 8
8 U.S.C. § 1611 ................................................................................................................ 3
42 U.S.C. § 1306 .............................................................................................................. 9
42 U.S.C. § 1320d-5 ........................................................................................................ 9

**Other Authorities**

42 C.F.R. § 401.134 ......................................................................................................... 9
45 C.F.R. § 164.512 ......................................................................................................... 9
*Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security*,
    90 Fed. Reg. 53,324 (Nov. 25, 2025) ..................................................................... 4, 5
Federal Rule of Civil Procedure 65 ............................................................................... 10

## INTRODUCTION

This supplemental brief requested by the Court addresses two general topics raised by the Court during the hearing on Plaintiffs' renewed motion for a preliminary injunction. ECF No. 134.

First, the brief addresses a variety of questions raised by the Court at last week's preliminary injunction hearing regarding the reasoning of ICE Policy Memo 11066.2, *Use of HHS Information and Rescission of ICE Policy Memorandum 11,066.1* (Oct. 27, 2025) ("ICE 2025 Memo"), ECF No. 131-2. As important background for answering these questions, the ICE 2025 Memo focuses on explaining the basis for sharing information collected by the Medicaid program about aliens receiving federal emergency Medicaid benefits. That is the form of information sharing that ICE and the Centers for Medicare & Medicaid Services ("CMS") are actually pursuing at this time, as their contemporaneous actions demonstrate. The ICE 2025 Memo is not infirm because it acknowledges ICE may have broader legal rights to request information. Nor would it be appropriate for the Court to consider such challenges here.

Second, with respect to the question of whether the Court could, consistent with the Administrative Procedure Act ("APA"), *partially* enjoin the ICE 2025 Memo to the extent the Court treats the ICE 2025 Memo as final agency action with respect to data sharing beyond the Medicaid data ICE has actually requested from CMS that does not satisfy the APA, Defendants respond in the affirmative. The APA gives the Court ample authority to issue both preliminary relief under 5 U.S.C. § 705, as well as final relief under § 706, as to only part of a final agency action. That being said, for the reasons stated here and in Defendants' opposition to Plaintiffs' motion, ECF No. 138, Plaintiffs have not shown any entitlement to a preliminary injunction. As such, the Court should deny Plaintiffs' motion.

## DISCUSSION

I.  **The ICE 2025 Memo Complies With The APA's Reasoned Decision-Making Requirement**

In 2013, ICE issued a memorandum regarding "civil immigration enforcement policy regarding information concerning such individuals and their household members obtained during the eligibility determination process for such coverage." U.S. Immigration & Customs Enforcement, *Clarification of Existing Practices Related to Certain Health Care Information* (Policy Number 11066.1) (Nov. 25, 2013) ("ICE 2013 Memo"), available at https://perma.cc/4EH3-MCTH. The ICE 2013 Memo addressed health coverage schemes that require individuals to provide immigration status in connection with eligibility determinations, including "a qualified health plan offered on a Health Insurance Marketplace or through an insurance affordability program (i.e., premium tax credits, cost sharing reductions, Medicaid, Children's Health Insurance Program, or Basic Health Program)." It stated that "ICE does not use information about such individuals or members of their household that is obtained for purposes of determining eligibility for such coverage as the basis for pursuing a civil immigration enforcement action against such individuals or members of their household, whether that information is provided by a federal agency to [DHS] for purposes of verifying immigration status information or whether the information is provided to ICE by another source." *Id.*

The ICE 2025 Memo revokes the ICE 2013 Memo. ICE 2025 Memo 3. Although the 2013 Memo was focused on the health insurance eligibility process and on whether ICE would "pursu[e] a civil immigration enforcement action" based on information conveyed during that process, ICE acknowledges that the ICE 2013 Memo was "understood in ways that have caused confusion and suggested ICE would not use HHS information at all for immigration enforcement." *Id.* To address this confusion, the ICE 2025 Memo states that "the agency may, as permitted by law, request,

receive, and use HHS information that may be useful for any and all law enforcement activities that ICE is authorized to pursue as a matter of federal law." *Id.* at 1.

