BRETT A. SHUMATE
Assistant Attorney General
Civil Division
ELIZABETH J. SHAPIRO
Deputy Director
MICHAEL J. GERARDI (D.C. Bar No. 1017949)
Senior Trial Counsel
CHRISTIAN DIBBLEE (D.C. Bar No. 90002557)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 353-5980
Christian.r.dibblee@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | ) Case No. 3:25-cv-05536-VC |
| | ) |
| Plaintiffs, | ) **DEFENDANTS' OPPOSITION TO** |
| | ) **PLAINTIFFS' MOTION TO ENFORCE THE** |
| v. | ) **THIRD PRELIMINARY INJUNCTION ORDER** |
| | ) |
| U.S. DEPARTMENT OF HEALTH AND | ) Hearing Date: April 3, 2026 |
| HUMAN SERVICES, *et al.*, | ) Time: 10:00 AM |
| | ) Judge:  Hon. Vince Chhabria |
| Defendants. | ) Place: Courtroom 4 |
| | ) |
| | ) |
| | ) |

**INTRODUCTION**

Defendants have investigated the concerns raised in Plaintiffs' motion and, upon a thorough review, have determined that two data transfers likely exceeded the scope of transfers allowed by the preliminary injunction. Defendants regret these errors and have taken remedial measures. Immigration and Customs Enforcement (ICE) has deleted all files of data it received as part of these transfers that are stored locally or in cloud-based storage, and as to one of the transfers ICE is in the process of ensuring that all emails with the data file have been deleted. These actions return the parties to the status quo as it existed immediately after the Court issued its preliminary injunction. In light of these actions, Plaintiffs' motion should be denied. Along with this brief, Defendants are filing three declarations from U.S. Department of Health and Human Services (HHS) and U.S. Department of Homeland Security (DHS) witnesses that explain those agencies' handling of the data transfers in question. The information provided in those declarations removes the need for the discovery that Plaintiffs propose. Plaintiffs' request for a court order defining the term "not lawfully residing in the United States" is premature. This Court should instead set a schedule for briefing on the meaning of that term.

**BACKGROUND**

I.    **THE PRELIMINARY INJUNCTION AND PARTIES' CORRESPONDENCE OVER ITS MEANING**

In July 2025, Centers for Medicare & Medicaid Services (CMS) and ICE entered into a cooperative agreement to provide ICE with direct access to the Transformed Medicaid Statistical Information System (T-MSIS), the system that houses the national Medicaid data set. *See* Second Decl. of Kimberly Brandt ¶¶ 4, 10 (Brandt Decl.). That agreement was to expire on September 9, 2025, *see* ECF No. 83-1 ¶ 32, but Plaintiffs sued to block any information sharing under it. This Court preliminarily enjoined HHS, CMS's parent agency, from sharing Medicaid data from Plaintiff States "for immigration enforcement purposes" and enjoined DHS, ICE's parent agency, from using that data for the same purposes. ECF No. 98 at 4. A few weeks later, the Court amended the preliminary injunction to include data from Kentucky and Wisconsin. *See* ECF No. 127. The July 2025 data sharing agreement between CMS and ICE expired in September 2025 before ICE employees could receive the T-MSIS training required by that agreement. *See* Brandt Decl. ¶ 10.

Case No. 3:25-cv-5536-VC                    1                    Opp'n to Pls' Mot. to Enforce Third Preliminary Injunction Order

On November 21, 2025, ICE and CMS released documents explaining a new data-sharing policy focused on the sharing of basic biographical, location, and contact information. *See* ECF Nos. 131-1, 131-2. Plaintiffs sought to preliminarily enjoin those policies, *see* ECF No. 134, to which this Court agreed in part, *see* ECF No. 148 (Order). The Court ruled that Plaintiffs had not demonstrated a likelihood of success "as to the core aspects of the new data-sharing policies," namely "Medicaid data revealing the biographical, contact, and location information of unlawfully present aliens." *Id.* at 2. The Court also concluded that, "[b]eyond th[at] basic biographical information," *id.* at 5, the new policy was "likely arbitrary and capricious," *id.* at 6. Accordingly, the Court ruled that while this action is pending, HHS was enjoined from sharing any information from the Plaintiff States with DHS unless that data "(1) is from the Medicaid program, (2) pertains only to aliens who are not lawfully residing in the United States, and (3) divulges only those aliens' citizenship and immigration status, address, phone number, date of birth, and Medicaid ID." *Id.* DHS was enjoined from "using any data obtained from HHS or CMS (including any data already acquired from HHS or CMS) for immigration enforcement purposes, unless the data satisfies the aforementioned requirements." *Id.* at 7.

