ROB BONTA
Attorney General of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
WILLIAM BELLAMY
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU
ANNA RICH (State Bar No. 230195)
Deputy Attorneys General
 1515 Clay St., Floor 20
 Oakland, CA 94612-1499
 Telephone: (510) 879-0296
 E-mail: Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR,** in his official capacity as Governor of the Commonwealth of Kentucky**; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,**<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEP'T OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY JR.,** in his official capacity as Secretary of Health and Human Services**; U.S. DEP'T OF HOMELAND SECURITY; KRISTI NOEM,** in her official capacity as Secretary of Homeland Security,<br><br>Defendants. | 3:25-cv-05536-VC<br><br>**REPLY IN SUPPORT OF MOTION TO ENFORCE THE THIRD PRELIMINARY INJUNCTION ORDER**<br><br>Date: April 30, 2026<br>Time: 10:00 a.m.<br>Dept: 4<br>Judge: The Honorable Vince Chhabria<br>Trial Date: Not Set<br>Action Filed: July 1, 2025 |

PLAINTIFFS' REPLY ISO MOTION TO ENFORCE THE THIRD PRELIMINARY INJUNCTION ORDER
(3:25-cv-05536-VC)

**TABLE OF CONTENTS**

**Page**

I.    Defendants' Opposition Leaves Gaps and Inconsistencies Relating to Defendants' Violation of the PI Order ..................................................................... 1

    A.    Defendants Concede Violation of Order, but Accounting is Incomplete and Unverified............................................................................. 1

    B.    Other Indicia of Irregularity Support Plaintiffs' Motion to Enforce ........... 7

    C.    Deletion of Improperly Transferred Data is Not an Adequate Remedy ...................................................................................................... 8

II.    Defendants Refuse to Clarify Their Understanding of the Scope of Injunction ........................................................................................................ 9

III.    Defendants' Implementation of the Order Reveals Flawed Decision-Making Process .............................................................................................. 11

IV.    The Court Should Permit Discovery Regarding Defendants' Implementation of the Preliminary Injunction Order........................................... 12

CONCLUSION ....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Aleksander B. v. Trump*
No. 26-CV-170, 2026 WL 172435 (D. Minn. Jan. 22, 2026) ................................................. 8

*Am. Fed'n of Gov't Emps, AFL-CIO v. Trump*
155 F.4th 1082 (9th Cir. 2025) ............................................................................. 14

*Andrei C. v. Lyons*
No. 26-CV-0166, 2026 WL 123083 (D. Minn. Jan. 16, 2026) ................................................. 8

*Blue Mountains Biodiversity Project v. Jeffries*
99 F.4th 438 (9th Cir. 2024) ............................................................................. 13

*Calif. Dep't of Soc. Servs. v. Leavitt*
523 F.3d 1025 (9th Cir. 2008) ............................................................................. 13

*Ctr. For Taxpayer Rights v. Internal Revenue Serv.*
No. 25-CV-0457, 2025 WL 3251044 (D.D.C. Nov. 21, 2025) ................................................. 8

*Darvin M. v. Bondi*
No. 26-CV-0437, 2026 WL 184843 (D. Minn. Jan. 24, 2026) ................................................. 7

*Liban G. v. Noem*
No. 26-CV- 0301, 2026 WL 185334 (D. Minn. Jan. 23, 2026) ................................................. 7

*Nat'l Council of Nonprofits v. Office of Management and Budget*
763 F.Supp.3d 36 (D.D.C. 2025) ............................................................................. 7

*Ta Eh Doh Lah v. Bondi*
No. 26-CV-00171, 2026 WL 184529 (D. Minn. Jan. 23, 2026) ................................................. 8

*U.H.A. v. Bondi*
No. 26-CV-417, 2026 WL 222226 (D. Minn. Jan. 28, 2026) ................................................. 10

*U.H.A. v. Bondi*
No. 26-CV-417, 2026 WL 558824 (D. Minn. Feb. 27, 2026) ................................................. 10

**STATUTES**

Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ............................................................. 11, 13

Privacy Act, 5 U.S.C. § 552a ............................................................................. 11, 12

i

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

OTHER AUTHORITIES

Ctrs. for Medicare & Medicaid Servs., *Computer Matching Agreements*,
  https://www.cms.gov/regulations-and-
  guidance/guidance/compmatchagm/computer-matching-agreements ................................... 12

U.S. Dep't. of Health & Hum. Servs., *HHS Computer Matching Agreements
  (CMAs)*, https://www.hhs.gov/privacy/cmas/index.html; ....................................................... 12

U.S. Dep't of Homeland Sec., *Computer Matching Agreements and Notices*,
  https://www.dhs.gov/publication/computer-matching-agreements-and-notices..................... 12

PLAINTIFFS' MOTION TO ENFORCE THE THIRD PRELIMINARY INJUNCTION ORDER
(3:25-cv-05536-VC)

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENFORCE**

Defendants' Opposition, and the supporting declarations (ECF Nos. 155 through 155-5), confirm that the U.S. Department of Health and Human Services (HHS) and the Department of Homeland Security (DHS) violated this Court's third preliminary injunction order (ECF No. 148) (hereinafter, Order). Yet the Opposition omits essential evidence that could clarify the cause or verify the extent of the violations, and thus fails to assure Plaintiffs, the Court, or the public that the "errors" that led to these violations are not likely to recur. And Defendants still refuse to explain how they are determining who they deem to be "lawfully present" and therefore subject to the terms of the Court's preliminary injunction.

