ROB BONTA
Attorney General of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
ANNA RICH
Supervising Deputy Attorneys General
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU
WILLIAM BELLAMY
Deputy Attorneys General
State Bar No. 347029
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6086
Fax: (916) 324-8835
E-mail: William.Bellamy@doj.ca.gov
*Attorneys for Plaintiff State of California*
*Additional Counsel Listed on Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR,** in his official capacity as Governor of the Commonwealth of Kentucky**; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,**

Plaintiffs,

v.

**U.S. DEP'T OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY JR.,** in his official capacity as Secretary of Health and Human Services**; U.S. DEP'T OF HOMELAND SECURITY; KRISTI NOEM,** in her official capacity as Secretary of Homeland Security

Defendants.

3:25-cv-05536-VC

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION TO CLARIFY PRELIMINARY INJUNCTION AND MOTION FOR A CASE SCHEDULE**

Date: December 10, 2026
Time: 10:00 a.m.
Dept: 4
Judge: The Honorable Vince Chhabria
Trial Date: Not Set
Action Filed: July 1, 2025

## TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................ 1

BACKGROUND ........................................................................ 3

I. The Court's Preliminary Injunctions........................................ 3

II. Defendants' Failures to Comply with the Preliminary Injunction.......... 5

III. DHS's Broader Shift in Policy around Data Sharing and Privacy .......... 6

LEGAL STANDARD ........................................................................ 8

ARGUMENT ........................................................................ 8

I. The Court Should Adopt Plaintiffs' Proposal to Limit Data Sharing to Individuals Unlawfully Present in the Country ........................ 9

A. Individuals with Temporary Protected Status ........................ 12

B. Deferred Action Recipients ........................ 12

C. Applicants for Asylum ........................ 14

D. Sharing Permitted Categories ........................ 15

II. The Court Should Reject Defendants' Proposal for Clarifying the Injunction ........................ 15

A. "Aliens Subject To Final Order of Removal, Including Where Removal Is Withheld Or Deferred" ........................ 15

B. "Unlawfully Present Aliens Released from Detention Pending Removal Unless They Qualify in the Interim for a Sharing Prohibited Category" ........................ 17

C. "Aliens who entered the United States pursuant to a valid visa and are deportable under 8 U.S.C. § 1227" ........................ 17

D. "Applicants and Derivative Applicants for Immigration Benefits Who Do Not Qualify for a Sharing Prohibited Category" ........................ 19

E. "Refugees Who Have Not Appeared for Adjustment" ........................ 20

III. The Court Need Not Revisit its Prohibition on the Use of Federal Healthcare Data other than Medicaid Data ........................ 23

IV. The Court Should Clarify the Preliminary Injunction to Cover Federal Contractors ........................ 24

V. The Court Should Require Defendants to Implement Safeguards ........................ 25

VI. The Court Should Maintain a Broad and Clear Preliminary Injunction While the Parties Proceed to Summary Judgment or Adjudication ........................ 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*A. et al. v. Noem et al.*
No. 3:26-cv-30031 (D. Mass. Feb. 27, 2026), ECF No. 1-5 .......... 21, 22

*Alto v. Black*
738 F.3d 1111 (9th Cir. 2013) .......... 8

*Coal. v. Brewer*
757 F.3d 1053 (9th Cir. 2017) (Christen, J., concurring) .......... 10, 11, 13

*Bautista-Perez v. Holder*
No. C 07-4192 TEH, 2009 WL 2031759 (N.D. Cal. July 9, 2009) .......... 12

*Chaudhry v. Holder*
705 F.3d 289 (7th Cir. 2013) .......... 10, 11

*Choupanzadeh v. Mullin*
No. 26-cv-0277-SM-TSM, 2026 WL 1724398 (D.N.H. June 15, 2026) .......... 20

*Credit Suisse First Bos. Corp. v. Grunwald*
400 F.3d 1119 (9th Cir. 2005) .......... 8

*D.V.D. v. U.S. Dep't of Homeland Sec.*
821 F. Supp. 3d 102 (D. Mass. 2026) .......... 16

*Del Cid Marroquin v. Lynch*
823 F.3d 933 (9th Cir. 2016) .......... 16

*Department of Homeland Security v. D.V.D.,*
No. 26-426, 2026 WL 2917860 (U.S. Sept. 29, 2026 (2020) .......... 17

*Department of Homeland Security v. Regents of the University of California*
591 U.S. 1 (2020) .......... 13

*Dorcas Int'l Instit. of Rhode Island v. U. S. Citizenship and Imm. Servs.*
186 F.4th 883 (1st Cir. 2026) .......... 20

*Dorcas International Institute of Rhode Island v. United States Citizenship and Immigration Services*
834 F.Supp.3d 242 (D.R.I. 2026) .......... 19, 20

*Epic Games, Inc. v. Apple Inc.*
161 F.4th 1162 (9th Cir. 2025) .......... 25

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*ICE*
*Policy No. 11039.1* ....................21

*In re Blancas-Lara*
23 I&N Dec. 458 ....................11

*Kuang v. United States Dep't of Def.*
No. 18-CV-03698-JST, 2019 WL 718632 (N.D. Cal. Feb. 20, 2019) ....................8

*Kullab v. United States Dep't of Homeland Sec.*
No. 24-CV-04140-WHO, 2025 WL 901943 (N.D. Cal. Mar. 25, 2025) ....................14

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*
941 F.2d 970 (9th Cir. 1991) ....................8

*Medina v. U.S. Department of Homeland Security*
No. C17-218-RSM-JPD, 2017 WL 2954719 (W.D. Wash. March 14, 2017) ....................13

*N.A. Sales Co., Inc. v. Chapman Indus. Corp.*
736 F.2d 854 (2d Cir. 1984) ....................8

*National TPS Alliance v. Noem*
150 F.4th 1000 (9th Cir. 2025) ....................12

*Ramirez Ovando v. Mullin*
No. 1:25-cv-03183-RBJ, 2026 WL 2641058 (D. Colo. May 12, 2026) ....................25

*Su v. Mayorkas*
698 F. Supp. 3d 1168 (N.D. Cal. 2023) ....................14

*U.H.A. v. Bondi*
817 F.Supp.3d 752 (D. Minn. 2026) ....................21

*United States v. Venegas-Vasquez*
376 F. Supp. 3d 1094 (D. Or. 2019) ....................10, 13

*United States v. Washington*
853 F.3d 946 (9th Cir. 2017) ....................8

# TABLE OF AUTHORITIES
**(continued)**

**Page**

**STATUTES**

8 U.S.C. § 1159(a) ....................21

8 U.S.C. § 1182(a)(9)(B)....................10

8 U.S.C. § 1182(a)(9)(B)(iii)(II)....................14

8 U.S.C. § 1227.................... 17, 18, 19

8 U.S.C. § 1227(a)(1)(E)....................18

8 U.S.C. § 1227(a)(2)(A)(iii)....................17

8 U.S.C. § 1228....................17

8 U.S.C. §§ 1229a(a)(1), 1229a(c)(3)(A)....................17

8 U.S.C. § 1231(b)(3)(A) ....................15

8 U.S.C. § 1254a(f)(4)....................12

8 U.S.C. § 1641(b)(5)....................16

42 U.S.C. 1395o(a)(2)....................24

Affordable Care Act....................4

Arizona Dream Act.................... 10, 11, 13

Immigration and Nationality Act (INA)....................9

**COURT RULES**

Fed R. Civ. P. 65(d) ....................24

Fed. R. Civ. P. 65(d)(1)....................8

Fed R. Civ. P. 65(d)(2)....................24

**REGULATIONS**

8 C.F.R. § 1.3(a).................... 1, 9, 10

## TABLE OF AUTHORITIES
**(continued)**

**Page**

8 C.F.R. § 1.3(a)(1) ........ 16

8 C.F.R. § 1.3(a)(4)(ii) ........ 12

8 C.F.R. § 1.3(a)(4)(vi) ........ 13

8 C.F.R. §§ 103.7(b)(1), 244.6 ........ 12

8 C.F.R. § 208.7 ........ 14, 19

8 C.F.R. §§ 208.16(c), 208.18 ........ 15

8 C.F.R. § 244.9(b) ........ 12

8 C.F.R. § 244.10(f)(2)(iv) ........ 12

8 C.F.R. § 274a.12 ........ 21

8 C.F.R. § 274a.12(a)(10) ........ 16

8 C.F.R. § 274a.12(c)(18) […] ........ 16

8 C.F.R. § 1208.16(b) ........ 15

8 C.F.R. § 1240.8 ........ 17

(AFM), Chapter 40.9.2(b)(2)-(3) ........ 10

**OTHER AUTHORITIES**

American Immigration Council, *USCIS Backlog Grows Even as Agency Gets Fewer Filings* (Sep. 11, 2026), https://perma.cc/92D8-QDJJ ........ 20

