JONATHAN D. GUYNN
Acting Assistant Attorney General
ELIZABETH J. SHAPIRO
Deputy Director
CHRISTIAN DIBBLEE (D.C. Bar No. 90002557)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW,
Washington, DC 20005
Phone: (202) 353-5980
E-mail: christian.r.dibblee@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

STATE OF CALIFORNIA, et al.,

Plaintiffs,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants.

3:25-cv-05536-VC

**DEFENDANTS' REPLY IN SUPPORT OF RENEWED MOTION TO CLARIFY PRELIMINARY INJUNCTION AND MOTION FOR A CASE SCHEDULE**

**Date:** December 10, 2026
**Time:** 10:00 AM
**Courtroom:** Courtroom 4
**Judge:** Hon. Vince Chhabria

# TABLE OF CONTENTS

INTRODUCTION .......... 1

ARGUMENT .......... 1

I. The Court Should Adopt Defendants' Proposed Categories. .......... 1

II. The Court Should Not Adopt Plaintiffs' Categories Where They Differ or Add to Defendants' Categories. .......... 6

A. Lawful Presence Is An Inappropriate Standard .......... 6

B. Plaintiffs' Categories of "Lawfully Present" Aliens Should Not Be The Sharing Prohibited Categories .......... 9

C. Plaintiffs' Other Categories Are Overbroad. .......... 12

III. The Court Should Limit Its Injunction At Most To Data From The Programs Named In The 2013 ICE Memorandum. .......... 13

IV. Clarifying The Injunction To Apply To Contractors Is Unnecessary. .......... 15

V. Plaintiffs' Proposed "Safeguards" Are Unnecessary. .......... 15

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

## CASES

*Casa de Md. v. DHS*,
924 F.3d 684 (4th Cir. 2019) ............ 10

*Cisneros v. Blanche*,
182 F.4th 363 (4th Cir. 2026) ............ 9

*Cruz-Miguel v. Holder*,
650 F.3d 189 (2d Cir. 2011) ............ 8

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ............ 10

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) ............ 3

*Jean A. v. Noem*,
2026 WL 805207 (D. Mass. Mar. 23, 2026) ............ 5

*Johnson v. Guzman Chavez*,
594 U.S. 523 (2021) ............ 2

*Kullab v. DHS*,
2025 WL 901943 (N.D. Cal. Mar. 25, 2025) ............ 11

*Nasrallah v. Barr*,
590 U.S. 573 (2020) ............ 3

*Pac. Radiation Oncology LLC v. Queens Med. Ctr.*,
810 F.3d 631 (9th Cir. 2015) ............ 13

*Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ............ 10

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) ............ 9

*Sanchez v. Mayorkas*,
593 U.S. 409 (2021) ............ 11

*United States v. Orellano*,
405 F.3d 360 (5th Cir. 2005) ............ 4

*Xiao Lu Ma v. Sessions*,
907 F.3d 1191 (9th Cir. 2018) ............ 11

**STATUTES**

8 U.S.C. § 1101(a)(15) ........ 11

8 U.S.C. § 1159(a) ........ 5, 6

8 U.S.C. § 1182(a) ........ 6, 7, 8

8 U.S.C. § 1227(a) ........ 4, 8

8 U.S.C. § 1229(b)(5)(C)(ii) ........ 2

8 U.S.C. § 1231(a)(3) ........ 3

8 U.S.C. § 1254a(f)(4) ........ 11

8 U.S.C. § 1360(b) ........ 3, 6

8 U.S.C. § 1373 ........ 3, 6

8 U.S.C. § 1611(b)(2) ........ 7

**RULES**

Fed. R. Civ. P. 65(d)(2)(B) ........ 15

Federal Civil Rule 65 ........ 15

**REGULATIONS**

8 C.F.R. § 1.3(a) ........ 7, 8

8 C.F.R. § 236.21(c)(1) ........ 10

8 C.F.R. § 244.10(f)(2)(iv) ........ 11

8 C.F.R. § 244.16 ........ 10, 11

8 C.F.R. § 1003.6(a) ........ 2

8 C.F.R. § 1241.1(a) ........ 4

Adjustment of Status; Certain Nationals of the People's Republic of China, 62 Fed. Reg. 63249 (Nov. 28, 1997) ........ 9

Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53152 (Aug. 30, 2022) ........ 10

Privacy Act of 1974; System of Records,
89 Fed. Reg. 55638 (July 5, 2024) ........ 4

Proclamation No. 10998,
90 Fed. Reg. 59717 (Dec. 16, 2025) ........ 5

**OTHER AUTHORITIES**

DHS, *ICE Arrests More Than 100 Gang Members in Less Than a Week* (Oct. 19, 2026),
https://perma.cc/ZW7D-UAJY ........ 8