ICE's "duties are carried out through more than 400 federal statutes and focus on smart immigration enforcement, humane detention, preventing terrorism, and combating the illegal movement of people and goods." U.S. Dep't of Homeland Sec'y, *Immigration and Customs Enforcement*, https://perma.cc/GDR8-29KU (last accessed December 16, 2025). It would be impossible for a short memorandum to explain all of the ways in which ICE's mission set might interact with data in the possession of HHS. That being said, the ICE 2025 Memo's actual operational focus is much narrower:

> At this time, the information that ICE intends to request and receive from HHS will be limited to biographical information about aliens, location information, and contact information. Although ICE does not foresee, at this time, using other information, ICE reserves the right to revisit this issue at an appropriate time if it begins to encounter factual situations in which information beyond those categories becomes relevant to its criminal and civil law enforcement mission.

ICE 2025 Memo 7. The ICE 2025 Memo reinforces that ICE is currently seeking "the sort of biographical and location information ICE already has a right to access," *id.* at 6, such as the basic information aliens are required by law to provide to DHS through the statutory registration scheme found in the Immigration and Nationality Act, *id.* at 5 (discussing 8 U.S.C. §§ 1301–06); *see also id.* at 2 ("At this time, ICE contemplates using HHS's biographical, contact, and location information."). In particular, ICE is seeking this information *from Medicaid*, which has a unique structure with respect to aliens. Medicaid has a two-tier structure of "full scope" benefits for citizens and certain "qualified" aliens, and "emergency Medicaid" for aliens who are not "qualified" for "full scope" coverage. 8 U.S.C. § 1611(b)(1)(A). To distinguish between the two, Medicaid explicitly tracks which individuals are "[e]ligible only for payment for emergency services." *See* Centers for Medicare & Medicaid Servs., T-MSIS Data Guide, IMMIGRATION-

STATUS Data Element, https://perma.cc/6VTC-VM4E (last accessed Dec. 16, 2025). The present case was filed after ICE requested "data from the Transformed Medicaid Statistical Information System (T-MSIS) for a population of aliens from a list that ICE provided to HHS CMS." *Id.* at 3.

The ICE 2025 Memo concisely, but thoroughly, articulates ICE's reasons for pursuing this data sharing. It focuses in particular on individuals receiving "federal emergency Medicaid" while not complying with their legal obligations respecting immigration authorities, and on the reliance interests and policy concerns articulated by "state Medicaid agencies" and others by the assumption that such information sharing would not take place. *Id.* at 6–7. The complementary Federal Register notice issued by CMS that is also the subject of Plaintiffs' motion mirrors the ICE 2025 Memo because it "applies to data collected by CMS in connection with its role in the Medicaid program," and to no other data source. *Notice of Medicaid Information Sharing Between the Centers for Medicare & Medicaid Services and the Department of Homeland Security*, 90 Fed. Reg. 53,324, 53,324 (Nov. 25, 2025) ("CMS Notice"). And ICE's requests for information to CMS, including requests that have been made with respect to states that are not subject to the preliminary injunction in this case, have been similarly circumscribed. *See* Ex. A, Letter of Marcos D. Charles to Leslie Nettles, Dec. 10, 2025 (requesting "full name, addresses, Social Security Numbers, date of birth, citizenship and/or immigration status, and Medicaid ID of individuals with unsatisfactory immigration status (aliens not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law)" contained in "Medicaid data").

Against this backdrop, Defendants address the Court's questions from oral argument.