Shortly after the Court entered its preliminary injunction, Plaintiffs asked Defendants multiple questions about how Defendants interpret the Court's order. *See* ECF No. 151-2 at 3–4. Defendants confirmed in response that CMS was sharing information "about individuals who are not lawfully present in the United States." *Id.* at 3. Plaintiffs asked Defendants to confirm the accuracy of a five-paragraph notice that Plaintiff States wished to send to their residents. *See id.* at 1–2. That proposed notice stated that CMS would not share and ICE would not use data about individuals with a wide-range of immigration statuses. *See id.* at 1. Plaintiffs also requested further information about the types of data shared by CMS, *see id.* at 2 (questions 1 and 3), and asked whether CMS would be willing to share with Plaintiffs all data shared with ICE pursuant to the Court's order, *see id.* (question 4). Defendants responded through counsel to reiterate that ICE was requesting data on individuals "who are not lawfully present in the United States," consistent with the terms of the preliminary injunction. *See* Decl. of Christian Dibblee, Ex. 1 at 15.[1] Defendants' counsel also stated that CMS was providing the basic biographical information authorized by

---

[1] All pincites to this exhibit are to the ECF pagination.

this Court for sharing.  *See id.*  Plaintiffs, however, disputed counsel's representations that some aliens with a legal immigration benefit might be removable—and therefore "not lawfully residing in the United States"—under certain circumstances.  *See id.* at 14.

Before he left for extended paternity leave, Defendants' counsel scheduled a call with Plaintiffs' counsel to discuss Plaintiffs' concerns, which was then rescheduled due to the inability of one State to attend.  *See id.* at 11–12.  Defendants' counsel thus responded by email.  He noted that CMS had shared certain data with ICE, and he relayed that, while Defendants were determining the best interpretation of the "not lawfully residing" language in the Court's most recent injunction, ICE had "quarantined and not used" any data received from HHS since that injunction.  *Id.* at 11.  Plaintiffs asked for "concrete assurances" that ICE would take the action it had already taken, *i.e.* not "ingesting" the data.  *Id.* at 10.

At this point, Plaintiffs began to threaten action before the Court.  Undersigned counsel for the Defendants repeatedly reported that he was conferring with his clients, *see id.* at 8–9, and that the data was sequestered in the meantime, but Plaintiffs indicated on March 11 that they would "seek relief from the Court" unless they received a response two days later, *id.* at 8.  On that date, Defendants' counsel reiterated that the data received since this Court's injunction remained segregated from any enforcement databases.  *See id.* at 7.  Nevertheless, Defendants' counsel noted that Defendants would not violate that injunction by filtering such data to identify individuals currently subject to a final order of removal, who indisputably fell within a common understanding of "not lawfully residing."  *See id.*  Plaintiffs responded with further concerns about even this understanding of the Court's injunction.  *See id.* at 5.  Undersigned counsel again stressed that he was actively conferring with Defendants about all data sharing since the Court's injunction.  *See id.* at 5.  For the second time in two weeks, Plaintiffs threatened to seek judicial relief if they did not receive an answer, this time by March 26.  *See id.* at 3–4.