These actions undermine the protections offered by the Order and further degrade the States' ability to communicate with Medicaid stakeholders and to assure the public about the confidentiality and security of their personal Medicaid data. After reviewing Defendants' filing, Plaintiffs ask this Court should enforce its previous Order through additional, targeted discovery in order to verify Defendants' post-hoc litigation statements regarding the scope of violations of the Order and to allow the States to provide their residents with more accurate and complete descriptions of the federal datasharing practices that apply while this case is pending. This discovery should also include supplementation of the currently inadequate draft administrative record with HHS's prior memo explaining why Medicaid data should *not* be shared for immigration enforcement purposes. Plaintiffs also ask the Court to take measures to ensure that the Order is followed going forward, including ordering a formal datasharing agreement between DHS and HHS that makes clear such questions as who is considered "lawfully present" and what specific data elements being shared, and providing transparency to the States on future data transfers through monthly disclosures.

## I. DEFENDANTS' OPPOSITION LEAVES GAPS AND INCONSISTENCIES RELATING TO DEFENDANTS' VIOLATION OF THE PI ORDER

### A. Defendants Concede Violation of Order, but Accounting is Incomplete and Unverified

In their opposition, HHS and DHS staff confirm that Defendants violated the preliminary injunction on January 7 and January 19 by transferring data of residents of the Plaintiff States that

should have been protected by the Court's Order. *See, e.g.,* Opp'n at 1 (noting that Defendants have "determined that two data transfers likely exceeded the scope of transfers allowed"). This is a stark turnaround from earlier assurances, including Defendants' counsel's statement on January 22 that "I have conferred with the agencies and they have confirmed that they are in compliance with the injunction," because CMS "shares information […] in response to requests from ICE for information about individuals who are not lawfully present in the United States." Rich Decl., Ex. 1, ECF No. 151-2 at 3. Defendants characterize these incidents as inadvertent omissions, but their own explanations bely this characterization. The evidence clearly demonstrates that Defendants abdicated their responsibility to thoroughly consider and implement the Court's Order. Many more questions remain about the scope of these violations and how to ensure that Defendant do not violate the Order again. As set forth in Section IV below, additional relief—including discovery and restrictions on further data transfers—is necessary to ensure the Court's Order continues to have force.

Defendants identified two improper transfers. The first, from HHS to DHS on January 7, 2026, was part of what had been described as a "large and complex" data set (Rich Decl., Ex. 2, ECF No. 151-3 at 9) of millions of Medicaid records obtained originally from the Plaintiff States, Second Brandt Decl. ¶ 17, 20, an unknown number of which identify lawful residents. The second, transferred on January 19, 2026, involved a request for 6,000 records of Minnesotan refugees who had not yet adjusted their status to become lawful permanent residents (LPRs). Second Brandt Decl. ¶¶ 26-27 and 32. In both cases, U.S. citizens' information was among the data initially identified to be transferred, or actually transferred. *Id*. ¶¶ 25, 33.

Defendants' supporting papers show these improper transfers were inevitable outcomes from inadequate safeguards and training to ensure compliance. Plaintiffs have identified at least four categories of significant deficiencies:

***Lack of safeguards for adherence to the Order.*** Defendants, individually and collectively, did not take responsibility for administration of and compliance with the Order. In the declarations, each agency declarant passes off responsibility on the *other* agency, making inexplicable and unreasonable assumptions that a different agency would take responsibility for

2

narrowing or filtering a demand or supply of data in a manner that complies with the Court's Order; the outcome of these assumptions is that neither agency took responsibility, which led to violations. For example, Deputy CMS Administrator Kimberly Brandt states that a request HHS previously received from DHS/ICE containing 7.6 million entries was something that "*HHS/CMS understood* [...] to contain names and information of individuals with final orders of removal," and that the agency "*therefore, worked under the assumption*" that these individuals "were not lawfully residing in the United States." Second Brandt Decl. ¶ 17 (emphasis added). Ms. Brandt never explains *why* HHS made that assumption, or whether ICE actually represented that the individuals were subject to final orders of removal. The fact that CMS filtered out citizens from the dataset, *see* Second Brandt. Decl. ¶ 25, should have immediately alerted the agency to the fact that the DHS/ICE demand was, in fact, *not* so limited. But HHS seems to have made no inquiries or questions prior to complying with the DHS request. None of the declarations are supported by any contemporaneous evidence. At Plaintiffs' request, Defendants later disclosed a single interagency communication (the January 6, 2026 letter from ICE to CMS, *see* Supp. Rich Decl. Ex. 2), but this letter sheds no light on specifics of ICE's data demand.