American Immigration Council, *USCIS Backlog Grows Even as Agency Gets Fewer Filings* (Sep. 11, 2026), https://perma.cc/Y7LS-K8SL ........ 22

CMS, Dual Eligibility Categories (Feb. 11, 2026), https://perma.cc/Z9DY-8EKK ........ 24

CMS, Implementation Guide: Citizenship and Non-citizen Eligibility, https://www.medicaid.gov/resources-for-states/downloads/macpro-ig-citizenship-and-non-citizen-eligibility.pdf (last visited Nov. 26, 2025) ........ 4

Ctrs. for Medicaid &Medicare Servs., Medicare-Medicaid Data Sharing Program (last updated Jan. 17, 2025), https://perma.cc/RC24-FTKS, https://perma.cc/RC24-FTKS ........ 24

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Complaint, Joseph B. Edlow & Todd M. Lyons, *Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status* (Feb. 18, 2026) ....21

DHS, Directive 047-01, Privacy Policy and Compliance, at 8-9 (Feb. 3, 2025), https://perma.cc/6873-K7Q7 ....7

DHS OIG, *DHS Privacy Office Needs to Improve Oversight of Department-wide Activities, Programs, and Initiatives* (Nov. 4, 2020), https://perma.cc/QX4F-LY8Yhttps://perma.cc/QX4F-LY8Y ....7

DHS, *Privacy Impact Assessment for the Immigration Benefits Background Check Systems* (Nov. 5, 2010), https://perma.cc/F7VB-PHPJ; ....6

DHS, *Privacy Impact Assessment Update for the Global Enrollment System* (Nov. 1, 2016), https://perma.cc/V6PE-A8Y8; ....6

DHS, *Privacy Policy Guidance Memorandum* (Dec. 29, 2008), https://perma.cc/8A66-47YN ....17

Homeland Sec., *Privacy Impact Assessment for the Immigration Benefits Background Check Systems* (Nov. 5, 2010), https://perma.cc/XQ3Y-TVSU ....7

DHS, *Privacy Impact Assessment for the National Voting Center (NVC)* (Dec. 11, 2018), https://perma.cc/WR8E-ASC8, https://perma.cc/WR8E-ASC8 ....7

U.S. Citizen & Immigr. Servs., Temporary Protected Status (last reviewed Oct. 20, 2026), https://www.uscis.gov/humanitarian/temporary-protected-status ....12

U.S. Citizenship & Immigr. Servcs., Unlawful Presence and Inadmissibility (last updated Aug. 14, 2026), https://www.uscis.gov/laws-and-policy/other-resources/unlawful-presence-and-inadmissibility ....14

U.S. Citizenship & Immigr. Servcs., Adjudicator's Field Manual (AFM), Ch. 40.9.2(b)(2)-(3) (implementing § 1182(a)(9)(B)), https://www.uscis.gov/sites/default/files/document/policy-manual-afm/afm40-external.pdf ....10

Madeleine Ngo and Zach Montague, *Trump Administration Says It Will Restart Asylum and Immigration Processing*, New York Times (June 12, 2026), https://www.nytimes.com/2026/06/12/us/politics/trump-uscis-asylum-immigration.html (last visited November 18, 2026) ....19

Joseph Cox, *ICE Agents Have List of 20 Million People on Their iPhones Thanks to Palantir*, 404 Media (May 12, 2026) ....6

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

U.S. Citizenship & Immigr. Servcs. Adjudicator's Field Manual is available online at https://perma.cc/2KKT-P3YG; ....................14

U.S. Citizenship and Immigr. Servs., *Green Card for Refugees* (last updated July 8, 2025), https://perma.cc/9FPH-UB37....................22

U.S. Citizenship and Immigr. Servs., *Reduced Validity Periods for Newly Issued Employment Authorization Documentation* (last updated January 12, 2026), https://perma.cc/UW5Y-2KV8 ....................21

## INTRODUCTION

In December of 2025, the Court entered a preliminary injunction limiting Defendants' newly promulgated policies under which HHS could share, and DHS could use data shared by HHS obtained from Plaintiff States unless it (1) is from the Medicaid program, (2) pertains to "aliens who are not lawfully residing" in the United States, and (3) divulges limited identifying information. Since then, Plaintiff States, alongside medical providers and other stakeholders, have relied on the plain meaning of "aliens who are not lawfully residing" – i.e., individuals present in the country without permission – to communicate to the public about whose data may be shared with DHS. Now, nearly a year later, Defendants seek to rewrite the injunction so that they can share and use data of persons who are lawfully present in the country, including individuals with Temporary Protected Status (TPS); Deferred Action for Childhood Arrivals (DACA) and other "deferred action" recipients; and asylum applicants.

Consistent with the Court's original order, Plaintiffs propose that the preliminary injunction continue to limit data sharing only as to individuals who are unlawfully present. This includes individuals (1) who have a final order of removal that has not been stayed, withheld or deferred; (2) who have entered the country without permission and never sought permission to remain; or (3) who have received final administrative denials of an application for permission to be in the country, following exhaustion and expiration of available administrative review. The court should also interpret the order to preliminarily enjoin data sharing for (1) U.S. Citizens and Lawful Permanent Residents; (2) individuals with valid and unexpired visas, and other holders of valid, unexpired nonimmigrant status; (3) asylees, refugees and individuals whose removal has been withheld or deferred due to a fear of persecution or a risk of torture; (4) any other individual who satisfies the definition of "lawfully present" set forth at 8 C.F.R. § 1.3(a);[1] and (5) any individual who does not fall into one of the three "sharing permitted" categories identified above.

---

[1] As discussed in more detail below, this category would include individuals with Temporary Protected Status, DACA recipients and others with "deferred action" status, and applicants for asylum under Section 208(a) of the Act, among other lawfully present individuals. *See infra* at 9-14.

Defendants' proposed interpretation allows datasharing without any individualized suspicion of a violation of immigration law. As such, it would allow Defendants to share data *en masse*, as they did on January 7, 2026, when HHS violated the court's injunction by responding to a data request regarding approximately 7.6 million people from DHS with data that included U.S. citizens, LPRs, and others lawfully present in the country. Additionally, Defendants shared data of nearly 6,000 Minnesotans who were supposed to all be unadjusted refugees, but in fact included information on U.S. citizens and/or U.S. nationals, as well as information concerning these individuals' Medicaid claims. In the wake of these violations, the Court instructed the parties to propose clarifying interpretations of the injunction. The Court emphasized that these proposals should reflect plausible enforcement purposes justifying Defendants' data sharing and "workability" for the purposes of facilitating and monitoring their compliance. Defendants' latest proposal cuts against these goals by allowing data sharing regarding individuals who are lawfully present in the country, without any indication that a specific individual has committed a violation. Defendants fail to offer a reasoned explanation for why they do not already possess the necessary tools to locate and contact these individuals, who have completed detailed application processes to obtain their protected status, must renew employment authorization documents with DHS, and/or have submitted applications to DHS for immigration benefits. Worse, the terms of Defendants' proposal are ambiguous and overlap, and Defendants have failed to promulgate *any* underlying guidance that would provide guardrails against indiscriminate data sharing. As a result, Defendants' proposed modification of the preliminary injunction would exacerbate existing fears among lawfully present people that seeking necessary healthcare may put them on an ICE target list.

By contrast, Plaintiffs' proposal allows sharing of data of individuals who are unlawfully present in the country. It would also allow data sharing for the purpose of investigating legitimate enforcement of criminal laws where there is individualized suspicion. The clear terms of Plaintiffs' proposal would mitigate the chilling effect of data sharing on access to healthcare services and enable Plaintiffs to clearly advise the public, while still enabling Defendants to

pursue legitimate law enforcement purposes, until the Court reaches a final adjudication on the merits of all of Plaintiffs' claims. The Court should adopt Plaintiffs' proposed interpretation.

## BACKGROUND

### I. THE COURT'S PRELIMINARY INJUNCTIONS

This case arises out of the abrupt and secret transfer of millions of state records containing individuals' Medicaid data in June 2025 by CMS to ICE for immigration enforcement purposes, despite the federal government's longstanding policies and practices of not utilizing Medicaid data in this manner. *See generally* ECF No. 75 (Cash Decl.) ¶¶ 15-36, 43-52; ECF No. 108 (Am. Compl.) ¶¶ 212-236. After this transfer became public, CMS and ICE entered into an information exchange agreement allowing ICE agents to log directly into CMS's T-MSIS data system to retrieve nearly-unlimited information from confidential Medicaid records. ECF No. 83-3 (Information Exchange Agreement); ECF No. 83-2 (Charles Decl.) ¶ 12; ECF No. 83-1 (Brandt Decl.) ¶ 32.

On August 12, 2025, in response to Plaintiffs' first motion for preliminary relief, the Court preliminarily enjoined DHS "from using Medicaid data obtained from the plaintiff states for immigration enforcement purposes," and HHS "from sharing Medicaid data obtained from the plaintiff states with DHS for immigration enforcement purposes" until both agencies had completed a "reasoned decisionmaking process." ECF No. 98 ("Aug. 12, 2026 PI Order") at 4-5.