DHS, *Privacy Policy Guidance Memorandum* (Dec. 29, 2008),
https://perma.cc/8A66-47YN ........ 3

Memorandum from D. Meissner, Comm'r, Immig. and Naturalization Serv.,
to Regional Directors et al. (Nov. 17, 2000),
https://www.scribd.com/document/22092970/INS-Guidance-Memo-Prosecutorial-Discretion-Doris-Meissner-11-7-00 ........ 9

Memorandum from W. Yates, Assoc. Director of Operations, DHS,
Citizenship and Immigration Servs., to Director, Vt. Serv. Ctr.,
https://perma.cc/YLM5-V2BY (Oct. 8, 2003) ........ 10

Off. of the Dir., U.S. Immigr. & Customs Enf't, *Clarification of Existing Practices Related to Certain Health Care Information* (Oct. 25, 2013), https://perma.cc/C2KY-B66Y ........ 14

USCIS Adjudicator's Field Manual,
https://www.uscis.gov/sites/default/files/document/policy-manual-afm/afm40-external.pdf 7, 8

USCIS Form I-821, Application for Temporary Protected Status (Jan. 20, 2025),
https://perma.cc/GF47-JG4X ........ 11

## INTRODUCTION

Defendants U.S. Department of Homeland Security (DHS) and U.S. Department of Health and Human Services (HHS) crafted a proposal to clarify the aliens whose data they can share, consistent with this Court's guidance. *See* Renewed Mot. to Clarify, ECF No. 202 (Mot.). Defendants' proposed Sharing Permitted Categories are narrowly defined to permit enforcement, in accordance with the Court's preliminary injunction, against aliens who have entered the United States unlawfully, violated the terms of their admission, are amenable to removal, or who have final orders of removal. Plaintiffs' opposing proposal is deaf to those considerations, relying once again on the concept of lawful and unlawful presence. *See* Opp'n to Renewed Mot. to Clarify, ECF No. 205 (Opp'n). That concept has limited purchase in this information sharing case because it does not incorporate the Government's legitimate immigration enforcement needs. The Court should reject Plaintiffs' proposal and adopt Defendants'.

Defendants also reiterate their request to clarify the injunction's terms to the HHS programs mentioned in the 2013 Immigration and Customs Enforcement (ICE) memorandum that is an issue in this case. Plaintiffs want instead to enjoin transfers of all "federal healthcare data," even though their Amended Complaint does not extend that broadly, nor do the policies at issue in this case or this Court's own descriptions of the case. Accordingly, the preliminary injunction should affect data received by the Centers for Medicare and Medicaid Services (CMS) in certain programs, as Defendants have suggested.

## ARGUMENT

### I. The Court Should Adopt Defendants' Proposed Categories.

Plaintiffs deride Defendants' proposed categories as "deficient on [their] face" and bearing only a "tenuous connection to legitimate immigration enforcement priorities[.]" Opp'n 15. To the contrary, Defendants crafted a proposal that would permit sharing about various categories of aliens "against whom they are most likely to initiate enforcement actions or effectuate final orders of removal[.]" Mot. 17. Defendants have not proposed categories to "cover every permutation of immigration status," *id.*, but rather have engaged in a thoughtful analysis of their needs and this

Court's guidance. Above all, Defendants are not trying to "rewrite the injunction," Opp'n 1, as Plaintiffs baldly assert.[1] This Court has invited the parties to seek clarity of the preliminary injunction on multiple occasions and has most recently labeled Defendants' requests for clarity as "perfectly appropriate." Tr. of Proceedings at 7:15-16, ECF No. 195 (Tr.). To be sure, Defendants maintain that no injunction is warranted in this case and that, to the extent the Court enters a clarified injunction, their original clarification proposal is the correct avenue for clarity. *See* ECF No. 173. The Court has rejected those arguments, but there is nothing improper about seeking clarity through a new proposal.

The parties' proposed Sharing Prohibited categories overlap slightly. To the extent Plaintiffs add Sharing Prohibited categories, Defendants respond in section II. This section rebuts Plaintiffs' objections to Defendants' Sharing Permitted categories. Before proceeding, Defendants reiterate that despite Plaintiffs' references to "sensitive healthcare records," "sensitive Medicaid data," or "personal healthcare data," Opp'n 9, 16, 19, Defendants are not seeking to expand sharing beyond the "basic biographical information and contact information" already permitted by this Court. *See* Mot. 1 n.1. To the extent Plaintiffs ask why the Government needs access to data as described in those alarmist terms, they misapprehend what Defendants request.