*Medicaid v. Other Healthcare Programs* (PI Hr'g Tr. 2:23–3:1). ICE does not dispute that the ICE 2025 Memo acknowledges ICE may have a legal right to request data from HHS programs other than the Medicaid program. This is hardly surprising and is a routine part of the operations

of both agencies. That being said, the ICE 2025 Memo focuses on the Medicaid program because it is required by law to distinguish between "unqualified" aliens and individuals eligible for "full scope" Medicaid. HHS has only responded to the ICE 2025 Memo with respect to Medicaid, 90 Fed. Reg. at 53,324, and ICE has only requested information to date from Medicaid, Ex. A. Requests for information collected by other health benefit programs would also have to consider any statutes governing privacy under those authorities, as well as the extent to which ICE's statutory authorities authorize the sharing. For example, information shared by state and federal agencies for purposes of benefit verification with SAVE, operated by U.S. Citizenship and Immigration Services ("USCIS"), is not shared for "administrative (non-criminal) immigration enforcement purposes." Immigration Reform & Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, 3391; *see also* U.S. Citizenship & Imm. Servs., *About SAVE*, https://perma.cc/W8KX-H873 (last accessed Dec. 16, 2025). The ICE 2025 Memo is not infirm for stating that it may request information from HHS "as permitted by law." *See Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025) (Sotomayor, J., concurring in the grant of stay) (concluding, where challenged memorandum "directs agencies to plan reorganizations and reductions in force 'consistent with applicable law,'" that until plans were before the court, it had "no occasion to consider" their legality); *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (rejecting argument that "notwithstanding the President's instruction that the Executive Order be applied only '[t]o the extent permitted by law,' a particular agency may try to give effect to the Executive Order when to do so is inconsistent with the relevant funding statute.").

*Information about citizens and household members* (PI Hr'g Tr. 12:3–6). The ICE 2025 Memo states that, "[a]t this time, the information that ICE intends to request and receive from HHS will be limited to biographical information about aliens, location information, and contact

information." ICE 2025 Memo 7. "ICE does not foresee, at this time, using other information." *Id*. That limitation is reflected in the ICE 2025 Memo's focus on "information that aliens already have an obligation to provide to immigration authorities," as well as in ICE's contemporaneous request from CMS for data as to those with "unsatisfactory immigration status." *See* Ex. A. That being said, ICE's law enforcement mission set is broader than just civil immigration enforcement; it includes criminal law enforcement as well. The ICE 2025 Memo does not preclude the possibility that HHS possesses other types of information that may be relevant to carry out that mission set, including information about citizens or "household members." ICE 2025 Memo 1–2. But the ICE 2025 Memo is not intended to explain or justify every possible information request ICE could make, as ICE explained a need to "revisit" the memo "if it begins to encounter factual situations in which information beyond these categories becomes relevant to its criminal and civil law enforcement mission." ICE 2025 Memo 7. The legal terrain for requesting such uses would likely be different, as well. For instance, 8 U.S.C. § 1360(b) (emphasis added) mandates the sharing of information "as to the identity and location of *aliens*," not citizens, and the Privacy Act applies only to requests for information about "a citizen of the United States or an alien lawfully admitted for permanent residence," 5 U.S.C. § 552a(a)(2). Accordingly, any analysis of whether ICE may lawfully use such other information from HHS must wait until a concrete use case emerges.

*ICE's Mission Set* (PI Hr'g Tr. 16:16–18). As explained above, ICE's mission set is broader than civil immigration enforcement and includes criminal law enforcement more generally. The ICE 2025 Memo does not purport to explain or justify every possible form of information sharing between HHS and DHS that could apply to ICE's mission. Rather, the ICE 2025 Memo is focused on the use of information requested about aliens for "criminal investigations and immigration enforcement actions." ICE 2025 Memo 1. As an example, up-to-date address information "is

valuable in corroborating residential addresses which are often material to criminal investigations and immigration enforcement (e.g., warrants, safe apprehensions, service of process)." *Id.* at 4; *see also id.* (information obtained could help in identifying "those who have unlawfully entered the United States without inspection and admission and who have failed to meet their obligations to register their presence with [DHS.]"). ICE did not attempt to explain every potential use of information it current collects from HHS or may collect in the future, or provide a complete legal and policy justification for such sharing, but acknowledges that it can only use information "as permitted by law." *Id.* at 2; *see also id.* at 7–8.