Undersigned counsel responded on March 26 to tell Plaintiffs that ICE would delete all data received from CMS after issuance of the injunction.  *See id.* at 2.  Counsel reiterated that the data remained separate from ICE's enforcement databases, and he explained that in response to a data request from ICE identifying specific individuals, CMS had provided citizenship and immigration status, address, phone number, date of birth, and Medicaid ID for those individuals shown in T-MSIS to be non-citizens.  *See id.*

Notwithstanding Defendants' commitment to delete all data received since the Court's injunction—returning the parties to the status quo that existed as of the Court's injunction—Plaintiffs "determined that the information provided was insufficient to answer [their] questions or allay [their] serious concerns." *Id.* Accordingly, they "decided to proceed with filing the [ ] motion to enforce" that currently is before the Court. *Id.*

## II.    DEFENDANTS DISCOVER DATA EXCHANGES, AND DATA WAS SEGREGATED AND DELETED

Defendants have systematically reviewed internal communications and records to determine the details of any data sharing that occurred since the Court entered its preliminary injunction. Based on that review, Defendants understand that CMS shared data from the Plaintiff States on two occasions since this Cout's preliminary injunction. As discussed further below, ICE has deleted both sets of data that are stored locally or in cloud-based storage and is in the process of ensuring that data shared via email is deleted from user email accounts.

### A.  Transfer of Medicaid Data on January 7, 2026

The first data transfer at issue is best described as an outgrowth of a previous transfer. In mid-December 2025, ICE requested from CMS certain Medicaid data about aliens in non-Plaintiff States "with unsatisfactory immigration status (aliens not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law)." Decl. of Albert Briseno ¶ 6. ICE simultaneously shared a list of aliens with open ENFORCE Alien Removal Module (EARM) cases, meaning those aliens with initiated removal proceedings, aliens currently under investigation, and aliens with executable administratively final orders of removal. *See id.* ¶ 7. CMS understood that the spreadsheet contained only the names and information of individuals with final orders of removal entered against them. *See* Brandt Decl. ¶ 17.

After the Court entered its injunction, ICE issued another request, this time for Medicaid data from aliens residing in Plaintiff States. This request narrowed the information to be shared per alien to "citizenship and immigration status, phone number, addresses, date of birth, and Medicaid ID." Briseno Decl. ¶ 9. The second request repeated that it sought information about "individuals with unsatisfactory immigration status (aliens not admitted for permanent residence or otherwise permanently residing in the

United States under color of law)." *Id.* ICE did not provide an updated list of open cases, *see id.* ¶ 8, leaving CMS to rely on the spreadsheet previously shared in December, *see* Brandt Decl. ¶ 20. As with the previous transfer, CMS understood that the second request was for names and information of only individuals with final orders of removal entered against them, consistent with the Court's injunction. *See id.* ¶ 17. CMS therefore returned a spreadsheet that included the address, phone number, and Medicaid ID for each alien from Plaintiff States about whom ICE had requested data. *See id.* ¶ 20. Before transmitting the data, however, CMS noticed that the T-MSIS field for citizenship either indicated that some individuals were citizens or, for other individuals, was blank. *See id.* ¶ 25; *see also id.* ¶ 23 (explaining this field). "Out of an abundance of caution," CMS excluded those individuals from the spreadsheet it transmitted back to DHS—CMS provided no information about any alien that T-MSIS said was a citizen or for whom the citizenship status field was blank. *Id.* ¶ 25.

ICE understood that CMS data received on January 7, 2026, contained only data for aliens unlawfully residing in the United States. *See* Briseno Decl. ¶ 10. Once in receipt of the data, ICE used a data engineering program to start normalizing the data into a usable format for purposes of ICE's enforcement databases. *See id.* ¶ 11. That normalization process never finished because once ICE learned about the disagreement between the parties as to whether the data exchange came within the Court's injunction, ICE quarantined the data and agreed not to utilize it pending resolution of the disagreement. *See id.* ¶ 13. Nothing happened to that data until March 30, 2026, when ICE deleted the entire data file received from HHS. This deletion included the data file received by ICE as well as the data loaded into Databricks. *See id.* ¶¶ 14–15. To be clear, ICE never ingested the data into its enforcement databases before deletion. *See id.* ¶¶ 14, 16.