Nor does Ms. Brandt explain why HHS "understood" DHS's second request for data on Minnesota refugees "to indicate that DHS had determined these individuals were not lawfully residing." Second Brandt Decl. ¶ 26. Ms. Brandt states that "[a]fter this data was shared, it was identified" that "approximately" fifty of these individuals were in fact citizens. *Id*. ¶ 33. The declarations do not explain how this identification happened, whether any of the other individuals turned out to have any other lawful status, or under what circumstances Defendants determined that these refugees were not protected by the Order. There is no further explanation of how HHS ensured responsibility for review and implementation of the Order, which makes clear that "HHS or CMS may not share" data that is "not severable from other information that DHS and ICE are not entitled to obtain," Order at 6.

Defendants have also breached another limit in the Order:  sharing healthcare data not permitted by the Order. The Order placed clear restrictions on types of data that could be shared (i.e., only "citizenship and immigration status, address, phone number, date of birth, and

3

Medicaid ID," Order at 6). HHS, however, states that it also shared data like the date of the Minnesota refugees' latest medical claim ("MDCD_LATEST_CLM_DT"), which was not one of the categories of data permitted to be shared. Second Brandt Decl. ¶¶ 28, 31-32.  To the extent that Defendants believe this is the type of "basic information [that] must be collected to effectuate the portions of the policies that have not been preliminarily enjoined," they failed to "seek a modification of [the Court's] ruling" as required. Order at 6.

DHS similarly failed to ensure that its data requests or collection complied with the Court's order. For example, ICE Section Chief Alberto Briseno stated that when ICE received the large Medicaid dataset from CMS, *"[i]t was ICE's understanding* that the HHS/CMS list contained data for aliens unlawfully residing in the United States." Briseno Decl. ¶ 10 (emphasis added). Mr. Briseno does not explain why ICE had that understanding; to the extent ICE was relying on CMS to identify "aliens unlawfully residing," such reliance is unreasonable and inappropriate.[1] Moreover, Mr. Briseno states that ICE had previously shared a list of noncitizens with "open cases" that included those merely "under investigation"--an undefined category that presumably includes individuals lawfully residing. Briseno Decl. ¶ 7.  Later, "ICE determined that the parameters of the open EARM cases could have been further limited." *Id*. ¶ 13. He does not explain exactly who should have narrowed the parameters, and how they could have been "further limited."  There is again no explanation of how DHS ensured responsibility for review and implementation of the Order (apart from being alerted by questions from Plaintiffs on February 20, 2026). *Id*.

***Failure to determine which noncitizens are covered by the Court's Order***. Defendants' declarations also reveal their lack of clarity about the scope of the Court's Order. The DHS and HHS declarations and ICE's January 6 letter all refer to "unsatisfactory immigration status" to mean "aliens not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." Briseno Decl. ¶ 6, 9; Katz Decl. ¶ 6; Second Brandt Decl. ¶¶ 8, n.2, 16, 19; Supp. Rich Decl. Ex. 2. But Defendants never make clear what they mean when

---

[1] Among other reasons, as Ms. Brandt acknowledges, HHS's T-MSIS database is not a "reliable source for determinations regarding whether an individual is lawfully residing in the United States at a particular point of time." Second Brandt Decl. ¶ 6.

4

they use those phrases, or how the terms were operationalized by agency staff. Except for U.S. citizens, at no point do any of the declarants clearly express *any* categories of individuals whose data are off limits under the Order. Although the agencies had previously confirmed compliance, Defendants' counsel now states that the term "does not map well onto immigration law and is likely to lead to differing interpretations, as it already has." Opp'n at 10.

Defendants' confusion is not a minor detail. As Plaintiffs explained in their December 22, 2025, Supplemental Brief (ECF No. 147, pp. 3-4), "unsatisfactory immigration status," as that term is used for Medicaid purposes, is *not* synonymous with "not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." *See also* ECF No. 74, Ex. 1 (Mar. 18, 2025 Letter from CMS) (explaining that "without a satisfactory immigration status" includes LPRs "subject to a five-year waiting period"). Nor do these categories match the more general term used in the Court's order, which protects to all those residing "lawfully."

As Plaintiffs have explained, "the data collected by Medicaid programs on immigration status would not permit CMS to respond to ICE's open-ended request with information only about individuals who are not citizens or permanent residents" because Medicaid tracks only "whether an individual's immigration status renders them eligible for full scope Medicaid." Pls. Supp. Br. at 1, 3. As Plaintiffs previously warned, a demand from DHS to HHS for "individuals with unsatisfactory immigration status (aliens not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law)" therefore "make[s] little sense" because "unsatisfactory immigration status" for Medicaid purposes includes people who are lawfully present in the United States. *See id*. at 4. Despite the difficulties underscoring these definitions, HHS and DHS are obligated to ensure that they understand the Court's Order and only engage in any datasharing when they are confident they can abide by its terms. Their failure to do so was unreasonable. Clarity is also essential for Plaintiff States to be able to explain the impact of the Court's order to their residents and to provide accurate and complete information as to what data about what individuals could be shared.