On October 27, 2025, ICE Acting Director Todd Lyons executed a new policy memorandum in response to the Court's Order. The October 27, 2025 memo formally rescinded a 2013 ICE Policy Memorandum, which had stated that ICE would not use certain federal healthcare information for the purpose of immigration enforcement, and announced as ICE's new official policy "that the agency may, as permitted by law, request, receive, and use HHS information that may be useful for any and all law enforcement activities that ICE is authorized to pursue as a matter of federal law." *See* ECF No. 131-2 (hereinafter "ICE 2025 Memo") at 1. Unlike the agency actions challenged in Plaintiffs' first motion for a preliminary injunction, the ICE 2025 Memo permits sharing not only Medicaid data, but *any* HHS information, including

"*but not limited to*" information provided to CMS by individuals seeking health coverage through the Affordable Care Act (ACA) marketplace, the Children's Health Insurance Program (CHIP), or any other affordable healthcare program. *Id.* at 1-2 (emphasis added). CMS also published a notice announcing that it would provide certain information to ICE upon request in the Federal Register. ECF No. 131-1. The Court later found that both documents were vague and ambiguous as to whose data would be shared, as well as what data could be shared. ECF No. 148 (hereinafter "Dec. 29, 2025 PI Order") at 5-6.

On November 24, 2025, ICE transmitted a letter to CMS requesting "Medicaid data from June 2025 to the present pertaining to the biographical, contact, and location information of individuals with unsatisfactory immigration status." ECF No. 133-1 (hereinafter "ICE Letter"). The ICE Letter defined "unsatisfactory immigration status" as "aliens not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law," *see id.*, a definition that does not correlate to the definition of "satisfactory immigration status" used by Medicaid programs.[2]

In response, Plaintiffs moved for another preliminary injunction prohibiting Defendants from, among other things, transferring Plaintiff States' Medicaid and other healthcare data files containing personally identifiable, protected health information to DHS and using such data for purposes of immigration enforcement. *See generally* ECF No. 134. At the hearing on that motion, the Court repeatedly questioned Defendants about the scope of the data sharing at issue, and Defendants repeatedly explained that the agencies' current data sharing is limited to Medicaid data. *See* Transcript of Dec. 9, 2025 Hearing at 3:4-8. Defendants acknowledged,

> [A]s to other […] potential programs, that data has not been -- ICE hasn't requested it yet. CMS hasn't responded with respect to such a request. […] [I]f the agency were to do that, it might have to beforehand take -- you know, given the context of what's happened here, it might have to think about, like, what exactly the bases are for that type of sharing and the tradeoffs and the reliance interest and so on and so forth for those sorts of things.

[2] For example, a lawfully present and qualified non-citizen who remains subject to a five-year waiting period to access non-emergency Medicaid would appear in Medicaid records as lacking a "satisfactory" immigration status. *See, e.g.*, CMS, Implementation Guide: Citizenship and Non-citizen Eligibility, https://www.medicaid.gov/resources-for-states/downloads/macpro-ig-citizenship-and-non-citizen-eligibility.pdf (last visited Nov. 26, 2025).

*Id.* at 10:3-13.

On December 29, 2025, the Court granted the motion for a preliminary injunction in part, barring CMS from sharing Medicaid data with DHS unless the data "(1) is from the Medicaid program, (2) pertains only to aliens who are not lawfully residing in the United States, and (3) divulges only those aliens' citizenship and immigration status, address, phone number, date of birth, and Medicaid ID." Dec. 29, 2025 PI Order at 6. That order bars Defendants from sharing data "beyond these categories" because Defendants' policies are "totally unclear about what that information would be, why it would be needed for immigration enforcement purposes, and what the risks of sharing it with DHS would be." *Id.* at 1. It cabined any data sharing so that it would be congruent with the limited interests set forth by Defendants: "effective immigration enforcement" pertaining to "unlawfully present aliens." *Id.* at 4 (quoting ICE 2025 Memo).

## II. Defendants' Failures to Comply with the Preliminary Injunction

The parties met and conferred regarding implementation of the Dec. 29, 2025 PI Order. During those exchanges, it became clear that Defendants lacked a precise understanding of the Order's terms, an issue Plaintiffs raised in their motion to enforce the Preliminary Injunction. ECF No. 151. Subsequently, Defendants revealed that, on January 7 and January 19, 2026, HHS shared data to ICE in violation of the Order, by including the data of citizens, lawful permanent residents, refugees, and other presumably lawfully present individuals; and by including data beyond the basic biographical and contact information specified in the Order, such as the date of the latest medical claim made by an individual. *See* ECF No. 155 at 4–6.

Following a hearing on Plaintiffs' motion to enforce the preliminary injunction, the Court entered an interim order on May 26 barring HHS from sharing any Medicaid information received from Plaintiff States with DHS (except for purposes of refugee resettlement or confirming eligibility for Medicaid benefits) and barring DHS from using data obtained from HHS and received from Plaintiff States for immigration enforcement purposes, pending clarification of the preliminary injunction. ECF No. 170. On June 4, Defendants filed an "updated" declaration admitting that ICE had overlooked a copy of the January 7 data containing

millions of records from Plaintiff States, despite prior representations that all such data had been delated or made inaccessible. ECF No. 172-1. Defendants stated that they had deleted the data and found no additional copies of the data after a "comprehensive search." *Id.*, ¶ 17. Then, on July 7, 2026, despite the interim injunction on data sharing, Defendants filed a notice stating that HHS had again "inadvertently" shared with ICE a file of the January 7, 2026 data, ECF No. 180; and on July 8, Defendants filed a declaration stating that ICE had discovered on June 17 that an additional six ICE employees had copies of the data. ECF No. 181-1 at 4.

In addition to the improper data sharing to ICE, Defendants have also shared data with DHS contractors. On June 5, 2026, Defendants produced documents confirming that Medicaid data from Plaintiff States had been shared with employees or contractors of Palantir, a multinational Artificial Intelligence and data analytics corporation, including through "Microsoft Teams chat" messages. ECF No. 182-2. In subsequent discovery responses, Defendants admitted that they allowed an employee of their contractor team to maintain copies of the data that HHS shared on January 7, 2026, before the contractor subsequently deleted it. Rich Decl., ¶ 6, Ex. 4. Public reporting has documented Palantir's role in expanding the data available to ICE, including data from HHS. ECF No. 156-5. In May of 2026, a senior official at ICE stated that Palantir had provided ICE access to between 30 and 40 datasets and claimed that agency officers have access to data on 20 million people on their iPhones. Joseph Cox, *ICE Agents Have List of 20 Million People on Their iPhones Thanks to Palantir*, 404 Media (May 12, 2026), Rich Decl., ¶ 4, Ex. 2.

## III. DHS'S BROADER SHIFT IN POLICY AROUND DATA SHARING AND PRIVACY

Defendants' repeated efforts to share data from HHS with DHS *en masse* for immigration enforcement represent a marked shift in DHS's approach to data sharing and privacy. Historically, when engaging in screening and vetting activities, DHS and its constituent agencies share data from their own holdings on particular individuals with other agencies, and then request data on those individuals from those agencies' holdings.[3] Moreover, DHS's Privacy

[3] DHS, *Privacy Impact Assessment for the Immigration Benefits Background Check Systems* (Nov. 5, 2010), https://perma.cc/F7VB-PHPJ; DHS, *Privacy Impact Assessment Update* (continued…)

Policy and Compliance Directive calls for DHS to assess the privacy impacts of its policies and programs, propose steps to prevent unauthorized use and disclosure, and prepare documentation, such Privacy Threshold Analyses ("PTA's"), Privacy Impact Assessments ("PIA's"), and other guidance documents. *See* DHS, Directive 047-01, Privacy Policy and Compliance, at 8-9 (Feb. 3, 2025), https://perma.cc/6873-K7Q7.

For instance, a 2010 PIA describes how United States Customs and Immigration Services (USCIS) shares information on particular applicants for immigration benefits with the FBI so that the FBI can conduct searches in its own databases and share any results with USCIS according to specific protocols. *See* Dep't. of Homeland Sec., *Privacy Impact Assessment for the Immigration Benefits Background Check Systems*, at 3 (Nov. 5, 2010), https://perma.cc/XQ3Y-TVSU. Despite these policies to protect personally identifiable information ("PII"), in an audit published in 2020, DHS's Office of Inspector General (DHS-OIG) still identified significant concerns. *See* DHS OIG, *DHS Privacy Office Needs to Improve Oversight of Department-wide Activities, Programs, and Initiatives* (Nov. 4, 2020), https://perma.cc/QX4F-LY8Y. DHS-OIG found that DHS had "not conducted adequate oversight to ensure consistent execution of its privacy program across DHS components" and identified inadequacies such as a failure to ensure timely completion and review of privacy compliance documentation. *Id.* at 4. It warned that these inadequacies could prevent DHS from identifying new privacy risks and guarding against inappropriate dissemination of PII. *Id.*

The data sharing at issue in this litigation appears to represent a further break from DHS's prior statements regarding protection of individual privacy. Instead of seeking information on particular individuals for a specific purpose, such as applicants for an immigration benefit that require a background check, DHS has made bulk data requests to HHS. In one instance, DHS shared a spreadsheet listing approximately 7.6 million individuals, and asked HHS to fill out that spreadsheet with information concerning these millions of individuals. ECF No. 155-3 at ¶¶ 17-

*for the Global Enrollment System* (Nov. 1, 2016), https://perma.cc/V6PE-A8Y8; DHS, *Privacy Impact Assessment for the National Voting Center (NVC)* (Dec. 11, 2018), https://perma.cc/WR8E-ASC8.