***Aliens With Final Order of Removal.*** Defendants described in their motion how aliens with final orders of removal must be removed and how withholding or deferral of that removal does not provide "durable permission to be in the United States." Mot. 11. "Statutory withholding and CAT protection affect only *where*, not *whether*, an alien may be removed." *Id.* Plaintiffs do not contest that notion, nor could they given the Supreme Court's agreement that an order of removal "remains in full force" after a grant of withholding or deferral of removal. *Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021). Plaintiffs respond that aliens with withheld or deferred removal are eligible for public benefits and employment authorization. *See* Opp'n 15–16. Those allowances do not undermine these aliens' removability. Withheld or deferred removal under the

[1] Plaintiffs also imply Defendants have somehow sat on their rights for "nearly a year," Opp'n 1, which is obviously false. *See* ECF No. 155 at 10 (Defendants requesting clarity in April 2026).

Immigration and Nationality Act or Convention Against Torture (CAT) prohibits removal only to certain places. *See Nasrallah v. Barr*, 590 U.S. 573, 582 (2020) (describing the CAT); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987) (describing the INA). It is therefore inaccurate to say these aliens are "authorized to be present." Opp'n 16 (citation omitted). All they have is the right not to be removed to a particular country.

Plaintiffs see no link between sharing about these aliens and legitimate immigration enforcement. *See id.* But they ignore that aliens with a final order of removal are subject to "orders of supervision" that the Government could not administer without being able to locate the alien under supervision. *See* Mot. 11–12 (describing 8 U.S.C. § 1231(a)(3)). Allowing DHS to locate them is consistent with DHS's "broad statutory authority" to obtain information about aliens, Third PI Order at 2–3, ECF No. 148 (citing 8 U.S.C. § 1360(b)), *see also* 8 U.S.C. § 1373. That an alien who has applied for withholding "has provided DHS with detailed information" does not prohibit that alien from disappearing once withholding is granted, rendering that information useless. Opp'n 16. Similarly, although these aliens are "eligible" for employment authorization, *id.*, they are not required to seek it, and the Government cannot assume that they will or that the alien will abide by his obligation to provide updated contact information through the employment authorization process and validity period. In short, these "alternative pathway[s]" are wholly insufficient to overcome DHS's legitimate interests. *Id.* Defendants thus should not need to resort to these methods first, *contra id.*

Nor do the Fair Information Practice Principles (FIPPs) require DHS to do so. *See id.* FIPPs encourage DHS to collect information "directly relevant and necessary to accomplish the specified purpose(s)." DHS, *Privacy Policy Guidance Memorandum* at 4 (Dec. 29, 2008), https://perma.cc/8A66-47YN. The basic biographical information that DHS seeks now is "directly relevant and necessary" for locating the alien or confirming the alien's physical whereabouts. *See id.* Moreover, ICE privacy policies allow ICE to collect, maintain, and use biographical information "[t]o support the identification, arrest, charging, monitoring, detention, and/or removal

of individuals unlawfully entering or present in the United States in violation of the INA." Privacy Act of 1974; System of Records, 89 Fed. Reg. 55638, 55640 (July 5, 2024).

Defendants' proposal to share about aliens "subject to a final order of removal" refers to those orders of removal that are administratively final. Mot. 8; *see* 8 C.F.R. § 1241.1 (enumerating when an order of removal "shall become final"). An administratively fine removal order remains final, even if subsequently stayed. *See, e.g.*, 8 C.F.R. § 241.6(a) (governing "[a]ny request of an alien under *a final order of deportation or removal* for a stay" of that order (emphasis added)). Accordingly, sharing should be permitted about aliens with final orders of removal that have been stayed. *Contra* Opp'n 10; *see United States v. Orellano*, 405 F.3d 360, 370 (5th Cir. 2005) ("[T]emporary stay of removal does not render an otherwise illegal alien's presence lawful.").

***Aliens Who Entered With Visa and Are Deportable under 8 U.S.C. § 1227.*** Defendants previously explained their "strong interest" in locating aliens who are removable and placing them in removal proceedings. *See* Mot. 13–14. Plaintiffs acknowledge that interest, *see* Opp'n 19, but say sharing should occur for only those whose removability has been adjudicated, *see id.* at 17. That makes no sense; the interest in locating removable aliens requires locating aliens that DHS believes are removable so that DHS can place them into removal proceedings. Plaintiffs' other arguments misread Defendants' proposal. Lawful Permanent residents (LPRs) are not included in this category because they do not lose that status until ordered removed, unlike some visa holders. *See* Mot. 13–14; *contra* Opp'n 17–18. Also, Defendants' proposal "reflect[s] a clear carveout for all LPRs" by including LPRs in the Sharing Prohibited Category. Opp'n at 18, *see* Defs.' Proposed Order, ECF No. 202-1 at 2. As for Plaintiffs' concerns that Defendants have not specified how they would avoid sharing about "visa holders generally" under this category, Opp'n 18, Defendants' proposal includes holders of valid nonimmigrant status like visas as a Sharing Prohibited category. Moreover, Defendants know of no statutory authority foreclosing "bulk data sharing" of information about aliens. *Id.* Though some of § 1227's grounds of deportability are "individualized," *id.*, some are not, such as overstaying the term of one's visa, *see* 8 U.S.C. § 1227(a)(1)(C)(ii). Indeed, the Government's interest in locating deportable aliens—an interest

that Plaintiffs acknowledge—would be unlawfully handicapped by the kind of "procedures" Plaintiffs have in mind. Opp'n 18.