*Types of Information* (PI Hr'g Tr. 24:7–11). The ICE 2025 Memo notes that "it is concerned with the sort of biographical and location information ICE already has a right to access" because aliens have long been required to provide that information to immigration authorities under the relevant registration statutes. ICE 2025 Memo 6. ICE's contemporaneous requests for information reflect this. *See, e.g.*, Ex. A. Seeking information beyond that is an issue that the ICE 2025 Memo itself notes the agency would have to "revisit" in the future. *Id.* at 7. Whether such information would be covered by the relevant statutory authorities, or be subject to additional protections, or require additional process, is also a question that the ICE 2025 Memo does not address, except to acknowledge that ICE must act consistent with the law in requesting information from HHS.

## II. The Court Should Deny Plaintiffs' Motion In Full, Or, At A Minimum, Tailor Plaintiffs' Relief To Their Injury

Although Defendants understand and appreciate the Court's questions about the ICE 2025 Memo, there remains no basis for ruling in Plaintiffs' favor on their arbitrary and capricious claim related to the ICE 2025 Memo, partially or otherwise. Plaintiffs lack Article III standing to challenge a general statement of a right to engage in information sharing as permitted by law because the record does not demonstrate such sharing is imminent. *Clapper*, 568 U.S. at 409. There

is also no final agency action to challenge as to these forms of data sharing under 5 U.S.C. §704 and *Bennett*, 520 U.S. at 177–78. The ICE 2025 Memo does not "read[] like a ukase," *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); it explains what ICE is doing "at this time" and reserves the right to consider questions about uses not explicitly contemplated in the memo in the future. Moreover, the APA does not provide a cause of action to challenge all potential forms of data sharing between DHS and HHS that the agencies may, now or in the future, decide to undertake. The limitation of 5 U.S.C. § 706(1) to "agency action" serves to "preclude[] [this] kind of broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

Finally, in order to satisfy the arbitrary and capricious standard, Defendants were not required to "respond in advance to every hypothetical objection that might be raised" by ICE stating it is permitted, consistent with law, to request information from HHS. *Town of Southold v. Wheeler*, 48 F.4th 67, 83 (2d Cir. 2022) (rejecting arbitrary-and-capricious claim). The ICE 2025 Memo focuses on defending and explaining requests for information about aliens collected by Medicaid that falls squarely within statutory authorizations such as 8 U.S.C. § 1360(b). CMS has only given notice that it is sharing Medicaid information, and ICE's request for information, even as to non-Plaintiff states, are thus far consistent with that notice and the focus of the ICE 2025 Memo. Plaintiffs' requested injunction is also limited to Medicaid data. Pls.' Renewed Mot. For P.I., Notice of Motion at 1, ECF No. 134.

Plaintiffs have not moved for an injunction on contrary-to-law grounds under the APA or an *ultra vires* theory, so their arguments on this score during the hearing should be tabled for merits proceedings. In any event, they lack merit. As discussed, the Privacy Act only applies to citizens and lawful permanent residents, information that ICE's request letters do not seek from HHS. As to HIPAA, state attorneys general may enforce HIPAA in their role as *parens patriae* on behalf of

their citizens, 42 U.S.C. § 1320d-5, but this statute must be read against the longstanding rule that the states lack standing to proceed *parens patriae* against the federal government. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982). HIPAA's comprehensive remedial scheme does not contemplate states suing the federal government for HIPAA violations, and 5 U.S.C. § 704 does not permit Plaintiffs to countermand Congress's judgment on that score. Even if Plaintiffs could sue the federal government under HIPAA, HHS's implementing regulations for HIPAA permit disclosure of "protected health information" "for law enforcement purposes to a law enforcement official"; ICE's request complies with this regulation. 45 C.F.R. §§ 164.512(f)(1)(i)–(ii). Plaintiffs are also wrong about 42 C.F.R. § 401.134. HHS's disclosure regulations under the Social Security Act do not limit its ability to disclose information when authority to do so is "otherwise provided by Federal law," as is the case here. 42 U.S.C. § 1306(a)(1). Plaintiffs' position that HHS can only share information protected by § 1306(a)(1) by issuing regulations because of the use of the word "and" between the exceptions, even when that sharing is mandated by another federal statute or otherwise required by law, is unreasonable and must be rejected. *Cf. Pulsifer v. United States*, 601 U.S. 124, 133–41 (2024) (rejecting such an interpretation of the First Step Act).