**B. Transfer of Data on January 19, 2026, Regarding Unadjusted Refugees in Minnesota**

Defendants knew during their conferrals with Plaintiffs that there had been a transfer around the time of January 7, and Defendants' counsel made representations to Plaintiffs' counsel regarding deletion of the data obtained from that request. However, in the course of preparing this opposition, Defendants learned of a second data transfer dated January 19, described below. Defendants now provide the details of that transfer, including Defendants' affirmative deletion of the data received.

About two days after the January 7 transfer, HHS received a request from U.S. Citizenship and Immigration Services (USCIS) for the data of unadjusted refugees in Minnesota. *See* Decl. of Evan Katz ¶ 7. The spreadsheet accompanying this request contained approximately 5,948 entries. *See* Brandt Decl. ¶ 27. All refugees conditionally admitted into the United States are required to "return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission" as a lawful permanent resident (LPR). 8 U.S.C. § 1159(a)(1). Relying on the January 6, 2026, letter that limited ICE's request to aliens "with unsatisfactory immigration status (aliens not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law)," USCIS sought data about "unadjusted" refugees. *See* Katz Decl. ¶ 7. CMS understood this request to indicate that DHS had determined that those individuals on the list were not lawfully residing in the United States. *See* Brandt Decl. ¶ 26. CMS therefore returned a spreadsheet to DHS with biographical information— again, collected via T-MSIS—added for the individuals on the list sent by ICE. *See id.* ¶ 32. After CMS shared that data with ICE, CMS identified that approximately 50 of the 5,948 entries showed a T-MSIS status of either a U.S. citizen or U.S. national. *See id.* ¶¶ 33. For its part, ICE identified 12 refugees on the original list who had not been present in the United States for a year and thus arguably should not have been included on that list.[2] *See* Katz Decl. ¶ 11. CMS returned data on seven of those 12. *See id.*

Although the data was forwarded to ICE's National Criminal Analysis and Targeting Center (NCATC) for analysis and further normalization, NCATC determined that the data could not be ingested into ICE's system for targeting purposes. *See id.* ¶¶ 9–10. The data was therefore placed on a local drive at NCATC to be revisited if needed in the future. *See id.* ¶ 10. ICE never ingested the data into its enforcement databases or used the data for law enforcement purposes. *See id.* ¶ 10, 13. Upon learning that this dataset likely included information about some aliens who are arguably lawfully residing in the United States, ICE deleted the data file. *See id.* ¶ 12. ICE is currently engaged in a process to ensure deletion of any email that contained that file. *See id.*

---

[2] T-MSIS is not a reliable tracker of citizenship status. *See* Brandt Decl. ¶ 25. CMS tracks that status for different purposes than ICE would and, given ICE's expertise in these matters, ICE's information on the status of an individual as a refugee is more accurate. Moreover, T-MSIS will not track whether a refugee has readjusted.

## ARGUMENT

### I. DHS HAS DELETED THE DATA SETS.

Defendants' analysis of available records and communications from early January 2026 has shown that, unintentionally, data was shared about aliens outside the scope of what this Court allowed. Based on available information, the January 7 transfer involved data of all aliens within Plaintiff States that are currently in removal proceedings or about whom investigations have been initiated. Some aliens in that population are "lawfully residing in the United States," and CMS should not have shared their data. Order at 6. The data transfer occurred due to a misunderstanding. As CMS has now attested, it understood that ICE had already curated the list of aliens to only those with final orders of removal entered against them. *See* Brandt Decl. ¶ 17. And ICE understood that the list of matches it received from CMS included information about only aliens unlawfully residing in the United States. *See* Briseno Decl. ¶ 10. Although those mistaken understandings created no compliance issues when sharing data as to non-Plaintiff States, those mistaken assumptions were inconsistent with the injunction when sharing data from Plaintiff States. CMS and DHS acknowledge their error for not curating the information request or the list of matches regarding Plaintiff States to conform to this Court's injunction. Defendants' errors were entirely unintentional. And to the extent Plaintiffs argue that DHS's normalization of the data set was a prohibited use, *see* Mot. 7, that "use" stemmed from the same series of mistaken assumptions and was not a willful "disregard" of "aspects of the Court's order," *id.* at 6.