*Defendants' presentation does not address other likely violations or allow verification of compliance with the Order's other limits.* Plaintiffs appreciate that Defendants are willing to delete or segregate the States' Medicaid data disclosed during the January 7 and January 19 transfers, but the declarations are not sufficient for Plaintiffs or the Court to verify the scope of the violations of the Order. For example, Defendants' evidence does not address DHS's *use* of CMS healthcare data it may have received *prior* to December 29, either before or while the agencies were subject to the court's earlier preliminary injunction orders (ECF Nos. 98, 127). The Declarations submitted in support of the Opposition instead focus only on data transferred *after* the December 29 Order. Nothing in the Briseno or Katz Declarations verifies whether DHS's existing enforcement databases still contain data taken from the States' Medicaid databases, or how DHS would monitor use of those databases for compliance with the Order if they did. This is especially concerning in light of DHS's October 27, 2025, Memo which states that T-MSIS data has *already* been uploaded into ICE systems. *See* ECF No. 131-2 p. 3 ("ICE requested and received CMS data from the Transformed Medicaid Statistical Information System (T-MSIS)" that was "then uploaded into ICE systems to be used to support criminal and civil enforcement actions"). The declarations do not acknowledge this fact.

Furthermore, none of the declarations verify that non-Medicaid healthcare data is kept off-limits in accord with the Order. Yet recent reporting in the New York Times indicates that more data may being shared. Federal administration officials reportedly told DHS, "start asking for data from […] Medicare—places that historically have been firewalled from immigration. Like, Hey, open the doors to Medicare so we can figure out the last three hospitals this person went to." Supp. Rich Decl. Ex. 3, p. 13.

*No verification of thoroughness of review of scope of violations.* Although Defendants' brief asserts that these violations were identified after a review that was "thorough," Opp'n at 1, and conducted "systematically," *id.* at 4, no further details in the brief or the supporting declarations explain how that review was conducted, or what "thorough" or "systematic" review might mean to Defendants. The declarations do not explain how other components of HHS or DHS are being made aware of or implementing the Order. They do not explain how counsel was

6

led to confirm (erroneously) to Plaintiffs on January 22, 2026, that the Defendants were in compliance with the Order. Rich Decl. ¶ 5. Nor do any of the declarations explain what concrete steps will be taken to ensure that similar "errors" do not occur again in the future.

In light of the evidence that Defendants have violated the Court's Order, the significant holes and inconsistencies listed above, and in the absence of substantial evidence verifying most of the post-hoc litigation statements, Plaintiffs cannot agree with Defendants' suggestion that their violations of the Order arose only from "good faith and reasonable" misunderstanding, or technological difficulties. A "plea for a presumption of good faith rings hollow when [Defendants'] own actions contradict their representations." *Nat'l Council of Nonprofits v. Office of Management and Budget*, 763 F.Supp.3d 36, 50 (D.D.C. 2025).

### B.   Other Indicia of Irregularity Support Plaintiffs' Motion to Enforce

Discovery to test the veracity of Defendants' post-hoc litigation documents is particularly appropriate where, as here, there are other indicia of irregularity. These indications start with Defendants' admitted violations of the Order, but they do not end there.

First, independent reporting suggests that "addresses from the Department of Health and Human Services" are being disclosed to a DHS contractor in order to generate leads for locations where ICE might find "lots of people it might detain," including in Plaintiff States Oregon and Minnesota. *See* Supp. Rich Decl. Ex. 4, p. 2. ICE acknowledges that one purpose of the transfer of Minnesota refugee data was to "develop new leads for immigration enforcement," Katz Decl. ¶ 9. That data transfer took place during "Operation PARRIS (Post-Admission Refugee Reverification and Integrity Strengthening)," "a sweeping initiative reexamining thousands of refugee cases through new background checks and intensive verification of refugee claims," *see* Supp. Rich. Decl. Ex. 5, launched in the midst of "Operation Metro Surge," during which DHS deployed over 3,000 federal immigration enforcement agents to the state of Minnesota. Courts have repeatedly held that DHS's policy and practice of detaining unadjusted refugees under the guise of Operation PARRIS is unlawful. *See, e.g.*, *Darvin M. v. Bondi*, No. 26-CV-0437, 2026 WL 184843, at *2-6 (D. Minn. Jan. 24, 2026) ("Admission as a refugee is a distinct lawful immigration status."); *Liban G. v. Noem*, No. 26-CV- 0301, 2026 WL 185334, at *3-6 (D. Minn.

7

Jan. 23, 2026) (same); *Aleksander B. v. Trump*, No. 26-CV-170, 2026 WL 172435, at *3-6 (D. Minn. Jan. 22, 2026) (same); *Andrei C. v. Lyons*, No. 26-CV-0166, 2026 WL 123083, at *2-3 (D. Minn. Jan. 16, 2026) (same); *see also Ta Eh Doh Lah v. Bondi*, No. 26-CV-00171, 2026 WL 184529, at *2 (D. Minn. Jan. 23, 2026).