20. The administrative record provided to Plaintiffs does not indicate that DHS has completed an assessment of the risks posed by sharing data at this scale. And, as the Court previously found, data sharing has already occurred without clear guidance and documentation regarding what data and whose data can be shared. Dec. 29, 2025 PI Order at 5.

## LEGAL STANDARD

A preliminary injunction order must "state its terms specifically," and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). A district court has considerable discretion in fashioning relief and defining the injunction's terms. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). By clarifying the scope of an injunction, a court "add[s] certainty to an implicated party's effort to comply with the order and provide[s] fair warning as to what future conduct may be found contemptuous." *N.A. Sales Co., Inc. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984). A motion for clarification is an inappropriate vehicle for litigating the merits of any new policy. *Kuang v. United States Dep't of Def.*, No. 18-CV-03698-JST, 2019 WL 718632, at *3 (N.D. Cal. Feb. 20, 2019).

To the extent that a party requests a substantive modification of the terms of a preliminary injunction, not a clarification, a different standard of review applies. A "motion to modify a preliminary injunction is meant only to relieve inequities that arise after the original order." *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005) (quoting *Favia v. Indiana Univ. of Pennsylvania*, 7 F.3d 332, 338 (3d. Cir. 1993)). It "must rest on grounds that could not have been raised before," *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013), such as "if the circumstances, whether of law or fact, obtaining at the time of [the preliminary injunction's] issuance have changed, or new ones have since arisen." *United States v. Washington*, 853 F.3d 946, 979 (9th Cir. 2017) (quoting *System Federation No. 91 v. Wright*, 364 U.S. 642, 647 (1961)).

## ARGUMENT

In Section I, Plaintiffs present their proposal for clarifying which categories of individuals are subject to data sharing and which categories of individuals are protected from it under the

December 29, 2025 PI Order. In Section II, Plaintiffs explain why Defendants' proposal fails to meet the Court's criteria because it remains ambiguous, unworkable, and fails to clearly tie the proposed categories of people subject to data sharing to enforcement priorities.

## I. The Court Should Adopt Plaintiffs' Proposal to Limit Data Sharing to Individuals Unlawfully Present in the Country

Building on Plaintiffs' prior proposal (*see* ECF No. 182 at 9-12), Plaintiffs now present a more detailed proposal to preliminarily enjoin the sharing and use of data regarding individuals "present in the country with permission" pending the resolution of this case on the merits, while allowing sharing for individuals "who are in the country without permission." ECF No. 196 (Sept. 9, 2026 Order) at 2 n.1. This approach would give clear and easily administrable guidance to Defendants and to members of the public, including providers, applicants, and beneficiaries of federal healthcare programs, who have relied upon the plain terms of the Order since it was issued. Furthermore, Plaintiffs' proposal would limit data sharing for individuals already known to the federal government, thus avoiding the unnecessary use of sensitive healthcare records. Finally, Plaintiffs' reading of the preliminary injunction is appropriate in the present circumstances where the Court has already found that Defendants' policies are likely arbitrary and capricious due to their "vague language and likely overbroad scope." *See* Dec. 29, 2025 PI Order at 6. Plaintiffs' proposal is set forth below:

***Sharing Prohibited Categories***

- U.S. Citizens and Lawful Permanent Residents;
- Individuals with valid and unexpired visas, and other holders of valid, unexpired nonimmigrant status;
- Asylees, refugees and individuals whose removal has been withheld or deferred under the Immigration and Nationality Act (INA) or the Convention Against Torture (CAT);
- Any other individual who satisfies the definition of "lawfully present" set forth at 8 C.F.R. § 1.3(a), including but not limited to individuals with Temporary Protected Status, DACA recipients and others with "deferred action" status, and applicants for asylum under Section 208(a) of the Act;
- Any individual who does not fall exclusively into one of the "sharing permitted"

categories.[4]

***Sharing Permitted Categories***

- Noncitizens subject to a final order of removal that has not been stayed, withheld or deferred;
- Noncitizens who entered the country without permission and who have never applied for or received permission to be present in the country;
- Noncitizens whose applications for permission to be present in the country have received final administrative denials, following exhaustion and expiration of available administrative review

This proposal relies on federal immigration law where "unlawfully present" and "lawfully present" appear as terms of art. ECF No. 182 at 9; *see, e.g.*, 8 U.S.C. § 1182(a)(9)(B) (defining "Aliens unlawfully present" as being "present in the United States after the expiration of the period of stay authorized by the Attorney General" or "present in the United States without being admitted or paroled"); U.S. Citizenship & Immigr. Servcs., Adjudicator's Field Manual (AFM), Ch. 40.9.2(b)(2)-(3) at *53-54, *80-96 (implementing § 1182(a)(9)(B)), https://www.uscis.gov/sites/default/files/document/policy-manual-afm/afm40-external.pdf [hereinafter "USCIS Adjudicator's Field Manual"]; 8 C.F.R. § 1.3(a) (defining "[l]awfully present aliens for purposes of applying for Social Security benefits").

"[U]nlawful presence and unlawful status are distinct concepts" under immigration law. *Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1057 (9th Cir. 2017) (Christen, J., concurring) ("the terms 'presence' and 'status' are terms of art in the scheme of federal immigration law, and they are not necessarily interchangeable"); *United States v. Venegas-Vasquez*, 376 F. Supp. 3d 1094, 1099 (D. Or. 2019) (explaining that "unlawful presence is not synonymous with unlawful status" under immigration law); USCIS Adjudicator's Field Manual, at *57, (describing the "distinction between 'unlawful status' and 'unlawful presence'" and the "situations in which an alien who is present in an unlawful status nevertheless does not accrue unlawful presence" (capitalization

[4] Plaintiffs anticipate that all individuals whose data is held in T-MSIS fall into either the "sharing prohibited" or the "sharing permitted" categories, but include a catchall provision here to err on safeguarding privacy interests of individuals not contemplated by either party.

omitted)). Under federal immigration law, a person has lawful status when he has been inspected and admitted into the country or otherwise given the right to remain. USCIS Adjudicator's Field Manual at *53; *see also In re Blancas-Lara,* 23 I&N Dec. 458, 460 (BIA 2002) (observing that "status" is not defined in the INA but is "used in the immigration laws" to "denote[] someone who possesses a certain legal standing, e.g., classification as an immigrant or nonimmigrant"). But a person who lacks "lawful status" may nonetheless be "lawfully present" for a variety of reasons—for example, because she has an asylum application pending, or because she has received deferred action. *See, e.g.*, 8 U.S.C. § 1182(a)(9)(B) (defining asylum applicants as not accruing unlawful presence for inadmissibility purposes); USCIS Adjudicator's Field Manual Ch. 40.9.2(b)(3) (explaining that individuals with deferred action do not accrue unlawful presence for inadmissibility); 8 C.F.R. § 1.3 (same).

It is "entirely possible for aliens to be lawfully present even though their lawful status has expired"—for instance, when "a person's status becomes unlawful while she has a pending adjustment [of status] application," *Chaudhry*, 705 F.3d at 292—or never existed, such as those who have been granted DACA or some other form of discretionary relief from removal. *Ariz. Dream Act Coal.*, 757 F.3d at 1059.

Consistent with the Court's instructions, Plaintiffs' expanded proposal bars sharing and use of data regarding citizens, lawful permanent residents, and individuals with valid and unexpired visas. ECF No. 196 at 2. It is consistent with Defendants' proposal to prohibit data sharing for holders of valid, unexpired nonimmigrant status, asylees, and most refugees.[5] The parties further agree that data sharing is generally permitted for individuals with a final order of removal that has not been stayed (although Plaintiffs maintain that individuals granted withholding of removal under the INA or CAT are lawfully present and therefore should be protected by the order).

Where the parties disagree is whether the order should prohibit data sharing for individuals who are present in the country with permission, even when those individuals lack *permanent*

[5] Plaintiffs and Defendants disagree as to data sharing for refugees who have not appeared for adjustment.

lawful residency status. Each of these categories should be protected, as discussed below.