***Applicants for Immigration Benefits.*** Defendants cited several authorities explaining that mere application for an immigration benefit does not confer lawful status or permission to be in the United States. *See* Mot. 14–15. Plaintiffs refute or dispute none of those authorities. Instead, they seek carveouts for particular statuses and applicants—discussed in § II—and insist that this category is "inappropriate" given Government policies to pause adjudication of applications by aliens in 39 countries that the President has determined pose national security concerns because of deficiencies in their internal vetting processes. Opp'n 19; *see* Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 16, 2025). Defendants disagree. Those policies do not defeat the Government's legitimate interest (which Plaintiffs do not address) in ensuring that applicants give an accurate address, and this litigation focuses on those types of immigration enforcement interests. *See* Mot. 15. Those interests are similarly unaffected by the exact timing of review by DHS of pending applications. *Contra* Opp'n 20 (discussing hold on reviewing applications for asylum and withholding of removal). In any event, Plaintiffs respond that because these aliens are "actively applying to DHS," there is no need to seek data about them. *Id.* Not so. As with work authorization after a final order of removal, an active application does not guarantee that an alien's proffered information is correct. The Government has an interest in ensuring the accuracy of that information, both to expedite resolution of the application and to prevent delay tactics by applicants.

***Refugees Who Have Not Appeared For Adjustment.*** Plaintiffs do not dispute that each refugee must appear for adjustment of status after one year of presence in the United States. *See* 8 U.S.C. § 1159(a). Plaintiffs' main response is that failure to appear for adjustment is not grounds for removal or detention. *See* Opp'n 21. Defendants disagree; § 1159's requirement that an alien "shall . . . be returned" to DHS "custody" authorizes detention of unadjusted refugees as a matter of plain language. 8 U.S.C. § 1159(a)(1); *but see Jean A. v. Noem*, 2026 WL 805207, at *1 (D. Mass. Mar. 23, 2026). But even if not, DHS's interest in enforcing the appearance requirement

permits it to locate refugees who have failed to appear and inform them of their responsibility. Doing so also furthers the Government's interest in identifying removable aliens because appearing for adjustment of status could result in finding grounds for removal and initiating removal proceedings. *See* 8 U.S.C. § 1159(a)(1) (directing inspection to occur "in accordance with the provisions of sections 1225, 1229a, and 1231 of this title").

Plaintiffs' other arguments do not move the needle. They posit that "DHS presumably has the[] contact information" for these refugees because all refugees are authorized to work. Opp'n 21. Plaintiffs do not say that all refugees are required to seek that authorization, nor (as said multiple times) can DHS assume that their provided information is still accurate. Nor do the broad statutory authorities permitting DHS to obtain information about aliens require DHS to "contact refugees from these sources" first and seek information from HHS only if those efforts fail. *Id.*; *see* 8 U.S.C. §§ 1360(b), 1373. Neither do the FIPPS, for reasons already explained.

## II. The Court Should Not Adopt Plaintiffs' Categories Where They Differ or Add to Defendants' Categories.

Plaintiffs propose their own framework of categories that would expand Defendants' proposal to prohibit sharing about aliens deemed "lawfully present" in 8 C.F.R. § 1.3(a). That portion of Plaintiffs' proposal is overbroad, as are other elements of the proposal.

### A. Lawful Presence Is An Inappropriate Standard

Plaintiffs acknowledge that the keystone of their proposal is the concept of unlawful presence. *See* Opp'n 10–11. As in previous briefing, Defendants dispute that unlawful presence is the proper standard for determining the aliens about whom Defendants may share information. Plaintiffs again point to one statute and one regulation that relate to lawful presence, but neither authority relates to information sharing. 8 U.S.C. § 1182(a)(9)(B) defines unlawful presence only "for purposes of this paragraph," meaning subsection (a)(9). 8 U.S.C. § 1182(a)(9)(B)(ii). That subsection effects statutory bans of reentry of aliens who previously departed voluntarily or were removed, and it defines periods of unlawful presence for that purpose. Under subparagraph (I), an alien unlawfully present for over a year is inadmissible for 10 years after their departure or

removal. Under subparagraph (II), an alien is inadmissible for three years if unlawfully present for between 180–364 days but who voluntarily departed before removal proceedings began. In other words, § 1182(a)(9) uses the concept of "presence" in a specific statutory scheme about when aliens can return to the United States after leaving, not about information sharing. And the various exceptions and tolling for § 1182(a)(9)(B) make that standard totally unworkable. For example, filing a "bona fide application for asylum" tolls unlawful presence, but there is no statutory guidance for what is or is not a bona fide application. *Id.* § 1182(a)(9)(B)(iii)(II).