Finally, the Court also has the authority to grant Plaintiffs' motion in part, but deny it in part as to the sort of information sharing contemplated in ICE's request letters (eg, biographical, location, and contact information regarding aliens collected by Medicaid, as reflected in ICE's request letters, *see* Ex. A). The APA provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. In practice, courts can, and

do, preliminarily enjoin (or stay pending a ruling on the merits) only some parts of a challenged agency action pursuant to § 705 while allowing the rest of the policy to go into effect. *See, e.g., City of Columbus v. Kennedy,* 796 F. Supp. 3d 123, 177–78 (D. Md. 2025) (staying certain provisions of a final rule "pursuant to 5 U.S.C. § 705 pending a final ruling on the merits of this case," while declining to stay others); *Catholic Legal Immigration Network, Inc. v. Exec. Off. for Immigration Review*, 513 F. Supp. 3d 154, 178–79 (D.D.C 2021) (granting a motion under § 705 or, in the alternative, for a preliminary injunction by staying the effective date of six of eight fees changed in a final rule pending final adjudication of the case). Indeed, § 705's standard is comparable to the standard for preliminary injunctions pursuant to Federal Rule of Civil Procedure 65. *See Dist. of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020).

      This flexibility reflects the Court's authority to fashion appropriate relief as a final judgment under § 706 of the APA. Although § 706 speaks of setting aside "agency action," that term is defined in the APA to "include[] the whole *or part* of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof[.]" 5 U.S.C. § 551(13) (emphasis added). As such, courts are "permitted to sever and set aside an offending portion" of a particular agency action "while keeping intact the rest of the order." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1144 (D.C. Cir. 2022); *see also Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. Env't Prot. Agency*, 72 F.4th 284, 296 (D.C. Cir. 2023) ("[W]e set aside only the invalid parts" of a regulation "unless the remaining ones cannot operate by themselves or unless the agency manifests an intent for the entire package to rise or fall together.").

      This flexibility follows from the nature of APA cases. The standard remedy in an APA case is a "remand to the agency for additional investigation." *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985). In a case where a court has concluded the underlying policy is valid at least

in part, striking down the entire action would force the agency to go through the exercise of re-issuing a narrower version of the policy so it can continue to carry out lawful aspects of its policy. That effort would waste resources and effectively constitute an improper temporary injunction of a legally valid policy the government wishes to pursue. As in any context, injunctive relief fashioned by the Court must be "limited to the inadequacy that produced [the plaintiff's] injury in fact," and enjoining all of an agency action when parts of that action are lawful violates that principle. *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

In this case, different forms of data sharing are obviously severable from each other, and ICE has stated an intent to make those forms of data sharing severable. ICE 2025 Memo 9. So there is no reason why, even at final judgment, the Court could not segregate forms of information sharing in fashioning relief. Therefore, the Court may employ principles of severability, both at the preliminary relief stage under § 705 and when adjudicating the merits under § 706, to fashion appropriate relief here. Nonetheless, as explained below, the best course here is for the Court to deny Plaintiffs' motion in full, for there is nothing legally infirm about Defendants' actions.

## CONCLUSION

For all the foregoing reasons, as well as those stated in Defendants' opposition to Plaintiffs' motion and at oral argument, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: December 16, 2025                    Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Civil Division, Federal Programs Branch

*/s/Michael J. Gerardi*
Michael J. Gerardi
Senior Trial Counsel (DC Bar No. 1017949)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: Michael.J.Gerardi@usdoj.gov

*Counsel for Defendants*