As for the January 19 transfer, Defendants operated on a "good faith and reasonable interpretation of the court's order" when they transferred data about unadjusted refugees in Minnesota. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Refugees are conditionally admitted into the United States on a time limited basis. *See* 8 U.S.C. § 1159(a); 8 C.F.R. § 207.4. A refugee who has been physically present in the United States for at least one year, whose refugee status has not been terminated, and who has not adjusted status to that of a lawful permanent resident (LPR) "shall, at the end of such year period, return or be returned to the custody of the Department of Homeland Security (DHS) for inspection and examination for admission to the United States as an immigrant in accordance with" 8 U.S.C. §§ 1225, 1229a, and 1231. 8 U.S.C. § 1159(a)(1). At that point, a refugee who

has failed to timely adjust status is treated as an applicant for admission who should either be adjusted to LPR status or be placed into immigration proceedings, depending on the results of that inspection. *See generally id.* § 1225. Refugees who do not return to DHS custody after one year for inspection and examination are present in the United States in violation of 8 U.S.C. § 1159(a) because they have not abided by the mandate in that statute. Consequently, such refugees do not "lawfully reside" in the United States until an admissibility determination is made to adjust the alien's status to that of an LPR. Order at 6. At the very least, that conclusion is reasonable.

Defendants accordingly acted reasonably when they transferred data about refugees in Minnesota, the vast majority of whom appear to have not presented themselves for inspection and adjustment of status after one year. Unfortunately, CMS identified after the transfer that T-MSIS reflected approximately 50 individuals with a status of U.S. citizen or U.S. national, *see* Brandt Decl. ¶ 33, and ICE determined that 12 individuals on the list were refugees who had yet to be in the United States for a year, *see* Katz Decl. ¶ 11.[3] CMS provided data as to seven of those 12 individuals. *See id.* Defendants regret their error and will take all necessary steps in the future to ensure that no similar errors occur.

Defendants' voluntary remedial measures also weigh against Plaintiffs' motion. Defendants acknowledged early that Plaintiffs' stated concerns raised a significant "interpretive" question, and Defendants were in extended discussions with Plaintiffs over the best reading of the Court's order, and in particular about which aliens "are not lawfully residing in the United States." Dibblee Decl., Ex. 1 at 11. At that time, ICE ensured that any data received on January 7 was segregated from the agency's enforcement databases and would not proceed further absent direction from counsel. However, after Defendants realized that the January 7 data exchange might have contained information about aliens outside the scope of the injunction, Defendants deleted that data in an abundance of caution. *See* Briseno Decl. ¶ 15. Defendants have taken the same action as to the January 19 data, going so far as to begin the process to purge every copy of the data set from the emails of any ICE official who received it. *See* Katz

---

[3] To the extent Plaintiffs or the Court are concerned about CMS data reflecting more matches that are citizens, T-MSIS is not a reliable tracker of citizenship status. *See* Brandt Decl. ¶ 25. CMS tracks that status for different purposes than ICE would and, given ICE's expertise in these matters, ICE's information on the status of an individual as a refugee is more accurate. Moreover, T-MSIS will not track whether a refugee has readjusted.

Decl. ¶ 12.[4]  And as stated at the Case Management Conference, CMS will not share with ICE for immigration enforcement purposes any Medicaid data from Plaintiff States until Plaintiffs' motion is resolved.