Second, other court decisions have found that the federal government has overstated its law enforcement purposes in its attempts to leverage vast troves of government data for immigration enforcement purposes. *See, e.g., Ctr. For Taxpayer Rights v. Internal Revenue Serv.*, No. 25-CV-0457, 2025 WL 3251044, at *37 (D.D.C. Nov. 21, 2025) (finding that ICE representation that it was conducting targeted criminal investigations was "pretext" when it demanded 7.6 million individual tax records), *appeal filed*, No. 26-5006 (D.C. Cir. Jan. 13, 2026). There is no reason to believe the federal government has acted differently here.

Third, members of the House of Representatives have raised credible and serious concerns regarding the accuracy of CMS declarant's sworn statements relating to Plaintiff Minnesota's Medicaid funding. *See* Supp. Rich Decl. Ex. 6 (noting Ms. Brandt's conflicting and confusing testimony). Ms. Brandt is the same CMS declarant upon which Defendants rely in this case.

Plaintiffs need more information about Defendants' actions in order to test the credibility of Defendants' many post-hoc litigation assertions.

### C.    Deletion of Improperly Transferred Data is Not an Adequate Remedy

Defendants are wrong that deletion of the data identified as improperly transferred on January 7 and 19 is a sufficient remedy to restore the status quo. Violations of the Court's orders, regardless of the level of intent, damage public trust in governmental healthcare institutions, a key interest that Plaintiffs are attempting to protect in this lawsuit. *See* ECF No. 140, Pls. 3rd Reply Br. at 10. Plaintiffs can no longer trust in the assurances of Defendants' counsel that the Defendant agencies are taking necessary steps to comply with the Court's Order. As set forth in Section I(A) above, many gaps and ambiguities remain. This is especially true where Defendants continue to refuse to disclose internal or external guidance regarding their compliance with the Court's Order, and apparently have not executed a formal datasharing agreement.

Both violations of the Order and the lack of verified information impact Plaintiffs' ability to communicate to Medicaid stakeholders that the federal government's actions will match its words. As explained in the States' initial motion, the States have been unable to respond clearly to legitimate stakeholder questions regarding federal agencies' use of state Medicaid data, which has a direct, harmful impact on the States' programs. Defendants' change in policy has caused fear and confusion, even among individuals who are green card holders or otherwise lawfully present in the United States. The news that Defendants violated the Order makes matters worse, as Plaintiffs cannot assure the public that the Court's orders have been or will be followed.

## II.    DEFENDANTS REFUSE TO CLARIFY THEIR UNDERSTANDING OF THE SCOPE OF INJUNCTION

The harm of public fear and confusion is exacerbated by Defendants' refusal to explain how they are determining which individuals are "not lawfully residing in the United States." Order at 6. As Defendants previously explained to the Court, even individuals who are not green card holders or applicants may "in a legally valid way" be "residing in the United States permanently […] 'under color of law.'" Tr. 30:9-11 (Dec. 9, 2025). Yet despite months of discussion, Defendants refuse to confirm clearly what categories of noncitizens' data are "off limits" (ECF No. 148 at 3 n.2), raising additional significant concerns regarding continued lack of compliance with the Court's Order.

At the same time that they claim that violations of the Order have been cured and the motion to enforce should be denied, Defendants also claim that Plaintiffs' request for clarification of the term "not lawfully residing in the United States" is "premature," Opp'n at 1, that the parties should "attempt to reach a joint understanding regarding the interpretation of that phrase," and then ask the Court to later order "briefing of the issue as necessary." *Id*. at 10. Defendants do not explain what briefing is needed, or acknowledge that Plaintiffs have already spent months attempting to arrive at such an understanding with Defendants—to no avail. *See* ECF No. 151-1, Rich Decl. ¶¶ 4, 6, 8, 16, 19. And it strains credulity that Defendants, who previously stated they were in compliance with the Order only to later admit they repeatedly violated the Order, can proceed in the interim without an operational understanding of this key provision.

Compliance with the Court's order cannot reside solely with the Defendants' own shifting determination of who is "lawfully residing" in the Plaintiff States—as illustrated by the circumstance of the 6,000 Minnesota "unadjusted" refugees whose data was transferred on January 19, 2026. Katz Decl. ¶ 4, 7. On February 18, 2026, DHS revoked longstanding policies and operational guidance that protected those refugees from detention and removal. That revocation has since been preliminary enjoined by multiple courts. *See* Electronic Order, *Jean A. v. Noem,* No. 3:26-cv-30031 (D. Mass. Mar. 23, 2026), Dkt. No. 51; *U.H.A. v. Bondi*, No. 26-CV-417, 2026 WL 558824, at *1 (D. Minn. Feb. 27, 2026) (granting preliminary injunction against "new and erroneous statutory interpretation" of federal law used to "terrorize refugees who immigrated to this country under the promise that they would be welcomed and allowed to live in peace"); *U.H.A. v. Bondi*, No. 26-CV-417, 2026 WL 222226, at *13 (D. Minn. Jan. 28, 2026) (granting temporary restraining order). Yet, Defendants papers' confirmed that the refugees' data remained in the hands of ICE officials until early April 2026, despite the fact that, as of January 28, 2026, a Minnesota district court had preliminarily enjoined Defendant from arresting or detaining refugees in Minnesota on the basis that they had not yet been adjusted to lawful permanent resident status. Doctors in Plaintiff States cannot assure scared and fearful patients that receiving healthcare does not cause them to become a target for immigration enforcement if Defendants can retroactively exempt new categories of noncitizens from the Order's protections. Defendants should not be allowed to reinterpret federal law in "new and erroneous" ways in order to retroactively bless data sharing for unlawful immigration enforcement efforts.