**A. Individuals with Temporary Protected Status**

The Court has stated that the order . . . "likely should be construed as precluding the receipt or use of data for immigration enforcement purposes on people who currently have temporary protected status." ECF No. 196 at 2. Plaintiffs agree. TPS applicants must demonstrate to DHS that they are, among other things, nationals of a country designated for TPS (due to natural disaster, armed conflict, or other conditions) and have been continuously physically present in the U.S. since the date of the TPS designation. This includes providing "documentary proof of eligibility apart from his or her own statements," 8 C.F.R. § 244.9(b), and passing "background and security checks and identity verification." *Bautista-Perez v. Holder*, No. C 07-4192 TEH, 2009 WL 2031759 at * 2 (N.D. Cal. July 9, 2009) (referring to 8 C.F.R. §§ 103.7(b)(1), 244.6. TPS holders are protected from removal and receive employment authorization during the period of their status. *National TPS Alliance v. Noem*, 150 F.4th 1000, 1010 (9th Cir. 2025) (citing 8 U.S.C. § 1254a(a)(1), (b)(2)).[6] Given this application process, and TPS holders' authorization to not only remain in the U.S., but also to work, they have clearly obtained permission to be in the U.S. and should be included within the scope of the injunction.

Defendants fail to address the question of TPS holders explicitly. They seem to concede that the data of TPS holders should not be shared by including "[h]olders of valid, unexpired nonimmigrant status" among their proposed "sharing prohibited categories." Although TPS is a humanitarian benefit that can be granted to individuals regardless of their immigration status, TPS holders are "considered as being in, and maintaining, lawful status as [nonimmigrants]." 8 U.S.C. § 1254a(f)(4); 8 C.F.R. § 244.10(f)(2)(iv); *see also* 8 C.F.R. § 1.3(a)(4)(ii).

**B. Deferred Action Recipients**

For similar reasons, the Court should include DACA recipients and others with Deferred

---

[6] U.S. Citizen & Immigr. Servs., Temporary Protected Status (last reviewed Oct. 20, 2026), https://www.uscis.gov/humanitarian/temporary-protected-status ("Once granted TPS, an individual also cannot be detained by DHS on the basis of his or her immigration status in the United States.").

Action status (such as individuals with approved VAWA petitions who are waiting for a green card, or certain individuals granted deferred action due to cooperation with law enforcement authorities) within the scope of the injunction.

Applicants for the DACA program must submit documentary proof that they meet the eligibility requirements for the program, which includes educational attainment or military service and absence of criminal history or indication that they pose a threat to national security or public safety. *See Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 10 (2020) (describing eligibility requirements for DACA program). They must pass biographic and biometric background checks and apply for an Employment Authorization Document, allowing them to work in the U.S. *Medina v. U.S. Department of Homeland Security*, No. C17-218-RSM-JPD, 2017 WL 2954719, at *2-3 (W.D. Wash. March 14, 2017). Upon obtaining this status, DACA recipients are "permitted by DHS to remain in the United States" during renewable two-year periods and must complete a biographic and biometric background check as part of their renewal application. *Id.* at *3. Under such circumstances, DACA recipients are clearly present in the country with permission. *See Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1058-59, 1069 (9th Cir. 2014) (enjoining policy under which state agency refused to accept documents issued to plaintiffs under DACA "as proof that Plaintiffs are authorized under federal law to be present in the United States"); *United States v. Venegas-Vasquez*, 376 F. Supp. 3d 1094, 1100–01 (D. Or. 2019) (finding that DACA recipient "was not 'unlawfully present'" even though he "has no formal immigration status based on his receipt of DACA"); *see also* 8 C.F.R. § 1.3(a)(4)(vi). Given the information that DACA recipients are required to provide to apply for the program and to renew their authorization, it is unclear what additional value data from HHS would bring to DHS enforcement priorities for this category of individuals. Accordingly, the Court should interpret the injunction to cover DACA recipients and other Deferred Action recipients who are similarly known to the federal government.

### C. Applicants for Asylum

The Court should also interpret the preliminary injunction to cover applicants for asylum, as they are lawfully present in the country. "An alien, whose bona fide application for asylum is pending, is in an *authorized period of stay* and does not accrue unlawful presence for purposes of section 212(a)(9)(B) of the Act unless the alien is employed without authorization while the application is pending." U.S.. Citizenship & Immigr. Servcs., Adjudicator's Field Manual, Ch. 40.9.2(b)(2) (emphasis added)[7]; 8 U.S.C. § 1182(a)(9)(B)(iii)(II) ("No period of time in which an alien has a bona fide application for asylum pending . . . shall be taken into account in determining the period of unlawful presence . . . ."). After an initial waiting period, asylum applicants may seek authorization for employment while their asylum applications are pending. *See generally* 8 C.F.R. § 208.7. Under such circumstances, asylum applicants have permission to be in the country. *See, e.g., Su v. Mayorkas*, 698 F. Supp. 3d 1168, 1172 (N.D. Cal. 2023) ("While an asylum application is pending, asylum applicants are eligible to apply for employment authorization, and are deemed to be 'lawfully present' for the purposes of applying certain benefits." (citing 8 C.F.R. § 208.7(a)(1)); *Kullab v. United States Dep't of Homeland Sec.*, No. 24-CV-04140-WHO, 2025 WL 901943, at *3 (N.D. Cal. Mar. 25, 2025) ("[D]uring the pendency of their application, asylum applicants are 'lawfully present' without threat of removal and for the purposes of government benefits.").

Defendants have not shown a need to obtain data from HHS regarding asylum applicants. Asylum applicants have already made themselves known through their application and have a strong incentive to keep their addresses current with the government while their application is pending. They also rely upon DHS for employment authorization. In the absence of any clear need for HHS data, the preliminary injunction should be interpreted to cover asylum applicants.

---

[7] Chapter 40 of the U.S. Citizenship & Immigr. Servcs. Adjudicator's Field Manual is available online at https://perma.cc/2KKT-P3YG; *see also* U.S. Citizenship & Immigr. Servcs., Unlawful Presence and Inadmissibility (last updated Aug. 14, 2026), https://www.uscis.gov/laws-and-policy/other-resources/unlawful-presence-and-inadmissibility (referencing the Adjudicator's Field Manual).

### D. Sharing Permitted Categories

Plaintiffs propose allowing data sharing for noncitizens subject to a final order of removal (that is not stayed or subject to withholding or deferral) and noncitizens who entered the country without permission and who have never applied for or received permission to be present in the country. Plaintiffs also propose allowing data sharing for noncitizens whose applications for permission to be present in the country have received final administrative denials. These categories accord with the Court's reasoning that "the order clearly permits the receipt or use of data on people who came to the country illegally and were released from detention pending removal, unless some other event (such as a grant of asylum) conferred upon them permission to be present in the country." ECF No. 196 at 2.

## II. THE COURT SHOULD REJECT DEFENDANTS' PROPOSAL FOR CLARIFYING THE INJUNCTION

Defendants' proposal is deficient on its face. Defendants' proposed order fails to address DACA and TPS recipients, even though the Court stated that TPS recipients should likely fall within the scope of the injunction and that it was "unsure how DACA recipients should be treated." As explained above, both DACA and TPS recipients should be included within the scope of the injunction. Additionally, Defendants' proposed categories for permitted data sharing suffer from a tenuous connection to legitimate immigration enforcement priorities and are ambiguous and unworkable, as set forth below. Plaintiffs address each proposed category in turn:

### A. "Aliens Subject To Final Order of Removal, Including Where Removal Is Withheld Or Deferred"

The Court should clarify its order to prohibit data sharing for individuals with a final order of removal that has been withheld or deferred. Individuals who have received the statutory relief of withholding of removal, *see* 8 U.S.C. § 1231(b)(3)(A) and 8 C.F.R. § 1208.16(b), or whose removal is restricted by regulations implementing the Convention Against Torture (CAT), *see* 8 C.F.R. §§ 208.16(c), 208.18, reasonably fear persecution or are likely to be tortured if they are returned to their home countries. These individuals are eligible to receive certain federally-funded public benefits, subject to the same restrictions as LPRs, asylees and other "qualified

aliens." *See* 8 U.S.C. § 1641(b)(5); *see also* 8 C.F.R. § 1.3(a)(1) (including "qualified aliens" in the definition of "lawfully present in the United States"). By granting withholding of removal or CAT relief, the government has determined that these individuals have a lawful right to be present in the U.S., at least temporarily, even though they may later lose the right to stay. *See Del Cid Marroquin v. Lynch*, 823 F.3d 933, 940 (9th Cir. 2016) ("[A] nondetained alien who has been granted CAT deferral protection can seek employment authorization under 8 C.F.R. § 274a.12(c)(18) […] Such authorization obviously is not akin to legal status in the United States, but it does signal that the alien is authorized to be present in the country").