Perhaps aware of that unwieldiness, Plaintiffs' proposal incorporates 8 C.F.R. 1.3(a) rather than 8 U.S.C. § 1182(a)(9)(B). *See* Opp'n 9. That regulation lists categories of aliens "*only*" for "the purposes of 8 U.S.C. § 1611(b)(2)," 8 C.F.R. § 1.3(a) (emphasis added), a statute that allows the Attorney General to define lawfully present aliens for "any benefit payable under title II of the Social Security Act," which does not cover Medicaid. 8 U.S.C. § 1611(b)(2). The regulation says nothing about information sharing, and the Court should not rely on it to define that sharing. Further, it raises similar workability concerns as § 1182(a)(9)(B). For example, it deems certain parolees as lawfully present, but those determinations are based on the duration of parole and the reason for said parole. *See* 8 C.F.R. § 1.3(a)(3). Plaintiffs' complicated proposal—which would require HHS ICE to filter against a dozen or more categories or aliens—would result in an effective ban on all sharing from Plaintiff States, which is inconsistent with the Court's injunction.

Plaintiffs rely on the USCIS Adjudicator's Field Manual[2] (AFM) throughout their brief, but the AFM does not support adopting lawful presence as a standard. As Plaintiffs admit, the relevant chapters of the AFM "implement[] § 1182(a)(9)(B)," Opp'n 10, making it inapposite in this data-sharing case for the same reasons as § 1182(a)(9)(B), discussed above. The AFM's exceptions to unlawful presence also go beyond the exceptions in that statute. *See* USCIS

[2] Available at https://www.uscis.gov/sites/default/files/document/policy-manual-afm/afm40-external.pdf. All Manual pincites are to the PDF pages. USCIS is retiring the AFM and is working to update and incorporate all AFM content into the USCIS Policy Manual. *See* USCIS Policy Manual, https://www.uscis.gov/policy-manual (last visited Nov. 24, 2026). Information within the legacy AFM may, accordingly, not be up to date.

Adjudicator's Field Manual Ch. 40.9.2(a) at *85 (admitting these exceptions "are based on policy"). So not only is the Manual tied to an inapposite statutory scheme, it includes content beyond that statute's text. *Accord Cruz-Miguel v. Holder*, 650 F.3d 189, 200 (2d Cir. 2011) (labeling Manual an "internal guidance document" that is not binding or have "the force of law"). The Manual is about calculating unlawful presence for the narrow purpose of inadmissibility under § 1182(a)(9)(B), and that calculation does not depend on DHS's plausible immigration purposes. For example, the Manual says that aliens granted withholding or deferral of removal do not accrue unlawful presence, *see id.* Ch. 40.9.3(k)-(*l*) at *96, even though the Government has legitimate and plausible needs to locate those aliens, *see supra* at 2–4.

Indeed, lawful presence based on these authorities does not answer the Court's key question for this clarification exercise, which is the "categories of people [ICE might] plausibly need to be conducting immigration enforcement actions against." Tr. at 7:23-24. 8 U.S.C. § 1182(a)(9)(B) and 8 C.F.R. § 1.3(a) are about calculation of periods of unlawful presence for certain public benefits (not Medicaid) and inadmissibility. They do not consider immigration enforcement needs. Take the example of minors. Under § 1182(a)(9)(iii)(I), no alien under 18 years of age is unlawfully present. But the Government still has immigration enforcement interests in alien minors who, for example, commit crimes that are grounds for removal. *See* 8 U.S.C. §§ 1182(a)(2); 1227(a)(2); *see also* DHS, *ICE Arrests More Than 100 Gang Members in Less Than a Week* (Oct. 19, 2026), https://perma.cc/ZW7D-UAJY (describing arrest of illegal minor who possessed a gun at the time of arrest and is charged with first-degree murder and many other crimes). The Government would not be able to seek information about those aliens, despite legitimate immigration enforcement interests, if lawful/unlawful presence is the standard. To be sure, Defendants understand that clarification now is about "draw[ing] some sort of a reasonable line in the context of this injunction." Tr. at 21:7-8 (Court's remarks). Adopting the over one dozen categories of aliens deemed unlawfully present under 8 C.F.R. § 1.3(a) would be unreasonable given the injunction and the Government's "plausible immigration enforcement purposes." Order on Mot. to Clarify Inj., ECF No. 196 at 1.

### B. Plaintiffs' Categories of "Lawfully Present" Aliens Should Not Be The Sharing Prohibited Categories

Plaintiffs highlight specific categories which make clear that lawful presence is an inapt standard for this case. The Court also should not prohibit sharing for those specific categories, for the reasons discussed below.