These actions are not "insufficient under the circumstances."  Mot. 6.  Defendants engaged in serious discussions with Plaintiffs to resolve an interpretive issue.  Once Defendants could not guarantee that the data transferred on January 7 covered only those aliens with final orders of removal, even though CMS assumed that it did, they took corrective action.  That Defendants deleted the data *and* kept all data separate from enforcement databases for weeks while the parties conferred indicates the seriousness with which Defendants approach compliance issues.  And although the decision to delete might not "address use of CMS healthcare data [ICE] may have received *prior* to December 29," *id.*, CMS did not share Medicaid data for immigration enforcement purposes from Plaintiff States at any time between August 12, 2025, and January 6, 2026, *see* Brandt Decl. ¶ 15.[5]

## II.    PLAINTIFFS ARE NOT ENTITLED TO DISCOVERY

Defendants' submissions here remove the need for any discovery by Plaintiffs.  As an initial matter, discovery is presumptively inappropriate in cases brought under the Administrative Procedure Act, like this one is.  *See* 5 U.S.C. § 706.  But expedited discovery of the kind Plaintiffs seek is permitted "upon a showing of good cause."  *MACON Tech. Solutions Holdings, Inc. v. Infineon Techs. AG*, 2017 WL 1371247, at *2 (C.D. Cal. Mar. 17, 2017).  Good cause does not exist for discovery now.  Defendants have explained the instances of data sharing that occurred since this Court's injunction, including "what data CMS has shared with DHS/ICE."  Mot. 7; *see also* Brandt Decl. ¶¶ 20, 24–25, 28–31 (explaining type of information shared by CMS); Dibblee Decl., Ex. 1 at 1 (explaining this to Plaintiffs).  Defendants have also described "how such data has been used," Mot. 7, and have already told Plaintiffs that the data was not ingested into enforcement databases, *see* Dibblee Decl., Ex. 1 at 7, and the declarants from DHS have

---

[4] It is counsel's understanding that similar steps are being taken for recipients in any other component within DHS who might have received a copy of the email with the data attached.

[5] To the extent Plaintiffs chide Defendants for taking too long to provide a position on the Court's order, it bears noting that immigration law is complex, and whether an alien is lawfully residing in the United States depends on that alien's individual proceeding and status, contrary to what Plaintiffs suggest. *See* Mot. 6.  Defendants therefore needed time to fully discuss the issues.

further explained the limited, administrative actions taken with respect to the data received, *see* Briseno Decl. ¶¶ 11–12; Katz Decl. ¶¶ 8, 10.

Moreover, Plaintiffs are not entitled to monthly disclosures, including internal documents to "agency staff." Mot. 7. Plaintiffs provide no authority for such an invasive remedy that would inject them into the middle of Defendants' internal operations. Again, Defendants have provided the necessary assurances that "proper guardrails are in place." Mot. 8. Defendants have blocked the data from migration into immigration enforcement databases and have deleted the data, all to comply with the Court's injunction. There is no good cause for discovery in light of Defendants' submissions.

## III. THE COURT SHOULD CLARIFY THE SCOPE OF ITS INJUNCTION AFTER BRIEFING.

Defendants respectfully suggest that the Court should order briefing on the meaning of the phrase "not lawfully residing in the United States." Order at 6. Whether an alien is "lawfully residing in the United States" depends on their current immigration status and/or the current posture of their immigration proceedings. The phrase "not lawfully residing" therefore does not map well onto immigration law and is likely to lead to differing interpretations, as it already has. Those interpretations deserve more briefing and consideration than allowable in the emergency posture created by Plaintiffs' motion. Defendants therefore suggest that the Court not enter Plaintiffs' proposed order—which defines "lawfully residing" to include a bevy of immigration statuses and non-statuses. The proper path forward would be for the parties to attempt to reach a joint understanding regarding the interpretation of that phrase and, if agreement cannot be reached, to seek clarification from the Court. Defendants therefore request that the Court not make a determination at this time about the full reach of "not lawfully residing in the United States," but instead permit briefing of the issue as necessary.

## CONCLUSION

The Court should deny the motion to enforce and set a schedule for briefing on the meaning of "not lawfully residing in the United States."

Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPRIO
Deputy Director
Civil Division, Federal Programs Branch

*/s/ Christian Dibblee*
MICHAEL J. GERARDI (D.C. Bar No. 1017949)
Senior Trial Counsel
CHRISTIAN DIBBLEE (D.C. Bar No. 90002557)
Trial Attorney
Federal Programs Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
(202) 353-5980
christian.r.dibblee@usdoj.gov