Limiting the definition of individuals "not lawfully residing in the United States" for purposes of this Order to individuals who are subject to a final order of removal that has not been stayed could be a more administrable and clear limit on data sharing. Defendants have suggested that this is one understanding of how they are implementing the Order. *See* Rich Decl. ¶ 15 (noting Defendants' representation that ICE can identify "aliens subject to a final order of removal" and stating that ICE "will treat as a final order only those removal orders that are administratively final and have not been stayed"). It would also provide Plaintiff States and their residents with clearer notice of whose information may be shared.

10

If Defendants wish to change the scope of the Court's Order, they should file an appropriate motion. Unless and until that happens, the Court should enjoin Defendants from any further transfers of the States' Medicaid data until it is confirmed that they can do so without violating this Court's authority.

### III. DEFENDANTS' IMPLEMENTATION OF THE ORDER REVEALS FLAWED DECISION-MAKING PROCESS

The way that Defendants have implemented (and violated) the Order also raises serious issues relating to the merits of Plaintiff's claims that the agencies are violating the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, and other federal laws.

Federal law (including the Privacy Act, 5 U.S.C. § 552a, and other program-specific statutes and regulations) generally mandates that federal agencies enter into detailed agreements before sharing data or matching data sets held by different agencies. Defendants have previously recognized this obligation, as reflected in the July 2025 "information exchange agreement" between CMS and DHS that Defendants entered into the record. *See* ECF No. 83-3. Although the July 2025 agreement was incomplete and riddled with loopholes (*see* ECF No. 89 at 1-4), it at least provided a framework for ensuring that the agencies acted under lawful authority; defined who could have access to this data and for what purposes; and defined the data elements that the agencies could request and share. CMS's later notice, issued to comply with this Court's Second Preliminary Injunction, claimed that it would "transfer any information to ICE in a secure manner and establish appropriate safeguards for the information provided, including through written agreements or other arrangements with ICE." ECF No. 131-1 at 7.

Now, however, Defendants admit that CMS and ICE rushed into this new data sharing without any clear structure in place. They sent the most recent data transfers "via email," apparently with no verified security procedures. Katz Decl. ¶ 8. According to their own post-hoc declarations, CMS relied on stale, undefined, and error-filled ICE spreadsheets, and did not ask questions internally or of ICE to ensure that the agencies agreed on basic definitions. Defendants' inability to answer simple questions about the scope of their data sharing—and the fact that CMS has purportedly once again shared data files that ICE cannot use—are further evidence of the lack

11

of thought, planning or documentation that went into this latest data sharing activity. As one former ICE technology official explained,

> [T]hat data was walled off for a reason. For example, if you think your Medicare data might be shared, you might not go to the doctor when you have a highly communicable disease, and that harms the whole community. I think data privacy is going to be one of the bigger casualties of not keeping the adults in the room.

Supp. Rich Decl. Ex. 3, p. 13. These issues will be raised once Plaintiffs have a complete administrative record and can proceed to adjudication of the merits of this case.

In the meantime, given Defendants' failure to implement the Court's Order lawfully on their own initiative, additional transparency and oversight are warranted. The Court should require Defendants to prepare and present a detailed data sharing agreement (which complies with the Privacy Act and all other applicable laws) for the Court's review before CMS and DHS engage in further data sharing. The Defendant agencies have a long history of drafting, executing and complying with these legal requirements.[2] It is reasonable and not burdensome for the Court to ask Defendants to comply with these obligations here, and it would ensure the planning and transparency that Defendants have so far failed to provide.

## IV.  THE COURT SHOULD PERMIT DISCOVERY REGARDING DEFENDANTS' IMPLEMENTATION OF THE PRELIMINARY INJUNCTION ORDER

In light of Defendants' admitted violations of the Court's Order and significant holes in Defendants' witness testimony set forth in Section I above, Defendants' failure to present a coherent understanding of key terms in the PI order (Section II), and the relevance of Defendants' violations to their flawed decisionmaking process to the merits of this case (Section III), Plaintiffs ask the Court for leave to engage in targeted discovery so that they may obtain more information from Defendants and verify that the Court's Order is being followed in a manner that is transparent to Plaintiffs, the Court, healthcare stakeholders, and members of the public.