Defendants have failed to establish that sharing these individuals' federal healthcare data would advance their enforcement priorities. Anyone who has applied for withholding of removal has provided DHS with detailed information on themselves and their family members. *See,* U.S. Citizenship & Immigr. Servcs., Form I-589: Application for Asylum and for Withholding of Removal (last modified July 28, 2026), https://perma.cc/GFU9-RVGX. Individuals whose removal has been withheld are also eligible to obtain employment authorization documents from DHS 8 C.F.R. § 274a.12(a)(10). The application for an employment authorization document requires, among other things, a physical address and is renewable and thus incentivizes maintenance of current information with DHS.[8] This gives DHS an alternative pathway to obtain information about these individuals that does not implicate sensitive healthcare records. At the very least, the Court should require Defendants to first establish that they cannot contact an individual using data already held by DHS before resorting to sensitive healthcare information, rather than permitting the implementation of a policy that could chill healthcare use by lawfully present individuals.[9] This approach would be consistent with DHS's Fair Information Practice

[8] U.S. Citizenship & Immigr. Servcs., Form I-765: Application for Employment Authorization (Aug. 21, 2025), https://perma.cc/9AQZ-K8G4.

[9] This group is particularly likely to be chilled from accessing healthcare services, in light of the Administration's third-country deportation policy. See *D.V.D. v. U.S. Dep't of Homeland Sec.*, 821 F. Supp. 3d 102, 166–67 (D. Mass. 2026) (finding that plaintiff challenging policy "who was granted withholding of removal from Guatemala based on sexual violence he experienced there" was deported by DHS "to Mexico, where he had just been raped, and where he was quickly sent back to Guatemala, the place an immigration judge had just found he would

(continued…)

Principles (FIPPs), which emphasize minimizing data collection to what is directly relevant and necessary for a given purpose. *See* DHS, *Privacy Policy Guidance Memorandum* (Dec. 29, 2008), https://perma.cc/8A66-47YN.

**B. "Unlawfully Present Aliens Released from Detention Pending Removal Unless They Qualify in the Interim for a Sharing Prohibited Category"**

Plaintiffs agree that the preliminary injunction order permits data sharing as to unlawfully present aliens released from detention pending removal, unless they qualify for a sharing prohibited category. However, as stated above, Plaintiffs disagree with the narrow scope of Defendants' proposed categories of prohibited data sharing, which exclude individuals with TPS, DACA recipients, and applicants for asylum, among others. The Court should adopt Plaintiffs' proposed categories of prohibited data sharing instead.

**C. "Aliens who entered the United States pursuant to a valid visa and are deportable under 8 U.S.C. § 1227"**

This proposed category is ambiguous, and thus unworkable. As a threshold issue, outside of limited exceptions,[10] ICE does not determine whether an individual is "deportable"; rather, an immigration judge must make this determination, after ICE meets its burden of establishing deportability by clear and convincing evidence. 8 U.S.C. §§ 1229a(a)(1), 1229a(c)(3)(A); 8 C.F.R. § 1240.8. Defendants do not specify whether they are seeking to allow only data sharing regarding individuals with a final order of removal. Instead, they simply refer to aliens who "are deportable under 8 U.S.C. § 1227." ECF No. 202 at 13. If the Court incorporates any form of this exception into its Order, it should specify that data sharing is limited to individuals whose removability has been adjudicated (and, for the reasons described above, who have also received no determination in favor of withholding).

The category is particularly unworkable as applied to Lawful Permanent Residents, who

likely be persecuted"), *aff'd in part, vacated in part,* 192 F.4th 74 (1st Cir. 2026), and *cert. granted sub nom. Dep't of Homeland Sec. v. D.V.D.*, No. 26-426, 2026 WL 2917860 (U.S. Sept. 29, 2026).

[10] For instance, an individual who is deportable due to an aggravated felony conviction, *see* 8 U.S.C. § 1227(a)(2)(A)(iii), may be subject to expedited removal without a hearing before an immigration judge based on that conviction under 8 U.S.C. § 1228.

may enter the country on a valid, lawful visa and adjust to LPR status, but could in some circumstances become deportable under 8 U.S.C. § 1227. There is no dispute that the Order bars Defendants from using LPRs' Medicaid data for immigration enforcement, and Defendants claim that they have not included LPRs in this category. However, Defendants' proposed order fails to specify this carveout in its description of the category, raising significant concerns that DHS officers implementing the sharing and use of data will improperly target LPRs. This is particularly troubling in light of Defendants' prior sharing of information in violation of the Dec. 29, 2025 PI Order. At the very least, the Proposed Order should reflect a clear carveout for all LPRs from all categories of permissible data sharing.

Further, despite the Court's directive to "consider the workability of any proposal for the purposes of facilitating and monitoring the defendants' compliance," (ECF No. 196 at 1–2), Defendants set out no such parameters. 8 U.S.C. § 1227 consists of specific grounds for deportability. *See, e.g.*, 8 U.S.C. §§ 1227(a)(1)(E) (smuggling), 1227(a)(1)(G) (marriage fraud). Therefore, data sharing pursuant to this exception would necessarily be individualized, as with the contemplated sharing of data under the Order for facilitating criminal investigations into subjects based on individualized suspicion. However, Defendants have only engaged in bulk data sharing under their new policies. *See* ECF No. 155-4 (Briseno Decl.) ¶ 7; ECF No. 155-3 (Second Brandt Decl.) ¶ 17. Defendants do not set out any procedures to ensure that such bulk data sharing only occurs as to visa holders who satisfy one of the conditions set forth in 8 U.S.C. § 1227, as opposed to visa holders generally. The failure to provide any guardrails under this category creates a significant potential for abuse, as evidenced by previous incidents of data sharing that ran afoul of the Dec. 29, 2025 PI Order by including data on U.S. citizens and U.S. nationals. ECF No. 155-3 (Second Brandt Decl.) ¶¶ 25, 33; ECF No. 155-4 (Briseno Decl.) ¶¶ 7, 10, 13. The Court recognized these risks in its preliminary injunction order when it noted that the policies were "totally unclear" and could implicate "data from HHS about citizens or lawful permanent residents, including members of mixed-status households." ECF No. 148 at 5.

Plaintiffs do not dispute that "the Government has a strong interest in being able to locate"

visa holders who are deportable under the grounds listed in 8 U.S.C. § 1227 "for purposes of placing them in removal proceedings." ECF No. 202 at 13-14. But Defendants have never explained why they need sensitive Medicaid data to locate these people, and provide no further clarification in the present Motion. The Court should reject this exception.

### D. "Applicants and Derivative Applicants for Immigration Benefits Who Do Not Qualify for a Sharing Prohibited Category"

This proposed exception to the Order pulls in broad swaths of noncitizens who are lawfully present in the United States but whom Defendants have failed to include in their proposed "sharing prohibited" categories, including individuals with TPS, DACA recipients, and applicants for asylum. The Court is correct in its suggestion that TPS holders should fall within the scope of the Order, and DACA recipients should as well, given that they, like TPS holders, clearly have permission to be in the country. Applicants for asylum are similarly lawfully present; for example, after an initial waiting period, they may seek authorization for employment while their asylum application is pending. *See* 8 C.F.R. § 208.7. Nevertheless, this exception would subject all of these lawfully present individuals to data sharing.

Additionally, this proposed exception is inappropriate in the context of the federal administration's attempt to halt the processing of more than a million applications for immigration benefits. *See* Madeleine Ngo and Zach Montague, *Trump Administration Says It Will Restart Asylum and Immigration Processing*, New York Times (June 12, 2026), https://www.nytimes.com/2026/06/12/us/politics/trump-uscis-asylum-immigration.html (last visited November 18, 2026), Rich Decl., ¶ 5, Ex. 3. Among other actions, the federal government announced in policy memorandums in December 2025 and January 2026 "an indefinite pause on the adjudication of immigration benefit requests for individuals from thirty-nine African, Asian, Latin American, and Middle Eastern countries," barring individuals "from receiving final decisions on, among other things, their asylum, work permit, green card, and citizenship applications." *Dorcas International Institute of Rhode Island v. United States Citizenship and Immigration Services*, 834 F.Supp.3d 242, 263, 268-69 (D.R.I. 2026). The December 2025

policy memorandum also specifically placed a hold on applications for asylum and withholding of removal, regardless of the applicant's country of nationality, pending review. *Id.* at 269. A court has found this pause to be unlawful, and the Administration's policies have been largely enjoined while that decision is appealed. *See Dorcas Int'l Instit. of Rhode Island v. U. S. Citizenship and Imm. Servs.*, 186 F.4th 883, 884 (1st Cir. 2026). In the meantime, the federal government's actions have created an immense backlog. *Choupanzadeh v. Mullin*, No. 26-cv-0277-SM-TSM, 2026 WL 1724398, at * 6 (D.N.H. June 15, 2026) ("[G] iven the likely backlog of unadjudicated applications USCIS has caused by its unlawful actions, another extended period of time will be required before all long-pending applications before the Agency can be fully resolved and decisions administratively communicated – unfortunate, but a reality that cannot be ignored.") Indeed, while the number of applications for immigration benefits has fallen, USCIS's backlogs have only increased. *See* American Immigration Council, *USCIS Backlog Grows Even as Agency Gets Fewer Filings* (Sep. 11, 2026), https://perma.cc/92D8-QDJJ. As such, Defendants' proposed category would allow ICE to use the personal healthcare data of numerous individuals for targeting and deportation purposes solely because the federal government has purposefully delayed its processing of their applications for immigration relief. It is also unclear why the federal government needs contact information for these individuals from HHS in the first place, given that they are actively applying to DHS for an immigration benefit.