Defendants did not "address the question of" these categories because Defendants' proposal does not depend on them. Opp'n 12. Defendants instead crafted determinate Sharing Permitted categories tailored to the Government's immigration enforcement needs and consistent with the Court's guidance. If an alien does not fall into a Sharing Permitted category, Defendants could not share that alien's data. In other words, Defendants do not propose sharing for all aliens with DACA or TPS.[3] Defendants propose sharing only if they fall in a Sharing Permitted category. Plaintiffs, however, want to exclude all aliens in DACA or TPS. That would be unreasonable.

***Deferred Action Recipients.*** Deferred action is an "exercise in administrative discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999) (citation omitted). As a result, any alien benefitting from deferred action "remains in the country only at the government's sufferance, with no statutory entitlement that he can claim against it." *Cisneros v. Blanche*, 182 F.4th 363, 369 (4th Cir. 2026). Put simply, deferred action "confers no protection or benefit on an alien." Adjustment of Status; Certain Nationals of the People's Republic of China, 62 Fed. Reg. 63249, 63252 (Nov. 28, 1997). The Government can "commenc[e] removal proceedings at any time." *Cisneros*, 182 F.4th at 369, n.14. The Government has made this plain for decades. *See* Memorandum from D. Meissner, Comm'r, Immig. and Naturalization Serv., to Regional Directors et al. at 12 (Nov. 17, 2000) (directing that letters informing alien of deferred action "must make clear to the alien that exercising prosecutorial discretion does not confer any immigration status, ability to travel to the United States . . . immunity from future removal proceedings, or any

[3] By suggesting a Sharing Permitted category for applicants for immigration benefits, Defendants implicitly addressed asylum applicants, Plaintiffs' other specific category.

enforceable right or benefit upon the alien");[4] Memorandum from W. Yates, Assoc. Dir. of Operations, DHS, Citizenship and Immig. Servs., to Dir., Vt. Serv. Ctr. at 5, https://perma.cc/YLM5-V2BY (Oct. 8, 2003) ("Deferred action does not preclude the CIS from commencing removal proceedings at any time against an alien."). Since deferred action does not preclude removal proceedings, DHS has a legitimate interest in locating these aliens for purposes of those proceedings.

That interest extends to beneficiaries of the Deferred Action for Childhood Arrivals program (DACA). As its regulations make clear, receiving DACA "does not preclude DHS from commencing removal proceedings at any time." 8 C.F.R. § 236.21(c)(1); *see also* Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53152, 53211 (Aug. 30, 2022) (DACA does not confer "affirmative authorization to remain in the United States."). Plaintiffs question the Government's use of HHS data given the information DACA recipients must provide to apply for the program and renew their benefits, *see* Opp'n 13, but yet again DHS cannot assume that information is correct and has a legitimate interest in verifying that the information is reported consistently and accurately. In fact, the Government has always told DACA recipients "that information they provided could be used for immigration enforcement," and at least one circuit accordingly has refused to prohibit using that information for those purposes. *Casa de Md. v. DHS*, 924 F.3d 684, 705–06 (4th Cir. 2019). This Court should follow suit. Also, even if this Court were to use lawful presence as a barometer, that concept "is not the same as forbearance," which is all that deferred action is. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 26 n.5 (2020).

***Temporary Protected Status (TPS) Recipients.*** Defendants respectfully do not agree that the preliminary injunction should preclude sharing about "people who currently have [TPS]." ECF No. 196 at 2. That restriction would contradict regulations that expressly permit Government sharing of information about TPS recipients. 8 C.F.R. § 244.16 says that information contained in TPS applications and supporting documents "shall not be released in any form whatsoever to a

[4] Available at https://www.scribd.com/document/22092970/INS-Guidance-Memo-Prosecutorial-Discretion-Doris-Meissner-11-7-00.

third party requester" absent consent or a court order. 8 C.F.R. § 244.16. But excluded from the definition of third party requester is "an officer of DHS, or any federal or State law enforcement agency." *Id.* The regulation goes on to specify that "[a]ny information provided under this part may be used for purposes of enforcement of the [INA]." *Id.* In other words, existing law tells TPS to expect that their information will be shared for immigration enforcement purposes.