---

[2] *See, e.g.,* U.S. Dep't. of Health & Hum. Servs., *HHS Computer Matching Agreements (CMAs)*, https://www.hhs.gov/privacy/cmas/index.html; Ctrs. for Medicare & Medicaid Servs., *Computer Matching Agreements*, https://www.cms.gov/regulations-and-guidance/guidance/compmatchagm/computer-matching-agreements; U.S. Dep't of Homeland Sec., *Computer Matching Agreements and Notices*, https://www.dhs.gov/publication/computer-matching-agreements-and-notices.

Defendants claim that there is "no authority" for additional discovery demands, but do not deny, as Plaintiffs set forth in their motion to enforce, that "[t]here is no question that courts have inherent power to enforce compliance with their lawful orders . . . ." *Calif. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). Additional discovery, including prospective updates on public agency activities, is well within the Court's power.

Moreover, courts in some circumstances have authority to authorize extra-record discovery or supplementation of the administrative record for claims under the Administrative Procedure Act that would otherwise be decided on a limited administrative record. Documents ordinarily not included in an administrative record may be required when there is "impropriety or bad faith by the agency." *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 444 (9th Cir. 2024). Violations of a preliminary injunction are just such an indication of impropriety.

Therefore, Plaintiffs request an order granting their motion to enforce that allows the following discovery:

1. All communications and other documentary evidence relied upon by Defendants' declarants or references in their declarations.[3] This would help Plaintiffs understand and verify the many post-hoc litigation statements made in the declarations supporting Defendants' Opposition.

2. After review of these documents, Plaintiffs seek to serve interrogatories and/or take depositions of key staff.

3. Communications, directives, instructions, training, and guidance documents issued to agency staff, contractors, State Medicaid agencies, or other entities, regarding implementation of the current CMS and ICE policies (ECF Nos. 131-1 and 131-2) and compliance with the Order.

---

[3] Plaintiffs had some initial concerns, based on the Opposition, that Defendants were deleting evidence directly relevant to the issue of compliance with the Order, but Defendants have assured Plaintiffs that those records will be preserved. *See* Supp. Rich Decl. Ex. 2.

13

4. Monthly disclosures to Plaintiffs of any prospective communications, directives, instructions, and guidance documents issued to agency staff, contractors, State Medicaid agencies, or other entities by Defendants relating to implementation of any enforcement order. Such disclosures should further identify any State Medicaid agencies whose data was or will be shared by CMS pursuant to the Order. This will help Plaintiffs and the Court determine whether proper guardrails are in place to ensure their residents' data are protected and enable State Medicaid agencies to accurately communicate with stakeholders about the status of Medicaid data sharing between Defendants.

More generally, it seems clear from the Opposition that one factor contributing to Defendants' violations of the Order is CMS's novel policy of acceding to DHS requests for otherwise-protected healthcare data for immigration enforcement purposes without exercising its own independent judgment about how to respond to the requests, including additional questions or verification regarding the authority, purpose, or necessity of the datasharing. As Plaintiffs explained in the Complaint and their first motion for a preliminary injunction, this is a dramatic departure from HHS/CMS's past practices promulgating and enforcing its own privacy and confidentiality standards. The Opposition shows CMS failed to exercise independent judgment in responding to requests from DHS.

In order to understand this policy change, and in order to allow the Court to better evaluate the reasonableness of Defendants' actions in this case, Plaintiffs ask the Court to order production of the final, internal CMS memo issued in 2025 (as reported by AP News on June 13, 2025, *see* ECF No. 43-6, Boergers Decl., Ex. A, p. 2) concluding that State Medicaid data should *not* be shared with DHS, prior to HHS officials' decision to reverse longstanding policy and share States' Medicaid data with DHS. To the extent that Defendants view this record as pre-decisional or deliberative, Plaintiffs request that the Court waive this qualified privilege in light of the indicia of irregularity in the federal government's decision-making process. *See Am. Fed'n of Gov't Emps, AFL-CIO v. Trump*, 155 F.4th 1082, 1092-93 (9th Cir. 2025) (describing circumstances in which district courts may review assertions of deliberative process privilege, and

14

affirming district court's discovery order waiving privilege), *reh'g en banc denied*, 163 F.4th 1226 (9th Cir. 2026).

These measures will ensure that Plaintiff States and their residents may obtain the benefits of the preliminary relief that the Court has already ordered, to the extent possible. Without an order of enforcement, the States cannot rely on Defendants' representations about continued compliance with the Order.

## CONCLUSION

For these reasons, the Court should grant the motion to enforce.