Under such circumstances, this exception would allow for the resumption of widespread data sharing for unclear enforcement purposes, creating potential for abuse. The Court should reject it or, at the least, require revisions to ensure protections for holders of valid, lawful visas, asylum applicants, TPS holders, and recipients of DACA and others in a "deferred action" status.

**E. "Refugees Who Have Not Appeared for Adjustment"**

Finally, the Court should reject Defendants' proposal to allow data sharing for refugees who have not appeared for adjustment at the end of their first year in the country.

Defendants state that "[a] refugee who fails to appear is not in the United States with permission, and the Government has a plausible reason to enforce the established terms of

refugee status." ECF No. 202 at 16. Refugees are automatically authorized to work and are reliant upon DHS to provide them with employment authorization documents, which must be renewed every 18 months. 8 C.F.R. § 274a.12; U.S. Citizenship and Immigr. Servs., *Reduced Validity Periods for Newly Issued Employment Authorization Documentation* (last updated January 12, 2026), https://perma.cc/UW5Y-2KV8. DHS presumably has their contact information and Defendants fail to explain why they would not already have the necessary information to contact refugees from these sources (such an explanation would be consistent with FIPPs).

Moreover, Defendants provide no authority for their claim that these individuals are in the U.S. without permission. ECF No. 202 at 16. To the contrary, it is well established that failing to appear for adjustment as a refugee is not by itself grounds for detention or arrest or for removal. 8 U.S.C. § 1159(a) provides that individuals admitted to the U.S. as refugees, who, among other things, "[have] been physically present in the United States for at least one year" and have not obtained "permanent residence status," "shall, at the end of such year period, return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant." 8 U.S.C. § 1159(a). Courts have interpreted the phrase "return or be returned to custody" not to authorize detention and have enjoined efforts to arrest and detain refugees who have not appeared for adjustment based on 8 U.S.C. § 1159(a). *U.H.A. v. Bondi*, 817 F.Supp.3d 752, 765-767, 772 (D. Minn. 2026).

ICE also previously adhered to a policy that a refugee's failure to adjust status or to apply for adjustment "is not sufficient grounds to place them in removal proceedings, and therefore not a proper basis for detaining them." *See* Exhibit 3 to Complaint, *ICE Policy No. 11039.1: Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* (May 10, 2010), at 2, *A. et al. v. Noem et al.*, No. 3:26-cv-30031 (D. Mass. Feb. 27, 2026), ECF No. 1-5. In 2026, ICE published a new policy, concluding that § 1159(a)(1) mandates detention of all unadjusted refugees after one year. *See* Exhibit 2 to Complaint, Joseph B. Edlow & Todd M. Lyons, *Detention of Refugees Who Have Failed to*

*Adjust to Lawful Permanent Resident Status* (Feb. 18, 2026) ("Refugee Detention Memo"), at 1–2, *A. et al. v. Noem et al.*, No. 3:26-cv-30031 (D. Mass. Feb. 27, 2026), ECF No. 1-4. The 2026 policy is currently stayed under section 705 of the APA. *See* Order Granting Motion to Stay, *A. et al. v. Noem et al.*, No. 3:26-cv-30031 (D. Mass. Feb. 27, 2026), ECF No. 51.

Further undermining the supposed gravity of Defendants' claimed enforcement priorities for this category of refugee is the fact that USCIS instructs refugees *not* to apply for adjustment until after the one-year mark, as it cannot approve the application unless a refugee has been physically present in the U.S. for at least one year. U.S. Citizenship and Immigr. Servs., *Green Card for Refugees* (last updated July 8, 2025), https://perma.cc/9FPH-UB37. The proposed exception would allow data sharing as to refugees who have been present in the U.S. for 366 days, even though they have had just a single day to apply for adjustment. Furthermore, there is a significant backlog of unresolved applications by refugees for adjustment of status (I-485), as the number of pending cases rose 190% from FY2025 Q2 to FY2026 Q2. *See* American Immigration Council, *USCIS Backlog Grows Even as Agency Gets Fewer Filings* (Sep. 11, 2026), https://perma.cc/Y7LS-K8SL. As with other applicants for immigration relief described above, unadjusted refugees should not be punished (or subjected to unnecessary privacy violations) due to delays of Defendants' own making.

Finally, Defendants have already shown they cannot implement this proposed categorization precisely; when DHS sought Medicaid data regarding nearly 6,000 unadjusted refugees in Minnesota, the shared data was later found to include individuals who were U.S. citizens or nationals, as well as individuals who had not been in the U.S. for over one year. *See* ECF No. 155-3 (Second Brandt Decl.) ¶¶ 26-27, 33; ECF No. 155-5 (Katz Decl.) ¶¶ 4-7, 11-12. Defendants have never explained how this error occurred, or what policies and procedures could be implemented to prevent reoccurrence. As with the ambiguous and unworkable categories described above, the Court should consider this potential for future errors and limit Defendants' data sharing to individuals who are clearly and unmistakably unlawfully present.

Because Defendants have not clearly tied this category to any legitimate enforcement

purpose and have not explained why they need data from CMS or how they will accurately implement this category, the Court should decline to include this category in its clarified order.

## III. THE COURT NEED NOT REVISIT ITS PROHIBITION ON THE USE OF FEDERAL HEALTHCARE DATA OTHER THAN MEDICAID DATA

Defendants also seek to modify the scope of the preliminary injunction in regard to the healthcare programs covered; however, the Court should reject this effort. In promulgating the 2025 ICE Policy, Defendants explicitly stated that the policy is not limited to sharing data only from the Medicaid program or even data solely from CMS. ECF No. 131-2 at 1-2 ("It is ICE policy that the agency may…request, receive, and use *HHS information that may be useful for any and all law enforcement activities*…This *includes, but is not limited to*, information provided to HHS Centers for Medicare & Medicaid Services…") (emphasis added). This new ICE policy was, as Defendants acknowledge, the product of "the decision-making process required by the Court's order." Rich Decl. ¶ 3, Ex. 1. Therefore, Plaintiffs are appropriately challenging in this litigation the entirety of Defendants' new policy for sharing and using federal healthcare data.[11] *See, e.g.*, ECF No. 140; *see also* ECF No. 134. Types of federal healthcare data that are not expressly mentioned in the 2013 ICE policy or Defendants' proposed clarification are at issue in this lawsuit and should also be protected by the preliminary injunction, because they constitute "federal healthcare data," and the Court's determination that the new policies are likely arbitrary and capricious apply with equal force to them. This includes Medicare, as well as programs like California's standalone Family Planning, Access, Care, and Treatment Program (Family PACT), which covers contraception, screening and treatment of sexually transmitted diseases; and the federally funded Vaccines for Children program, which is administered by HHS's Centers for Disease Control and Prevention (CDC) and provides grants to states to support affordable access to vaccines. Other HHS components may also contain data derived from CMS data. As with Medicaid, allowing Defendants to share data from these programs "on citizens, lawful permanent residents, and others present in the country with permission" with DHS would present "a slew of

[11] Plaintiffs and Defendants agree that the injunction should not extend to data held by HHS from non-healthcare programs, such as TANF data. ECF No. 201.

privacy concerns not adequately explained in the new policies and not fully addressed by the parties." Sept. 8, 2026, Order at 2 n. 1.

The Court should again deny this request to narrow the injunction. Defendants previously acknowledged that if they were to pursue data sharing outside the Medicaid program, they would need to undertake some form of reasoned decision-making. *See* Transcript of Dec. 9, 2025 Hearing at 3:4-8. Yet now Defendants, without any explanation – or even any specific mention of the data they seek – attempt a policy reversal without any such process.

Defendants' arguments about the scope of this lawsuit are also meritless. The amended complaint makes clear that the Plaintiffs seek to protect healthcare data privacy writ large. *See, e.g.*, Am. Complaint ¶ 240 ("In administering their Medicaid *and other healthcare programs*, the States have relied on the federal government's assurances that it will follow the law and protect confidentiality") (emphasis added). Similarly, the October 2025 ICE policy now at the heart of this case does not limit itself to sharing data only from the Medicaid program or data solely from CMS. Failing to enjoin the sharing of Medicare data will render the protections of the injunction meaningless for individuals who are eligible for both Medicare and Medicaid.[12] These dual eligible individuals include LPRs who would otherwise be protected by the Order. 42 U.S.C. 1395o(a)(2). Under such circumstances, the Court should preserve the scope of the injunction.