As with other categories, Plaintiffs emphasize the nature of the TPS "application process" and the information applicants must provide as part of that process. Opp'n 12. As before, DHS cannot presume that information provided during an initial application or follow-on employment authorization is correct or current. And Plaintiffs omit that TPS applicants "authorize release of information contained in this application, in supporting documents, and in my USCIS records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws." USCIS Form I-821, Application for Temporary Protected Status at 11 (Jan. 20, 2025), https://perma.cc/GF47-JG4X. The application itself thus *favors* sharing of information about TPS recipients for immigration enforcement purposes, as the law permits. And Plaintiffs selectively quote the law about TPS and nonimmigrant status. TPS beneficiaries are "considered as being in, and maintaining, lawful status as a nonimmigrant" only "for purposes of adjustment of status . . . and change of status," not for all purposes. 8 U.S.C. § 1254a(f)(4); *see Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) (explaining that § 1254a(f)(4) "ensures that, in applying for permanent residency, a TPS recipient will be treated as having nonimmigrant status—even if . . . he really does not"); *see also* 8 C.F.R. § 244.10(f)(2)(iv). In contrast, actual nonimmigrant classifications are those enumerated in 8 U.S.C. § 1101(a)(15), and TPS is not one of them.

***Asylum Applicants.*** Defendants have largely rebutted this proposed category in their arguments for why mere applicants for immigration benefits are not permitted in the United States. *See* Mot. 14–15; *supra* at 5. Plaintiffs' contrary arguments specific to asylum applications rest on the concept of lawful presence, which is inappropriate here. *See supra* § II.A; *cf. Xia Lu Ma v. Sessions*, 907 F.3d 1191, 1199 (9th Cir. 2018) (application for employment authorization did not confer lawful status). Moreover, DHS again cannot assume that the information in an asylum

application is current, no matter the "strong incentive" that applicants might have to provide only accurate information. Opp'n 14.

The only novel argument Plaintiffs raise is in a parenthetical about another court in this District which wrote that asylum applicants are "without threat of removal" during the pendency of their application. *Kullab v. DHS*, 2025 WL 901943, at *3 (N.D. Cal. Mar. 25, 2025) (cited by Opp'n 14). *Kullab* was about a backlog of processing asylum applications, not whether certain agencies may share aliens' basic biographical information with ICE. And whether asylum applicants are "lawfully present" in the United States was not an issue in *Kullab*. It did not cite, much less examine, any law on this issue. On the other hand, Defendants cited numerous cases where courts of appeals held that, as a matter of commonsense, merely filing an asylum application does not give the applicant permission to be in the United States. *See* Mot. 14.

**C. Plaintiffs' Other Categories Are Overbroad.**

Defendants object to Plaintiffs' overly narrow language in their Sharing Permitted Categories. For one thing, Plaintiffs' categories do not account for visaholders who overstay the term of their visas, even though such aliens are immediately deportable on that basis. *See* Mot. 13–14. Not allowing the Government to share data about those aliens shows the overall infirmity of Plaintiffs' proposal. Plaintiffs also propose to permit sharing about aliens who entered the country "without permission and who have never applied for or received permission to be present in the country." Opp'n 10. This would prohibit sharing about aliens who entered without permission and then later had an application rejected, even though that alien is still in the United States without permission. Similarly, Plaintiffs' third Sharing Permitted category would prohibit sharing until an alien-applicant exhausts "available administrative review." *Id.* Plaintiffs provide no authority justifying that limitation. As Defendants have demonstrated, merely applying for an immigration benefit does not confer permission to be in the United States, regardless of whether an application is submitted to the first decisionmaker or later decisionmakers on appellate review.[5]

[5] Defendants do not object to a catchall provision like the one suggested by Plaintiffs, *see* Opp'n 9–10 & n.4, because it comports with their proposal as well, *see supra* at 9.

**III. The Court Should Limit Its Injunction At Most To Data From The Programs Named In The 2013 ICE Memorandum.**

This Court has said the "amended complaint and motion for a preliminary injunction challenged ICE's reversal of its 2013 policy," which covered HHS programs beyond Medicaid. ECF No. 196 at 3. Defendants maintain that Plaintiffs challenge only disclosures of Medicaid data, but they have nevertheless argued for an injunction that tracks the Court's observation, covering data from only the programs mentioned in the 2013 policy. *See* Mot. 18–20.

In response, Plaintiffs assert that they "seek to protect healthcare data privacy writ large," and that their challenge encompasses sharing of all "federal healthcare data." Opp'n 23–24. Plaintiffs' Amended Complaint does not use the phrase "federal healthcare data." As Defendants have consistently argued, that pleading challenges only the sharing of Medicaid information. *See Pac. Radiation Oncology LLC v. Queens Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."). Plaintiffs cite a paragraph of their pleading that described States' "reliance interests" in how they administer health care programs. Am. Compl. ¶ 240, ECF No. 108 (cited at Opp'n 24). That paragraph does not describe the disclosures challenged. And one paragraph does not overcome that Plaintiffs' actual claims as pled focus on disclosures of "Medicaid data." *E.g. id.* ¶¶ 268, 270, 275, 293, 313, 314.