Dated:  April 16, 2026

LETITIA JAMES
Attorney General for the State of New York
MARK LADOV*
Special Counsel
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
ZOE LEVINE*
Special Counsel for Immigrant Justice
NATASHA KORGAONKAR*
Special Counsel
28 Liberty St. New York, NY 10005
mark.ladov@ag.ny.gov
*Attorneys for the State of New York*
*Admitted pro hac vice

Respectfully submitted,

ROB BONTA
Attorney General for the State of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
WILLIAM BELLAMY
KATHERINE MILTON
KEVIN G. REYES
ANNA RICH
STEPHANIE T. YU

/s/_Anna Rich_____
ANNA RICH
Deputy Attorneys General
*Attorneys for the State of California*

*Additional Counsel*
KRISTIN K. MAYES
Attorney General for the State of Arizona
ALEXA G. SALAS*
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Alexa.Salas@azag.gov
ACL@azag.gov
*Attorneys for the State of Arizona*
*Admitted pro hac vice

PHILIP J. WEISER
Attorney General for the State of Colorado
RYAN LORCH*
Senior Assistant Attorney General
SAM WOLTER*
Assistant Attorney General
1300 Broadway, #10
Denver, CO 80203
Ryan.lorch@coag.gov
samuel.wolter@coag.gov
*Attorneys for the State of Colorado*
*Admitted pro hac vice

15

WILLIAM TONG
Attorney General of Connecticut
JANELLE MEDEIROS*
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
Janelle.Medeiros@ct.gov
*Attorneys for the State of Connecticut*
*Admitted pro hac vice

KATHLEEN JENNINGS
Attorney General for the State of Delaware
IAN R. LISTON
Director of Impact Litigation
JENNIFER KATE AARONSON
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*
*Admitted pro hac vice

ANNE E. LOPEZ
Attorney General for the State of Hawaiʻi
KALIKOʻONĀLANI D. FERNANDES*
Solicitor General
DAVID D. DAY*
Special Assistant to the Attorney General
425 Queen Street
Honolulu, HI 96813
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
*Attorneys for the State of Hawaiʻi*
*Admitted pro hac vice

KWAME RAOUL
Attorney General for the State of Illinois
HARPREET KHERA*
Bureau Chief, Special Litigation
SHERIEF GABER*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
sherief.gaber@ilag.gov
harpreet.khera@ilag.gov
*Attorneys for the State of Illinois*
*Admitted pro hac vice

S. TRAVIS MAYO
General Counsel
Office of the Governor of Kentucky
S. Travis Mayo*
General Counsel
Taylor Payne*
Chief Deputy General Counsel
Laura C. Tipton*
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Governor of Kentucky,
Andy Beshear*
* Admitted pro hac vice

AARON M. FREY
Attorney General for the State of Maine
BRENDAN KRECKEL*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
brendan.d.kreckel@maine.gov
*Attorneys for the State of Maine*
*Admitted pro hac vice

16

ANTHONY G. BROWN
Attorney General for the State of Maryland
MICHAEL DREZNER*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Mdrezner@oag.state.md.us
*Attorneys for the State of Maryland*
*Admitted pro hac vice

ANDREA JOY CAMPBELL
 Attorney General for the State of
Massachusetts
KATHERINE DIRKS
Chief State Trial Counsel
CHLOE CABLE
ETHAN W. MARKS*
Assistant Attorneys General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
Katherine.Dirks@mass.gov
Chloe.Cable@mass.gov
Ethan.W.Marks@mass.gov
*Attorneys for the Commonwealth of
Massachusetts*
*Admitted pro hac vice

DANA NESSEL
Attorney General for the State of Michigan
NEIL GIOVANATTI*
BRYAN BEACH*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
GiovanattiN@michigan.gov
BeachB@michigan.gov
*Attorneys for the State of Michigan*
*Admitted pro hac vice

KEITH ELLISON
Attorney General for the State of Minnesota
KATHERINE J. BIES
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
Katherine.Bies@ag.state.mn.us
*Attorneys for the State of Minnesota*

AARON D. FORD
Attorney General for the State of Nevada
HEIDI PARRY STERN* (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov
 *Attorneys for the State of Nevada*
*Admitted pro hac vice

JENNIFER DAVENPORT
Attorney General for the State of New Jersey
ESTEFANIA PUGLIESE-SAVILLE*
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Estefania.Pugliese-Saville@law.njoag.gov
*Attorneys for the State of New Jersey*
*Admitted pro hac vice

RAÚL TORREZ
Attorney General of New Mexico
AMY SENIER*
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
asenier@nmdoj.gov
*Attorneys for the State of New Mexico*
*Admitted pro hac vice

DAN RAYFIELD
Attorney General State of Oregon
BRIAN S. MARSHALL
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Brian.S.Marshall@doj.oregon.gov
*Attorneys for the State of Oregon*

PETER F. NERONHA
Attorney General for the State of Rhode
Island
LEE B. STALEY*
Chief, Health Care Unit
150 South Main Street
Providence, RI 02903
lstaley@riag.ri.gov
*Attorneys for the State of Rhode Island*
*Admitted pro hac vice

CHARITY R. CLARK
Attorney General for the State of Vermont
RYAN P. KANE*
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
Ryan.kane@vermont.gov
 *Attorneys for the State of Vermont*
*Admitted pro hac vice

NICHOLAS W. BROWN
Attorney General of Washington
ZANE MULLER, WSBA 63777*
WILLIAM MCGINTY, WSBA #41868*
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
*Attorneys for the State of Washington*
*Admitted pro hac vice

JOSHUA L. KAUL
Attorney General for the State of Wisconsin
KARLA Z. KECKHAVER*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

OK2025900292

18