## IV. THE COURT SHOULD CLARIFY THE PRELIMINARY INJUNCTION TO COVER FEDERAL CONTRACTORS

As part of any order clarifying the preliminary injunction, the Court should make clear that the limits that it imposes on Defendants also extend to federal contractors, including but not limited to Palantir. Fed R. Civ. P. 65(d) provides that an injunction extends to not only the parties, but also the "agents" and "other persons who are in active concert or participation with anyone" described in the rule. Fed R. Civ. P. 65(d)(2). Additionally, courts generally seek to

[12] *See* CMS, Dual Eligibility Categories (Feb. 11, 2026), https://perma.cc/Z9DY-8EKK (describing dual eligible individuals generally). Medicare and Medicaid data overlap, and CMS's Medicare-Medicaid Data Sharing Program helps state Medicaid agencies access Medicare data for dual eligible individuals to coordinate care. Ctrs. for Medicaid &Medicare Servs., Medicare-Medicaid Data Sharing Program (last updated Jan. 17, 2025), https://perma.cc/RC24-FTKS.

interpret injunctions in a manner that prevents "loopholes" and aiding and abetting of violations of court orders. *Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1177 (9th Cir. 2025).

Here, Defendants have admitted that they shared the Medicaid data from January 7, 2026, with Palantir, which has played a well-documented role in making datasets available to ICE. Given these past actions, the Court should clarify that the preliminary injunction extends to Palantir and any other federal contractor working with Defendants to guard against any end-runs around the limits on data sharing imposed by the Court.

## V. THE COURT SHOULD REQUIRE DEFENDANTS TO IMPLEMENT SAFEGUARDS

To facilitate compliance with any clarified preliminary injunction order, the Court should impose conditions on future data sharing. This should include written procedures establishing in detail an administrable process for implementation. Such procedures should entail a requirement that, *before* CMS discloses information, DHS establish that an individual is indeed subject to data sharing by providing sufficient identifiers for CMS to independently verify that it can properly disclose a specific individual's data. Additionally, the Court should require Defendants to maintain a contemporaneous auditable record of individuals whose data CMS has shared with DHS (subject to audit and verification rights by Plaintiffs) and provide periodic compliance certifications to Plaintiffs. Courts have imposed similar reporting requirements on ICE in connection with their immigration enforcement activities. *See*, *e.g.*, *Ramirez Ovando v. Mullin*, No. 1:25-cv-03183-RBJ, 2026 WL 2641058, at * 24 (D. Colo. May 12, 2026).

## VI. THE COURT SHOULD MAINTAIN A BROAD AND CLEAR PRELIMINARY INJUNCTION WHILE THE PARTIES PROCEED TO SUMMARY JUDGMENT OR ADJUDICATION

Plaintiffs do not oppose Defendants' request that the Court direct the Parties to propose a schedule for dispositive briefing.[13] However, the Court should maintain a broad preliminary injunction, consistent with Plaintiffs' proposed order, that provides clear guidance to the Parties and to the public while the Parties brief the myriad and complicated legal issues in this case.

---

[13] Plaintiffs reserve the right to seek summary adjudication as opposed to summary judgment.

Dated: November 20, 2026

Respectfully submitted,

LETITIA JAMES
Attorney General for the State of New York
MARK LADOV*
Special Counsel
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
ZOE LEVINE*
Special Counsel for Immigrant Justice
NATASHA KORGAONKAR*
Special Counsel
28 Liberty St. New York, NY 10005
mark.ladov@ag.ny.gov
*Attorneys for the State of New York*
*Admitted pro hac vice

ROB BONTA
Attorney General for the State of California
NELI PALMA
Senior Assistant Attorney General
KATHLEEN BOERGERS
ANNA RICH
Supervising Deputy Attorneys General
WILLIAM BELLAMY
KATHERINE MILTON
KEVIN G. REYES
STEPHANIE T. YU

/s/ *William Bellamy*
WILLIAM BELLAMY
Deputy Attorneys General
*Attorneys for the State of California*

*Additional Counsel*

KRISTIN K. MAYES
Attorney General for the State of Arizona
ALEXA G. SALAS*
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Alexa.Salas@azag.gov
ACL@azag.gov
*Attorneys for the State of Arizona*
*Admitted pro hac vice

PHILIP J. WEISER
Attorney General for the State of Colorado
RYAN LORCH*
Senior Assistant Attorney General
SAM WOLTER*
Assistant Attorney General
1300 Broadway, #10
Denver, CO 80203
Ryan.lorch@coag.gov
samuel.wolter@coag.gov
*Attorneys for the State of Colorado*
*Admitted pro hac vice

WILLIAM TONG
Attorney General of Connecticut
JANELLE MEDEIROS*
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
Janelle.Medeiros@ct.gov
*Attorneys for the State of Connecticut*
*Admitted pro hac vice

KATHLEEN JENNINGS
Attorney General for the State of Delaware
IAN R. LISTON
Director of Impact Litigation
JENNIFER KATE AARONSON
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*
*Admitted pro hac vice

ANNE E. LOPEZ
Attorney General for the State of Hawai'i
KALIKO'ONĀLANI D. FERNANDES*
Solicitor General
DAVID D. DAY*
Special Assistant to the Attorney General
425 Queen Street
Honolulu, HI 96813
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
*Attorneys for the State of Hawai'i*
*Admitted pro hac vice

S. TRAVIS MAYO
General Counsel
Office of the Governor of Kentucky
S. Travis Mayo*
General Counsel
Taylor Payne*
Chief Deputy General Counsel
Laura C. Tipton*
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov
*Attorneys for Plaintiff Governor of Kentucky, Andy Beshear*
* Admitted pro hac vice

KWAME RAOUL
Attorney General for the State of Illinois
HARPREET KHERA*
Bureau Chief, Special Litigation
SHERIEF GABER*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
sherief.gaber@ilag.gov
harpreet.khera@ilag.gov
*Attorneys for the State of Illinois*
*Admitted pro hac vice

AARON M. FREY
Attorney General for the State of Maine
BRENDAN KRECKEL*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
brendan.d.kreckel@maine.gov
*Attorneys for the State of Maine*
*Admitted pro hac vice

ANTHONY G. BROWN
Attorney General for the State of Maryland
MICHAEL DREZNER*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Mdrezner@oag.state.md.us
*Attorneys for the State of Maryland*
*Admitted pro hac vice

ANDREA JOY CAMPBELL
Attorney General for the State of Massachusetts
KATHERINE DIRKS
Chief State Trial Counsel
CHLOE CABLE
ETHAN W. MARKS*
Assistant Attorneys General
Office of the Massachusetts Attorney General
1 Ashburton Place Boston, MA 02108
Katherine.Dirks@mass.gov
Chloe.Cable@mass.gov
Ethan.W.Marks@mass.gov
*Attorneys for the Commonwealth of Massachusetts*
*Admitted pro hac vice

DANA NESSEL
Attorney General for the State of Michigan
NEIL GIOVANATTI*
BRYAN BEACH*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
GiovanattiN@michigan.gov
BeachB@michigan.gov
*Attorneys for the State of Michigan*
*Admitted pro hac vice

KEITH ELLISON
Attorney General for the State of Minnesota
KATHERINE J. BIES
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
Katherine.Bies@ag.state.mn.us
*Attorneys for the State of Minnesota*

AARON D. FORD
Attorney General for the State of Nevada
HEIDI PARRY STERN* (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov
*Attorneys for the State of Nevada*
*Admitted pro hac vice

JENNIFER DAVENPORT
Attorney General for the State of New Jersey
ESTEFANIA PUGLIESE-SAVILLE*
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Estefania.Pugliese-Saville@law.njoag.gov
*Attorneys for the State of New Jersey*
*Admitted pro hac vice

RAÚL TORREZ
Attorney General of New Mexico
AMY SENIER*
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
asenier@nmdoj.gov
*Attorneys for the State of New Mexico*
*Admitted pro hac vice

DAN RAYFIELD
Attorney General State of Oregon
BRIAN S. MARSHALL
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Brian.S.Marshall@doj.oregon.gov
*Attorneys for the State of Oregon*

PETER F. NERONHA
Attorney General for the State of Rhode Island
LEE B. STALEY*
Chief, Health Care Unit
150 South Main Street
Providence, RI 02903
lstaley@riag.ri.gov
*Attorneys for the State of Rhode Island*
*Admitted pro hac vice

CHARITY R. CLARK
Attorney General for the State of Vermont
RYAN P. KANE*
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
Ryan.kane@vermont.gov
*Attorneys for the State of Vermont*
*Admitted pro hac vice

NICHOLAS W. BROWN
Attorney General of Washington
ZANE MULLER, WSBA 63777*
WILLIAM MCGINTY, WSBA #41868*
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
*Attorneys for the State of Washington*
*Admitted pro hac vice

JOSHUA L. KAUL
Attorney General for the State of Wisconsin
KARLA Z. KECKHAVER*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
karla.keckhaver@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*