The Court has nonetheless decided that the pleading encompasses more than that information, but that decision should not mean that the Amended Complaint encompasses data generated from every HHS program. If it did, this Court's standing and irreparable harm analysis must be redone. The Court credited Plaintiffs' evidence of harms when it entered the preliminary injunction. *See* ECF No. 148 at 6. That evidence is about effects on "Medicaid enrollment," "States' sovereign prerogatives to administer their State Medicaid programs," and "Loss of Federal Medicaid Funding." ECF No. 42-2 at 21–23. Defendants understand the Court views these assertions of injury as sufficient to enjoin disclosure of more than just Medicaid data. But, those asserted injuries cannot apply to every HHS program, each of which operates under unique

authorities and through different relationships with States. Plaintiffs' attempt to expand the injunction also contradicts their other assertions about their challenge. They assert that TANF data is not at issue here, *see* Opp'n 23 n.11—and Defendants agree—but TANF arguably generates "HHS information that may be useful for any and all law enforcement activities" and thus would seemingly come within the 2025 ICE memorandum, ECF No. 131-2 at 2. Respectfully, the Court should not allow Plaintiffs to unilaterally pick and choose at this stage the HHS programs that they challenge. At the very most, their asserted injuries possibly establish standing and irreparable harm as to disclosure from the programs mentioned in the 2013 ICE policy.[6] Plaintiffs also have not shown that a challenge to any other program is ripe, nor could they since their pleading covers only transfers of Medicaid data.

Limiting to the mentioned programs also conforms with the Court's description of the case. If Plaintiffs challenge "ICE's *reversal* of its 2013 policy" and the preliminary injunction enjoins that reversal, the injunction cannot affect programs that were never part of the 2013 policy in the first place. ECF No. 196 at 3 (emphasis added). The 2013 ICE memorandum dealt with "individuals seeking coverage under a qualified health plan offered on a Health Insurance Marketplace or through an insurance affordability program (i.e., premium tax credits, cost sharing reductions, Medicaid, Children's Health Insurance Program, or Basic Health Program)" who were required by law to provide information about their immigration status. Off. of the Dir., U.S. Immigr. & Customs Enf't, *Clarification of Existing Practices Related to Certain Health Care Information* at 1 (Oct. 25, 2013), https://perma.cc/C2KY-B66Y. The memorandum then said ICE would not use "information provided by individuals for such coverage . . . as the basis for pursuing a civil immigration enforcement action." *Id.* That memorandum does not mention, among others, "Medicare" or the "Vaccines for Children program," Opp'n 23, and Plaintiffs cannot seriously suggest that Defendants are "attempt[ing] a policy reversal" as to such unmentioned programs when there was never a policy about information sharing from those programs, *id.* at 24.

[6] For avoidance of doubt, Defendants maintain that Plaintiffs do not have standing at all, *see* ECF No. 83 at 10–13, and that, if they do, the correct legal result is standing only as to Medicaid data.

### IV. Clarifying The Injunction To Apply To Contractors Is Unnecessary.

Defendants know that any injunction entered under Federal Civil Rule 65 binds the "agents" of the enjoined party. Fed. R. Civ. P. 65(d)(2)(B). Accordingly, Defendants have always treated this Court's injunction as applying to their contractors, as seen by DHS's instruction that contractors delete data shared on January 7, 2026, *see, e.g.*, ECF No. 182-2, and its enterprise-wide searches for that data, including in the hands of contractors, *see* Fourth Briseño Decl. ¶ 19, ECF No. 181-1. Further clarification on this point is therefore unnecessary.

### V. Plaintiffs' Proposed "Safeguards" Are Unnecessary.

Plaintiffs ask the Court to "impose conditions on future data sharing[,]" including "written procedures," a "contemporaneous auditable record of individuals whose data has been shared," and "periodic compliance certifications to Plaintiffs." Opp'n 25. Defendants strongly object to these requested measures. The broad statutory authorities governing data sharing do not contemplate such conditions, nor have Plaintiffs provided a basis for such invasive procedures, particularly given Defendants' remedial measures to cure any alleged violations that occurred earlier this year. Indeed, by requesting the right to "audit and verif[y]" Defendants' data sharing, Plaintiffs effectively ask for a block on any data sharing they don't like. *Id.* The Court should not impose such onerous conditions, which risk future compliance proceedings at Plaintiffs' whim. Much like Plaintiffs' request for "ad hoc approval before sharing data" for non-immigration purposes, their requests are "unworkable." ECF No. 196 at 2–3.

## CONCLUSION

The Court should grant Defendants' renewed motion and clarify the preliminary injunction consistent with Defendants' proposal in that motion.

Dated: November 25, 2026

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Civil Division, Federal Programs Branch

*/s/ Christian Dibblee*
CHRISTIAN DIBBLEE (D.C. Bar No. 90002557)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 353-5980
Christian.r.dibblee@usdoj.gov

*Counsel for Defendants*